UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| YA MON EXPEDITIONS, LLC, a Wyoming limited liability corporation, on behalf of itself and all other similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>INTERNATIONAL YACHT BROKER'S ASSOCIATION, INC., a Florida Not for Profit Corporation, YACHT BROKER'S ASSOCIATION OF AMERICA, INC., a Maryland corporation, BOATS GROUP, LLC, a Florida Limited Liability Company, PERMIRA ADVISERS LLC, a New York Limited Liability Company, YATCO, LLC, a Florida Limited Liability Company, UNITED YACHT SALES, LLC, a Florida Limited Liability Company, DENISON YACHT SALES, INC., a Florida corporation, DENISON NEW YACHTS, LLC, a Florida Limited Liability Company, NORTHROP & JOHNSON YACHT SHIPS, LLC, a Florida Limited Liability Company, GALATI YACHT SALES, LLC, a Florida Limited Liability Company, HMY YACHT SALES, INC., a Florida Corporation, ALLIED MARINE, INC, a Florida Corporation, MARINEMAX, INC., a Florida Corporation, SHARON & JACK MALATICH, LLC, a Maryland Limited Liability Company, TOURNAMENT YACHT SALES, LLC, a Florida Limited Liability Company, and RJC YACHT SALES, INC., a Florida Corporation;<br><br>    Defendants. | No. _____<br><br>**COMPLAINT – CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Ya Mon Expeditions, LLC, brings this action on behalf of itself and on behalf of all others similarly situated who paid a commission to a listing broker affiliated with the Defendants, from February 29, 2020, to the present (the "Class Period"), in connection with the sale of a vessel listed on one of the Covered Multiple Listing Services (the "Covered MLSs"). Defendants are the International Yacht Brokers Association, the Yacht Brokers Association of America, Boats Group, LLC (the owners of several of the Covered MLSs), YATCO, and several large Yacht Brokerages, each of which has a significant presence in Florida.  Together, Defendants conspired to require Plaintiff and the putative class members (the "Class") to pay the broker representing the buyer of their vessels, and to pay an inflated amount, all in violation of federal antitrust law (the "Challenged Restraints").

Plaintiff seeks treble damages under federal antitrust law, injunctive relief, and the costs of this lawsuit, including reasonable attorney's fees, and demands a trial by jury.

The allegations of this Complaint are based upon the personal knowledge of Plaintiff as to itself, and on information and belief as to all other matters through investigation of Plaintiff's counsel.

## INTRODUCTION

1.      Plaintiff, a yacht seller who listed a yacht on one (or more) of the Covered MLSs, bring this class action against Defendants for agreeing, combining, and conspiring to impose and enforce an anticompetitive restraint that requires as a condition to the sale of its yacht the payment of a commission to the buyer's broker, and an inflated one at that.

2.      Defendants' conspiracy centers around the adoption and implementation of an archaic, anti-competitive rule that requires all brokers to make a non-negotiable offer of buyer-

broker compensation (the "Buyer-Broker Commission Rule") when listing a vessel on a Member Listing Service ("MLS").

3.    Much like the Multiple Listing Services used in the residential real estate market, a yacht MLS comprises a database of vessels listed for sale in a particular geographic region.  The vast majority of large vessels in the United States are sold on an MLS marketplace.

4.    Brokers, if they are members of an MLS, are required to list all vessels on the MLS.

5.    Many of the MLSs at issue in this case are owned by Boats Group, LLC.

6.    Boats Group, LLC permits only brokers to view (1) the prices vessels previously sold for and (2) the commission split offered on any particular vessel.

7.    Defendants, including but not limited to Boats Group, LLC, require brokers that list vessels on the MLS pages to follow the Buyer-Broker Commission Rule.

8.    Moreover, Defendants collectively require brokers to list all vessels on these MLS pages.

9.    Defendants and their co-conspirators, through their control of the MLSs, collectively possess the power to command the illicit buyer-brokerage commissions.

10.    This forces yacht sellers to bear an inflated cost that would in a competitive market be borne by the buyer.

11.    Moreover, because most buyer-brokers will not show vessels to their clients if a seller is offering a lower buyer-broker commission, or will show vessels with higher commission offers first, sellers are incentivized when making the required non-negotiable offer to procure the buyer-brokers' cooperation by offering a high commission as part of complying with the Buyer-Broker Commission Rule.

12.     But for the Buyer-Broker Commission Rule, which as explained herein is a direct result of Defendants' agreed-upon, anti-competitive conduct, the cost of the buyer-broker's commission would be paid by their clients—the yacht buyers—and thus buyer-brokers would have to compete with one another by offering a lower commission rate.

13.     The Buyer-Broker Commission Rule accordingly operates to restrain price competition among buyer-brokers because the person who actually retains the buyer-broker—the yacht buyer—does not negotiate or pay the commission for his, her, or its broker.

14.     This unlawful conduct is systemic and pervasive within the industry.  Specifically, yacht brokers handle a great majority of large vessel sales in the United States. In a typical transaction, one broker will represent the seller of a vessel and another broker will represent the buyer of a vessel. Both the buyer-broker and seller-broker (also known as the listing broker) are paid a percentage of the vessel's sale price. Currently, total broker compensation is ten percent (10%) of the vessel's sale price, with approximately half of that amount paid to the buyer-broker.

15.     Defendants' conspiracy has kept buyer-broker commissions in the 4 to 5 percent (4% to 5%) range, artificially and anticompetitively elevated beyond where they would be in a market free from Defendants' conspiracy, for many years, despite the diminishing role of buyer-brokers.

16.     Many yacht buyers no longer search for prospective vessels with the assistance of a broker, but rather independently through online services.

17.     Upon information and belief, Defendants have studied and are aware of this factual trend.

18.     Prospective yacht buyers increasingly retain a buyer-broker *after* the client has already found the vessel the client wishes to buy.

19.     Despite this diminishing role for buyer-brokers, the standard percentage of their commission has remained constant.

20.     And because vessel prices have significantly increased during the last several years, far outpacing inflation, and considering that commissions are calculated as a percentage of the vessel's sale price, the actual dollar amounts of commissions have commensurately increased as well, all because of Defendants' efforts and unlawful agreements.

21.     Plaintiff, on behalf of itself and the class defined herein, hereby seeks treble damages, injunctive relief, and the costs of this lawsuit, including attorneys' fees, for Defendants' violation of federal antitrust law.

## PARTIES

### A.     Plaintiff

22.     Ya Mon Expeditions LLC ("YME") is a Wyoming limited liability company. On January 13, 2023, YME sold a vessel located in Wanchese, North Carolina. Davin Lamm is the sole member and manager of YME and a resident of Pennsylvania. The vessel was listed on the YachtWorld MLS, along with others of the Covered MLSs. In that sales transaction, YME was represented by Tournament Yacht Sales, of Tequesta, Florida. As part of that sales transaction, YME paid a substantial broker commission.

### B.     Defendants

23.     Defendant International Yacht Broker's Association, Inc. ("IYBA") has over 1,900 members and is the largest yacht brokers association in the country.  It has collected substantial dues and membership fees during the Covered MLS Class Period, including substantial amounts from brokers in Florida.  IYBA has a significant lobbying presence, advocating for the interest of yacht brokers.  IYBA also owns yachtbroker.org, one of the largest yacht MLS pages in the

country.  IYBA is headquartered in Miami, Florida and several of its officers and directors are located in Florida.

24.     Defendant Yacht Broker's Association of America, Inc. ("YBAA") has more than 250 firms as members representing over 1,000 yacht brokers.  It has collected substantial dues and membership fees during the Covered MLS Class Period, including substantial amounts from brokers in Florida.  YBAA has a significant lobbying presence, advocating for the interest of yacht brokers in Florida. YBAA regularly does substantial business in Florida. Its vice president and board of directors are located in Florida.  YBAA is headquartered in Annapolis, Maryland.

25.     Defendant Boats Group, LLC ("Boats Group") owns and operates the largest boating MLS pages, including Boat Trader, Yacht World, and Boats.com, among others.  Boats Group also owns BoatWizard, which is exclusive to brokers and dealers and interfaces with each of Boats Group's MLS pages.  Boats Group also owns and operates YachtCloser.com, which offers draft brokerage contracts for yacht brokers. Boats Group collects substantial listing fees from brokerages located in Florida and advertises and does substantial business in Florida.  Through its various MLS pages, Boats Group lists thousands of vessels for sale in Florida. Boats Group is headquartered in Miami, Florida.

26.     Defendant Permira Advisers LLC ("Permira") wholly owns and operates Boats Group. Through Boats Group, and other ventures, Permira regularly does business in Florida. Permira is headquartered in New York, New York.

27.     Defendant Yatco, LLC ("YATCO") owns and operates one of the largest yacht MLS pages, named YATCO.  YATCO collects substantial listing fees from brokerages located in Florida and advertises and does substantial business in Florida.  YATCO regularly lists hundreds, if not thousands of vessels for sale in Florida.  YATCO is headquartered in Parkland, Florida.

28.     Defendant United Yacht Sales, LLC ("United") is one of the largest yacht brokerages in the world.  United has over 250 yacht brokers in 104 different locations worldwide, including over 100 yacht brokers in Florida.  United regularly sells vessels in Florida and collects brokerage commissions from yachts sold in Florida.  It wholly owns and operates each of these brokerages.  United is headquartered in Stuart, Florida.

29.     Defendants Denison Yacht Sales, Inc. and Denison New Yachts, LLC, (together, "Denison") are a large yacht brokerage.  Denison has several brokers in Florida and does substantial advertising and business in Florida. Denison regularly sells vessels in Florida and collects brokerage commissions from yachts sold in Florida.  Denison is headquartered in Dania Beach, Florida.

30.     Defendant Northrop & Johnson Yacht Ships, LLC ("Northrop & Johnson"), is a large yacht brokerage.  Northrup & Johnson has several brokers in Florida and does substantial advertising and business in Florida. Northrup & Johnson regularly sells vessels in Florida and collects brokerage commissions from yachts sold in Florida.  Northrup & Johnson is headquartered in Fort Lauderdale, Florida.

31.     Defendant Galati Yacht Sales, LLC ("Galati") is a large yacht brokerage.  Galati has several brokers in Florida and does substantial advertising and business in Florida. Galati regularly sells vessels in Florida and collects brokerage commissions from yachts sold in Florida.  Galati is headquartered in Anna Maria, Florida.

32.     Defendant HMY Yacht Sales, Inc. ("HMY") is a large yacht brokerage.  HMY has several brokers in Florida and does substantial advertising and business in Florida.  HMY regularly sells vessels in Florida and collects brokerage commissions from yachts sold in Florida. HMY is headquartered in Palm Beach Gardens, Florida.

33.     Defendant Allied Marine, Inc. ("Allied Marine") is a large yacht brokerage.  Allied Marine has several brokers in Florida and does substantial advertising and business in Florida. Allied Marine regularly sells vessels in Florida and collects brokerage commissions from yachts sold in Florida. Allied Marine is headquartered in Fort Lauderdale, Florida.

34.     Defendant MarineMax, Inc. ("MarineMax") is a large yacht brokerage and dealer. MarineMax has several brokers in Florida and does substantial advertising and business in Florida. MarineMax regularly sells vessels in Florida and collects brokerage commissions from yachts sold in Florida.  MarineMax is headquartered in Clearwater, Florida.

35.     Defendant Sharon & Jack Malatich, LLC, D/B/A S&J Yachts ("S&J Yachts") is a large yacht brokerage. S&J Yachts is headquartered in Rock Hall, Maryland, and does substantial business in Florida. S&J Yachts has brokers in Florida and collects substantial brokerage commissions from yachts sold in Florida. S&J Yachts has offices located in Florida, including Palmetto, Stuart, and Fort Lauderdale.

36.     Defendant Tournament Yacht Sales, LLC ("Tournament Yacht") is a yacht brokerage. Tournament Yacht has several brokers in Florida and does substantial advertising and business in Florida. Tournament yacht regularly sells vessels in Florida and collects brokerage commissions from yachts sold in Florida. Tournament Yacht is headquartered in Tequesta, Florida.

37.     Defendant R.J.C. Yacht Sales, Inc. ("RJC Yacht") is a yacht brokerage. RJC Yacht has several brokers in Florida and does substantial advertising and business in Florida. RJC Yacht regularly sells vessels in Florida and collects brokerage commissions from yachts sold in Florida. RJC Yacht is headquartered in Fort Lauderdale, Florida.

## JURISDICTIONAL ALLEGATIONS

38.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331(d)(2),

because the class contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of the class is a citizen of a State different from Defendants. Subject matter jurisdiction over this action exists under 15. U.S.C. §§ 4, 16 and under 28 U.S.C. §§ 1331, 1337.

39.     Defendant IYBA resides in this District and used its headquarters in this District to implement and coordinate the restraints of trade described below.

40.     In addition, all Defendants: (1) transact substantial business in the United States, including this District; (2) transact with members of the Class throughout the United States, including in this District; (3) have substantial contacts within the United States, including this District; and (4) committed substantial acts in furtherance of their unlawful scheme in the United States, including this District.

41.     The Court has personal jurisdiction over Defendants under 15 U.S.C. § 22, which allows for nationwide service of process; under § 48.193(2) for all Florida-based Defendants; and under § 48.193(1)(a) for all Defendants, because, as alleged throughout this complaint, Plaintiff's claims arise from Defendants operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state, from Defendants committing a tortious act within this state, from Defendants causing injury to persons or property within this state arising out of an act or omission by Defendants outside this state while Defendants were engaged in solicitation or service activities within this state, and from Defendants forming, engaging, and participating in a conspiracy, at least some acts in furtherance of which were carried out in Florida.

42.     Venue is proper in this district under 28 U.S.C. §1391(b), (c), and (d).  Each Defendant transacted business, was found, had agents, and/or resided in this District; a substantial

part of the events giving rise to Plaintiff's claims arose in this District; and a substantial portion of the affected interstate trade and commerce described herein has been caried out in this District.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

**A.      Background on the Yacht Brokerage Industry**

43.      Florida licensing laws prohibit unlicensed brokers from representing sellers and buyers in the yacht market.  *See* Fla. Stat. § 326.004.

44.      Licensed brokers are the only entities permitted under Florida law to be paid a commission to represent buyers or sellers in a yacht transaction. For that reason, all yacht brokerage contracts between sellers and buyers require licensed brokers.

45.      The standard practice in the yacht brokerage industry is to compensate brokers with commissions that are calculated as a percentage of a vessel's sale price.  Commissions are paid when the vessel sale transaction closes.

46.      Most brokers occupy dual roles:  They operate as seller-brokers for some yacht sales and buyer-brokers for other yacht sales.

47.      A seller-broker's compensation is specified in a listing agreement, a contract between the seller and the seller-broker that details the terms of the listing.  A listing agreement typically states that the seller-broker has the exclusive right to market the seller's vessel.  The listing agreement specifies the total commission that a yacht seller will pay to the seller-broker, often with a portion of that amount earmarked to be paid to the buyer-broker.

48.      If the buyer has a broker, the seller or the seller-broker pays the buyer-broker a commission out of the total commission paid by the seller.  In other words, buyer-brokers—who assist their client in negotiating against the seller—receive their compensation from the total commission paid by the seller, not from the buyer they represent.  In fact, the IYBA, YBAA, and

several of the Brokerage Defendants[1] frequently represent that their buyer-brokers' services are free.

49.     In the listing agreement, the seller sets the total commission to be paid to the seller-broker with the expectation that a portion of the commission will be paid to a buyer-broker because buyers are represented by brokers for the majority of yacht sales.

50.     If, as would happen in the absence of the Buyer-Broker Commission Rule, buyers paid their brokers, (a) sellers would agree to pay a commission solely to compensate the seller-broker because sellers have no incentive to compensate a buyer-broker negotiating against their interests and (b) the seller-broker commission would be about half or less of the amount that sellers have paid as a total commission to compensate both the buyer-broker and the seller-broker.

51.     When a buyer retains a broker, the buyer enters into a contract with that broker. The contract typically discloses that the buyer-broker will be compensated by receiving a commission from the seller-broker.

52.     An MLS is a database of vessels listed for sale, accessible to yacht brokers that comply with the rules of the MLS.  Seller-brokers list their client's vessels on an MLS, as required by IYBA and YBAA rules, among others, to ensure that buyer-brokers and prospective buyers are aware of the vessel being listed for sale.

53.     If a seller-broker does not list a client's vessel on an MLS, most buyer-brokers will not show that vessel to prospective buyers.

---

[1] The "Brokerage Defendants" are United, Denison, Northrop & Johnson, Galati, HMY, Allied Marine, MarineMax, S&J Yachts, Tournament Yacht, and RJC Yacht.

54.     MLSs also act as the main source of listings for online websites, such as YachtWorld or YachtBroker.org, through which many prospective yacht buyers locate and research vessels for sale.

55.     A vessel that is not listed on an MLS is, in turn, much less visible to prospective yacht buyers.

56.     The Buyer-Broker Commission Rule obligates a seller-broker, on behalf of the seller, to make a non-negotiable offer of compensation to buyer-brokers when listing a yacht on an MLS.

57.     If a buyer represented by a broker purchases the vessel, the buyer-broker receives the offered compensation.

58.     The following example illustrates how this process typically works:

a.     A yacht owner enters into a contract with a seller-broker, in which the seller agrees to pay the seller-broker ten percent (10%) in total commissions in exchange for marketing and facilitating the sale of the yacht;

b.     As required by the Buyer-Broker Commission Rule, the seller-broker makes a non-negotiable offer of five percent (5%) commission to the buyer's broker when it lists the yacht on the MLS;

c.     A buyer-broker shows the vessel to a buyer-client who buys the vessel for $500,000 (in this example); and

d.     The seller-broker receives ten percent (10%) of the sales price ($50,000) from the seller.  The seller-broker then pays five percent (5%) of the sales price ($25,000) to the buyer-broker.

59.     Defendants adopted the Buyer-Broker Commission Rule at least as early as 2020 and the rule has been continuously in force ever since.

60.     The Buyer-Broker Commission Rule has been enforced in a variety of instances, including but not limited through standard rules enforced by the IYBA and the YBAA, rules regarding listing or becoming a member of the Covered MLSs, rules from the Brokerage Defendants, and through industry practice.

**B.     Anti-Competitive IYBA and YBAA Rules**

61.     The YBAA includes the Buyer-Broker Commission Rule in its Code of Ethics:

> 3.3     The Broker will cooperate with other Brokers on vessels listed by him/her on a Central Listing Basis whenever it is in the interest of the Seller, *sharing commissions on a previously agreed basis*. Negotiations concerning vessels listed on a Central Listing basis will be carried on with the listing Broker, not with the Seller, except with consent of the listing Broker.
>
> 3.4     When a Broker obtains a Central Listing, he/she will endeavor to distribute the listing to corresponding Brokers as quickly as possible. *Central Listings and shared Open Listings are generally shared on a commission basis, agreed to beforehand as a matter of policy, or agreed upon by the cooperating parties negotiated on a particular sale*. Should the central or loaning Broker show the boat or perform work above and beyond the customary effort of providing the listing and negotiating with the Seller, the commission arrangements should be reconsidered by the parties involved.

YBAA, CODE OF ETHICS & BUSINESS PRACTICE 5 (July 12, 2021), https://www.ybaa.yachts/aws/YBAA/asset_manager/get_file/50088?ver=21578 (emphasis added).

62.     Similarly, the IYBA includes in its code of ethics, which is part of its bylaws, the following:

> Section 17. Members should cooperate with other members on vessels listed with him whenever it is in the interest of the client.

> Negotiations concerning a vessel listed exclusively with one member should be carried on with the listing broker, not the owner, except with the express consent of the listing member. *All shared commission agreements should be negotiated prior to the submission of any Offer to Purchase.*

IYBA, *Bylaws of the Florida Yacht Brokers Association, Inc.* (last accessed January 29, 2024), https://iyba.org/bylaws#:~:text=It%20is%20the%20duty%20of,of%20the%20yacht%20brokerage%20profession (emphasis added).

63.     As alleged above, the Buyer-Broker Commission Rule shifts a cost to the seller that would be paid by the buyer in a competitive market.

64.     Moreover, by requiring the seller to make a pre-arranged offer, the rule incentivizes sellers to procure the cooperation of buyer-brokers by offering a high buyer-broker commission.

65.     Many buyer-brokers will not show a vessel offering a lower buyer-broker commission or will show other vessels first.

66.     The Buyer-Broker Commission Rule by itself leaves the possibility of buyers seeking to reduce their broker's commission by making that reduction a condition of a vessel purchase offer.  However, both IYBA and YBAA rules identified above require yacht brokers to negotiate and enter commission arrangements *before* making offers on a vessel.

67.     In the absence of the Buyer-Broker Commission Rule and its anti-competitive restrictions, buyers—not sellers—would pay buyer-broker commissions, and brokers would compete with each other by offering lower commissions to prospective buyer clients.

68.     IYBA and YBAA successfully require their members to comply with the above anti-competitive rules, and with other rules contained in the IYBA and YBAA Code of Ethics.

69.     IYBA and YBAA require their members to comply with their respective code of ethics or face expulsion.

70.     For example, IYBA's bylaws provide for expulsion for failure to follow the bylaws:

> [F]ailure to abide by the Bylaws of the Association, or if it appears from a written communication from any member or other person or persons that the conduct of a member has been prejudicial to the Association or yacht brokerage profession, the Board of Directors, after citing said member, with seven days notice of hearing, shall have full power to suspend for a period of not more than one year, or expel said member, and he shall be and is expelled after being so declared.

IYBA, *Bylaws of the Florida Yacht Brokers Association, Inc.* (last accessed January 29, 2024), https://iyba.org/bylaws#:~:text=It%20is%20the%20duty%20of,of%20the%20yacht%20brokerage%20profession (emphasis added).

71.     Similarly, the YBAA has a three-strike rule, where if a member is found to have violated the code of ethics three times, they may be permanently terminated from the association. YBAA, CODE OF ETHICS & BUSINESS PRACTICE 2-3 (July 12, 2021), https://www.ybaa.yachts/aws/YBAA/asset_manager/get_file/50088?ver=21578 (emphasis added).

### C.     MLS Pages Require Members to Comply with the Same Anti-Competitive Rules

72.     YachtWorld, along with other MLS pages, require brokers to have a listing agreement before listing a vessel.  Those listing agreements must fit into one of the following types of listings:

> CENTRAL/EXCLUSIVE LISTING - A written listing agreement signed by the owner of the vessel authorizing only one brokerage to offer a boat for sale whereby the owner relinquishes the right to sell the boat himself and agrees to pay the listing brokerage a specified commission if any sale is entered into during the term of the listing agreement. Proper broker-to-broker ethics do not allow any contact with the owner without the listing broker's authorization.
>
> OPEN/NON-EXCLUSIVE LISTING - A written listing agreement signed by the owner of the vessel given to one or more brokerages

> whereby the broker that produces a buyer is paid a commission and the owner remains free to sell the boat to his own prospects without paying a commission.
>
> TRADE-IN - A boat owned by a dealer or brokerage being offered for sale.
>
> AVAILABLE FOR CO-BROKERAGE - A mutual agreement to split the commission between two brokerage firms, for a sale completed by two firms. Traditionally the Listing Agent (firm with the signed agreement with seller to offer boat) & the Selling Agent (firm representing buyer with a signed Purchase & Sales Agreement) cooperate to sell either a Central/Exclusive or an Open/Non-Exclusive listing.

YachtWorld Member Service Agreement (Revised July 25, 2017), https://account.boatwizard.com/service-agreements/agreement_us.html.

73.    Listings must be identified to indicate the type of listing and the co-brokerage type; however, listings "for sale by owner," are not allowed.  In other words, only listings with a broker-seller agreement are permitted, and each of those has a required commission that will be split with the buyer-broker. *Id.*

*74.*    In order to search for "co-brokerage" vessels, a broker must list at least 10 "central" and "available for co-brokerage" listings to the BoatWizard MLS.  *Id.*

75.    Moreover, to become a member of YachtWorld, brokers must provide a minimum of three central/exclusive boats for sale, available for co-brokerage, with signed listing agreements from three different owners.  *Id.*

76.    The Covered MLSs further only permit yacht brokers to list vessels on their websites.  For example, YATCO only permits yacht brokers affiliated with a yacht brokerage association, including YBAA, to post listings on its website.

77.     Defendant Yacht Brokerages, for its part, actively participates in this arrangement, recognizing that by listing with an MLS, such as YachtWorld, its brokers will obtain a split of the commission.

78.     For example, Defendant MarineMax states on its website, that:

> Brokers have exclusive access to websites such as YachtWorld.com, which has become the gold standard for searching from anywhere in the world. It functions much like the Multiple Listing Service (MLS) of the real estate brokering community. This is important. By listing on YachtWorld, your broker has agreed to sell it through a co-brokerage agreement that requires your broker to split the typically 10-percent commission with the buyer's broker. About 70-percent of all brokerage sales are co-brokered. Remember, that in this type of agreement, if you bring the buyer or even ending up donating your yacht, you are still liable for the broker's commission.

MarineMax, *A Yacht Broker to Navigate You Through the Process* (last accessed January 31, 2024), https://www.marinemax.com/boats-and-yachts/brokerage/brokerage-process.

79.     Likewise, the Covered MLS pages only permit listings posted by broker-members. Moreover, many MLS pages, including YATCO, only permit Central listings, not permitting open listings or other listings that could potentially compromise the Buyer-Broker Commission Rule. YATCO, *Frequently Asked Questions* (last access January 31, 2024), https://www.yatco.com/faqs/.

80.     The shared commissionsplit information is hidden from the general public, yacht sellers, and yacht buyers.  Instead, it is only available to yacht brokers after entering into the members-only portion of an MLS.

81.     For example, at yachtbroker.org, an MLS, which is, upon information and belief, owned and operated by IYBA (and, upon information and belief, affiliated and/or co-owned YBAA), the commission split information resides in a separate field filled in by the selling broker. This information is "only behind the login, so no customer, no audience will see this.  It is only

broker-to-broker."  In other words, this information is "private." Yachtbroker.org, *Vessel Edit –*
*Commission Notes* (last accessed January 27, 2024) https://mls.yachtbroker.org/support.

82.     Similarly, using BoatWizard, the broker MLS tool for Boats Group, LLC's MLS
pages, brokers may search by co-brokerage status to ensure the brokerage agreement with the seller
includes a commission split with the buyer's broker. YachtWorld, *YachtWorld Broker*
*Appreciation Days* (February 14, 2012), https://www.yachtworld.com/research/yachtworld-
broker-appreciation-days/.

83.     As a result, buyer-brokers who see a lower commission split or lower commission
on a particular vessel will avoid showing that vessel to the potential buyer, resulting in
incentivizing seller-brokers to offer the standard five percent (5%) commission split.

84.     Other anti-competitive measures abound. For example, previous sale prices of
yachts, unlike real estate, are not shown on the MLS pages and are not generally available to the
public.  Instead, this information is behind brokers-only access on soldboats.com. YachtWorld,
YachtWorld.com       Terms       of       Use       (August       2017),
https://www.yachtworld.com/core/globalnav/termOfUse.jsp.

85.     Specifically, after a vessel is sold, YachtWorld requires that broker members must
input sold price information to soldboats.com in order to access the site.

86.     Moreover, YachtWorld's policies state that "soldboats.com data may not be
published onto websites viewable by non-soldboats.com member[s], unless it is information that
has already been published and made publicly available by YachtWorld."  YachtWorld, however,
does not make public previously sold boats, so this information too prevents competitive pricing
for vessels resulting in higher commissions for brokers.

**D.     Yacht Brokerages Designed and Participated in the Conspiracy**

87.     Brokerage Defendants orchestrated and have participated in the conspiracy alleged herein in at least two ways: (a) they have required their employee-brokers to comply with IYBA and YBAA rules, including the Buyer-Broker Commission Rule; and (b) their executives have supervised IYBA and YBAA operations, including the adoption, maintenance, and enforcement of the Buyer-Broker Commission Rule.

88.     Brokerage Defendants implemented the conspiracy by striking an agreement requiring their brokers to comply with IYBA's and YBAA's rules, including the Buyer-Broker Commission Rule.

89.     They further implemented an inter-Brokerage agreement to comply with IYBA's and YBAA's rules, including the Buyer-Broker Commission Rule.

90.     Galati Yacht Sales, for example, requires all of its brokers to be accredited by the IYBA, or alternatively, to be a Certified Professional Yacht Broker, which is associated with IYBA and YBAA. Galati, *Working with a Yacht Broker* (last accessed January 31, 2024), https://www.galatiyachts.com/working-with-a-yacht-broker/.

91.     Similarly, Allied Marine advertises its more than 40 licensed yacht brokers each "adhere to the International Yacht Brokers Association (IYBA) professional code of ethics." Allied Marine, *Our Philosophy* (last accessed January 31, 2024),   https://www.alliedmarine.com/sell-your-yacht/yacht-sales-philosophy.

92.     Brokerage Defendants perpetuate the Buyer-Broker Commission Rule as they typically advertise that buyer-broker's services are free, as the commission is paid by the seller.

93.     United Yacht Sales states the following on their website:

> Boat buyers often forget that it costs nothing to hire a yacht broker
> to help you find the right vessel. Commissions are 10% in the marine

> industry, all of which is paid by the seller unless special negotiations
> are made. That means as the buyer, your broker is working on your
> behalf, but at no cost to you.

United Yacht, *Why You Need to Hire a Yacht Broker When Buying a Yacht* (May 10, 2017),

https://www.unitedyacht.com/Yacht-News/why-you-need-to-hire-a-yacht-broker-when-buying-a-yacht.

94.     Brokerage Defendants, through their cumulative industry clout, influence and supervise IYBA's and YBAA's operations to ensure the Buyer-Broker Commission Rule is adopted, maintained, and enforced, as Brokerage Defendants ensure several of their brokers sit on the board of directors for both the IYBA and YBAA.

95.     For example, IYBA's board of directors include Charles A. Cashman, employed with defendant MarineMax, Jon Burkard, employed by Defendant Allied Marine, James Corts, employed by defendant MarineMax, Bob Denison, employed by Defendant Denison, and Michael Scalisi, employed by Defendant HMY Yacht Sales, Inc.

96.     Similarly, YBAA's board of directors includes William Bolin, who is employed by Defendant S&J Yachts.

97.     Plaintiff's injuries are a result of the concerted scheme among these Brokerage Defendants requiring the Brokerage Defendants to act in concert. Without the cooperation of each Defendant, the conspiracy falls apart.

**E.      Brokerage Defendants and the IYBA and YBAA have Complied with and Enforced IYBA and YBAA's Rules in the Areas where the Covered MLSs Operate**

98.     In each of the areas in which the Covered MLSs operate and elsewhere, Brokerage Defendants collaborated with IYBA and YBAA to implement, comply with, and enforce IYBA

and YBAA's rules, including the Buyer-Broker Commission Rule, in furtherance of the conspiracy alleged herein.

### F.   Effects of the Conspiracy

99.   Defendants' conspiracy has had at least the following chilling, anti-competitive effects, in each area in which a Covered MLS operates:

a.   Yacht sellers have been forced to pay commissions to buyer-brokers—their adversaries in negotiations to sell their yachts—thereby substantially inflating the cost of selling their yacht;

b.   Yacht sellers have been compelled to set a high buyer-broker commission to induce buy brokers to show their vessels to the buyer-broker's clients;

c.   Yacht sellers have paid inflated buyer-broker commissions and inflated total commissions;

d.   The retention of a buyer-broker has been severed from the setting of the broker's commission; the yacht buyer retains the buyer-broker, while the yacht seller sets the buyer-broker's compensation;

e.   Price competition among brokers to be retained by yacht buyers has been restrained;

f.   Competition among yacht buyers has been restrained by their inability to compete for the purchase of a vessel by lowering the buyer-broker commission;

g.   Competition among yacht buyers has been restrained by their inability to obtain complete information regarding the previous sale price of a vessel; and

h.   Brokerage Defendants have increased their profits substantially by receiving inflated buyer-broker commissions and inflated total commissions.

100.     Plaintiff is not aware of any pro-competitive effects of Defendants' conspiracy or the Challenged Restraints.  To the extent any such pro-competitive effects exist, which Plaintiff denies, they are substantially outweighed by the conspiracy's anti-competitive effects on the yacht brokerage market.

101.     Defendants' conspiracy has resulted in buyer-broker commissions and total commissions paid by yacht sellers that are inflated well above competitive levels, including in the areas in which the Covered MLSs operate.

### G.     Market Power

102.     The relevant service market for the claims asserted herein is the bundle of services provided to yacht buyers and sellers by yacht brokers with MLS access.

103.     Defendants' control of the Covered MLSs gives Defendants the ability to impose the Buyer-Broker Commission Rule and other anticompetitive IYBA and YBAA rules on class members and other market participants.

104.     Access to the Covered MLSs is critical for brokers to compete and to assist yacht buyers and sellers in the areas in which those MLSs operate.

105.     The relevant geographic market for the claims asserted herein are no broader than the geographic area in which the Covered MLSs operate.

106.     Nearly all vessels sold in these geographic areas were listed on one or more of the Covered MLSs by brokers that are subject to the MLS, IYBA, and YBAA rules and standards.

107.     Brokerage Defendants, and other conspiring brokers in the areas whereby the Covered MLSs operate, collectively provide the vast majority of the yacht broker services in these areas.

108.    Defendants and their co-conspirators collectively have market power through their control of the MLSs and their dominant share of the local market.

109.    Any buyer-brokers where the Covered MLSs operate who wished to compete outside Defendants' conspiracy would face insurmountable barriers.  Specifically, Defendants' control of the Covered MLSs through their co-conspirators means that non-conspiring brokers would need to establish an alternative listing service to compete with the conspiring brokers, or alternatively, attempt to compete without access to a listing service.

110.    A broker who represented a seller without using a listing service would lose access to the large majority of potential buyers, and a broker who represented a buyer without using a listing service would lose access to the large majority of sellers.

111.    Brokers cannot compete effectively without access to a listing service.

112.    For an alternative listing service to compete effectively with one of the Covered MLSs, the alternative would need to have listings as comprehensive (or at least nearly so) as the Covered MLSs.

113.    Brokers who currently profit from inflated buyer-broker commissions and total commissions have minimal incentive to participate on an alternative listing service that would generate lower buyer-broker commissions and lower total commissions.

114.    Further, many buyers are reluctant to retain a buyer-broker operating on an alternative listing service that required them to pay the buyer-broker commission, when other buyer-brokers operating on the Covered MLSs are entirely compensated by yacht sellers.

115.    Accordingly, seller-brokers on an alternative listing service would struggle to attract buyer-brokers and their buyer clients.

116.     Moreover, many yacht sellers would not retain brokers using a new, unfamiliar alternative listing service that had no track record of success and had failed to attract sufficient buyers and buyer-brokers.

117.     Consequently, a listing service attempting to compete with any of the Covered MLSs would more likely than not fail to attract enough yacht listings to operate profitably and competitively with the incumbent MLS.

118.     The absence of listing services that compete with the Covered MLSs (or other MLSs) reflects the very substantial barriers to entry.

**H.     Continuous Accrual**

119.     During the four years preceding the filing of this complaint, Defendants, through their co-conspirator brokers where the Covered MLSs operate, repeatedly charged and received buyer-broker commissions and total commissions that were inflated as a result of the conspiracy. These inflated commissions during the preceding four years were paid by Plaintiff and other class members in connection with the sale of vessels listed on one of the Covered MLSs.  Each payment of these inflated commissions by Plaintiff and the other class members during the last four years injured them and gave rise to a new cause of action for that injury.

120.     During the last four years, Defendants and their co-conspirators have maintained, implemented, and enforced the Buyer-Broker Commission Rule and other anticompetitive IYBA and YBAA rules throughout Florida, including in the areas in which the Covered MLSs operate.

**<u>FACTUAL ALLEGATIONS SPECIFIC TO PLAINTIFF</u>**

121.     YME's sole managing member is Davin Lamm, a Pennsylvania resident.

122.     On July 18, 2022, YME retained Tournament Yacht as its brokerage to list the "Click Bait," a custom 58' Sportfish.

123.    The broker representing YME at Tournament Yacht, located in Tequesta, Florida, and, upon information and belief, provided his brokerage services by listing and advertising the vessel while operating from Tequesta.

124.    Tournament Yacht, through its owner and president, James Field, is a member of IYBA.

125.    YME's broker at Tournament Yacht listed the "Click Bait" on the YachtWorld MLS and, upon information and belief, the remainder of the Covered MLSs, including IYBA and YATCO.

126.    The listing agreement between Tournament Yacht and YME includes a non-negotiable 10 percent (10%) commission fee.

127.    Without the common action among Tournament Yacht and the other Brokerage Defendants, Plaintiff would have been able to secure a lower seller-broker commission and a wider pool of buyers for the vessel.

128.    The listing agreement provides that YME provides Tournament Yacht with the exclusive right to sell the yacht and others with whom they chose to sub list.

129.    On January 13, 2023, YME, through Tournament Yacht, sold the Click Bait in Wanchese, North Carolina for $1,000,000.

130.    Representing the buyer was another broker at Tournament Yacht.

131.    As part of that sales transaction, YME was damaged and paid an inflated 10 percent (10%) broker commission of $100,000 to Tournament Yacht, which was split between the selling and buyer-brokers, both at Tournament Yacht. But for the conspiracy amongst the Defendants, YME would not have been forced to pay an inflated broker commission.

## **CLASS ALLEGATIONS**

132.    Pursuant to Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff brings this action on behalf of itself and the following class:

> All persons or entities who paid a broker commission to a listing broker affiliated with the Brokerage Defendants, during the Covered MLS Class Period, in connection with the sale of a vessel listed on one of the Covered MLSs.

Excluded from the Class are Defendants and their officers and directors, and the judicial officer(s) presiding over this action and the members of his/her/their immediate family and judicial staff.

133.    <u>Numerosity</u>.  Due to the nature of trade and commerce involved, Plaintiff believes the Class has many thousands of members, the exact number and their identities being known to Defendants and their co-conspirators.

134.    <u>Commonality & Predominance</u>.  There are numerous questions of law and fact common to the claims of Plaintiff and members of the putative Class, and those common questions predominate over any questions that may affect individual putative Class members.  Common questions include, but are not limited to the following:

> a.  Whether Defendants conspired as alleged herein to require payment of the buyer-broker commissions by the Class;
>
> b.  Whether Defendants conspired as alleged herein to require payment of inflated buyer-broker commissions by the Class;
>
> c.  Whether buyer-broker commissions and total commissions were inflated as a result of the conspiracy in the areas in which the Covered MLSs operate;
>
> d.  Whether the conspiracy was implemented in the areas in which the Covered MLSs operate;

    e.   Whether the conspiracy harmed competition through the Challenged Restraints as alleged herein;

    f.   Whether the competitive harm from the conspiracy substantially outweighs any competitive benefits; and

    g.   The appropriate class-wide measure of damages.

135.   <u>Typicality</u>.  Plaintiff's claims are typical of the Class members.  All claims of the putative Class are based on the same legal and factual issues concerning Defendants' alleged conspiracy and anti-competitive conduct.

136.   <u>Adequacy of Representation</u>.  Plaintiff will fairly and adequately represent and protect the interests of the Class, and have retained counsel competent and experienced in complex class actions.  Plaintiff has no interests antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiff.

137.   <u>Superiority</u>.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The prosecution of separate actions by individual members of the Class would impose heavy burdens on the Court and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A multiplicity of individual actions would also likely increase the expense and time of litigation given the complex legal and factual controversies presented in this Complaint.  A class action, on the other hand, provides the benefits of fewer management difficulties, single adjudication, economy of scale, and comprehensive supervision by a single court, and would result in reduced time, effort and expense for all parties and the Court, and ultimately, the uniformity of decisions.

138.     Plaintiff's and class members' injuries are the result of a conspiracy or concerted schemes between each and every of the Defendants, among other co-conspirators, at whose collective hands Plaintiff and the Class suffered injury.

**CLAIMS FOR RELIEF**

**VIOLATION OF SECTION 1 OF THE SHERMAN ACT (15 U.S.C. § 1)**

139.     Plaintiff incorporates by reference paragraphs 1–138 of the foregoing allegations of this Complaint.

140.     Beginning more than four years before the filing of this Complaint, Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

141.     The contract, combination, or conspiracy alleged herein has consisted of a continuing agreement amongst Defendants and their co-conspirators to require yacht sellers to pay the buyer-broker commission and to pay an inflated commission amount, *i.e.*, the Challenged Restraints.

142.     In furtherance of the contract, combination, or conspiracy, Defendants and their co-conspirators have committed one or more of the following overt acts:

a.    Participated in the establishment, maintenance, and implementation of the Buyer-Broker Commission Rule and other anticompetitive IYBA and YBAA rules;

b.    Participated in the establishment, maintenance, and implementation of rules by the IYBA, YBAA, and Covered MLSs that implemented the Buyer-Broker Commission Rule and other anticompetitive IYBA and YBAA rules in the areas in which the Covered MLSs operate; and

    c.   Included provisions in the Brokerage agreements with Brokerage Defendants that require brokers to implement the Buyer-Broker Commission Rule and other anticompetitive IYBA and YBAA rules in the areas in which the Covered MLSs operate.

143.    In the areas in which the Covered MLSs operate, Defendants' conspiracy has, among other things, (a) required sellers to pay buyer-brokers, (b) required sellers to pay an inflated buyer-broker commission and an inflated total commission, and (c) restrained price competition among buyer-brokers, all of which individually and cumulatively substantially outweigh any competitive benefits arising from the conspiracy, to the extent any such competitive benefits exist.

144.    Defendants' conspiracy has caused buyer-broker commissions and total commissions in the areas in which the Covered MLSs operate to be inflated.

145.    Plaintiff and other members of the Class paid these inflated commissions during (and before) the last four years in connection with the sale of vessels listed on one of the Covered MLSs.  Absent Defendants' conspiracy and anti-competitive conduct, Plaintiff and other class members would have paid substantially lower commissions because the brokers representing the buyer of their yachts would have been paid by the buyer.

146.    As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, Plaintiff and other class members have been injured in their business and property and suffered damages in an amount to be proven at trial.

## **REQUESTED RELIEF**

WHEREFORE, Plaintiff requests the following relief:

    a.   That the Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure,

and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

b. That the Court enter an order declaring that Defendants' actions, as set forth in this Complaint, violate the law;

c. That the Court award Plaintiff and other members of the Class damages and/or restitution in an amount to be determined at trial;

d. That the Court award Plaintiff pre- and post-judgment interest;

e. That the Court award Plaintiff its costs of the suit, including reasonable attorneys' fees and expenses;

f. That the Court award Plaintiff and the Class a permanent injunction under Section 16 of the Clayton Act, enjoining Defendants from continuing to require sellers to pay the buyer-broker and from continuing to restrict competition among buyer-brokers; and

g. That the Court award such other relief as the Court may deem just and proper.

## **JURY DEMANDED**

Plaintiff demands trial by jury on all issues triable as a right by jury.

Dated: February 29, 2024

                Respectfully submitted,

                __/s Lea P. Bucciero_____
                Ricardo M. Martinez-Cid (FBN 383988)
                Lea P. Bucciero (FBN 84763)
                Matthew Weinshall (FBN 84783)
                **PODHURST ORSECK, P.A.**
                1 SE 3rd Avenue, Suite 2300
                Miami, FL 33131
                Telephone: (305) 358-2800

Facsimile: (305) 358-2382
LBucciero@podhurst.com
MWeinshall@podhurst.com
RMCTeam@podhurst.com
*Attorneys for Plaintiff and Plaintiff's Class*

Kevin D. Neal
(application for *Pro Hac Vice* to be submitted)
William F. King
(application for *Pro Hac Vice* to be submitted)
Kenneth N. Ralston
(application for *Pro Hac Vice* to be submitted)
**GALLAGHER & KENNEDY, P.A.**
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Tel: (602) 530-8000
kevin.neal@gknet.com
bill.king@gknet.com
ken.ralston@gknet.com
*Attorneys for Plaintiff and Plaintiff's Class*

Hunter Shkolnik
(application for *Pro Hac Vice* to be submitted)
**Napoli Shkolnik***
1302 Avenida Ponce de Leon, Santurce
Puerto Rico 00907
(787) 493-5088
Hunter@nsprlaw.com
* Napoli Shkolnik is a registered tradename for NS
PR Law Services, LLC.
A Puerto Rican Limited Liability Corporation

AND

Salvatore C. Badala
(application for *Pro Hac Vice* to be submitted)
**Napoli Shkolnik PLLC**
400 Broadhollow Rd, Suite 305
Melville, NY 11747
(212) 397-1000 Ext. 1045
SBadala@NapoliLaw.com
*Attorneys for Plaintiff and Plaintiff's Class*