**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No.1:24-CV-20805-MOORE-REID**

| | |
|---|---|
| YA MON EXPEDITIONS, LLC, a Wyoming limited liability corporation, on behalf of itself and all other similarly situated,<br><br>                Plaintiff,<br>vs.<br><br>INTERNATIONAL YACHT BROKER'S ASSOCIATION, INC., a Florida Not for Profit Corporation, YACHT BROKER'S ASSOCIATION OF AMERICA, INC., a Maryland corporation, BOATS GROUP, LLC, a Florida Limited Liability Company, PERMIRA ADVISERS LLC, a New York Limited Liability Company, YATCO, LLC, a Florida Limited Liability Company, UNITED YACHT SALES, LLC, a Florida Limited Liability Company, DENISON YACHT SALES, INC., a Florida corporation, DENISON NEW YACHTS, LLC, a Florida Limited Liability Company, et. al.,<br><br>                Defendants. | |

**MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) FOR FAILURE TO STATE A CLAIM**

i

**TABLE OF CONTENTS**

I.   INTRODUCTION AND PARTIES……………………………………………….... 1

II.  STANDARD OF REVIEW:  MOTION TO DISMISS AN ANTITRUST

CLAIM………………………………………………………………………….... 2

    A. SHERMAN ACT § 1 – ELEMENT 1:  PLAINTIFF FAILS TO

    ALLEGE AN AGREEMENT, COMBINATION, OR

    CONSPIRACY BY DENISON……………………………………………...... 3

        i.  THE CONCLUSORY FRAMEWORK ALLEGATIONS……………… 3

            1.  DENISON HAS NEVER REQUIRED ITS

                BROKERS LIST ON ANY MLS………………………………….. 4

            2.  DENISON HAS NEVER CONTROLED ANY MLS…………… 4

            3.  DENISON HAS NEVER REQUIRED ITS BROKERS

                BE MEMBERS OF THE IYBA/YBAA NOR ALLOW

                ITSELF TO BE GOVERNED OR CONTROLLED BY

                IYBA/YBAA…………………………………………………...... 5

        ii.  THE ALLEGATIONS AGAINST DENISON WHICH MUST

          BE TAKEN AS TRUE DO NOT SUPPORT THE

          PLAUSIBILTIY OF A CONTRACT, COMBINATION, NOR

          A CONSPIRACY……………………………………………..………… 7

            1.  DENISON IS A YACHT BROKERAGE………………………..... 7

            2.  BOB DENISON WAS ON THE BOARD OF IYBA……..……… 8

    B. SHERMAN ACT §1 – ELEMENT 2:  PLAINTIFF FAILS TO

    ALLEGE AN UNREASONABLE RESTRAINT ON TRADE………..…….… 10

        i.  THE COMPLAINT FAILS TO DEFINE THE RELEVANT

          MARKETS NOR DESCRIBE CROSS-ELASTICITY OF

          DEMAND…………………………………………………..………11

        ii.  THE COMLAINT FAILS TO ALLEGE PLAUSIBLE ANTI-

          COMPETITIVE EFFECT NOR A PRICE INCREASE IN

          BROKER COMMISSIONS…...……………………………..……… 12

        iii.  PROCOMPETITIVE EFFECT:  COMPLAINT DOES NOT

ADDRESS THE CONFLICT OF INTEREST IT

NECESSITATES NOR THE PRESUMED ILLEGALITY……………. 14

   C.  SHERMAN ACT §1 – ELEMENT 3:  INTERSTATE COMMERCE………… 15

   D.  SHERMAN ACT §1 – ELEMENT 4:  PLAINTIFF FAILS TO

ALLEGE AN ANTITRUST INJURY AND HAS NO STANDING……...…… 15

     i.  PLAINTIFF'S DAMAGES STEM FROM A CONFLICT

OF INTEREST………..………………………………………………….15

     ii.  PLAINTIFF LACKS STANDING AND IS NOT AN

EFFICIENT ENFORCER OF THE ANTITRUST LAWS

WARRANTING DISMISSAL…………………………………………17

III.    CONCLUSION……………………………………………………………………..20

IV.    REQUEST FOR HEARING……………………………………………………..20

# TABLE OF AUTHORITIES

**CASES**

*AD/SAT v. Associated Press*,
181 F.3d 216, 234 (2d Cir. 1999)…………………….…………………………………10

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328, 344, 110 S. Ct. 1884 (1990) …………………………………………12, 15

*Amey, Inc. v. Gulf Abstract & Title, Inc.*,
758 F.2d 1486 (11th Cir.1985) ……………………………………………………17

*Ashcroft v. Iqbal*,
556 U.S. 662, 129 S.Ct. 1937 (2009) ………………..……..……………………………2

*Associated General Contractors v. Carpenters*
459 U.S. 519 (1983) ………………………………………….…….……………… 18

*Austin v. Blue Cross & Blue Shield of Alabama*,
903 F.2d 1385(11th Cir. 1990)……………………………….…………….…………17

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)……………………… 2, 4, 8, 10

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*,
509 U.S. 209, 113 S.Ct. 2578, 2587 (1993). …………………………………………13

*Business Elecs. Corp. v. Sharp Elecs. Corp.*,
485 U.S. 717, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988) ………………………………10

*Clark Memorials of Alabama Inc. v. SCI Alabama Funeral Services LLC.*,
991 F. Supp. 2d 1151 (N.D. Ala. 2014) …………………..…………..…………….……8

*Continental T.V., Inc. v. GTE Sylvania, Inc.*,
433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) …………..………..……………… 10

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
363 F.3d 761, 771 (8th Cir. 2004) ………………………………..………..………………10

*Davidson v. Capital One Bank (USA) N.A.*,
797 F.3d 1309 (11th Cir. 2015).……………………………………..…….………………2

*Florida Seed Company, Inc. v. Monsanto Company*,
105 F.3d 1372 (11th Cir.1997) …………………………………….…………………17

*Jacobs v. Tempur-Pedic Intern., Inc.*,
626 F.3d 1327 (11th Cir. 2010) …………………………..……….……………2, 3, 12, 13

*Levine v. Cent. Fla. Med. Affiliates, Inc.*,
72 F.3d 1538 (11th Cir.1996) ……………………………………..…………………… 11

*Midwest Communications v. Minnesota Twins*,
779 F.2d 444 (8th Cir. 1985).…………………..………….....…………………………17

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984) ………………………………..……….………………….. 8, 9

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
310 F. Supp. 3d 1002 (E.D. Mo. 2018) …………………………………..……….8

*Rebel Oil Co. v. Atl. Richfield Co.,*
51 F.3d 1421 (9th Cir.1995) ……………………..………………………………………12, 14

*Rossi v. Standard Roofing, Inc.,*
156 F.3d 452 (3d Cir. 1998) …………………………………………..………………………11

*Sinaltrainal v. Coca–Cola Co.,*
578 F.3d 1252 (11th Cir.2009) ………………………………..…………………………………2

*State Oil Co. v. Khan,*
522 U.S. 3, 118 S.Ct. 275 (1997) ………………………………………..………………10

*Stizer vs. N.A. of Realtors.,*
420 F. Supp. 3d 903 (W.D. Mo. 2019) ……………………………..……………1, 5, 9, 10, 12, 14

*Spanish Broadcasting System of Fla., Inc. v. Clear Channel
Communications, Inc.,*
376 F.3d 1065 (11th Cir. 2004) ……………………………………….…………………… 11, 13

*Todorov v. DCH Healthcare Auth.,*
921 F.2d 1438 (11th Cir.1991) ……………………………………..……………………2, 17, 18

**STATUTES**
15 U.S.C. § 1………………………………………………….……1, 2, 3, 4, 6, 7, 10, 11, 15,
§326.006(2)(e), Fla. Stat.(2023) …………………………………………… 9, 13, 14, 16, 19

**RULES**
Fed. R. Civ. P. 12(b)(6) …………………………………………….…………………1, 2, 20

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6) FOR**
**FAILURE TO STATE A CLAIM**

## I. INTRODUCTION AND PARTIES

Comes now Defendants Denison Yacht Sales, Inc., and Denison New Yachts, LLC (collectively "DENISON"), requesting dismissal for itself only, on the grounds that the Complaint fails to state claim against DENISON pursuant to Fed. R. Civ. P. 12(b)(6). Now before this esteemed Court is a "copycat" complaint modeled after *Sitzer vs. N.A. of Realtors* 420 F. Supp. 3d 903 (W.D. Mo. 2019). Upon careful review of the Complaint, it is readily apparent that DENISON has done nothing wrong and is being sued for merely being a yacht brokerage and having had an executive that served on the board of IYBA.

Plaintiff Ya Mon Enterprises, LLC's Complaint identifies three (3) classes of Defendants:

1) Associations:  International Yacht Broker Association (herein "IYBA") and Yacht Brokers Association of America (hereafter "YBAA") (collectively "IYBA/YBAA");

2) MLSs:  Boat Group, LLC (hereafter "BG MLS"), YATCO (hereafter "YATCO MLS") (collectively "MLSs"), and

3) Yacht Brokerages:  Numerous brokerages including DENISON.

The Complaint goes on to say that all Defendants adopted, implemented, and enforced the "Buyer-Broker Commission Rule" in contract, combination, and conspiracy so as to "inflate commissions." See Complaint ¶¶ 2-3, 9. In further allegation, the Complaint in conclusory fashion states that defendants control the MLS marketplace so as to require sellers to pay buyer's broker's commissions and to inflate commissions. See Complaint ¶ 9. However, this is stated as a conclusion throughout the Complaint about the entire industry.

DENISON is just one brokerage who has been lumped into these broad stroke allegations that it has "implemented," "adopted," and "enforced" the "rule" despite the fact that DENISON has no such requirement, does not require its brokers to be members of any association (including IYBAA or YBAA), nor require use of any MLS, nor mandate brokers pay cooperating brokers (inclusive of buyer's broker) – its purely free market and DENISON's only major requirements are that its brokers be legally licensed and impeccably honest.

1

## II. <u>STANDARD OF REVIEW:  MOTION TO DISMISS AN ANTITRUST CLAIM</u>

When considering a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must accept all factual allegations as true.  See *Davidson v. Capital One Bank (USA) N.A.,* 797 F.3d 1309, 1312 (11th Cir. 2015).  Further, Plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).  Plausibility is the key, as the "well-pled allegations must nudge the claim 'across the line from conceivable to plausible.'" *Sinaltrainal v. Coca–Cola Co.,* 578 F.3d 1252, 1261 (11th Cir.2009) (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. at 1974).  And to nudge the claim across the line, the complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. at 1965. "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (citing *Twombly,* 550 U.S. at 555, 127 S.Ct. at 1964-65.

Assessing the sufficiency of an antitrust complaint is a two-step process:

> "[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."

*Jacobs v. Tempur-Pedic Intern., Inc.,* 626 F.3d 1327, 1333 (11th Cir. 2010).

In order to a state a claim pursuant to 15 U.S.C. § 1, Plaintiff must plausibly allege: (1) a contract, combination, or conspiracy among two or more separate entities that (2) unreasonably restrains trade, (3) affects interstate or foreign commerce, and (4) causes antitrust injury and damages.  *See Todorov v. DCH Healthcare Auth.,* 921 F.2d 1438, 1455, 1459 (11th Cir.1991).  To survive a Rule 12(b)(6) challenge, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

### A. <u>SHERMAN ACT § 1 – ELEMENT 1:  PLAINTIFF FAILS TO ALLEGE AN AGREEMENT, COMBINATION, OR CONSPIRACY BY DENISON</u>
### i. <u>THE CONCLUSORY FRAMEWORK ALLEGATIONS</u>

Review of the complaint reveals that there are very few specific allegations regarding DENISON.  Virtually all of the allegations are as to all "Defendants" or as to "Brokerage Defendants" and not specifically to DENISON which makes these allegations by definition vague and conclusory since there are over fifteen (15) named "Defendants" and more than ten (10) named "Brokerage Defendants."

The Complaint is mostly comprised of vague conclusions.  For example, at ¶ 2, the Complaint states: "Defendants' conspiracy centers around the adoption and implementation" of the "Buyer-Broker Commission Rule."  Similarly, at ¶ 15, the Complaint states: "Defendants conspiracy has kept buyer-broker commissions… anticompetitively elevated."  Similarly, at ¶ 59, the Complaint states "Defendants adopted the Buyer-Broker Commission Rule...."  At ¶ 88, "Brokerage Defendants implemented the conspiracy by striking an agreement…"  Virtually all of the allegations are vague and conclusory as to DENISON since they refer to so many "Defendants" all together, thus, rendering these types of broad-stroke allegations vague and conclusory – they cannot be taken as true.  *Jacobs v. Tempur-Pedic Intern., Inc.,* 626 F.3d 1327, 1333 (11th Cir. 2010).  While theses conclusory allegations may provide a framework they cannot be taken as true. *Id.*

Ultimately, studying the allegations reveals that there are really only three "framework" allegations made pertaining to actions by the "Brokerage Defendants" of which DENISON is incorporated via foot note 1, on page 11, of the Complaint.  Though these allegations cannot be taken as true, they arguable provide at least a conceivable basis to support the existence of a "contract," "combination," or "conspiracy" to implement and adopt the Buyers Broker Commission Rule.  These conclusory allegations are in essence: 1) Defendant Brokerages require their brokers to list on the MLS pages; 2) Defendant Brokerages control the MLSs; and 3) Defendant Brokerages require their brokers be members of IYBA/YBAA.  See Complaint ¶¶ 8, 9, and 88-91.

3

1.  **DENISON HAS NEVER REQUIRED ITS BROKERS LIST ON ANY MLS**

The Complaint alleges at ¶ 8 that:

> "8.     Moreover, Defendants collectively **require** brokers to list all vessels on these MLS pages."

> [Emphasis added.]

This would amount to parallel conduct since it would be reasonable for an innocent market participant to use the MLS resources to engage in transactions. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 127 S. Ct. 1955, 1966, 167 L. Ed. 2d 929 (2007) ("A statement of parallel conduct, even conduct consciously undertaken, needs some setting suggesting the agreement necessary to make out a § 1 claim; without that further circumstance pointing toward a meeting of the minds, an account of a defendant's commercial efforts stays in neutral territory.")

However, it cannot be taken as true because it states "Defendants collectively" do this and does not state **how** Defendants "require" brokers to list on the MLS pages, which is **conclusory**. As a consequence, it cannot be taken as true.

There are no allegations that DENISON itself specifically does anything to require its brokers to list on any MLS – i.e., no allegation of a rule or policy by DENISON. This substantiates that DENISON cannot be part of the "contract," "combination," and "conspiracy." In truth, the allegation has not and cannot be made truthfully that DENISON requires its brokers to use any MLS because there has never been such a requirement.

2.  **DENISON HAS NEVER CONTROLED ANY MLS**

The next framework allegation against the Defendant Brokerages is found at ¶ 9 of the Complaint which states again in conclusory fashion:

> "9. Defendants and their co-conspirators, through their **control** of the MLSs, collectively possess the power to command the illicit buyer-brokerage commissions."

> [Emphasis added.]

The same vague and conclusory allegation is repeated at ¶ 103 of the Complaint which states:

4

"103.     Defendants' **control** of the Covered MLSs gives Defendants the ability to impose the Buyer-Broker Commission Rule and other anticompetitive IYBA and YBAA rules on class members and other market participants. "

[Emphasis added.]

The allegations purport to be a means to enforce the Buyer's Broker Commission Rule – i.e., through "control of the MLSs."  However, without stating **how** the Defendants "control" the MLSs, the phrases are conclusory. They are also vague and conclusory by referring to "Defendants and their co-conspirators" whom "collectively possess the power."  What power over the MLSs is there?  There are no allegations as to how DENISON could ever control the MLSs – these are independent entities that dictate the terms of their services, not the other way around.

In *Sitzer vs. N.A. of Realtors* 420 F. Supp. 3d 903 (W.D. Mo. 2019), the National Association of Realtors (aka "NAR"), exercised control over all of the MLSs in the United States due to the fact that the MLSs were owned and controlled by NAR's sub-associations – i.e., NAR had a means of control.  Here, there is no means for DENISON to exert control over the BG MLS and YATCO MLS.  The MLSs are their own separate entities, they are not owned or controlled by DENISON.

Statements that "Defendants" "control" the "MLSs" are simply empty conclusions that cannot be taken as true.  There is no specific allegation possible that DENISON controls the MLSs and the allegation cannot be truthfully made. It requires more and there are no allegations anywhere against DENISON showing it did anything to exert "control" over the MLSs.  In truth, DENISON had no control whatsoever over the MLSs and it cannot be truthfully alleged in this or any other complaint.

3.   **DENISON HAS NEVER REQUIRED ITS BROKERS BE MEMBERS OF THE IYBA/YBAA NOR ALLOW ITSELF TO BE GOVERNED OR CONTROLLED BY IYBA/YBAA**

It is telling that there are specific allegations as to other yacht brokerages which must be taken as true, but not made about DENISON.  For example, ¶ 90 of the Complaint specifically states as to another Defendant Brokerage:

> "90.     Galati Yacht Sales, for example, **requires all of its brokers to be accredited by the IYBA**, or alternatively, to be a Certified Professional Yacht Broker, which is associated with IYBA and YBAA. Galati, Working with a Yacht Broker (last accessed January 31, 2024), https://www.galatiyachts.com/working-with-a-yacht-broker/."
>
> [Emphasis added.]

This is a key allegation as and against an individual brokerage – i.e., that they mandated that their brokers be members of the IYBA and YBAA, which in turn would require compliance with the IYBA's ethics rules specifically identified at Complaint ¶¶ 61 & 62 – i.e., requiring the "Buyers Broker Commission Rule."   Arguably, requiring that its brokers be members of the IYBA/YBAA would be the essential act necessary for a yacht brokerage such as DENISON to be a part of the alleged "contract," "combination," or "conspiracy."   However, the allegation is not made against DENISON.   Without this specific allegation, which cannot be truthfully made, the Complaint substantiates the innocence of DENISON.

Similarly, ¶ 91 of the Complaint, states as to another Defendant Brokerage (but not DENISON), that:

> "91.     Similarly, Allied Marine advertises its more than 40 licensed yacht brokers each "adhere to the International Yacht Brokers Association (IYBA) professional code of ethics." Allied Marine, Our Philosophy (last accessed January 31, 2024),  https://www.alliedmarine.com/sell-  your-yacht/yacht-sales-philosophy. "

Again, the Complaint makes specific allegations of acts in furtherance by other yacht brokerages of the alleged illegal "contract," "combination," and "conspiracy," but not as to DENISON.   DENISON does not advertise that it is governed nor controlled by IYBA, YBAA, nor any association dispelling the notion that it is "implementing," "adopting," "maintaining," or "enforcing" the allegedly offensive Buyer's Broker Commission Rule. See Conclusions in Complaint at ¶ 94.   By failing to make such an allegation against DENISON the Complaint supports a finding of innocence in DENISON.   Taken on its face and in light of these allegations, the Complaint does **not** allege facts of a **plausible** "contract," "combination," or "conspiracy" in restraint of trade by DENISON.   15 U.S.C. § 1.

6

Nowhere in the Complaint is there any allegation that DENISON requires its brokers to be members of the IYBA/YBAA.  Nowhere in the Complaint is there an allegation that DENISON advertises its compliance with IYBA/YBAA nor that any association governs or controls it.  This defeats any **plausibility** that DENISON is acting in furtherance of the scheme to promulgate and enforce the allegedly offensive Buyer's Broker Commission Rule, since it is completely in opposite to the alleged scheme's purpose which is to "adopt," "implement," "maintain," and "enforce" the "Buyers Broker Commission Rule" industry wide which is stated in conclusory fashion at Complaint ¶¶ 2, 15, 89, and 94.  This affirmative allegation as to other Defendant Brokerages and the failure to make it against DENISON substantiates that DENISON cannot be at fault based on the Complaint's own allegations.  In truth and in fact, DENISON has never at any time required its brokers be a member of any trade association inclusive of the IYBA/YBAA, and never advertised that it is governed and/or controlled by IYBA/YBAA.

ii. **THE ALLEGATIONS AGAINST DENISON WHICH MUST BE TAKEN AS TRUE DO NOT SUPPORT THE PLAUSIBILTIY OF A CONTRACT, COMBINATION, NOR A CONSPIRACY**

1. **DENISON IS A YACHT BROKERAGE**

Distilling out the allegations in the Complaint that pertain specifically to DENISON, we are left with only ¶ 29 and ¶ 95.  ¶ 29 of the Complaint states:

> "29.   Defendants Denison Yacht Sales, Inc. and Denison New Yachts, LLC, (together, "Denison") are a large **yacht brokerage**. Denison has several brokers in Florida and does substantial advertising and business in Florida. Denison regularly sells vessels in Florida and **collects brokerage commissions** from yachts sold in Florida. Denison is headquartered in Dania Beach, Florida."

> [Emphasis added.]

Taken as true, there is nothing in ¶ 29, that can **plausibly** demonstrate that DENISON has formed a "contract," "combination," nor a "conspiracy."  See 15 U.S.C. § 1.  These facts are generic, and it is difficult to **conceivably** connect DENISON to anything improper simply because Denison is a "yacht brokerage" and "collects brokerage commissions."

7

## 2. <u>BOB DENISON WAS ON THE BOARD OF IYBA</u>

¶ 95 of the Complaint states:

> "95.    For example, **IYBA's board of directors include** Charles A.
> Cashman, employed with defendant MarineMax, Jon Burkard, employed by
> Defendant Allied Marine, James Corts, employed by defendant MarineMax,
> **Bob Denison, employed by Defendant Denison**, and Michael Scalisi,
> employed by Defendant HMY Yacht Sales, Inc."
>
> [Emphasis added.]

This singular specific factual allegation about DENISON, appears to be the only basis for naming DENISON in lawsuit.  The fact that Bob Denison was on the IYBA board of directors at one time in the past, at best provides a highly **speculative** yet **conceivable** basis for a "contract," "combination," or "conspiracy," but certainly not a **plausible** basis.  "Factual allegations in a complaint need not be detailed, but they "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 1964–1965, 167 L.Ed.2d 929 (2007); *Clark Memorials of Alabama Inc. v. SCI Alabama Funeral Services LLC*, 991 F. Supp. 2d 1151, 1156 (N.D. Ala. 2014).  Here, all we have is **speculation** because neither IYBA, nor any of its directors including DENISON's executive had knowledge that the Buyer's Broker Commission Rule was an unreasonable restraint on trade.  To hold DENISON liable, based on one of its executive's past participation in IYBA leadership, there must be "some evidence of actual **knowledge** of, and participation in, the illegal scheme." *Id.*; *see also Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 310 F. Supp. 3d 1002, 1015 (E.D. Mo. 2018) (mere allegation that executives serving on trade association board "lacks temporal context and is not, in and of itself, indicative of any anticompetitive influence").  The Complaint must contain "enough factual matter (taken as true) to suggest that an agreement was made." *Twombly*, 550 U.S. at 556.  This requires plausible factual allegations of a "**conscious commitment** to a common scheme designed to achieve an unlawful objective."  *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).  It stands to reason, that in order to have **conscious commitment** there must be some basis for **knowledge.**  Here, there are no allegations that Bob Denison had actual knowledge of, and participated in anything, he was just on the board of directors.

Further insight on this point is found in *Sitzer vs. N.A. of Realtors* 420 F. Supp. 3d 903 (W.D. Mo. 2019), the case and complaint upon which this case is a copy.  In *Sitzer*, the National Association of Realtors (aka "NAR"), had actually conducted an internal 2015 study titled the "D.A.N.G.E.R." report showing that real estate commissions in the United States were inflated compared to international markets (e.g., UK at 1-2%, Singapore at 1.5-2%, Netherlands at 1.5-2%, Australia at 2-3%, Belgium at 3%, Germany at 3-6%) – i.e., it was alleged in the complaint therein that NAR, MLSs, and the brokerages had **actual knowledge** that their commissions were inflated, and then acted upon it by engaging in coordinated efforts to ensure that **all** agents, brokers, franchises, and affiliates were members of NAR and only utilized NAR controlled MLSs.  This created a monopoly which they used to inflate commissions via the NAR's Adversary Commission Rule (aka "Buyer's Broker Commission Rule"). *Id.*  The facts in *Sitzer* were extreme.

In this case now pending, the Complaint does not and cannot allege any plausible basis for Bob Denison nor DENISON to have known that the IYBA ethics rules nor the Buyer's Broker Commission Rule were inflating commissions (if this is true).  Further, there are no allegations that other similar yacht brokerage markets in other countries have a better or different commission structure as was the situation in the *Sitzer* case establishing that the NAR had knowledge.

Further, there is at least one **ethical basis** and **procompetitive** consideration for why a seller, or its broker might want to ensure that a prospective buyer have its own yacht broker suggesting, and that is to **avoid a conflict of interest**.  See §326.006(2)(e), Fla. Stat.(2023) (prohibiting dual representation by yacht broker without signed consent).  A desire to avoid a conflict of interest is reasonable, and some sellers and brokers will want to avoid this for good reason – e.g., commingling of funds, perception, disclosures, consistent fiduciary duties, etc.  That means any practice of seller's broker paying buyer's broker would at most be parallel conduct.

For these reasons, it is **impossible** to say IYBA is the same as NAR, and it is engaged in anything other **unconscious parallel conduct.**  For the same reasons, it is **impossible** to say that DENISON nor Bob Denison are accountable since there is no evidence of a "conscious commitment" to the scheme**.** *See Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).

One might expect that given the existence of the *Sitzer* case that it will be argued by Plaintiff that everyone now "knows" that a "Buyer's Broker Commission Rule" inflates

commissions.  However, the real estate market and the ship and yacht sales market are very different, they are not "apples and apples," they are "apples and oranges," with the latter being intertwined with international law, admiralty and maritime law, arrest and seizure consequences, boat surveys, engine surveys, sail surveys, rigging surveys, and more.  The nature of the transactions is very different and vessels are transferred differently, title recorded at the Federal level with the United States Coast Guard, and conducted less frequently with form agreements as opposed to how it is done with real estate.  There is simply no **plausible** way to allege that DENISON knows of the "scheme" if there ever was one, which is doubtful.

Neither is there any basis to suggest that Bob Denison had any involvement with anything related to the Buyer's Broker Commission Rule since it predated his presence on the board by decades and was never even discussed.  DENISON's executive was as a mere board member (not as the president nor an officer), and as a consequence the allegations his presence on the board of IYBA somehow makes DENISON responsible for anything IYBA did when none knew of the alleged consequence of the "rule" puts this at the "speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 1964–1965, 167 L.Ed.2d 929 (2007).

Trade associations are a ubiquitous feature in many industries, and the law provides that even if "a trade association, its officers, employees or members are found to have violated the antitrust laws, membership in the association will not automatically involve all members in the violation." *Craftsmen Limousine, Inc. v. Ford Motor Co.*, 363 F.3d 761, 771 (8th Cir. 2004) (quoting *AD/SAT v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999)).

## B. SHERMAN ACT § 1 – ELEMENT 2:  PLAINTIFF FAILS TO ALLEGE AN UNREASONABLE RESTRAINT ON TRADE

The rule of reason is the "prevailing standard" for determining a restraint's effect upon competition in a relevant market. *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). *See also Business Elecs. Corp. v. Sharp Elecs. Corp.,* 485 U.S. 717, 726, 108 S.Ct. 1515, 99 L.Ed.2d 808 (1988) ("there is a presumption in favor of a rule-of-reason standard"); *State Oil Co. v. Khan,* 522 U.S. 3, 22, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) ("[T]he majority of commercial arrangements subject to the antitrust laws[ ] should be evaluated under the rule of reason").

10

Under Eleventh Circuit case law, alleged Sherman §1 agreements analyzed under the rule of reason require a plaintiff "to prove (1) the anticompetitive effect of the defendant's conduct on the relevant market, and (2) that the defendant's conduct has no pro-competitive benefit or justification." *Levine v. Cent. Fla. Med. Affiliates, Inc.,* 72 F.3d 1538, 1551 (11th Cir.1996); *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.,* 376 F.3d 1065, 1071 (11th Cir. 2004).

### i. THE COMPLAINT FAILS TO DEFINE THE RELEVANT MARKETS NOR DESCRIBE CROSS-ELASTICITY OF DEMAND

§ 1 plaintiffs must define both (1) a geographic market and (2) a product market. *Jacob v. Tempur-Pedic Intern., Inc.* 626 F.3d 1327, 1336 (11th Cir. 2010); *See also Rossi v. Standard Roofing, Inc.,* 156 F.3d 452, 464 (3d Cir. 1998).

The Complaint at ¶ 105 states in fatally vague terms what it considers the "geographic market:

> "105.   The relevant geographic market for the claims asserted herein are no broader than the geographic area in which the Covered MLSs operate."

This statement is devoid of meaning, it is a **non sequitur**, it would be the same as saying "it is as long as piece of string."  There is nothing to it.  Because of this, it does not even provide conceivability, let alone plausibility.  Plaintiff is making serious allegations that will affect millions of people, he should be required to satisfy the technical requirements of the claim and to state an actual geographic territory be it Florida, the United States, or otherwise.  We are left to speculate and guess which is by definition vague as to the geographic market and consequently this element as stated is inconceivable and not plausible.

Neither does the Complaint state the relevant service market because it does **not allege cross-elasticity of demand** nor the effect of the same.  The Complaint alleges only at ¶ 102:

> "102.    The relevant service market for the claims asserted herein is the bundle of services provided to yacht buyers and sellers by yacht brokers with MLS access. "

This cannot be the product market because buyers and sellers of yachts are not price sensitive to the yacht broker's use of the MLSs, even if the allegation was made which it is not. Further, the Complaint has no allegations whatsoever addressing **cross-elasticity of demand**

11

necessary to define the market.  *See Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1337–38 (11th Cir. 2010) ("The complaint provides **no factual allegations of the cross-elasticity of demand**…" [Emphasis added.]); *See also Rebel Oil Co. v. Atl. Richfield Co.,* 51 F.3d 1421, 1435 (9th Cir.1995).

Further, the Complaint fails to state whether there are other MLSs who are not defendants in this case and whether and what effect there is on price cross elasticity necessary to substantiate its conclusory allegations that there are "barriers."  See Complaint Paragraph 109, ("… would face insurmountable barriers…").  In order to allege a barrier of this nature, Plaintiff must describe how it occurs in terms of cross-elasticity of demand and the Complaint just glosses over the pleading requirement with broad stroke conclusions and non sequiturs.

ii. <u>THE COMLAINT FAILS TO ALLEGE PLAUSIBLE ANTI-COMPETITIVE EFFECT NOR A PRICE INCREASE IN BROKER COMMISSIONS</u>

Plaintiff's allegations are simply bald statements and speculations that commissions are higher than they would be if there was no Buyer's Broker Commission Rule.  For example, Complaint ¶ 113 states: "profit from inflated commissions…"  However, the Complaint does not point to another yacht brokerage market with lower commissions – e.g., the Complaint fails to allege plausibility because it cannot find a better more efficient yacht brokerage market on the planet allowing the inference that the free market is working correctly in this one – i.e., Plaintiff's allegations are mere speculation.

The facts were extreme in *Sitzer vs. N.A. of Realtors* 420 F. Supp. 3d 903 (W.D. Mo. 2019), where the NAR had conducted a study substantiating higher commissions versus other foreign real estate markets.  Then the NAR, the MLSs, and the brokerages, with knowledge acted to eliminate cross-elasticity of demand at the MLS level, establish a monopoly, and inflate commissions.  In *Sitzer* the NAR had eliminated cooperating brokerage in favor of fixed system which hinged on NAR monopoly control of the MLSs.  Had the NAR, MLSs and brokerages not gone to such lengths to manipulate the market, the mere fact that there was a Buyer's Broker Commission Custom may not have caused the distortion of inflated commissions – it took a lot of additional action and coordination far beyond the mere custom of the seller's broker paying cooperating brokers.  Here, Plaintiff simply speculates that IYBA is the same a NAR and therefore the Buyer's

12

Broker Commission Rule must be wiped out in the yacht brokerage space.  The Complaint simply raises a conceivable notion or a possibility, but cannot allege a study or actual data making the claim of a higher commissions plausible relative to any other yacht brokerage market.  Allegations here are mere speculation and innuendo.

"The plaintiff has the burden of demonstrating damage to competition with 'specific factual allegations.'" *Spanish Broadcasting System of Fla., Inc. v. Clear Channel Communications, Inc.,* 376 F.3d 1065 (11th Cir. 2004).  Further, even if Plaintiff could plausibly allege that commission prices are higher, "Higher prices alone are not the "epitome" of anticompetitive harm. Rather, consumer welfare, understood in the sense of **allocative efficiency**, is the animating concern of the Sherman Act." *Jacobs v. Tempur-Pedic Intern., Inc.,* (626 F.3d 1327, 1339 (11th Cir. 2010) [Emphasis added.]; See *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 221, 113 S.Ct. 2578, 2587, 125 L.Ed.2d 168 (1993).

Here, Plaintiff makes no allegations as to the efficiency of the market and what the consequences in an illiquid market such as yacht brokerage would be by reducing or changing the supply of buyer's broker commissions.  However, the consequence should be obvious, there will be less buyers.  It stands to reason that if you reduce the number of seller's brokers who would pay buyer's side commissions, there will be less supply of commissions for buyer's brokers and as a consequence **less assistance to buyers and less demand for yachts**. **This means that seller will suffer a reduction in the price of his yacht (and a reduction in liquidity).** Further, the **seller's brokers will suffer too**, because they will have to secure conflicts of interest waivers on every transaction as dual agent thereby **reducing transactional velocity**, losing some transactions, or otherwise proceed in violation of §326.006(2)(e), Fla. Stat.(2023), as Plaintiff's broker Tournament Yacht might have done in Plaintiff's transaction in the Complaint.  Buyers, Sellers, and Brokers on both sides, will have fewer transactions and lower commissions due to the drop in demand and price – i.e., **everyone loses**.  That is why it is reasonable for a seller to want to pay the buyer's broker commission – **it theoretically and rationally could create demand for purchase of his asset**.  Applying the Rule of Reason to these allegations results in a finding that this is not an unreasonable restraint.

Without alleging more, and applying the Rule of Reason to these allegations (as opposed to what occurred in *Sitzer*), the old adage of be careful what you wish for likely applies, because

by wiping out the freedom of contract right of sellers to pay the buyer's broker commission, this Plaintiff seller may very well end up paying very little commission on his next sale indeed, because there will be such a reduction in demand that the price for his asset will diminish for more than the commission he is so disdainful of.

### iii. PROCOMPETITIVE EFFECT: COMPLAINT DOES NOT ADDRESS THE CONFLICT OF INTEREST IT NECESSITATES NOR THE PRESUMED ILLEGALITY

Plaintiff seeks to alter the market by increasing conflicts of interest by reducing supply of buyer's broker commissions and increasing dual agency potentially in violation of the law. It is not enough to point to the commissions in the yacht brokerage market in broad conclusory terms and say they are "too high, they would be lower." That's just speculation. Further, the Complaint completely ignores the procompetitive effect that buyer's brokers play in reducing the conflict of interest that is inherent in the increase in dual agency that will occur without the Buyer's Broker Commission Rule. By eliminating the Buyer's Broker Commission Rule, Plaintiff would not increase competition between buyer's brokers, he would eliminate or drastically reduce the supply of commissions to the buyer's brokers and thereby reduce buyer's brokers from transactions on the margin (there will be fewer buyers represented) – thereby necessitating an increase in conflicts of interest in dual agencies which are presumptively unlawful. It is presumed unlawful for one yacht broker to represent both sides of the transaction. See §326.006(2)(e), Fla. Stat.(2023) (requiring full disclosure and written consent).

By "anticompetitive," the law means that a given practice both harms allocative efficiency and could "raise[] the prices of goods above competitive levels or diminish[ ] their quality." *Rebel Oil Co., Inc. v. Atlantic Richfield Co.* 51 F.3d 1421, 1433 (9th Cir. 1995). There is more at play than just the total amount of commission paid by the yacht seller and to think otherwise is myopic. First, there is no plausibility of higher commissions, but as importantly the yacht brokerage transactions are complicated and both sides need to be represented. Sellers agreeing to pay buyer's brokers, gives incentive to buyers brokers to gather buyers and bring demand to the market. Seller will say, "Buyer should go pay for his own broker." And they legally can, but that negates the assurance to buyer's broker to receive the commission and this increases buyer's broker **risk** and the natural consequence is that reduces buyer's brokers from engaging in

transactions along with their efforts to bring buyers to the transactions, on the margin.  The Complaint presumes this is a good thing, but on balance it might not be so – we just do not know. This might be ok in the real estate industry given the uniformity of the forms driven transactions, and even more so in light of the **extreme actions of the NAR**, but IYBA/YBAA are not NAR. And the MLSs in the yacht brokerage market are not under IYBA's/YBAA's control – the allegations in the Complaint are conclusory and false.  Neither does DENISON have control over any MLS nor association, and is only guilty of good honest brokerage in a system that existed long before it did.

     C.  <u>SHERMAN ACT §1 – ELEMENT 3:  INTERSTATE COMMERCE</u>

DENISON concedes interstate commerce.

     D.  **<u>SHERMAN ACT §1 – ELEMENT 4:  PLAINTIFF FAILS TO ALLEGE AN ANTITRUST INJURY AND HAS NO STANDING</u>**

       i.  **<u>PLAINTIFF'S DAMAGES STEM FROM A CONFLICT OF INTEREST</u>**

Plaintiffs asserting a claim under §1, must always allege an antitrust injury and damages that flow from the alleged competition-reducing aspect of defendant's behavior.  *See Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344, 110 S. Ct. 1884, 1894, 109 L. Ed. 2d 333 (1990) ("The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-*reducing* aspect or effect of the defendant's behavior.")

Analysis of the Complaint and salient facts related to Plaintiff's underlying transaction demonstrates that Plaintiff has not suffered an antitrust injury and has no standing to assert this claim.  See Complaint ¶¶ 121-131.  Specifically, Ya Mon Enterprises, LLC, (herein "YME") entered into a listing agreement with Tournament Yacht, located in Tequesta, Florida, to list and sell its million-dollar yacht titled "Click Bait." Complaint ¶¶ 123-125.  On January 13, 2023, YME through Tournament Yacht sold "Click Bait" for $1,000,000.  Complaint ¶ 129.  Then the Complaint states at ¶ 130:

"130.    Representing the buyer was another broker at Tournament Yacht."

Then in conclusory fashion at ¶ 130, the Complaint states:  "…But for the conspiracy amongst Defendants YME would not have been forced to pay an inflated commission."

15

First, nowhere is it alleged in the Complaint that DENISON was in anyway a part of the transaction.  Further, looking at the transaction we see that there was no independent buyer's broker, this transaction was handled by a **<u>dual agent</u>** and there was by definition a potential **conflict of interest** due to the fact that Tournament Yacht represented **both sides of the transaction**.

Though the Complaint states that "Click Bait" was listed on various MLSs (¶ 125), it does not state whether the buyer's broker (i.e., also Tournament Yacht) found the listing on the MLS. Common sense dictates that Tournament Yacht did not "find" the vessel on the MLS, and reason suggests that Tournament Yacht having secured the listing, **discovered the listing through itself, not the MLS nor through any other marketing channels**.  Assuming this is true, and the Complaint allows the reasonable inference through its own vague and conclusory allegations, Plaintiff's injury most likely did not occur from anything to do with anyone other than Tournament Yacht who breached its duty and acted in **conflict of interest** to its client YME.

The Complaint does not allege that Tournament Yacht complied with §326.006(2)(e), Fla. Stat.(2023) (prohibiting dual representation by yacht broker without signed consent), thereby allowing the inference that Tournament Yacht did not comply with §326.006(2)(e) and thereby conducted the transaction in violation of the law – making this transaction and Plaintiff **non-typical**, demonstrating there is **no antitrust injury**, and that Plaintiff is **not a member of the class** (i.e., No Standing).  Yacht Brokerages do not typically violate §326.006(2)(e).

Further, the gravamen of the Complaint is that sellers should not pay the buyer's broker commissions.  However, here there was no independent buyer's broker, the buyer's broker was a dual agent through Tournament Yacht and the commission was not paid to the buyer's broker because of the MLS rules, but because buyer had a contract with Tournament Yacht – the blame falls there alone.

Had Tournament Yacht properly done what it was supposed to do, marketed, and priced the "Click Bait" and found an independent buyer broker that represented the buyer via the MLS instead of Tournament Yacht steering the transaction to itself, the transaction would likely have had a very different complexion – e.g., more potential buyers (i.e., more demand for the asset) at a **higher purchase price** and more benefit to the seller despite his disdain for the total commission. Had there been no conflict of interest, Plaintiff would likely have made more on the sale of "Click

Bait" over and above the extra 5% he complains of paying to his own dual agent **who steered the transaction away from the MLSs**.

Ultimately, Plaintiff **has not suffered an antitrust injury**.  The Complaint alleges that Plaintiff has suffered an injury from a **conflict of interest.**  There is no connection between Plaintiff's injury and anyone other than Tournament Yacht.  Tournament Yacht sold Plaintiff out, not DENISON, not IYBA/YBAA, not the MLSs – the vessel wasn't sold through the MLSs, it was sold internally through Tournament Yacht.

### ii. PLAINTIFF LACKS STANDING AND IS NOT AN EFFICIENT ENFORCER OF THE ANTITRUST LAWS WARRANTING DISMISSAL

The question of standing to sue under the Sherman Act is one of law.  *Midwest Communications v. Minnesota Twins*, 779 F.2d 444, 449 (8th Cir. 1985).  "In order to determine whether a plaintiff has standing to bring an antitrust action, a court must review the allegations contained in the complaint." *Austin v. Blue Cross & Blue Shield of Alabama*, 903 F.2d 1385, 1387 (11th Cir. 1990).  "[T]he doctrine of antitrust standing reflects prudential concerns and is designed to avoid burdening the courts with speculative or remote claims." *Florida Seed Company, Inc. v. Monsanto Company,* 105 F.3d 1372, 1374 (11th Cir.1997). "[T]he court must find a close relationship between the plaintiff's injury and the alleged antitrust violation." *Amey, Inc. v. Gulf Abstract & Title, Inc.,* 758 F.2d 1486, 1493 (11th Cir.1985), *cert. denied,* 476 U.S. 1153, 106 S.Ct. 2267, 90 L.Ed.2d 712 (1986).

The Eleventh Circuit has identified a two-pronged approach to determine whether a plaintiff has antitrust standing.  First, a plaintiff must establish that it has suffered an "antitrust injury."  Second, a plaintiff must establish that it is an "efficient enforcer" of the antitrust laws. *Todorov v. DCH Healthcare Auth.*, 921 F.2d 1438, 1451 (11th Cir. 1991).

Applying *Todorov*, the first prong is satisfied and Plaintiff fails to allege an antitrust injury - DENISON incorporates by reference Section III.D.i of this brief titled, "PLAINTIFF'S DAMAGES STEM FROM A CONFLICT OF INTEREST" (i.e., there is no antitrust injury, Plaintiff's injury occurred due to a conflict of interest in Tournament Yacht who acted as dual agent and steered the sale of Click Bait away from the MLSs and to itself instead).  Even if the Court were to disagree with this analysis and find antitrust injury, "[a] showing of antitrust injury

is necessary, but not always sufficient, to establish standing…" *Todorov v. DCH Healthcare Auth.,* 921 F.2d 1438, 1449 (11th Cir. 1991).  Thus, dismissal is still warranted if Plaintiff is not an "efficient enforcer" of the antitrust laws.

Applying *Todorov's* second prong, it is readily apparent that Plaintiff is not an "efficient enforcer."   In making this determination, the court should apply the following battery of factors: 1) the existence of a casual connection between the antitrust violation and the alleged injury; 2) the nature of the plaintiff's alleged injury; 3) the directness or indirectness of the asserted injury and the related inquiry of whether the damages are speculative; 4) the potential for duplicative recover or complex apportionment of damages; and finally, 5) the existence of a more direct victim from the alleged anti-competitive conduct.  *Associated General Contractors v. Carpenters,* 459 U.S. 519, 535–36 (1983).

Applying *Associated General Contractors,* we see that the casual connection between Plaintiff's alleged antitrust violation and Plaintiff's damages is at best **tenuous** and **remote**:

1) <u>No Casual Connection</u>.  Plaintiff alleges that the antitrust violation arises from a "control" over the MLSs to enforce IYBA's/YBAA's "Buyer's Broker Commission Rule."   However, Plaintiff's injury wasn't caused by the control scheme over the MLSs, since even though his vessel "Click Bait" was allegedly listed on various MLSs, the vessel was not sold through a broker found on the MLS, "Click Bait" was sold in-house through his own **dual agent brokerage** Tournament Yacht.  Further, there is no plausible allegation that the IYBA/YBAA control the MLSs.

2) <u>The Nature of Plaintiff's Injury is Conflict of Interest</u>.  Plaintiff wants to claim that his injury was an inflated commission in the amount of 5% – representing a total loss of $50,000.  However, had Tournament Yacht not steered the transaction to itself and away from the MLSs, Plaintiff would likely have secured an increase in his sale price of greater than 5% and he would have not suffered injury.  The nature of Plaintiff's injury was not the commission it was the **conflict of interest**.

3) <u>No Connection Either Indirect or Direct</u>.  Plaintiff didn't sell his vessel "Click Bait" through the alleged scheme by and through the Defendants' "control" over the MLSs in enforcing the "Buyer's Broker Commission Rule."   That could only occur if the vessel was sold through the MLS, there was control of the MLSs, an agreement, etc.  "Click Bait" was sold to the buyer

18

through dual agency and through Tournament Yacht.  Tournament Yacht simply steered the transaction to itself to reduce marketing expense and make a quick easy commission in **conflict of interest** to its client.  To say that the loss in total dollars came from the Buyer's Broker Commission Rule when there really was no independent buyer's broker is completely speculative – arguably there was only one "broker" and certainly there was dual agency in Tournament Yacht.

4) <u>Damages Apportionment Would Complex</u>.  In order to determine what Plaintiff's true economic damages are, it would have to be determined at the time of the sale, how much Plaintiff would have received on the sale had the vessel "Click Bait" been properly marketed and sold absent the conflict of interest.  It would further have to be determined what the correct commission would have been based on intermarket price analysis and cross elasticity of demand and it would have been higher, Plaintiff has no damages.  Further, "Click Bait" may very well have sold for a price higher than 5% if sold on through the MLSs, indicating Plaintiff has no cognizable damages on the Sherman §1 Claim,.  If the price difference increase was less than 5% damages apportionment would become complex.  Evidentiarily speaking, determining what marketing efforts were done or avoided by Tournament Yacht, how the transaction was steered, what verbal and written assurances were made or not made in a market where transactions are typically unique and original, whether there was proper compliance with §326.006(2)(e), Fla. Stat.(2023), as well as the level of **sophistication** of YME's sole managing member David Lamm (¶ 121) relative to all of these considerations in the sale of his luxury yacht, would be expensive given he was apparently **naïve to the conflict of interest** that occurred and otherwise not advised that all broker commissions are negotiable/renegotiable, and what Tournament told him including at the time he would have signed the waiver on the conflict.

5) <u>More Direct Victim</u>.  DENISON contends that there are no victims of anything it has done, because there is no scheme, no contract, no combination, nor a conspiracy – DENISON is an innocent market participant.  However, if there were, this Plaintiff is not direct because he did not sell his vessel through the MLSs.

Applying the factors from *Associated General Contractors,* it is obvious that YME is could not be an efficient enforcer, even if there were a §1 Claim.  Plaintiff's damages are highly

speculative to say the least. *Id.* at 543. ("the Court discussed that the plaintiffs' damages claims were highly speculative; this was due in part to the indirectness of the plaintiffs' injuries and the operation of other independent effects. This, of course, weighs against affording a plaintiff antitrust standing…" The indirectness of the alleged injury also implicates the "strong interest ... in keeping the scope of complex antitrust trials within judicially manageable limits.")

### III. <u>CONCLUSION</u>

For all of the aforementioned reasons stated herein DENISON hereby requests the Complaint be dismissed pursuant to Fed. R. Civ. Proc. 12(b)(6) for failure to state a claim.

### IV. <u>REQUEST FOR HEARING</u>

DENISON requests a hearing and to provide oral argument on the grounds the matter involves complex areas of law, and in support/rebuttal of issues raised in the motion papers.

Date:  March 28, 2024          Respectfully submitted,

Emily Heim
FL Bar No. 1015867
Bayramoglu Law Office, LLC
emily@bayramoblu-legal.com
11540 W. Warm Springs Rd., Ste 100, Henderson, NV 89014
Tel: (702) 462 - 5973

Date:  March 28, 2024

Christopher M. Brainard, esq.
*Applicant Pro Hac Vice* (CA SBN 199444)
christopherbrainard@gmail.com
8549 Wilshire Blvd., Pmb 2095, Beverly Hills, CA 90211
Tel: (310) 266 - 4115