UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No. 24-Civ-20805-KMM

YA MON EXPEDITIONS, LLC, BLUEBERRY
ENTERPRISES, LLC, MAGNA CHARTA, LLC,
PRIDE CONTRACTING, INC., KIP LAMAR
SNELL, and JUAN GALAN, Individually and on
Behalf of All Others Similarly Situated,

    Plaintiffs,

  vs.

ALLIED MARINE, INC., GALATI YACHT
SALES, LLC, HMY YACHT SALES, INC.,
MARINEMAX, INC., NORTHROP & JOHNSON
YACHTS-SHIPS, LLC, FRASER YACHTS
FLORIDA, INC., FRASER YACHTS
CALIFORNIA CORPORATION, MARINEMAX
EAST, INC., ONEWATER MARINE INC.,
DENISON YACHTS INTERNATIONAL, LLC,
YACHTING ASSETS AND OPERATIONS LLC,
UNITED YACHT SALES, LLC,
INTERNATIONAL YACHT BROKERS
ASSOCIATION, INC., YACHT BROKERS
ASSOCIATION OF AMERICA, INC.,
CALIFORNIA YACHT BROKERS
ASSOCIATION, INC., NORTHWEST YACHT
BROKERS ASSOCIATION, BOATS GROUP,
LLC, PERMIRA ADVISERS LIMITED,
PERMIRA ADVISERS LLC, and YATCO, LLC.

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

<u>JURY TRIAL DEMANDED</u>

**CONSOLIDATED CLASS ACTION COMPLAINT**

Case No. 24-Civ-20805-KMM

Pursuant to the Court's Orders dated April 1, 2024, and June 5, 2024 [ECF 40 and 139, respectively], Plaintiffs Blueberry Enterprises, LLC, Ya Mon Expeditions, LLC, Magna Charta, LLC, Pride Contracting, Inc., Kip Lamar Snell, and Juan Galan file this Consolidated Class Action Complaint on behalf of themselves and all other sellers in the United States of a pre-owned boat through a broker listed for sale on any Defendant's multiple listing services ("MLS"), and who paid a broker commission during the Class Period, *i.e.*, from February 29, 2020, to the present (the "Class Period").[1]  Based upon the personal knowledge of Plaintiffs as to themselves, and upon information and belief and the investigation of counsel as to the remaining allegations, Plaintiffs allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs bring this class action against Defendants for agreeing, combining, and conspiring to adopt, impose, and enforce an anticompetitive restraint that, as a condition for selling their yachts, requires pre-owned yacht sellers to pay a supracompetitive total aggregate commission fee that includes an inflated brokerage fee for the buyer's broker.

2.      Defendants are boating brokerages, yacht broker associations, and MLS that reside or have a significant presence in this District and nationwide.  Along with other unnamed co-conspirators, Defendants have engaged in long-standing anticompetitive conduct in violation of federal antitrust laws.

---

[1]     There is no universally accepted definition for differentiating water vessels as "boats" or "yachts."  As a general proposition, recreational watercraft 10 meters (33 feet) or longer intended for overnight use, are typically referred to as "yachts."  For purposes of this action, "yacht" and "boat" are defined interchangeably and refer specifically to all such water vessels listed on MLS and sold during the Class Period.

Case No. 24-Civ-20805-KMM

3.      Most pre-owned boats are sold in the United States much like homes – they are listed on MLS.  Boats are listed on Defendants' MLS by the would-be seller's broker.

4.      MLS are databases created for boat brokers to share their listings on a single platform.  MLS facilitate information sharing among prospective buyers, sellers, and brokers; they have greatly reduced the time and effort required for buyers to shop for boats.  Consequently, the role of buyer brokers has become significantly less important over time, as more and more prospective yacht buyers utilize MLS to locate boats and yachts to purchase.  In a competitive market, this change in market dynamics would result in decreasing utilization of buyer brokers and decreasing brokerage commissions.  However, as a result of Defendants' anticompetitive behavior here, this has not been the case.

5.      When pre-owned boats and yachts are sold, the aggregate broker commission on the sale is frequently 10% of the sales price – called "the norm" internally within the yacht broker community – and is paid by the seller at the time of the closing.  If the buyer is represented by a broker, the commission is shared by the seller's broker and the buyer's broker, typically on a 60/40 or 50/50 split.  The brokers' collective commissions are paid by the seller.

6.      Only boat brokers can list boats and yachts for sale on Defendants' MLS.  Those MLS will not accept listings from boat owners who want to sell their vessels themselves, known as For Sale by Owner ("FSBO") sales.

7.      Most larger boats and yachts sold on the MLS are subject to standard listing agreements (*e.g.*, a "Central Listing Agreement"), whereby the prospective seller of a yacht grants a particular broker the exclusive right to sell the yacht.

Case No. 24-Civ-20805-KMM

8.      As a result, Defendants and their co-conspirators together control the market for the purchase and sale of pre-owned boats and yachts because it is virtually impossible to sell a pre-owned boat or yacht without using the services of Defendants and their co-conspirators.  This control of the market gives Defendants and their co-conspirators unchecked power to insist upon boat and yacht sellers paying inflated brokerage costs that are higher than they would otherwise be in a competitive market.

9.      Central Listing Agreements are standardized forms with terms and conditions provided by national trade associations, including Yacht Brokers Association of America, Inc. ("YBAA"), International Yacht Brokers Association, Inc. ("IYBA"), California Yacht Brokers Association, Inc. ("CYBA"), and Northwest Yacht Brokers Association ("NYBA") for boat brokers to use.  Those agreements generally require the seller's broker to make a non-revocable offer of compensation, referred to at times as a "co-brokerage agreement," to the buyer's broker, who can be referred to as a "cooperating broker" – in all material ways, the same fundamental commission construct used in the residential real estate market.

10.     Some of the MLS were founded or are owned by yacht broker associations.  Others are independent.  However, if the independently owned MLS want to obtain listings from brokers, they must conform to industry practice at the insistence of boat brokers, who are also members of the yacht broker associations.  Therefore, in either case, the boat brokerage firms, whether through their membership in and influence on the yacht broker associations or through their participation in the MLS, have contributed to the creation and maintenance of an anticompetitive agreement that establishes the ground rules for the sale of a substantial number of pre-owned boats and yachts on the MLS owned or operated by Defendants.  As a result of that anticompetitive agreement, boat

Case No. 24-Civ-20805-KMM

owners who sell their boats through participating MLS end up paying the buyer's broker as part of a commission rate, and also pay an overall commission fee that is inflated and arbitrarily tied to the purchase price.

11.     The economic reality is that buyers' brokers are financially incentivized to show their clients boats and yachts where the broker will earn the standard – and inflated – commission rates of 4%-5% through co-brokerage transactions, and, thus, steer their clients towards purchasing boats yielding the expected standard commission rates.  As a result, most buyers' brokers either will not show their clients listings offering a lower commission rate to the buyer broker or will show listings offering higher commission rates first, while working cooperatively with sellers' brokers to maximize their collective commissions.

12.     Because of the utter dominance of the yachting MLS in the market, boat owners who want to sell their boats or yachts are severely disadvantaged if they do not use a broker and list their boats for sale on the MLS, which brokers recognize and tout to prospective yacht sellers. To list on those MLS, they must sign a listing agreement with a broker requiring co-brokerage terms; that is, listing agreements whereby the seller is required to pay a commission to the broker representing the buyer even though the interest of the buyer is opposed to the seller's interest.

13.     The upshot is twofold: (a) yacht broker associations and brokers have conspired to create, impose, enforce, and maintain rules that require boat and yacht owners to sign a listing agreement by which they agree to pay a commission to buyers' brokers as part of those listing agreements in order to sell their boats and yachts; and (b) sellers of pre-owned boats and yachts pay overall commissions at an inflated rate higher than they would absent the anticompetitive conduct alleged herein and pay a commission to the buyer's broker.

- 4 -

Case No. 24-Civ-20805-KMM

14.     Because of Defendants' conduct, this anticompetitive system remains entrenched, even as pre-owned boat and yacht buyers increasingly look for and find yachts themselves on yachting MLS on the internet, with buyers' brokers doing correspondingly less work but earning the same commissions.

15.     Indeed, prospective yacht buyers increasingly retain a buyer broker after the buyer has already found the vessel the buyer wishes to buy.  Upon information and belief, Defendants are aware of this trend.  Nonetheless, despite this diminishing role for buyer brokers, the standard percentage of their commission remains constant.

16.     Because the price of boats and yachts has increased faster than the rate of inflation in recent years, and because buyer's broker's commissions are set under co-brokerage agreements as a percentage of the sales price of a vessel, the commissions paid by sellers to buyer brokers and the overall commissions paid by sellers have also increased faster than the rate of inflation in recent years.  As a result, boat sellers are paying buyer brokers more for doing less work.

17.     Each year in the United States, pre-owned boat and yacht sales gross billions of dollars.  And as a result of collusive, anticompetitive conduct among boating MLS, yacht broker associations and boat broker firms, boat sellers pay hundreds of millions of dollars more in commissions every year than they would in a competitive market.

18.     Plaintiffs, for themselves and on behalf of the proposed Class, accordingly seek treble damages under federal antitrust law, declaratory and injunctive relief, and the costs of suit, including reasonable attorneys' fees and demand a trial by jury.

Case No. 24-Civ-20805-KMM

## JURISDICTION AND VENUE

19.     The Court has federal question jurisdiction pursuant to 28 U.S.C. §§1331 and 1337. This case arises under Section 1 of the Sherman Antitrust Act of 1890 ("Sherman Act"), 15 U.S.C. §§1 and 4, and Section 16 of the Clayton Antitrust Act of 1914 ("Clayton Act"), 15 U.S.C. §§15 and 26.

20.     This Court also has subject matter jurisdiction under 28 U.S.C. §1332(d)(2), because the Class contains more than 100 persons, the aggregate amount in controversy exceeds $5,000,000, and at least one member of the Class is a citizen of a state different from Defendants.

21.     Venue is proper is proper in this District under Sections 4 and 12 of the Clayton Act, 15 U.S.C. §§15 and 22, since each Defendant resides or inhabits, is found, has an agent in this District, and transacts business in this District.

22.     Venue is also proper in this District under 28 U.S.C. §1391(b), (c), and (d) against all Defendants.  Each Defendant transacted substantial business, was found, had agents, and/or resided in this District; a substantial portion of the events giving rise to Plaintiffs' claims took place in this District; and a substantial portion of the conduct alleged here that impacted interstate commerce and trade arose in this District.

23.     This Court, pursuant to 15 U.S.C. § 22, has personal jurisdiction over Defendants, each of which has: (a) transacted substantial business in the United States, including in this District; (b) transacted business with members of the Class throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and (d) committed substantial acts in furtherance of their unlawful scheme in the United States, including in this District.

24.     This Court also has personal jurisdiction against Defendants under Fla. Stat. §48.193 because as alleged here, among other things, Defendants engage in substantial and no isolated activity within this state, and Plaintiffs' claims arise from Defendants having: operated, conducted, engaged in, or carried on a business or business venture in this state or had an office or agency in this state; committed tortious acts within the State of Florida; caused injury to persons or property within the State of Florida arising out of an act or omission by Defendants outside this state; and engaged in solicitation or service activities within the State of Florida.

25.     Each Defendant has received revenue attributable to business transacted in Florida, and in this District from the brokerage operations of their respective subsidiaries, franchisees, affiliates, and/or transaction counterparts that transact business in Florida and in this District.

## PARTIES

**Plaintiffs**

26.     Plaintiff Ya Mon Expeditions, LLC ("YME") is a Wyoming limited liability company.  On January 13, 2023, YME sold a vessel located in Wanchese, North Carolina.  The vessel was listed on the YachtWorld MLS, along with other MLS. In that sales transaction, YME was represented by Tournament Yacht Sales of Tequesta, Florida.  As part of that sales transaction, YME paid a broker commission, which included a commission to the buyer's broker.

27.     Plaintiff Blueberry Enterprises, LLC ("Blueberry") is a Florida Limited Liability Company located in Port Orange, Florida.  On June 13, 2022, Blueberry sold a boat delivered to Daytona Beach, Florida.  In that transaction Blueberry was represented by Denison Yachting of Fort Lauderdale, Florida, and the vessel was listed using MLS.  Blueberry entered into a Listing

Case No. 24-Civ-20805-KMM

Agreement with Denison Yachting and, in conjunction with the sale, paid a commission, which included a commission to the buyer's broker.

28.     Plaintiff Magna Charta, LLC is a North Carolina limited liability company.  In 2021, sold a boat using broker Sunshine Cruising Yachts.  The boat was listed on one or more of Defendants' MLS, upon sale of the boat, Magna Charta paid a commission, which included a buyer's commission.

29.     Plaintiff Pride Contracting, Inc. ("Pride") is an Arizona corporation.  On March 24, 2022, Pride sold a boat located in Palm Beach, Florida.  The vessel was listed on the YachtWorld MLS, along with other MLS.  In that sales transaction, Pride was represented by Denison Yachting of Palm Beach Gardens, Florida.  As part of that sales transaction, Pride paid a broker commission, which included a commission to the buyer's broker.

30.     Plaintiff Kip Lamar Snell ("Snell"), a natural person and a resident of the State of Alabama, entered into a Central Listing Agreement with Galati Yacht Sales, LLC ("Galati"), to sell a 41-foot 2003 Express Cruiser Sea Ray that required a broker commission, including a commission paid to the buyer's broker.  Snell's vessel was listed on an MLS, was sold and he paid a commission, including a commission to the buyer's broker.

31.     Plaintiff Juan Galan ("Galan") a natural person and a resident of the State of Florida, entered into a Central Listing Agreement with Seattle Northwest Yachts, LLC d/b/a Seattle Yachts International ("Seattle Yachts"), to sell a 52-foot 1996 SonShip. Plaintiff Galan's vessel was sold and he paid a commission on the transaction, including a commission paid to the buyer's broker.

Case No. 24-Civ-20805-KMM

**Broker Defendants**

32.     Defendant Allied Marine, Inc. ("Allied Marine") is a yacht brokerage based in South Florida.  It regularly sells yachts in Florida, earns substantial brokerage commissions on yachts sold in Florida, has agents in Florida, and advertises in Florida.  It specializes in brokering vessels 50 to 100 feet.  It also has a superyacht division specializing in larger yachts. Allied Marine is owned by Ferretti Group.  Ferretti S.p.A., an Italian multinational shipbuilding company headquartered in Forlì, Italy, and specializes in the design, construction, and sale of luxury motor yachts.  Ferretti announced that in 2023 its valuation surpassed one billion euros.

33.     Defendant Galati Yacht Sales, LLC has been in business since 1970 and is one of the largest privately owned yacht brokerages and dealerships in the world.  Galati regularly sells yachts in Florida, has agents in Florida, collects substantial brokerage commissions from yachts sold in Florida, and advertises in Florida.  Galati has six Florida offices, in Anna Maria, Destin, Sarasota, Fort Lauderdale, Tampa Bay, and Naples.

34.     Defendant HMY Yacht Sales, Inc. ("HMY") is a yacht brokerage.  HMY regularly sells yachts in Florida, has agents in Florida, collects substantial brokerage commissions from yachts sold in Florida, and advertises in Florida.  HMY's principal place of business is in Palm Beach Gardens, Florida.

35.     Defendant MarineMax, Inc. ("MarineMax") is a Florida corporation with its principal place of business in Clearwater, Florida.  MarineMax is publicly traded under the ticker symbol HZO, and touts itself as the world's largest recreational boat and yacht retailer. MarineMax regularly sells yachts in Florida, has agents in Florida, collects substantial brokerage commissions from yachts sold in Florida, and advertises in Florida.

- 9 -

Case No. 24-Civ-20805-KMM

36.     Defendant Northrop & Johnson Yachts-Ships, LLC ("Northrop & Johnson") is a yacht brokerage.  Northrop & Johnson is a wholly owned subsidiary of MarineMax.  Northrop & Johnson regularly sells yachts in Florida, has agents in Florida, collects brokerage commissions from yachts sold in Florida, and advertises in Florida.  Northrop & Johnson is headquartered in Fort Lauderdale, Florida.

37.     Defendants Fraser Yachts Florida, Inc. and Fraser Yachts California, Corporation (together, "Fraser Yachts") are a large yacht brokerage and wholly owned subsidiaries of MarineMax. Fraser Yachts has several branch locations worldwide including branches in Europe, Asia, and the United States and has a current value of $15.5 million dollars.  Fraser Yachts regularly sells yachts in Florida, through their brokers in Florida, and collects substantial brokerage commissions from yachts sold and advertised in Florida.

38.     MarineMax acquired Northrop & Johnson in 2020 and Fraser Yachts in 2019. MarineMax's revenue for fiscal year ending September 30, 2023, was nearly $2.4 billion, with a net income of approximately $109.3 million.   Approximately 70% of the company's revenue comes from new boat sales and approximately 5% comes from brokerage sales.

39.     Defendant MarineMax East, Inc. is a yacht brokerage incorporated in Delaware, with a principal place of business in Clearwater, Florida.  MarineMax East, Inc. is a wholly owned subsidiary of MarineMax.

40.     Defendant OneWater Marine Inc. ("ONEW") is a publicly traded company and has 98 retail locations across the United States.  It is a Delaware corporation with principal place of business in Buford, Georgia.  ONEW regularly sells yachts in Florida, has agents in Florida, collects brokerage commissions from yachts sold in Florida, and advertises in Florida.

- 10 -

Case No. 24-Civ-20805-KMM

41.     Defendant Denison Yachts International, LLC ("Denison Yachting"), is a Florida limited liability company with its principal place of business in Fort Lauderdale, Florida.  Denison Yachting regularly sells yachts in Florida, has agents in Florida, collects substantial brokerage commissions from yachts sold in Florida, and advertises in Florida.

42.     Defendant Yachting Assets and Operations LLC d/b/a Denison Yachting is a Delaware limited liability company with its principal place of business in Buford, Florida, at the same address as ONEW.  Upon information and belief, Yachting Assets and Operations LLC is a wholly owned subsidiary of ONEW and operates the website www.denisonyactsales.com, through which Denison Yachting and affiliated Denison entities offer their services, including the sale of pre-owned boats.

43.     ONEW acquired Denison-affiliated business entities in 2022 and owns 30 other yacht/boat brokerages.   It reported in excess of $1.9 billion in revenue in fiscal year ending September 30, 2023.  Its adjusted EBITDA was $247 million in 2022 and $167 million in 2023. Its currently reported market capitalization is $386 million and enterprise value is $1.48 billion.

44.     Defendant United Yacht Sales, LLC ("United Yacht Sales") is a yacht brokerage based in Stuart, Florida.  It regularly sells boats in Florida, has agents in Florida, collects substantial brokerage commissions from boats sold in Florida, and advertises in Florida.  United Yacht Sales touts itself as the world's largest yacht brokerage firm with 250 brokers in 104 locations.  It has sold over $1.75 billion in boats since opening its doors in 2002.

Case No. 24-Civ-20805-KMM

45.     United Yacht Sales' estimated annual revenue is currently $63.8 million per year.[2] United Yacht Sales is the world's largest yacht brokerage firm with over 150 brokers worldwide and more than 25 offices that create the biggest network of boat buyers and sellers in the industry.[3]

46.     Allied Marine, Galati, HMY, MarineMax, Northrop & Johnson, Fraser Yachts, MarineMax East, Inc., ONEW, Denison Yachting, Yachting Assets and Operations LLC, and United Yacht Sales, are collectively referred to as "Broker Defendants."

**Defendant Yacht Broker Associations**

47.     Defendant International Yacht Brokers Association, Inc., f/k/a the Florida Yacht Brokers Association, touts that it has "more than 2000+ members and growing" and is "the world's largest and most influential association for the yacht brokerage & charter industry."  IYBA, through its own legislative affairs program, advocates for the interests of yacht brokers.  In 1987, IYBA was "founded by a coalition of yacht brokerage business owners in South Florida."  In 2013, IYBA introduced standardized contracts for the transaction of yacht sales.  In the years thereafter, IYBA, in conjunction with other yacht broker associations, including CYBA, NYBA, and YBAA, founded yachtbroker.org (now, Yachtr.com), as an industry-wide association-owned MLS platform to serve the yacht brokerage community.  Yachtbroker.org boasts that it includes co-brokerage member listings from IYBA, CYBA, NYBA, and YBAA.[4]

---

[2]   *United      Yacht      Sales      Revenue      and      Competitors*,      Growjo, https://growjo.com/company/United_Yacht_Sales (last visited June 7, 2024).

[3]   *About     United     Yacht     Sales*,     Superyacht     Times,     https://www.superyachttimes .com/companies/united-yacht-sales (last visited June 7, 2024).

[4]   *Member Benefits*, YachtBroker.org, https://info.yachtbroker.org/ (last visited June 7, 2024).

Case No. 24-Civ-20805-KMM

48.    In spring 2024, the associations released a new "public-facing, lead-generating advertising site called yachtr.com."[5]   Yachtr.com is an MLS showing listings from the yachtbroker.org repository, and effectively replaces yachtbroker.org as the yacht-broker-association-owned MLS.  IYBA is based in Miami, with numerous members, officers and directors based in Florida.  It has collected substantial dues and membership fees from yacht brokers in Miami, including in the last four years.

49.    Defendant Yacht Brokers Association of America, Inc.'s mission is "to unite Yacht Sales Professionals throughout North America to establish, promote and enforce high standards of professional competence, character, and ethical conduct."   Its principal place of business is in Washington, D.C. and it lobbies nationwide on behalf of yacht brokers, including in Florida. YBAA is a professional trade association comprised of over 250 corporate firms representing over 1,000 individual yacht sales professionals.  YBAA has collected substantial dues and membership fees from yacht brokers in Miami, including in the last four years.  YBAA, along with other yacht broker associations, founded yachtbroker.org as an industry-owned MLS, now known at Yachtr.com.

50.    Defendant California Yacht Brokers Association, Inc. has more than 260 firms as members representing over 400 yacht brokers.  It has collected substantial dues and membership fees during the Class Period.  CYBA has a significant lobbying presence, advocating for the interest of yacht brokers.  It provides members with a comprehensive set of sales and listing contracts in use by the yacht brokerage industry.  MLS YATCO, LLC ("YATCO") and Boats

---

[5]    *Compass*,    IYBA    7    (Spring    2024),    https://iyba.org/compass-issues/3d-flip-book/kWmsiD0AOD8z8dVN.pdf?fb3d-page=1.

Case No. 24-Civ-20805-KMM

Group, LLC ("Boats Group") are gold sponsors of CYBA.  CYBA regularly does substantial

business in Florida through its affiliation with MLS Pages and Defendants herein.  CYBA is

headquartered in Martinez, California and its executive director is located in Florida

51.     Defendant Northwest Yacht Brokers Association is a nonprofit corporation with

headquarters in Seattle, Washington.  NYBA currently has over 250 member yacht brokers.

NYBA has collected substantial dues and membership fees during the Class Period. NYBA aims

to develop strategic partnerships and conducts direct lobbying efforts for the interest of yacht

brokers.  NYBA is an association partner of YBAA and CYBA.  As an association partner of

YBAA, NYBA members adhere to YBAA and CYBA Code of Ethics, which include the

commission sharing requirement.[6]  NYBA regularly does substantial business in Florida as a

participant of the MLS.

52.     Purportedly in order to create uniformity in pre-owned yacht brokerage industry

sales practices, YBAA, in partnership with IYBA and additional yacht broker associations,

established the Certified Professional Yacht Broker ("CPYB") certification program, which is used

throughout the United States.  The certification program is administered by YBAA in partnership

with IYBA, NYBA, and CYBA, among other broker and marine trade associations.[7]  To obtain

certification under the program requires, *inter alia*, an agreement to conduct all business in

---

[6]     *About CPYB*, Northwest Yacht Brokers Ass'n, https://www.nwyachtbrokers.com/broker-certification/about-cpyb/ (last visited June 7, 2024).

[7]     *Find a CPYB Broker*, CPYB, https://www.cpyb.net/aws/CPYB/pt/sp/find (last visited June 7, 2024).

Case No. 24-Civ-20805-KMM

compliance with the CPYB Code of Ethics, among other obligations.[8]  Uniform CPYB standards, including the seller- pays-the-buyer's-broker requirement and other standardized forms, are contained in program materials entitled, *The Guide for the Professional Practice of Yacht Brokerage & Sales* (YBAA 2020 ed.).

53.      IYBA, YBAA, CYBA, NYBA, and YBAA are collectively referred to as "Yacht Broker Association Defendants."

**Multiple Listing Services Defendants**

54.      Defendant Boats Group, LLC owns and operates several large yachting MLS, including Boat Trader, YachtWorld, and Boats.com.

55.      Boats Group also owns and operates BoatWizard, access to which is limited to brokers and dealers.  BoatWizard allows its members to make and print custom presentations of boats listed on the MLS that Boats Group owns and operates.

56.      Similarly, Boats Group owns and operates YachtCloser.com, which provides yacht brokers with draft brokerage contracts.

57.      Boats Group is headquartered in Miami, Florida.  Boats Group does substantial business in Florida, including collections of listing fees from Florida yacht brokerages. YachtWorld is a Diamond Sponsor of CPYB.[9]

---

[8]      *Earning Certification*, CPYB, https://cpyb.net/aws/CPYB/pt/sp/earning_certification (last visited June 7, 2024).

[9]      *Industry Resources*, CPYB, https://www.cpyb.net/aws/CPYB/pt/sp/resources (last visited June 7, 2024).

Case No. 24-Civ-20805-KMM

58.     Defendants Permira Advisers Limited and Permira Advisers LLC (together, "Permira") own and operate Boats Group.  Through Boats Group, and other ventures, Permira regularly does business in Florida.  Permira is a British company, with an office in London. Permira Advisers LLC is headquartered in New York, New York.

59.     Defendant YATCO, LLC was founded in 2000 by seven professional yacht broker associations.  A boating MLS, YATCO is headquartered in Deerfield Beach, Florida and lists about 7,709 yachts on its website.  YATCO states that it has 3,000 members, "works with over 2,000 professional yacht brokers" and has the largest and most reliable inventory of new and used yachts for sale.  YATCO collects substantial fees from brokerages in Florida and elsewhere for listing their yachts on YATCO.

60.     YATCO, Yachtbroker.org/Yachtr.com, and YachtWorld and all other multiple listing services owned or operated by any Defendant are collectively referred to as MLS.

61.     Broker Defendants, Boats Group, Permira, IYBA, YBAA, and YATCO are collectively referred to as "Defendants."

### UNNAMED CO-CONSPIRATORS

62.     Unnamed co-conspirators include other yacht brokers, yacht broker associations, and yachting MLS, who acted in concert with Defendants to fix, inflate, and maintain yachting commission rates at supracompetitive levels.

### INTERSTATE TRADE AND COMMERCE

63.     The anticompetitive effects of Defendants' actions have manifested primarily in interstate commerce in the United States, where boat sellers were required to pay supracompetitive brokerage fees.  Defendants' conspiracy, and the resulting impact on brokers' commission rates,

Case No. 24-Civ-20805-KMM

occurred in and affected interstate commerce and commerce in and between the states and territories of the United States.

## FACTUAL ALLEGATIONS

**Boating Industry Background**

64.     A typical co-brokerage listing agreement, including Central Listing Agreements, provides for a pre-owned boat or yacht commission equal to 10% of the purchase price of the yacht, with the commission paid at the time of the sale out of the sale proceeds.  As a result, the yacht seller bears the expense of all brokers' commissions.  The commission is shared between the seller's broker and the buyer's broker, usually on a 50/50 or 60/40 basis.

65.     Most brokers represent yacht sellers in some transactions and yacht buyers in other transactions.  Thus, they enjoy the benefit of high commission rates, including those paid to buyer's brokers.

66.     By way of illustration, if a pre-owned yacht is sold for $600,000 with the seller paying a 10% commission and the seller's broker offering 50% of that commission to the buyer's broker, then the seller will pay a $60,000 commission, half of which would go to the buyer's broker.

67.     Pursuant to the listing agreements relevant here, such pre-owned boats for sale are listed in MLS.  MLS is a database of pre-owned boats and yachts available for sale, just as multiple listing service in the residential real estate market lists homes available for sale.  The boats and yachts listed on MLS are accessible to brokers who belong to and comply with the rules of the MLS.  The commission split on a given boat, that is the rate being offered to the buyer's broker, is accessible on the MLS only to brokers.  It is opaque to the seller.

Case No. 24-Civ-20805-KMM

68.    Most boats and yachts listed on the MLS are listed with a listing agreement specifying that the seller's broker will pay a mandatory commission to a broker who brings a buyer to the transaction.

69.    MLS also function as the main source of listings via online websites, such as YachtWorld, YachtBroker.org, and Yachtr.com, through which prospective yacht buyers can locate and research vessels for sale.

70.    This system, which has been in place continuously since at least the early 2000s, causes sellers to pay commissions to buyer's brokers they would not otherwise pay in a competitive market and, in addition, to pay inflated aggregate commission rates.

71.    Boats Group owns YachtWorld, a Miami-based MLS organization that was established in 1995.  It claims to be "the largest database of brokerage boats for sale offered by more than 2,900 yacht brokers and 70 manufacturers worldwide."

72.    YachtWorld, one of the largest yachting MLS, states:

> Yacht brokers charge a commission when a vessel is sold, and the commission amount will be specified in writing when the boat owner signs a listing agreement with the seller's broker.  If another broker brings a buyer to the table on a co-brokerage arrangement, the total commission will be shared between the two brokers.  A commission on a yacht is typically not more than 10 percent.  Often that's split 50/50, or sometimes it's 60/40.  The boat owner/seller always pays the brokerage commission.[10]

73.    YachtWorld will only accept listings from a licensed broker.

---

[10]   Jeanne Craig, *Co-Brokerage: What the Yacht Buyer Needs to Know*, YachtWorld (Oct. 20, 2013),        https://www.yachtworld.com/research/co-brokerage-what-the-yacht-buyer-needs-to-know/.

Case No. 24-Civ-20805-KMM

74.     YachtWorld has nearly 3,000 international brokerages listed and, as of the filing of this complaint, it has more than 100,000 yachts for sale.

75.     Similarly, MarineMax one of the larger boat brokerages and dealers, states: "By listing on YachtWorld, your broker has agreed to sell it through a co-brokerage agreement that requires your broker to split the typically 10-percent commission with the buyer's broker.  About 70-percent of all brokerage sales are co-brokered."[11]

76.     For its part, HMY explains that "[e]very boat listed with HMY goes into the YachtWorld MLS system, which means your vessel will not only display on YachtWorld, but every other major brokerage company website in America."[12]  HMY also lists on other similar MLS.[13]

77.     A form contract from YBAA, a "VESSEL BROKERAGE CENTRAL LISTING AGREEMENT," illustrates the standard form used in listing transactions.  It provides the boat owner will pay a commission set as a percentage of the selling price.  This standard form agreement further specifies that the broker, in turn, agrees to distribute information about the boat for sale to

---

[11]  *A Yacht Broker to Navigate You Through the Process*, MarineMax, https://www.marinemax.com/boats-and-yachts/brokerage/brokerage-process#:~:text=By%20 listing%20on%20YachtWorld%2C%20your,brokerage%20sales%20are%20co%2Dbrokered (last visited June 7, 2024).

[12]  *Market Your Yacht*, HMY Yachts, https://www.hmy.com/about-hmy/market-your-yacht/ (last visited June 7, 2024).

[13]  *Id.*

Case No. 24-Civ-20805-KMM

"Corresponding Brokers," *i.e.*, brokers representing potential buyers, and "[t]o pay any Corresponding Broker who sells the VESSEL a percentage of the commission."[14]

78.     Importantly, the Vessel Brokerage Central Listing Agreement requires the Selling Broker to agree "[t]o pay any Corresponding Broker who sells the VESSEL, a percentage of the commission."

79.     Yachtbroker.org is also an important pre-owned boat and yacht MLS.  The company is headquartered in Fort Lauderdale, Florida.  In or around 2016, IYBA, in conjunction with other yacht broker associations, including CYBA, NYBA, and YBAA founded yachtbroker.org, as an industry-wide association-owned MLS platform to serve the yacht brokerage community.

80.     Yachtbroker.org boasts that it includes co-brokerage member listings from IYBA, CYBA, NYBA, and YBAA.[15]  This service allows members to control and exchange purchases and sales data and promote their products in ways never before achievable through private enterprise.  Yachtbroker.org is now known as Yachtr.com, which is also industry owned.

81.     According to IYBA, this industry-owned MLS "unites our members for the benefit of our members."  IYBA describes the MLS this way:

> The member listing service (MLS) is a database established by our industry's leading professional yacht broker associations to collect, control & provide data about vessels for sale and is exclusively for yacht sales professional use.  The MLS allows yacht brokers to see one another's listings with the goal of connecting buyers to sellers through a yacht sales professional (YSP).

---

[14]   *The Guide for the Professional Practice of Yacht Brokerage & Sales* (YBAA 2020 ed.).

[15]   Member Benefits, *supra* note 4.

82.     Almost all large boats, as that term is used herein, are advertised for sale on the MLS.  Most brokerage firms require their brokers to list boats for sale on those MLS.  Large boats not listed on those MLS are much less visible to potential buyers and severely disadvantaged in sales, if they sell at all.

**Anticompetitive Rules**

83.     Defendants have conspired to boost buyers' brokers' commission rates and total commission rates above a competitive level and have strived to maintain those inflated rates through numerous actions.  Among other things, they have enacted anticompetitive rules through MLS and influential trade associations composed of yacht brokers who should be competing with one another but, instead, cooperate with each other to the detriment of pre-owned boat sellers.

84.     For example, YBAA Code of Ethics prohibits brokers from competing with one another in important ways, directing members to cooperate even when they are representing clients with adverse interests, and requiring members to use standardized form contracts.

85.     The preface to YBAA Code of Ethics states:

> YBAA strongly recommends that all members utilize YBAA's copyrighted, standardized contractual Forms, which are provided as a free member benefit, designed to simplify the transaction process and to enhance customer satisfaction. Forms include: *Central Listing Agreement; Open Listing Agreement; Purchase & Sale Agreement; and Acceptance of Vessel; and Amendment to the Purchase & Sales Agreemen*t and are available in U.S. and Canadian versions.  Use of the forms is strictly limited to current members, without alteration or edits.  Members will use the current dated version of each Form.  Forms are updated annually.[16]

86.     The Code of Ethics rules prohibit certain forms of competition, stating:

---

[16]   *Code of Ethics & Business Practice*, YBAA (approved Aug. 17, 2007, reviewed July 12, 2021), https://www.ybaa.org/aws/YBAA/asset_manager/get_file/50088?ver=9194.

Case No. 24-Civ-20805-KMM

3.2 The Broker and/or Brokerage firm who holds a Central Listing will be respected. A Brokerage firm will not solicit a Central Listing from a Seller while that Seller has a Central Listing agreement with another Broker.  A Broker cooperating with a listing Broker will not invite the cooperation of a third Broker without the consent of the listing Broker.[17]

87.    The Code also requires seller and buyer brokers to cooperate with one another when it comes to sharing commissions:

3.3  *The Broker will cooperate with other Brokers on vessels listed by him/her on a Central Listing basis whenever it is in the interest of the Seller, sharing commissions on a previously agreed basis*.  Negotiations concerning vessels listed on a Central Listing basis will be carried on with the listing Broker, not with the Seller, except with the consent of the listing Broker.

3.4  When a Broker obtains a Central Listing, he/she will endeavor to distribute the listing to corresponding Brokers as quickly as possible.  *Central Listings and shared Open Listings are generally shared on a commission basis, agreed to beforehand as a matter of policy, or agreed upon by the cooperating parties negotiated on a particular sale*.  Should the central or loaning Broker show the boat or perform work above and beyond the customary effort of providing the listing and negotiating with the Seller, the commission arrangements should be reconsidered by the parties involved.[18]

88.    IYBA rules also direct brokers to cooperate with one another, even though their clients have diametrically competing interests.

89.    Its bylaws, for example, provide the purpose of IYBA is "[t]o unite those engaged in the yacht brokerage business for the purpose of promoting cooperation and professionalism among its members."[19]

90.    Similarly, IYBA Code of Ethics, which are part of IYBA bylaws, state:

---

[17]  *Id.*

[18]  *Id.* (emphasis added).

[19]  *Bylaws of the Florida Yacht Brokers Association, Inc.*, IYBA, https://iyba.org/bylaws (last visited June 7, 2024).

- 22 -

Case No. 24-Civ-20805-KMM

Section 17.  Members should cooperate with other members on vessels listed with him whenever it is in the interest of the client.  Negotiations concerning a vessel listed exclusively with one member should be carried on with the listing broker, not the owner, except with the express consent of the listing member.  ***All shared commission agreements should be negotiated prior to the submission of any Offer to Purchase***.[20]

91.    The ethical rules also prohibit brokers from competing with one another in certain ways:

Section 15.  Members should not advertise other members' listings without their permission. Prices advertised on other members' listings should not be other than the listed offering price.

\*    \*    \*

Section 18.  The agency of a member who holds an exclusive or central listing should be respected.  A member cooperating with the listing member should not invite the participation of a third party without the express consent of the listing Broker.[21]

92.    IYBA provides a model Central Listing Agreement that specifies the seller is solely responsible for the broker's commission.  IYBA added that provision to the Purchase and Sale Agreement ("PSA") so that a broker can point to paragraph 5 of the PSA and reassure the buyer.[22]

93.    Significantly, IYBA rules specify the commission split should be "negotiated [between the brokers] prior to the submission of any Offer to Purchase" thereby precluding buyers from making an offer to purchase a yacht for a reduced price by reducing the commission paid to

---

[20]   *Id.* (emphasis added).

[21]   *Id.*

[22]   *FYBA Brokerage Forms Update*, IYBA (July 30, 2014), https://iyba.org/news-detail/fyba-brokerage-forms-update.

Case No. 24-Civ-20805-KMM

the buyer's broker.  YBAA rules also specify that the commissions splits should be "agreed to [by the brokers] beforehand as a matter of policy."

94.     CYBA rules also direct brokers to cooperate with one another, even though their clients obviously have competing interests. The bylaws state that the purpose of CYBA is "[t]o unite those engaged in the yacht brokerage business for the purpose of promoting cooperation and professionalism among its members."[23]

95.     Similarly, the ethical rules prohibit brokers from competing with one another in certain ways, stating:

> Section 19. – *Central Agency Listings*. The agency of a member who holds an exclusive / central listing should be respected.  A Member cooperating with the listing Broker should not invite the participation of a third Broker without the express consent of the listing Broker.[24]

96.     CYBA's rules, similar to those of other co-defendant yacht broker associations, require its members to negotiate sharing commissions as soon as possible in the transaction:

> Section 18. – *Co-ops and Broker Commissions*.  Member [sic] should cooperate with other Brokers on vessels listed with him whenever it is in the best interest of the client. All cooperative agreements should be executed ***as early as possible and prior to the submission of an Offer to Purchase***, and should designate the percentage of the commission and all commission splits.  Negotiations concerning a vessel listed on an exclusive/central basis with one Broker should be carried on with listing Brokerage, not the owner, except with express consent of the listing Broker.[25]

---

[23]   *By-Laws,* Article II, §1, CYBA, https://cyba.info/about-the-cyba/cyba-by-laws/#A2 (last visited June 7, 2024).

[24]   *Code of Ethics*, CYBA, https://cyba.info/cyba-code-of-ethics/ (last visited June 7, 2024).

[25]   *Id.* (emphasis added).

Case No. 24-Civ-20805-KMM

97.     CYBA successfully requires its members to comply with the above anti-competitive rules, and with other rules contained in CYBA's Code of Ethics. CYBA also has the power to impose significant penalties on members who do not comply with its rules, including rules about cooperating with competing brokers.   For example, Article V of CYBA's bylaws provides:

> Section 3. Suspension or Expulsion. For failure to abide by the Bylaws of the Association, or if it appears from a written communication from any member or other person or persons that the conduct of a member has been prejudicial to the Association or yacht brokerage profession, the Board of Directors, after citing said member, with seven days notice of hearing, shall have full power to suspend for a period of not more than one year, or expel said member, and he shall be and is expelled after being so declared.[26]

98.     CYBA participates in the conspiracy alleged herein through exclusive affiliations with MLS, including YATCO and Boat Groups, which are only available to members of yacht broker associations who comply with the industry-wide rules for sharing commissions.

99.     Upon information and belief, CYBA's Former Executive Director, Don Abbott, has a complimentary membership with IYBA.[27]

100.    CYBA promotes the anti-competitive practices alleged herein as the industry standard, by including commission sharing between seller and buyer brokers in its standardized agreements and forms, which are supplied to all CYBA members.  Additionally, upon information and belief, CYBA's standardized agreements and forms include an anti-competitive dual agency clause.

---

[26]   *By-Laws*, Article V, §3, *supra* note 23.

[27]   *See* CYBA, https://www.iyba.org/member-directory (last visited June 7, 2024)

Case No. 24-Civ-20805-KMM

101.     Similarly, NYBA's rules includes a requirement that commission sharing should

be negotiated as soon as possible in the transaction process:

> Section 17: Member should cooperate with other Members on vessels listed with them whenever it is in the interest of the client.  Negotiations concerning a vessel listed exclusively with one Member should be carried on with the listing broker, not the owner, except with the express consent of the listing broker.  ***All shared commission agreements should be negotiated prior to the submission of an Offer to Purchase***.[28]

102.     NYBA (like CYBA, IYBA, and YBAA) requires its members to comply with the

above anti-competitive rule, while exposing brokers to expulsion in the event of noncompliance.[29]

103.     High profile officers and active members of NYBA are yacht brokers for multiple

co-defendant Yacht brokerage companies included herein.  For example, the current director of

NYBA, Byron Shirley, is a yacht broker for Denison Yachting, which operates and sells yachts in

Florida.

104.     Additionally, upon information and belief, NYBA promotes the anti-competitive

practices alleged herein as the industry standard, by requiring boat sellers to pay both seller's and

buyer's broker commissions in its standardized agreement forms and clauses, which are supplied

to all its members.

105.     In the absence of these rules and their anti-competitive restrictions, buyers – not

sellers – would pay buyer's broker commissions, if any, and brokers would compete with each

other by offering lower commissions to prospective buyer clients.

---

[28]  *Code of Ethics*, NYBA, https://www.nwyachtbrokers.com/about/code-of-ethics/ (emphasis added) (last visited June 7, 2024).

[29]  *See Bylaws*, §7, NYBA, https://nyba.wildapricot.org/resources/Documents/2022-2023-NYBA-Bylaws.pdf (last visited June 7, 2024).

Case No. 24-Civ-20805-KMM

106.    As demonstrated below, members of Yacht Broker Association Defendants, as well as other yacht broker associations, that do not comply with these anticompetitive rules set forth in the respective organizations Code of Ethics face disciplinary action, including potential expulsion.

107.    YBAA application for corporate membership specifies the requirements for membership, stating, *inter alia*: "Any sole proprietorship, partnership or corporation legitimately established and engaged in the full time **practice of selling yachts on a co-brokerage basis** who meets, or agrees to comply with, the following[.]"[30]  One of the specified conditions is to: "[e]nsure that all business conducted by the company and its brokers (including employees, independent contractors, etc.) complies in full with the Association's Code of Ethics."[31]

108.    In a 2022 article, YBAA's executive director advised subscribing brokers that if they do not list their yachts for sale under a co-brokerage agreement, they might be in violation of YBAA Code of Ethics and YBAA's Central Listing Agreement, potentially exposing themselves to ethical and legal action.[32]

109.    Defendants have also conspired to create, impose, and maintain inflated commission rates through the MLS, which they control directly and indirectly.

---

[30]  *YBAA          Corporate          Membership          Application*,          YBAA, https://associationdatabase.com/aws/YBAA/input_form/display_form_01_show?contact_id=$$Contact%20ID$$&form_no=167&host=retain&contact_id=$$Contact%20ID$$&_gl=1*117djyb*_ga*MjExMzI5ODgzNy4xNzEwOTQ2OTk0OTk0OTk0OTk0*_ga_9XKP0NS5LB*MTcxMDk0Njk5NC4xLjAuMTcxMDk0Njk5NC42MC4wLjA (last visited June 7, 2024).

[31]  *Id.*

[32]  JP Skov, *Not Available for Co-Brokerage* (Feb. 15, 2022), https://ybaa.yachts/aws/YBAA/page_template/show_detail/422324?model_name=news_article.

Case No. 24-Civ-20805-KMM

110.    For instance, YATCO, one of the largest and most important yachting MLS, only accepts centralized listings by professional brokers and those listings must make an offer of compensation to the buyer's broker.

111.    The YATCO "Rules & Regulations" provide: "For YATCO Professional Members to list their yacht listings on YATCO.com, they ***must*** show proof of a current Central Listing Agreement.  A Central Listing Agreement is entered into with just one brokerage firm, thus, guaranteeing the listing agent and listing yacht broker a portion of the selling commission."  The agreement requires an owner to agree up front to a commission split and that the broker must similarly agree "[t]o pay any corresponding broker who sells the YACHT, a percentage of the commission received from the OWNER."

112.    YATCO touts its similarity to the regional MLS that dominate the market for the sale of residential real estate, stating: "Similar to realtors using a real estate MLS system, YATCO Members adhere to a strict code of rules and ethics."  Those rules include the rules of IYBA and YBAA, and other yacht broker associations, which mandate brokers to share the commission paid, which must be paid by the seller.

113.    The information on commissions offered to buyer brokers is available only to brokers and dealers.  Similarly, information on prices at which yachts have previously sold are not generally available to the public on the MLS.

114.    Because of its popularity, YATCO has had an enormous influence on the sale of yachts in its coverage area.  Specifically, YATCO has reported more than 150,000 registered customers and over 2,000 professionals using its products.  The company also recently reported over $5 billion in annual transactions worldwide.

Case No. 24-Civ-20805-KMM

115.    YachtWorld, like others, limits listing to subscribing professional agents: "Only brokers can list boats on the site, which functions much like the Multiple Listing Service for real estate agents."[33]

116.    YachtWorld does not accept FSBO listings, that is, listing from boat owners who want to sell their boats themselves without the use of a broker. Rather, the MLS states:

> To have your boat presented on the YachtWorld.com site, we require that you use the services of a professional yacht broker.  YachtWorld advertising services are only available to yacht brokerage firms and dealerships representing multiple boats for sale on behalf of an owner/seller such as yourself.  We do not offer services directly to the individual owner/seller.

117.    In 2009, YachtWorld and YBAA entered into a collaboration agreement.   In announcing the agreement, YBAA's then-President, David Pugsley ("Pugsley"), emphasized the role and success of YachtWorld in ensuring selling brokers share their commissions with buyer brokers: "YBAA has teamed up with YachtWorld because of their extraordinary track record and ability to help yacht brokers promote and *co-broker their listings to buyers around the world*."[34] YachtWorld in turn promised, according to the press release, to use its influence to promote YBAA's standards, which include a general directive on sharing commissions, stating: "YachtWorld will use its broker communication network to educate its members with professional standards developed by YBAA and YachtWorld."

---

[33]  *Especially when buying or selling a large boat, the right broker can reduce stress and make the transaction go smoothly and painlessly*, BoatU.S., https://www.boatus.com/expert-advice/expert-advice-archive/2013/october/what-a-yacht-broker-can-do-for-you    ("*Especially when buying*") (last visited June 8, 2024).

[34]  *YachtWorld.com and YBAA Sign Collaboration Agreement*, YachtWorld (June 8, 2009), https://www.yachtworld.com/research/yachtworldcom-and-ybaa-sign-collaboration-agreement/.

Case No. 24-Civ-20805-KMM

118.     YachtWorld will accept listings whereby sellers are represented by a brokerage and the seller pays a commission in conjunction with the sale of their vessel.

119.     The vast majority of yachts sold through YachtWorld are sold through a co-brokerage agreement with the selling and buying broker sharing in the brokerage commission.

> A central agency agreement (sometimes called an exclusive listing) means you've hired a specific broker to sell your boat.  With this type of agreement, the broker typically lists your boat on Yachtworld and – this is important – is obligated to sell it through a co-brokerage arrangement. Co-brokerage means that if another broker finds a buyer for your boat, your broker agrees to split the commission with him.  This incentive to help each other is why about 70 percent of all brokerage sales are co-brokered.  Keep in mind, though, with this type of agreement, even if you bring in the seller or end up donating your boat, you'll still be liable for the broker's commission.   The majority of brokerage sales are central agency agreements.[35]

120.     On YachtWorld, brokers can search listings by co-brokerage status to make sure the listing offers a mandatory commission to the buyer broker.[36]

**Oversight of and Enforcement of Rules**

121.     YATCO has published its Listing Rules & Regulations over the years on its website.  They provide: "All YATCO Professional Members must adhere to a strict code of ethics, rules, and regulations to continue to be a YATCO Professional Member and maintain their membership to . . . one or more [specified] associations [including YBAA]."

---

[35]   *Especially when buying*, *supra* note 33.

[36]   *YachtWorld Broker Appreciation Days*, YachtWorld (Feb. 14, 2012), https://www.yachtworld.com/research/yachtworld-broker-appreciation-days/.

Case No. 24-Civ-20805-KMM

122.     Currently, YATCO's website indicates that: "All YATCO Members must adhere to a strict code of ethics, rules, and regulations to list their yachts for sale and charter on the YATCO MLS and to continue to be a YATCO Professional Member."

123.     In that regard, YATCO requires: "To be a member of YATCO, a company must be an active member of a professional association or must have a referral from two existing YATCO members."

124.     YATCO accepts "only central yacht and boat MLS listings.  We are concerned about the negative impact of open listings on our industry."

125.     The yacht broker associations, including Yacht Broker Association Defendants, can impose significant penalties on members who do not comply with their rules, including rules about cooperating with competing brokers.  *See, e.g.*:

Article V:

Section 3. Suspension or Expulsion.  For failure to abide by the Bylaws of the Association, or if it appears from a written communication from any member or other person or persons that the conduct of a member has been prejudicial to the Association or yacht brokerage profession, the Board of Directors, after citing said member, with seven days notice of hearing, shall have full power to suspend for a period of not more than one year, or expel said member, and he shall be and is expelled after being so declared.  Any member suspended or expelled shall have the right, after six months from the date of suspension or expulsion, to apply for reinstatement.  It shall be the duty of the Secretary to notify in writing each Active Member of the Association in case of such suspension or expulsion.[37]

YBAA Code of Ethics:

1.8.d.  If the Broker is found to have been in violation of the YBAA Code of Ethics, the decision will be forwarded to the member brokerage firm principal with whom the broker is employed or contracted.  The principal will be asked to respond to the YBAA Professional Standards & Ethics Committee, acknowledging

---

[37] *Bylaws of the Florida Yacht Brokers Association, Inc.*, *supra* note 19.

Case No. 24-Civ-20805-KMM

the problem and defining the actions they will take to ensure that no further such violation occurs.  The decision will be kept on file in the YBAA office and, if the broker is CPYB certified, forwarded to the CPYB Certification Advisory Council.

1.8.e.  If the same Broker is found guilty of a second violation of the Code of Ethics, the Broker, and their employing brokerage will be suspended from YBAA membership for one year, after which membership reinstatement will be considered upon request of the brokerage.  The Professional Standards & Ethics Committee decision regarding the suspension may be published in YBAA's *Yacht Broker News* newsletter and/or referred to the CPYB Certification Advisory Council.  A record of all such actions will be maintained by the YBAA office.

1.8.f.  If the same Broker is found guilty of any third violation of the Code of Ethics, the Broker will be permanently terminated from membership in YBAA. The broker's employing member firm will also be reviewed by the Professional Standards & Ethics Committee for possible suspension or termination.  The loss of such memberships may be reported in the *Yacht Broker News*.

126.    MarineMax explains the situation more directly, describing how YachtWorld enforces the Broker Rules: "Brokers have exclusive access to websites such as Yachtworld, which has become the gold standard for searching from anywhere in the world.  It functions much like the Multiple Listing Service (MLS) of the real estate brokering community."[38]  "This is important. By listing on YachtWorld, your broker has agreed to sell it through a co-brokerage agreement that requires your broker to split the typically 10-percent commission with the buyer's broker.  About 70-percent of all brokerage sales are co-brokered. Remember, that in this type of agreement, if you bring the buyer or even ending up donating your yacht, you are still liable for the broker's commission."[39]

---

[38] *Why Use a Broker? Advantages Of Using A Brokerage*, MarineMax, https://www.marinemax.com/boats-and-yachts/brokerage/advantages-of-a-broker (last visited June 7, 2024).

[39] *A Yacht Broker to Navigate You Through the Process*, MarineMax https://www.marinemax.com/boats-and-yachts/brokerage/brokerage-process (last visited June 7, 2024).

Case No. 24-Civ-20805-KMM

127.    This means that to get access to the single most important tool to sell a Yacht, a seller must: (1) retain a seller-broker; and (2) agree that the seller-broker will charge a 10% commission and share half of that commission with the buyer's broker.

128.    Defendants also make it difficult to join their exclusive club and gain access to the Yacht MLS as a broker.  YachtWorld has strict membership requirements.  Yacht brokers must:

(a)    show proof they are a broker;

(b)    be licensed by the state where they reside if there is such a requirement in that state;

(c)    have a business license in the name of the broker's proposed YachtWorld account name;

(d)    have a minimum of three Yachts for sale that: (i) are over 25 feet long or over $30,000, (ii) are central listings, (iii) are available for co-brokerage;[40] (iv) have a signed listing agreement, (v) are not owned by the member, and (vi) are not already listed on YachtWorld;

(e)    include in their listings a photo of the Yacht for sale, a description of the Yacht, and information describing the broker's business; and

(f)    agree to the Member Service Agreement and Policies.[41]

129.    The requirements that a prospective broker have three Yacht listings available for co-brokerage, and that are central listings, further enforce the Broker Rules.

---

[40]    "Available for co-brokerage" in this context means that the seller-broker will split the commission with the buyer-broker.  Jeanne Craig, *supra* note 10.

[41]    *Eligibility Requirements for Membership*, YachtWorld https://www.yachtworld.com/core/members/eligibility.jsp (last visited June 7, 2024).

130.    Boats Group's Member Service Agreement and Policies also enforce the Broker Rules by (1) requiring that listings identify whether they are available for co-brokerage; (2) prohibiting listings from including customer-specific contact information or information that can be used "to thwart co-brokerage activity"; and (3) requiring that to maintain access to YachtWorld, the broker must always have three Yachts "or 75% of Customer's inventory . . . available for co-brokerage, whichever is greater."[42]

**Defendants Designed, Joined, and Participated in the Conspiracy**

131.    Broker Defendants joined, furthered, and maintained the conspiracy alleged here in multiple ways, including at minimum, by: (a) having their executives participate in Yacht Broker Association Defendants, including those associations' adoption, maintenance, and enforcement of the rule that sellers pay buyers' commissions; (b) requiring their broker employees to comply with the anticompetitive Yacht Broker Association Defendants' rules, including the rule that sellers pay buyers' commissions; (c) having their executives promulgate and/or enforce the anticompetitive rules adopted by the MLS; (d) having their employees join, or be accredited by, Yacht Broker Association Defendants; and (e) listing yachts for sale on MLS such as YATCO, YachtBroker.org, and Yacht World.

132.    Jonathan Chapman, formerly with Northrop & Johnson at its Newport, Rhode Island location, and now with Worth Avenue, was YBAA President from 2020 to 2022.  He is currently the 2024 YBAA Treasurer.  William Bolin, of co-conspirator S&J Yachts, is also on YBAA's Board of Directors, serving as Vice President.

---

[42]    *Service Agreement and Policies*, *supra* note 35.

Case No. 24-Civ-20805-KMM

133.    Current members of IYBA Board of Directors include: Charles A. Cashman of MarineMax, Trevor Carroll of Fraser Yachts, James Corts of MarineMax, Michael L. Scalisi of HMY, Carmine Galati Jr. of Galati, and Cole Watkins of Allied Marine.

134.    Likewise, Christopher Carroll (partner and co-owner of co-conspirator Atlantic Yacht and Ship, Inc. ("Atlantic")), has close ties with IYBA, since his brother, Trevor Carroll, is the current Vice President of the Board of Directors of IYBA (and top broker in competing brokerage firm, Fraser Yachts), who exercises a great influence over the decision-making and rule-making process of IYBA's requirements that sellers pay both seller and buyer commissions.  As a result of Christopher and Trevor Carroll's great influence, Broker Defendants have been able to adopt, maintain, and enforce the industry practice of sellers paying the buyers' brokers in furtherance of the conspiracy alleged herein.  For example, on March 2, 2024, the Christopher and Trevor Carroll announced on the *SuperYacht Times* and their own brokers' webpage that they had brokered the sale of a 36.58-metre Ocean Alexander motor yacht "Long A Weighted" with Trevor (Fraser Yachts) acting as the broker-buyer and Christopher (Atlantic) acting as the broker-seller.

135.    Hal Slater ("Slater"), President and owner of co-conspirator Brewer Yacht Yard Group Holdings, Inc. ("Brewer"), has been a member of YBAA Board of Directors since 2009, serving as treasurer, Vice President, and as President for the 2015-2016 term.  As President of YBAA, Slater was "responsible for the general supervision, direction and management of the affairs of this Corporation."[43]  Considering all these years of experience on the Board of Directors

---

[43] *See Bylaws of Yacht Brokers Association of America, Inc.*, Article 7, §7.3, YBAA (Feb. 4, 2021), https://ybaa.yachts/aws/YBAA/pt/sp/about.

Case No. 24-Civ-20805-KMM

of YBAA, Slater has been, and continues to be, an influential person in the decision-making process of the association, including the rule-making process of commission sharing.

136.    According to Slater, YBAA's "standardization of forms and contracts" means "unity within the industry."[44]  As President of Brewer, Slater still advances the goals of YBAA which is to "[p]romote the use of, and adherence to, Code of Ethics & Business Practice by all member yacht sales professionals."[45]

137.    As stated by Slater: a "Yacht Broker may also represent both the Seller and the Buyer, as a 'Dual Agent,' with responsibilities to both parties.  It is prudent, however, to be assured that you are working with a CPYB certified Yacht Sales Professional who abides by the Code of Ethics of one of the participating industry associations: YBAA, FYBA, NYBA, CYBA, [Ontario Yacht Brokers Association], [Gulf Coast Yacht Brokers Association], and [British Columbia Yacht Brokers Association]."[46]

138.    Upon information and belief, Slater, has been offering webinars on how to navigate the industry-owned MLS.[47]

---

[44]  Brewer Yacht Sales, *Brewer Yacht Sales President & YBAA Past-President Hal Slater Congratulates YBAA on it's* [sic] *100-year Anniversary*, Facebook (July 2021), https://www.facebook.com/share/v/oVWz3TV28tqTdg4M/?mibextid=oFDknk.

[45]  *About YBAA, Association Goals*, YBAA, https://ybaa.yachts/aws/YBAA/pt/sp/about (last visited June 7, 2024).

[46]  Hal Slater, *When Seeking Your Next Yacht, Use a CPYB Broker as Your Buyers Agent!* (June 14, 2013), https://associationdatabase.com/aws/YBAA/page_template/show_detail/77473?model_name=news_article.

[47]  *See CPYB E-Seminars & Pre-Approved Events*, CPYB (last visited June 7, 2024) https://cpyb.net/aws/CPYB/pt/sp/eseminars.

139.    Upon information and belief, Pugsley, Executive Director of YBAA, is also Vice President and General Manager of Brewer and manages its yacht brokerage offices across the United States, including in Florida.  Pugsley has been and is an influential person in the decision-making process of the association, including making the anti-competitive rules governing commission sharing.

140.    Similarly, Fraser Yachts' top salesman, Trevor Carroll, also serves as Vice President of the Board of Directors of IYBA while exercising a great influence in the rule-making and decision-making process of IYBA.  As stated above, Trevor Carroll has close ties with Atlantic (which is co-owned by his brother, Christopher Carroll) after being one of the top salesmen for seven years.

141.    Upon information and belief, Christopher and Trevor Carroll have used their influential positions within the yacht industry to push IYBA standardized agreements that require sellers to pay both seller's and buyer's broker commissions.

142.    Fraser Yachts' brokers use a dual agency to collect brokerage commissions from yachts sold in Florida.

143.    The former Director of U.S. Operations of co-conspirator YCO, Inc. ("Y.CO"), Bruce Schattenburg ("Schattenburg"), is a former President of IYBA Board of Directors (formerly known as the Florida Yacht Brokers Association).   While working at Y.CO, Schattenburg continued serving as a member of the Board of Directors of IYBA.  Upon information and belief, with an employee sitting in the Board of Directors, Y.CO influenced and supervised IYBA's operations to ensure the standard practice that sellers pay both seller's and buyer's broker commissions was adopted, maintained, and enforced.

144. Likewise, co-conspirator Yachtzoo LLC ("Yachtzoo") is a partner of IYBA.[48] Upon information and belief, by requiring their brokers to become members of IYBA, Yachtzoo ensures that brokers comply with IYBA anti-competitive rules and Code of Ethics, exposing brokers to face expulsion if they fail to comply with IYBA bylaws.

145. Former Yachtzoo employee, Rob Newton, while working as a broker at Yachtzoo, was elected in 2016 as a member of the Board of Directors of IYBA. Upon information and belief, with an employee sitting in the Board of Directors, Yachtzoo influenced and supervised IYBA's operations to ensure the standard practice that sellers pay both seller's and buyer's broker commissions was adopted, maintained, and enforced

146. Co-conspirators Nigel Burgess, Inc. and Nigel Burgess Holdings, Inc. (together, "Burgess Yachts") and its officers have directly participated in the conspiracy alleged herein. As an example, Grant Henderson ("Henderson") is a sales executive in Burgess Yachts, who at the same time serves as President of the Board of Directors for IYBA.

147. As a sales executive for Burgess Yachts, Henderson has supported and encouraged IYBA's transactional policies and standards in Burgess Yachts' business practices. Moreover, Henderson has publicly stated that as "a leader in the yachting world . . . it is imperative that we support IYBA's goal of promoting professionalism and cooperation among its members while maintaining the highest of standards while facilitating yacht transactions."[49]

---

[48] *Our Partners*, Yachtzoo, https://www.yacht-zoo.com/partners/ (last visited June 7, 2024).

[49] Dea Jusufi & Hannah Rankine, *Why the US is One of the Most Buoyant Markets in the Superyacht World*, BOAT Int'l (Mar. 13, 2024), https://www.boatinternational.com/boat-presents/burgess-palm-beach.

Case No. 24-Civ-20805-KMM

148.     Executives with Broker Defendants and the yacht broker co-conspirators hold key positions with Yacht Broker Association Defendants; they have furthered the conspiracy by helping IYBA and YBAA to promulgate and enforce anticompetitive rules, including that sellers pay buyers' commissions, including by requiring their members to comply with such rules.

149.     For instance, Galati brokers "all are certified professional yacht brokers earning their designation from either the Certified Professional Yacht Broker or the International Yacht Brokers Association."[50]

150.     Allied Marine touts of its brokers: "All of whom adhere to the International Yacht Brokers Association (IYBA) professional code of ethics."[51]

151.     Denison Yachting says most of its brokers are licensed and bonded.[52]

152.     Northrop & Johnson "is proud to be affiliated with the yachting industry's most influential and important associations[,]" including both YBAA and IYBA.[53]

---

[50]   *Working with a Yacht Broker*, Galati Yacht Sales, https://www.galatiyachts.com/working-with-a-yacht-broker/ (last visited June 7, 2024).

[51]   *Our Philosophy*, Allied Marine, https://www.alliedmarine.com/sell-your-yacht/yacht-sales-philosophy (last visited June 7, 2024).

[52]   *10 Ways Denison Can Your Boat Faster*, Denison Yachting, https://www.denisonyachtsales.com/list-your-boat-with-denison/ (last visited June 7, 2024).

[53]   *Affiliations*, Northrop & Johnson, https://www.northropandjohnson.com/our-company/affiliations (last visited June 7, 2024).

153.    As United Yacht Sales explains in recruiting brokers to join their team, it explains the "[United Yacht Sales] Listings Team will enter your listings into BoatWizard & IYBA so you have time to do what you do best, SELL!"[54]

154.    Co-conspirator S&J Yachts touts: "We are a member of the Yacht Brokers Association of America (YBAA) and adhere to a strict code of ethics."[55]

155.    Broker Defendants also help maintain the rule that sellers pay buyers' commissions by promoting the claim that brokerage services are free to buyers, thereby undercutting any movement to have buyers negotiate fees with their brokers.

156.    For instance, United Yacht Sales admits: "Boat buyers often forget that it costs nothing to hire a yacht broker to help you find the right vessel."[56]

157.    Other Defendants make the same or similar representations.  For instance, YachtWorld states: "Traditionally, the seller pays the commissions that a yacht broker earns – not the buyer . . . ."

158.    As of the filing of this complaint, all Broker Defendants have employees who are members of at least one of the Yacht Broker Association Defendants.

---

[54]   *A Service Company for Yacht Brokers*, United Yacht Sales, https://www.whyuys.com/ (last visited June 7, 2024).

[55]   *Sell Your Boat*, S&J Yachts, https://sjyachts.com/services/sell-your-boat/ (last visited June 7, 2024).

[56]   Rob Bowman, *Why You Need to Hire a Yacht Broker When Buying a Yacht*, United Yacht (posted May 10, 2017, updated June 3, 2020), https://web.archive.org/web/20231001011015/https://www.unitedyacht.com/Yacht-News/why-you-need-to-hire-a-yacht-broker-when-buying-a-yacht.

Case No. 24-Civ-20805-KMM

159.    As of the filing of this complaint, all Broker Defendants have pre-owned boats for sale listed on at least one of YATCO, Yachtbroker.org, Yachtr.com, or Yacht World.

**Effects of the Conspiracy**

160.    The Brokerage Defendants have conspired with Yacht Broker Association Defendants to implement, comply with, and enforce the Yacht Broker Associations' rules, including their anticompetitive rules, in furtherance of their conspiracy.

161.    Defendants have caused yacht sellers to pay brokerage fees elevated above commission rates that would prevail in a competitive market.  Defendants' actions have caused at least the following anticompetitive results:

- yacht sellers have been forced to pay commissions for brokers who represent buyers even though the buyers' interest is opposed to the sellers' interest, thereby substantially inflating the costs of selling their yachts;

- yacht sellers have been compelled to set a high buyer broker commission to induce buyer brokers to show their yachts to the buyer brokers' clients;

- yacht sellers who do not offer a sufficiently high commission to buyer's brokers risk having buyer brokers direct or steer their clients to sellers who offer a higher buyer broker commission;

- sellers who refuse to offer a buyer's broker's commission are prohibited from having their yachts listed on key MLS, and their yachts receive much less exposure than yachts sold by boat owners who comply with the standard fee sharing agreements;

- brokers cooperate with one another to their mutual benefit and the detriment of the boat seller even though the respective clients have competing interests;

- boat purchasers do not negotiate with brokers representing them to determine the level of services they want and the commission rate they are willing to pay;

- price competition among brokers to be retained by yacht buyers has been restrained, as has price competition among brokers seeking to be retained to sell yachts;

Case No. 24-Civ-20805-KMM

- competition among yacht buyers has been restrained by their inability to compete for the purchase of a yacht by lowering the buyer broker commission; and

- Broker Defendants have increased their profits substantially by receiving inflated buyer's broker commissions and inflated total commissions.

162. There is no pro-competitive benefit to Defendants' conspiracy. But for the conspiracy, buyer brokers would negotiate directly with yacht buyers in a more competitive market without the problems that arise from having the buyer's commissions determined by the seller's broker and paid for by the seller. Buyer brokers would have to compete more vigorously on price and service, leading to a decrease in commission rates paid to buyer brokers as well as a decrease in the overall commission rates.[57]

163. Defendants' ability to raise and maintain high commission rates for buyer brokers, despite the advent of new technologies, including increased reliance on the internet and yachting MLS, presents a stark contrast to the experience of other industries.

164. Defendants' success in maintaining inflated commission rates is similar to the success of real estate companies and agents, until recently, in maintaining elevated residential commission rates for selling homes. The antitrust activity in the residential real estate industry has been mirrored in the yachting industry. "[I]n almost every other consumer industry – booksellers,

---

[57] Significantly, in one of the pending class actions challenging commission practices in the real estate market (*Nosalek v. MLS Prop. Info. Network, Inc.*, No. 1:20-cv-12244-PBS (D. Mass. Feb. 15, 2024), the U.S. Department of Justice entered an appearance and rightly asserted that "[a]s long as sellers can make buyer-broker commission offers, they will continue to offer 'customary' commissions out of fear that buyer brokers will direct buyers away from listings with lower commissions – a well-documented phenomenon known as steering." ECF 290 at 2. Such a rule's anticompetitive effect, in part, encompasses the ability of sellers to set compensation for the buyer's broker, instead of promoting competition by permitting buyers to negotiate directly with their own brokers. The core anticompetitive nature of the required practice that sellers' pay buyers' brokers' commissions is the same in both real estate and pre-owned yacht sales.

retailers, home appliances, insurance, banking, stock brokers – the introduction of Internet and discount sellers has been a phenomenal financial benefit to customers. . . .  Economists call this process of squeezing out transaction costs 'disintermediation.'  If any industry is ripe for this, it is the $70 billion-a-year real estate brokerage market."[58]

165.     There is also a sharp disconnect between buyer broker costs and buyer broker commissions.  Normally competition pushes firms to adopt fee structures that approximate their costs, but this is not the case for yachting brokerage fees because, among other reasons, buyer broker costs are unrelated to the price of the yacht.

166.     As *The Wall Street Journal* has explained about the real estate industry, which has been plagued by anticompetitive conduct similar to that which plagues the yachting industry, "[m]any, if not most, of the services that Realtors provide don't vary with the sales price, so the percentage fee should fall as home price rises."  Instead, broker commissions remain disconnected from the quantity, quality, and value of the services.  Indeed, if a potential buyer has already selected a boat from an internet MLS listing before engaging a broker, the broker's costs in terms of time and money are extremely low.

167.     Even if there were any plausible pro-competitive effects, they would be substantially outweighed by the conspiracy's anticompetitive effects.  There is substantial economic evidence that Defendants' conspiracy has resulted in buyer's broker commissions and total commissions that are inflated well above a competitive level nationwide.[59]

---

[58]  *Opinion, The Realtor Racket*, Wall St. J. (Aug. 12, 2005), https://www.wsj.com /articles/SB112381069428011613.

[59]  The National Association of Realtors ("NAR") and several major real estate brokerages recently settled real estate commission lawsuits which, just like the boating commission terms, had

Case No. 24-Civ-20805-KMM

**Relevant Markets and Defendants' Market Power**

168.    The relevant service market for the claims asserted herein is yacht brokerage services provided to yacht sellers and buyers by yacht brokers with access to the MLS.

169.    Defendants' control of the MLS and of Yacht Broker Associations Defendants' MLS enables them to impose and enforce anticompetitive rules on class members and other market participants, including the rule that sellers pay both their and buyers' commissions, and other anticompetitive rules.

170.    The relevant geographic market for the claims asserted herein is the United States. While many boat and yacht sellers and buyers using Defendants' and their co-conspirators' services are citizens of other countries or business entities formed under the laws of other countries, and MLS are available on the internet worldwide, MLS Defendants operate from the United States, Broker Defendants list boats for sale in the United States, and the transactions resulting from listings posted by Broker Defendants with MLS Defendants affect commerce in the United States.

---

a provision requiring sell-side agents to make an offer of compensation to buyer brokers. The cases alleged that these provisions amounted to anti-competitive conduct, leading to a jury verdict and damages of $1.8 billion in a trial in Missouri brought by home sellers against the NAR and real estate brokerage firms Home Services of America ("HSA") and Keller Williams Realty, Inc. Debra Kamin, *Judge Approves $418 Million Settlement That Will Change Real Estate Commissions*, N.Y. Times (Apr. 23, 2024), https://www.nytimes.com/2024/04/23/realestate/nar-settlement-realtors-commission.html. On April 23, 2024, the U.S. District Court for the Western District of Missouri granted preliminary approval of a $418 million settlement with NAR and $250 million settlement with major real estate brokerage HSA. *Id.* RE/MAX, LLC, the parent company to major real estate brokerages Century 21 Real Estate LLC, Coldwell Banker, Sotheby's, and others, settled for $55 million prior to trial. The settlements would ban any rules that would allow a seller's agent to set compensation for a buyer's agent. *RE/MAX, LLC Releases Details in U.S. Settlement Agreement*, RE/MAX (Oct. 6, 2023), https://news.remax.com/remax-llc-settlement-agreement.

171.    Broker Defendants and other conspiring brokers collectively provide the vast majority, if not the entirety, of yacht broker services in this area.

172.    The overwhelming majority of boats and yachts sold in the United States were listed on one of more of the MLS by brokers that are subject to and comply with the MLS's rules and standards as well as the rules and standards of YBAA and IYBA.

173.    Defendants and their co-conspirators collectively have market power through their control of the MLS, YBAA, IYBA, and their dominant share of the market.

174.    Access to the MLS is critical for brokers and agents to assist sellers and buyers.

175.    Any broker who wished to compete outside of Defendants' unlawful agreement in the areas where the MLS operate would face insurmountable barriers.

176.    A broker who represented a seller without using MLS would lose access to the large majority of potential buyers, and a broker who represented a buyer without using the same would lose access to the large majority of sellers.  Brokers cannot conduct business effectively without access to the MLS.

177.    An alternative MLS or listing service attempting to compete effectively with an MLS Defendant, without including Defendants' MLS listings, would not have listings as comprehensive as the listings on Defendants' MLS.

178.    Brokers and their individual agents who currently profit from inflated commissions and total commissions have minimal incentive to participate in an alternative MLS service that would generate lower buyer commissions and lower total commissions.  Further, buyers would be reluctant to retain a broker operating on an alternative MLS that required them to pay the broker's commission, when other brokers operating on MLS are entirely compensated by sellers.

Accordingly, seller's brokers on an alternative MLS would struggle to attract buyers' brokers and their buyer clients.

179.    Moreover, many yacht sellers would not retain brokers using a new, unfamiliar MLS that had no track record of success and had failed to attract sufficient buyer and seller brokers. Accordingly, a listing service attempting to compete with the MLS, without relisting their listed boats, would likely fail to attract enough boat listings to operate profitably and be a competitive constraint on the MLS.

180.    The fact that there is not a listing service that meaningfully competes with the MLS is indicative of the substantial barriers to entry.

**Class Action Allegations**

181.    Plaintiffs bring this action on behalf of themselves, and as a class action under Rule 23 of the Federal Rules of Civil Procedure, on behalf of the members of the Class defined as:

> All persons or entities[60] who, from February 29, 2020 to the present: 1) sold a pre-owned boat or yacht, utilizing a boat or yacht broker who listed the vessel for sale on any of the multiple listing services operated by any of Defendants, and paid a commission in connection with the sale of the vessel; or 2) paid a commission to a broker affiliated with one of the Defendant Brokers in connection with the sale of the vessel.

182.    Excluded from the Class are Defendants, their officers, directors, and employees; any entity in which Defendant has a controlling interest; any person or entity having a controlling interest in any Defendants, and any affiliate, legal representative, heir or assign of any Defendant. Also excluded from the Class are any judicial officer(s) presiding over this action and the members

---

[60]  "Persons or entities" includes all individuals, firms, corporations, partnerships, companies, cooperatives, associations, trusts or any other organization, legal entity, or group of individuals.

Case No. 24-Civ-20805-KMM

of his/her/their immediate family; judicial staff; jurors; and Plaintiffs' counsel and employees of their law firms and their immediate families.

183.     The Class is readily ascertainable because records of the relevant transactions should exist.

184.     Class members are so numerous that individual joinder of all its members is impracticable.  Due to the nature of the trade and commerce involved, Plaintiffs believe that the Class has thousands of members, the exact number and their identities being known to Defendants and their co-conspirators.

185.     Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs' interests are aligned with, and not antagonistic to, those of other members of the Class.

186.     Common questions of law or fact exist as to all members of the Class and predominate over any question affecting only individual Class members.  Such common questions, each of which also may be certified under Rule 23(c)(4), include, but are not limited to, the following:

- whether Defendants engaged in the alleged anti-competitive conspiracy;

- whether the anti-competitive conduct of Defendants and their co-conspirators caused injury to the business or property of Plaintiffs and other members of the Class;

- whether the effect of Defendants' conspiracy was to inflate both total commissions and buyer broker commissions;

- whether the competitive harm from the conspiracy substantially outweighs any competitive benefits;

- whether Plaintiffs and other members of the Class are entitled to, among other things, injunctive relief, and, if so, the nature and extent of such injunctive relief;

- whether Defendants' conduct is unlawful; and

- whether a common methodology exists to determine class-wide damages and the measure of such damages.

187.   Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs' claims arise from the same course of conduct by Defendants and the relief sought is common to each member.

188.   The interests of the Class will be fairly and adequately protected by Plaintiffs and their counsel. Plaintiffs' interests are aligned with those of the Class and have no interests that are antagonistic to the Class. Further, Plaintiffs' retained counsel are competent and experienced in the prosecution of antitrust class action litigation to represent themselves and the Class.  Together, Plaintiffs and their counsel will prosecute this action vigorously for the benefit of the Class.

189.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The prosecution of separate actions by individual members of the Class would impose heavy burdens on the Court and Defendants, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class.  A class action, on the other hand, would achieve substantial economies of time, effort, and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results.  Absent a class action, it would not be feasible for the members of the Class to seek redress for the violations of law alleged herein. Plaintiffs anticipate no undue problems in the manageability of this case as a class action.

190.   Additionally, the Class may be certified under Rule 23(b)(2) because:

- the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members that would establish incompatible standards of conduct for Defendants;

- the prosecution of separate actions by individual Class members would create a risk of adjudications with respect to them which would, as a practical matter, be dispositive of the interests of other Class members not parties to the adjudication, or substantially impair or impede their ability to protect their interests; and/or

- Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class members as a whole.

**Antitrust Injury**

191.  Plaintiffs and Class members have been injured in their business or property by reason of Defendants' antitrust violations.  Their injury consists of paying higher prices for yacht broker commissions than they would have paid in the absence of those violations.  These injuries will continue unless halted.

192.  Defendants' anticompetitive agreements and conduct have had the following effects, among others:

- potential sellers of pre-owned boats and yachts have been forced to retain brokers in order to access the market for selling their vessels;

- sellers of boats and yachts have been made to pay inflated costs to sell their vessels because Defendants' rules and practices require them to pay commissions to buyer brokers;

- boat and yacht sellers have been forced to set buyers' brokers' commissions to induce buyers' brokers to show the sellers' vessels to prospective buyers;

- price competition has been restrained, both among buyers' brokers and among sellers' brokers; and

- Broker Defendants have inflated their profits through artificially increased total commissions and increased buyer broker commissions.

193.  By reason of the alleged violations of the antitrust laws, Plaintiffs and the Class have sustained injury to their business or property, have paid higher total commissions than they

Case No. 24-Civ-20805-KMM

would have paid in the absence of Defendants' anticompetitive conspiracy, and have suffered damages as a result.

194.    There are no pro-competitive effects of Defendants' conspiracy that are not substantially outweighed by the conspiracy's anticompetitive effects.

195.    Plaintiffs will adduce economic evidence that Defendants' conspiracy has resulted in Plaintiffs and the Class paying supracompetitive buyers' broker and total other commissions.

196.    This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## CLAIMS FOR RELIEF

### COUNT I

**Violation of Section 1 of the Sherman
Antitrust Act of 1890, 15 U.SC. §1
(Conspiracy to Fix Commissions)**

197.    Plaintiffs hereby repeat and incorporate by reference paragraphs 1 through 195 as though fully set forth herein.

198.    Defendants have engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

199.    Defendants have conspired to: (a) require yacht sellers to pay artificially inflated broker commissions and eliminate competition; (b) preclude price competition for broker commissions by agreeing to split commissions in, for example, Central Listing Agreements between the seller's broker and the buyer's broker; and (c) require yacht sellers to pay artificially inflated commissions.

200.    In furtherance of their contract, combination, or conspiracy, Defendants have: (a) participated in the establishment, implementation, and enforcement of the anticompetitive rules of Yacht Broker Association Defendants and other yacht broker associations, including, but not limited to, required payment by sellers of commissions to the buyer's broker; (b) participated in the establishment, implementation, and enforcement of the anticompetitive rules of YATCO and YachtWorld, including, but not limited to, the required payment by sellers of commissions to the buyer's broker; and (c) included provisions in the policy manuals and other corporate agreements that require their brokers to comply with the Codes of Conduct of Yacht Broker Association Defendants, and other yacht broker associations, and abide by and enforce the requirement that sellers pay commissions to the buyer's broker.

201.    Defendants have required sellers to pay an inflated buyer's broker's commission and/or inflated total commission and have restrained broker price competition/negotiation.  This harm to competition substantially outweighs any competitive benefits.

202.    Defendants have conspired to and did artificially inflate buyer's broker commissions and/or total commissions.  Plaintiffs and other members of the Class paid these inflated commissions throughout the Class Period.

203.    Absent Defendants' unlawful agreement(s) or conspiracy, Plaintiffs and other Class members would have paid substantially lower total commissions and lower buyer's broker commissions because the broker representing the buyer would have been paid by the buyer.

204.    Defendants' unlawful agreement(s) and/or conspiracy constitute a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. §1, because it fixes, raises, maintains and/or stabilizes broker commissions.  Alternatively, Defendants' agreements are unlawful under the Rule of

Case No. 24-Civ-20805-KMM

Reason as the procompetitive benefits of their actions are outweighed by the anticompetitive effects.

205.     As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, 15 U.S.C. §1, Plaintiffs and other Class members have been injured in their business and property and suffered damages in an amount to be proven at trial.

**COUNT II**

**Violation of Section 1 of the Sherman
Antitrust Act of 1890, 15 U.SC. §1
(Concerted Refusal to Deal)**

206.     Plaintiffs hereby repeat and incorporate by reference paragraphs 1 through 195 as though fully set forth herein.

207.     Defendants engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

208.     MLS Defendants, in conspiracy with and at the behest of Broker Defendants, have refused to deal with sellers who are not represented by a licensed broker by refusing to accept FSBO listings.

209.     Likewise, Broker Defendants, when acting in the capacity of a seller's broker, have refused to deal with potential buyers unless the potential buyer is also represented by a licensed broker, even if the potential buyer has already selected the boat they wish to purchase themselves by reviewing MLS listings on the internet.

210.    Because of this concerted refusal to deal, it is virtually impossible for the owner of a large boat or yacht to obtain access to the market in order to sell it without the use of a broker, and paying the brokers' commissions imposed by Broker Defendants.

211.    But for MLS Defendants' agreement with Broker Defendants not to accept FSBO listings, Broker Defendants would not be able to impose pre-set inflated brokers' commissions to pay both seller brokers and buyer brokers.

212.    As a result of the foregoing concerted refusal to deal, Plaintiffs and other members of the Class would not have had to pay brokers' commissions or would have been able to negotiate lower commissions in a competitive market.

213.    As a direct and proximate result of Defendants' past and continuing violation of Section 1 of the Sherman Act, Plaintiffs and other Class members have been injured in their business and property and suffered damages in an amount to be proven at trial.

### COUNT III

**Declaratory and Injunctive Relief for Violation of Section 1
of the Sherman Antitrust Act of 1890, 15 U.S.C. §1 and Section 16
of the Clayton Antitrust Act of 1914, 15 U.S.C. §26**

214.    Plaintiffs hereby repeat and incorporate by reference paragraphs 1 through 195 as though fully set forth herein.

215.    Defendants' Sherman Act conspiracy is ongoing, and the injuries alleged herein will continue unless enjoined.

216.    Plaintiffs and the Class, pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. §2201(a), hereby seek a declaratory judgment that Defendants' conduct constitutes a violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

Case No. 24-Civ-20805-KMM

217.    Plaintiffs and the Class further seek equitable and injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. §26, and other applicable law, to correct the anticompetitive effects caused by Defendants' continuing unlawful conduct and to restore competition in the yacht commission market.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for judgment against Defendants as to each and every claim made herein and for the following relief:

A.    That the Court determine that this action may be maintained as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, and direct that notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to members of the Class;

B.    That the Court enter an Order declaring that Defendants' actions, as set forth in this complaint, violate the law;

C.    That the Court award Plaintiffs and the Class treble damages in an amount to be determined at trial;

D.    That the Court award Plaintiffs and Class members pre- and post-judgment interest;

E.    That the Court award Plaintiffs and Class members their costs of suit, including reasonable attorneys' fees and expenses;

F.    That the Court award Plaintiffs and the Class a permanent injunction, under Section 16 of the Clayton Act, 15 U.S.C. §26, enjoining Defendants from continuing conduct determined to be unlawful; and

G.    That the Court award such other relief as it may deem just and proper.

- 54 -

Case No. 24-Civ-20805-KMM

## JURY TRIAL DEMAND

Plaintiffs, on behalf of themselves and all others similarly situated, hereby demand a jury

trial of all issues so triable.

Respectfully submitted,

*/s/ Lea P. Bucciero*

Lea P. Bucciero (FBN 84763)
Ricardo M. Martinez-Cid (FBN 383988)
Matthew Weinshall (FBN 84783)
**PODHURST ORSECK, P.A.**
1 SE 3rd Avenue, Suite 2300
Miami, FL 33131
Telephone: (305) 358-2800
Facsimile: (305) 358-2382
LBucciero@podhurst.com
Rmartinez-cid@podhurst.com
MWeinshall@podhurst.com
RMCTeam@podhurst.com

*Attorneys for Plaintiffs Ya Mon Expeditions, LLC,*
*Pride Contracting, Inc. and Juan Galan*

Kevin D. Neal - PHV
William F. King - PHV
Kenneth N. Ralston - PHV
**GALLAGHER & KENNEDY, P.A.**
2575 East Camelback Road
Phoenix, Arizona 85016-9225
Tel: (602) 530-8000
kevin.neal@gknet.com
bill.king@gknet.com
ken.ralston@gknet.com

*Attorneys for Plaintiffs Ya Mon Expeditions, LLC,*
*Pride Contracting, Inc. and Juan Galan*

Hunter Shkolnik - PHV
**NAPOLI SHKOLNIK***
1302 Avenida Ponce de Leon, Santurce
Puerto Rico 00907
(787) 493-5088

- 55 -

Case No. 24-Civ-20805-KMM

Hunter@nsprlaw.com
* Napoli Shkolnik is a registered tradename for NS
PR Law Services, LLC.
A Puerto Rican Limited Liability Corporation

AND

Salvatore C. Badala - PHV
**NAPOLI SHKOLNIK PLLC**
400 Broadhollow Rd, Suite 305
Melville, NY 11747
(212) 397-1000 Ext. 1045
SBadala@NapoliLaw.com

*Attorneys for Plaintiffs Ya Mon Expeditions, LLC,
Pride Contracting, Inc. and Juan Galan*

Paul J. Geller
Florida Bar No. 984795
Mark J. Dearman
Florida Bar No. 982407
Stuart A. Davidson
Florida Bar No. 0084824
Lindsey H. Taylor
Florida Bar No. 1027908
**ROBBINS GELLER RUDMAN
  & DOWD LLP**
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33432
Telephone:  561-750-3000
561/750-3364 (fax)
pgeller@rgrdlaw.com
mdearman@rgrdlaw.com
sdavidson@rgrdlaw.com
ltaylor@rgrdlaw.com

*Attorneys for Plaintiff Kip Lamar Snell*

Arthur L. Shingler, III
David W. Mitchell
**ROBBINS GELLER RUDMAN
  & DOWD LLP**
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058

- 56 -

Case No. 24-Civ-20805-KMM

ashingler@rgrdlaw.com
davidm@rgrdlaw.com

*Attorneys for Plaintiff Kip Lamar Snell*

Marc Aaron Wites
Thomas Bowen Rogers, Jr.
**WITES & KAPETAN, PA**
4400 North Federal Hwy
Lighthouse Point, FL 33064
Tel: 954-570-8989
Fax: 954-354-0205
mwites@wklawyers.com
trogers@wklawyers.com

*Attorneys for Plaintiff Kip Lamar Snell*

Kevin B. Love
**CRIDEN & LOVE, P.A.**
2020 Salzedo Street, Suite 302
Coral Gables, FL 33134
Tel: (305) 357-9010
Fax: (305) 357-9050
klove@cridenlove.com

*Attorneys for Plaintiff Magna Charta, LLC*

Michael J. Boni – PHV
Joshua D. Snyder – PHV
John E. Sindoni – PHV
Benjamin J. Eichel – PHV
**BONI, ZACK & SNYDER LLC**
15 St. Asaphs Road
Bala Cynwyd, PA 19004
Tel: (610) 822-0200
Fax: (610) 822-0206
mboni@bonizack.com
jsnyder@bonizack.com
jsindoni@bonizack.com
beichel@bonizack.com

*Attorneys for Plaintiff Magna Charta, LLC*

Jeffrey J. Corrigan – PHV
Jeffrey L. Spector – PHV

- 57 -

Case No. 24-Civ-20805-KMM

**SPECTOR ROSEMAN & KODROFF PC**
Two Commerce Square, Suite 3420
2001 Market Street
Philadelphia, PA 19103
Tel: 215-496-0300
Fax: 215-496-6611
jcorrigan@srkattorneys.com
jspector@srkattorneys.com

*Attorneys for Plaintiff Magna Charta, LLC*

Jeffrey B. Gittleman – PHV
Meghan J. Talbot
**POGUST GOODHEAD LLC**
Eight Tower Bridge, Suite 250
161 Washington Street
Conshohocken, PA 19428
Tel: 610-941-4204
jgittleman@barrack.com
mtalbot@pogustgoodhead.com

*Attorneys for Plaintiff Magna Charta, LLC*

Roberta D. Liebenberg – PHV
Paul Costa – PHV
**FINE KAPLAN & BLACK RPC**
One South Broad Street, 23rd Floor
Philadelphia, PA 19107
Tel: 215-567-6565
Fax: 215-568-5872
rliebenberg@finekaplan.com
pcosta@finekaplan.com

*Attorneys for Plaintiff Magna Charta, LLC*

William J. Leonard – PHV
**OBERMAYER REBMAN MAXWELL &
HIPPEL LLP**
1500 Market Street, Suite 3400
Philadelphia, PA 19102
Tel: 215-665-3000
william.leonard@obermayer.com

*Attorneys for Plaintiff Magna Charta, LLC*

- 58 -

Case No. 24-Civ-20805-KMM

Linda P Nussbaum
**NUSSBAUM LAW GROUP, PC**
1133 Ave of the Americas, 31 Floor
New York, NY, 10036
Tel: 917-438-9189
Lnussbaum@nussbaumpc.com

*Attorneys for Plaintiff Magna Charta, LLC*

Etan Mark
Florida Bar No. 720852
**MARK MIGDAL & HAYDEN**
80 SW 8th Street
Suite 1999
Miami, FL 33130
Tel: 305-374-0440
etan@markmigdal.com

Lee Albert - PHV
Brian D. Brooks - PHV
**GLANCY PRONGAY & MURRAY LLP**
230 Park Avenue, Suite 358
New York, NY 10169
Tel: (212) 682-5340
lalbert@glancylaw.com
bbrooks@glancylaw.com

*Attorneys for Plaintiff Blueberry Enterprises, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served by CM/ECF on

10th day of June, 2024, on all counsel or parties of record.

/s/  *Lea P. Bucciero*
Lea P. Bucciero