**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Case No. 24-cv-20805-KMM**

YA MON EXPEDITIONS, LLC, BLUEBERRY
ENTERPRISES, LLC, MAGNA CHARTA,
LLC, PRIDE CONTRACTING, INC., KIP
LAMAR SNELL, and JUAN GALAN,
Individually and on Behalf of All Others
Similarly Situated,

          Plaintiffs,

  v.

ALLIED MARINE, INC., GALATI YACHT
SALES, LLC, HMY YACHT SALES, INC.,
MARINEMAX, INC., NORTHROP &
JOHNSON YACHTS-SHIPS, LLC, FRASER
YACHTS FLORIDA, INC., FRASER YACHTS
CALIFORNIA CORPORATION,
MARINEMAX EAST, INC., ONEWATER
MARINE INC., DENISON YACHTS
INTERNATIONAL, LLC, YACHTING
ASSETS AND OPERATIONS LLC, UNITED
YACHT SALES, LLC, INTERNATIONAL
YACHT BROKERS ASSOCIATION, INC.,
YACHT BROKERS ASSOCIATION OF
AMERICA, INC., CALIFORNIA YACHT
BROKERS ASSOCIATION, INC.,
NORTHWEST YACHT BROKERS
ASSOCIATION, BOATS GROUP, LLC, and
YATCO, LLC

          Defendants.

---

**DEFENDANTS' JOINT MOTION TO DISMISS PLAINTIFFS' CONSOLIDATED
CLASS ACTION COMPLAINT AND MEMORANDUM OF LAW**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................................... ii

INTRODUCTION ..................................................................................................................... 1

STATEMENT OF ALLEGED FACTS ..................................................................................... 4

   1.  Brokers ................................................................................................................................ 4

   2.  Associations ........................................................................................................................ 5

   3.  Online Marketplaces ........................................................................................................... 6

ARGUMENT .............................................................................................................................. 8

   1.  PLAINTIFFS FAIL TO SUFFICIENTLY PLEAD THAT DEFENDANTS AGREED TO INFLATE COMMISSIONS ............................................................................................ 8

      a.  Plaintiffs Fail to Allege Any Direct Evidence of an Agreement ................................... 9

      b.  Plaintiffs Fail to Allege Adequately Circumstantial Evidence of an Agreement ....... 10

         i.  Plaintiffs Fail to Allege Parallel Conduct ............................................................. 11

         ii.  Plaintiffs Also Fail to Allege Plus Factors ........................................................... 15

      c.  Plaintiffs' Attempt to Analogize to the Real Estate Industry Is Inapt, and Fails on its Own Terms .......................................................................................................... 17

      d.  Plaintiffs Rely on Improper "Group Pleading," Requiring Dismissal ........................ 20

   2.  PLAINTIFFS FAIL TO PLEAD THE REMAINING ELEMENTS OF A SECTION 1 CLAIM ............................................................................................................................. 22

      a.  Plaintiffs' Allegations Do Not Qualify For Per Se Treatment Under the Antitrust Laws ........................................................................................................................... 22

      b.  Plaintiffs Fail to State a Claim Under the Rule of Reason ......................................... 24

         i.  Plaintiffs Fail to Allege a Plausible Relevant Product Market ............................. 25

         ii.  Plaintiffs Fail to Allege a Plausible Relevant Geographic Market ....................... 27

         iii.  Plaintiffs Fail to Allege an Anticompetitive Effect on the Purported Market ...... 29

   3.  PLAINTIFFS ALLEGE NO AGREEMENT SUPPORTING A CONCERTED REFUSAL TO DEAL CLAIM ......................................................................................... 34

      a.  Plaintiffs' FSBO Theory Fails to Allege an Anticompetitive Agreement ................. 35

      b.  Plaintiffs' Buyer Broker Theory Fails to Allege an Anticompetitive Agreement ...... 37

   4.  DEFENDANTS EXPRESSLY RESERVE THE RIGHT TO COMPEL ARBITRATION AGAINST YACHT SELLERS WHO HAVE AGREED TO ARBITRATE THEIR CLAIMS ................................................................................... 39

      CONCLUSION ..................................................................................................................... 40

i

## **TABLE OF AUTHORITIES**

**Cases**                                                                                              **Page(s)**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................... 12

*Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    953 F.3d 707 (11th Cir. 2020) ......................................................... 10, 34, 36

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ...................................................................................*passim*

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
    441 U.S. 1, 24 (1979) ........................................................................................ 22

*Consolidated Metal Products, Inc. v. American Petroleum Institute*,
    846 F.2d 284 (5th Cir. 1988) ......................................................................... 14

*Constr. Aggregate Transp., Inc. v. Fla. Rock Indus., Inc.*,
    710 F.2d 752 (11th Cir. 1983) ....................................................................... 34

*Consultants & Designers, Inc. v. Butler Serv. Group, Inc.*,
    720 F.2d 1553 (11th Cir. 1983) ..................................................................... 22

*Cosgrove v. Oregon Chai, Inc.*,
    520 F. Supp. 3d 562 (S.D.N.Y. 2021) .......................................................... 5

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) .......................................................................... 33

*Duty Free Ams., Inc. v. Estée Lauder Cos.*,
    797 F.3d 1248 (11th Cir. 2015) ............................................................... 24, 27

*Ellison v. Postmaster Gen., United States Postal Serv.*,
    2022 WL 4726121 (11th Cir. Oct. 3, 2022) ................................................ 28

*In re Farm-Raised Salmon & Salmon Prods. Antitrust Litig.*,
    2021 WL 1109128 (S.D. Fla. Mar. 23, 2021) ................................... 9, 15, 16

*First Priority Emergency Vehicles, Inc. v. REV Ambulance Grp. Orlando, Inc.*,
    2020 WL 2029344 (D.N.J. Apr. 28, 2020) .................................................. 27

*In re Fla. Cement & Concrete Antitrust Litig.*,
    746 F. Supp. 2d 1291 (S.D. Fla. 2010) ....................................................... 21

ii

*FTC. v. Indiana Fed'n of Dentists*,
    476 U.S. 447 (1986) ................................................................................ 22, 23

*Gamm v. Sanderson Farms, Inc.*,
    944 F.3d 455 (2d Cir. 2019) ............................................................................ 10

*Generac Corp. v. Caterpillar, Inc.*,
    172 F.3d 971 (7th Cir. 1999) .......................................................................... 23

*Grace v. RE/MAX Holdings, Inc.*,
    2024 WL 2761188 (N.D. Cal. May 29, 2024) .................................................. 19, 20

*Gutierrez v. Wells Fargo Bank, N.A.*,
    889 F.3d 1230 (11th Cir. 2018) ...................................................................... 40

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
    626 F.3d 1327 (11th Cir. 2010) ................................................................*passim*

*In re Auto Body Shop Antitrust Litig.*,
    2015 WL 4887882 (M.D. Fla. June 3, 2015) .................................................. 20

*In re Jan. 2021 Short Squeeze Trading Litig.*,
    2021 WL 5359731 (S.D. Fla. Nov. 17, 2021) ............................................... 9, 10

*In re Jan. 2021 Short Squeeze Trading Litig.*,
    2022 WL 1522054 (S.D. Fla. May 13, 2022) .............................................. 15, 16, 23

*In re Jan. 2021 Short Squeeze Trading Litigation*,
    105 F.4th 1346 (11th Cir. 2024) .................................................................... 24, 30

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) ....................................................................... 10

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ....................................................................... 21

*Kleen Prod. LLC v. Int'l Paper*,
    276 F. Supp. 3d 811 (N.D. Ill. 2017), *aff'd sub nom. Kleen Prod. LLC v.*
    *Georgia-Pac. LLC,* 910 F.3d 927 (7th Cir. 2018) ....................................... 20

*L.H. Equity Invs. LLC v. Wade*,
    2010 WL 11505176 (S.D. Fla. Mar. 29, 2010) .............................................. 25

*Langer v. Music City Hotel LP*,
    2021 WL 5919825 (N.D. Cal. Dec. 15, 2021) ................................................ 7

iii

*Levine v. Cent. Fla. Med. Affiliates, Inc.*,
   72 F.3d 1538 (11th Cir. 1996) ............................................................ 24, 29, 30, 31, 34

*Location 24, LLC v. Drs. Same Day Surgery Ctr., Inc.*,
   2023 WL 2931458 (M.D. Fla. Jan. 18, 2023) ............................................................. 28

*Lockheed Martin Corp. v. Boeing Co.*,
   314 F. Supp. 2d 1198 (M.D. Fla. 2004) .................................................................. 26, 29

*Maris Distrib. Co. v. Anheuser-Busch, Inc.*,
   302 F.3d 1207 (11th Cir. 2002) ..................................................................................... 33

*McArthur Dairy, LLC v. McCowtree Bros. Dairy, Inc.*,
   2011 WL 2118701 (S.D. Fla. May 27, 2011) .............................................................. 27

*Moehrl v. National Association of Realtors*,
   492 F. Supp. 3d 768 (N.D. Ill. 2020) .................................................................... 17, 18

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
   465 U.S. 752 (1984) ............................................................................................... 9, 34

*Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*,
   779 F.2d 592 (11th Cir. 1986) ....................................................................................... 23

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
   472 U.S. 284, 297 (1985) ............................................................................................. 22

*Ohio v. Am. Express Co.*,
   585 U.S. 529 (2018) ........................................................................................... 23, 24, 29

*Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.*,
   998 F.2d 1224 (3d Cir. 1993) ....................................................................................... 20

*Pierson v. Orlando Reg'l Healthcare Sys., Inc.*,
   619 F. Supp. 2d 1260 (M.D. Fla. 2009) ..................................................................... 20

*Procaps S.A. v. Patheon, Inc.*,
   845 F.3d 1072 (11th Cir. 2016) ................................................................................... 24

*Q Club Resort & Residences Condo. Ass'n, Inc v. Q Club Hotel, LLC*,
   2010 WL 11454483 (S.D. Fla. Jan. 6, 2010) ....................................................... 24, 27

*QSGI, Inc. v. IBM Glob. Fin.*,
   2012 WL 13019046 (S.D. Fla. July 31, 2012) ...................................................... 2, 27

*Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*,
   917 F.3d 1249 (11th Cir. 2019) ............................................................. *passim*

*Run it First, LLC v. CVS Pharmacy, Inc.*,
   2022 WL 484862 (S.D. Fla. Feb. 16, 2022) ................................... 10, 15, 17

*Schachar v. Am. Acad. of Ophthalmology, Inc.*,
   870 F.2d 397 (7th Cir. 1989) (Easterbrook, J.) ............................................ 14

*Seagood Trading Corp. v. Jerrico, Inc.*,
   924 F.2d 1555 (11th Cir. 1991) ......................................................... 16, 22

*Setai Hotel Acquisition, LLC v. Miami Beach Luxury Rentals, Inc.*,
   2017 WL 11630386 (S.D. Fla. Mar. 24, 2017) ............................................. 4

*Sitzer v. Nat'l Ass'n of Realtors*,
   420 F. Supp. 3d 903 (W.D. Mo. 2019) ........................................... 2, 18, 19

*Spanish Broad. Sys., Inc. v. Clear Channel Comm'ns, Inc.*,
   242 F. Supp. 2d 1350 (S.D. Fla. 2003), *aff'd*, 376 F.3d 1065 (11th Cir.
   2004) ............................................................................ 21, 29, 30, 33

*Spectrofuge Corp. v. Beckman Instr., Inc.*,
   575 F.2d 256, 276 (5th Cir. 1978) ............................................................ 24

*Thompson v. Metro. Multi-List, Inc.*,
   934 F.2d 1566 (11th Cir. 1991) ............................................................... 31

*U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*,
   7 F.3d 986 (11th Cir. 1993) .................................................................... 31

*United Am. Corp. v. Bitmain, Inc.*,
   530 F. Supp. 3d 1241 (S.D. Fla. 2021) ............................................... 11, 15

*United States v. Bestfoods*,
   524 U.S. 51 (1998) ............................................................................... 21

*United States v. Colgate & Co.*,
   250 U.S. 300 (1919) ............................................................................. 34

*United States v E.I. du Pont de Nemours & Co*,
   351 US 377,404 (1956) .......................................................................... 25

*Verizon Commc'ns., Inc. v. Law Offices of Curtis V. Trinko, LLP*,
   540 U.S. 398 (2004) ............................................................................. 37

*Warren Tech., Inc. v. UL LLC,*
   962 F.3d 1324 (11th Cir. 2020) ............................................................................. 2

*Williamson Oil Co. v. Philip Morris USA,*
   346 F.3d 1287 (11th Cir. 2003) ................................................................... 10, 15

*Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc.,*
   89 F.4th 430 (3d Cir. 2023) ................................................................................. 23

**Statutes**

Sherman Act, 15 U.S.C. § 1 ...........................................................................*passim*

**Other Authorities**

Boat Trader, https://www.boattrader.com/sell/ ................................................... 7

Boats Group, https://www.boatsgroup.com/advertising-policy ........................... 7

Boats, https://www.boats.com/sell-my-boat/ ...................................................... 7

Fed. R. Civ. P. 8 ................................................................................................ 20

Fed. R. Civ. P. 8 and 12(b)(6) ............................................................................. 1

Fed. R. Civ. P. 11 ................................................................................. 11, 36, 37

*Market Your Yacht*, HMY Yachts, https://www.hmy.com/about-
   hmy/market-your-yacht/ ............................................................................ 4, 26

Defendants, *see* nn. 2-4 *infra*, by and through their respective undersigned counsel and pursuant to Federal Rules of Civil Procedure 8 and 12(b)(6), hereby jointly move to dismiss Plaintiff's Consolidated Class Action Complaint, *see* [ECF No. 140] (the "Complaint"), as it fails to state a cause of action. In support of this Motion, the Defendants set forth the following:

<u>**INTRODUCTION**</u>

Plaintiffs' Complaint is the proverbial attempt to fit a square peg in a round hole. Throughout the Complaint, Plaintiffs strain to analogize the yacht industry to the real estate industry, seeking to piggyback off lawsuits against the National Association of Realtors ("NAR") and real estate brokers that alleged conspiracies to inflate real estate commission rates. *See, e.g.*, ¶¶ 9, 67, 164, 167. These efforts fail given the fundamental differences between the allegations in the real estate cases and those put forward here.

In the real estate cases, a single entity, NAR, was both the dominant association *and* the operator of the dominant listing platform. It could unilaterally impose and enforce the challenged restraint. An agreement to join NAR, according to plaintiffs there, itself constituted an agreement to use the platform for anticompetitive ends. Use of the platform, moreover, was limited to NAR members. Alleging and proving a single overarching agreement was, accordingly, straightforward. There is nothing similar here. No dominant yacht broker-trade association can set rules for all yacht brokers, and no single platform is essential to competition.

Instead, as Plaintiffs acknowledge, there are at least four different and distinct yacht broker associations, each with its own members and guidelines. Critically, yacht brokers need not even be a member of any of the Association Defendants (or any association at all) to list and sell yachts on the Marketplace Defendants' online marketplaces. Some marketplaces—including some operated by certain Marketplace Defendants—even allow listings by non-brokers.

Instead of the real estate multi-listing service ("MLS")—which is governed by the realtors

who all must be members of a realtor association following the rules of a single national trade organization, *see, e.g., Sitzer v. Nat'l Ass'n of Realtors*, 420 F. Supp. 3d 903, 910, 914, 917 (W.D. Mo. 2019)—the various yacht "MLSs" are operated primarily by independent parties, who (1) are unaffiliated with yacht brokers or associations, (2) provide independent online marketplaces to yacht buyers and sellers, and (3) have no economic stake at all in yacht broker compensation. This is fatal to Plaintiffs' claims. Without a connection between, and common interests among, Defendant Brokers, Defendant Associations, and online marketplaces to advertise listings operated by Defendant Marketplaces, Plaintiffs cannot plausibly allege a conspiracy among all 18 Defendants. Thus, Plaintiffs cannot plausibly allege that Defendants all consciously committed to a common scheme designed to achieve an unlawful objective—as the antitrust laws require.

In their attempt to track the allegations in the real estate cases, Plaintiffs put forward a Complaint riddled with contradictions, false accusations at odds with material the Complaint incorporates by reference, and impermissible group pleading. But this Court is "not required to credit conclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts." *Warren Tech., Inc. v. UL LLC*, 962 F.3d 1324, 1328 (11th Cir. 2020); *see also QSGI, Inc. v. IBM Glob. Fin.*, 2012 WL 13019046, at *4 (S.D. Fla. July 31, 2012) (court need "not accept facts that are internally inconsistent, facts that run counter to facts which the court may take judicial notice of, conclusory allegations, unwarranted deductions, or mere legal conclusions").

Fundamentally, Plaintiffs fail to allege direct or indirect evidence that Defendants entered into a conspiracy regarding brokerage fees. They also fail to allege cognizable facts in support of their second claim, that Defendants conspired to refuse to deal with yacht sellers or buyers not represented by brokers. The Complaint does not allege any parallel conduct on the part of all Defendants—a heterogenous group of industry participants that includes independent website marketplaces, broker associations, and brokers. Instead, the Complaint acknowledges that: (1) each

Association Defendant has different guidelines, (2) some Marketplace Defendants' websites do not require co-brokerage arrangements and others allow sales by owners directly, and (3) Broker Defendants can use a variety of Marketplace Defendants' online marketplaces, and a variety of other various channels to market and list yachts. Nor does the Complaint adequately plead any plus factors tending to show the existence of a conspiracy. Rather, Plaintiffs' allegations are wholly consistent with the various Defendants' independent business interests.

Even assuming that Plaintiffs had sufficiently alleged an agreement regarding brokerage commissions, a refusal to deal with yacht sellers or buyers who do not have brokers, or the prohibition of For Sale by Owner ("FSBO") listings (despite the fact that they implicitly acknowledge the rules they cite unequivocally demonstrate that some of Marketplace Defendants' online marketplaces allow FSBO listings), any such agreements extend across multiple levels of the alleged market, making application of the *per se* rule to Plaintiffs' claims inappropriate. All of Plaintiffs' claims based on such alleged agreements are thus still subject to the demanding rule of reason standard. This is fatal because the Complaint fails to allege two independent pleading requirements for rule-of-reason claims: *First*, it fails to allege plausible antitrust markets by putting forward a gerrymandered market definition that ignores the commercial realities of the yachting industry and the wide range of options buyers and sellers have at their disposal. *Second*, it fails to plausibly allege any actual or potential anticompetitive harm stemming from the alleged conduct. Plaintiffs allege no facts whatsoever showing that any of the Defendants or Defendant groups, individually or collectively, operating at any level of the market, have market power. It is well-settled that defendants without market power are incapable of causing harm to competition.

In short, under every possible theory of harm, the Complaint fails to state any claim under the antitrust laws, and it should be dismissed with prejudice.

## STATEMENT OF ALLEGED FACTS[1]

Plaintiffs are purported yacht sellers who allege that a wide-ranging group of differently situated defendants—yacht brokerages[2], yacht broker trade associations[3], and independently-owned and operated online boat sales marketplaces[4] (together, "Defendants")—conspired to inflate the commissions that yacht brokers are paid for their services. ¶¶ 32-61.[5] The Complaint alleges that this conduct has artificially raised commissions in the alleged product market for "yacht brokerage services provided to yacht sellers and buyers by yacht brokers with access to the multiple listing services" ("MLSs"). ¶ 168. Plaintiffs also claim that the Marketplace Defendants and Broker Defendants have "refused to deal with potential buyers or sellers who are not represented by a licensed broker." ¶¶ 208-09.

### 1. **Brokers**

Owners can choose to sell their yachts themselves or to use the services of a broker. ¶ 5. Brokers advertise yacht listings in a variety of different channels, not limited to the websites of Marketplace Defendants, including "on Google, social media, email, YouTube, in yachting magazines, MLS[s], blogs, digital ads and more."[6] If a yacht owner chooses to engage a broker to

---

[1] Defendants adopt Plaintiffs' allegations solely for this motion and do not concede their accuracy.

[2] Allied Marine, Inc., Galati Yacht Sales, LLC, HMY Yacht Sales, Inc., MarineMax, Inc., Northrop & Johnson Yacht Ships, LLC, Fraser Yachts Florida, Inc., Fraser Yachts California Corp., MarineMax East, Inc., OneWater Marine Inc., Denison Yachts International, LLC, Yachting Assets and Operations LLC, and United Yacht Sales, LLC (collectively "Broker Defendants").

[3] International Yacht Brokers Association, Inc. (IYBA), Yacht Broker's Association of America, Inc. (YBAA), California Yacht Brokers Association, Inc. (CYBA), and Northwest Yacht Brokers Association (NYBA) (collectively "Association Defendants"). CYBA does not join this motion.

[4] Boats Group, LLC and Yatco, LLC (collectively "Marketplace Defendants"). "Marketplaces" refer to the platforms operated by these Defendants—boats.com, Yacht Broker, YachtWorld, and Yatco—as well as the association-owned marketplace, Yachtr.com.

[5] "¶" and "¶¶" citations refer to corresponding numbered paragraphs in Plaintiffs' Complaint.

[6] *See* **Ex. A**, *Market Your Yacht*, HMY Yachts, https://www.hmy.com/about-hmy/market-your-yacht/. The "incorporation by reference" doctrine allows courts to consider documents and materials referenced in a complaint at the motion to dismiss stage where the materials are (1) referenced in the complaint and (2) the contents are undisputed. *Setai Hotel Acquisition, LLC v.*

help them sell their yacht, the seller and the broker may decide that, upon a successful sale, the seller will pay that broker a commission, which varies and depends on the specific terms of the agreement between the seller and the broker. ¶¶ 5, 72, 87, 90, 93, 126-27. And if the buyer who actually purchases the seller's yacht is also represented by a broker, the seller's broker may agree to share some of his commission with that buyer's broker in what is known as a "co-brokerage." ¶¶ 19, 127. The amount of any such division of a commission varies. ¶¶ 93, 96, 101.

Other types of arrangements are also frequently used, in which either the buyer or the seller (or both) is not represented by a broker, or through a dual-agency agreement where one broker represents both the buyer and the seller. *See* ¶ 126 (alleging that only "70-percent of all brokerage sales [on YachtWorld] are co-brokered"); ¶¶ 137, 142 (alleging the use of dual agency agreements); *infra* at 7, n.7 (discussing the availability of "for sale by owner" listings).

There are no allegations that Broker Defendants require their brokers or affiliated agents to join any broker trade association, including those organized by the Association Defendants, or to participate in any specific online marketplaces, including those operated by certain Defendants, or to adhere to any marketplace's (certain Defendants' or otherwise) listing rules or policies.

### 2. __Associations__

The Complaint does not identify any rule promulgated by a Broker Defendant, Association Defendant, or Marketplace Defendant that sets commissions for buyer's brokers or mandates co-brokerage (i.e., sharing of any commission among brokers), and many Association Defendants'

---

*Miami Beach Luxury Rentals, Inc.*, 2017 WL 11630386, at *1 n.1 (S.D. Fla. Mar. 24, 2017) (finding a website "printout" to be incorporated by reference where plaintiff "does not dispute the text from the webpage"). Plaintiffs incorporate the above-referenced webpage in the Complaint. *See* ¶ 76 n.12. This webpage and those cited below are also subject to judicial notice. *See Cosgrove v. Oregon Chai, Inc.*, 520 F. Supp. 3d 562, 581 n.5 (S.D.N.Y. 2021) ("A court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and it is capable of accurate and ready determination.").

rules expressly permit brokerage fees to be negotiated on a per-sale basis. ¶¶ 87, 90, 96, 101. Plaintiffs do not point to any provision set forth by any Defendant that limits negotiations. Instead, Plaintiffs only allege that there is a "norm" of a 10% broker commission, ¶ 5, but concede that the commission "is typically not *more* than 10 percent." ¶ 72 (emphasis added). Plaintiffs allege that this commission is "typically" shared 60/40 or 50/50 by the buyer's broker and seller's broker. ¶ 5.

The Complaint does not specifically allege that there are any enforcement or punishment mechanisms for brokers who do not charge a 10% or any specific commission to the seller, or who do not agree to share in any way a commission with the buyer's broker. Instead, Plaintiffs only point to generic discipline provisions for general ethical violations of Association Defendant membership rules. ¶¶ 97, 121-125. Plaintiffs also do not allege that these general discipline rules have ever been used to discipline a seller's broker who did not charge 10% or any specific commission on a sale or who did not agree to share any commission that seller's broker received.

### 3. **Online Marketplaces**

Plaintiffs allege that yacht owners, dealers, and brokers can and do use a wide range of competing marketplaces to list yachts for sale, including independent marketplaces like boats.com, Boat Trader, YachtWorld (each operated by Defendant Boats Group) and Defendant Yatco, none of which are affiliated with any Defendant Association or any Defendant Broker. *See* ¶¶ 4, 54, 59. Plaintiffs allege only one online marketplace owned by yacht broker associations—yachtbroker.org (now, Yachtr.com). ¶ 47. Prospective buyers can research yachts for sale on any or all of these online marketplaces (or elsewhere), either by themselves or with the assistance of brokers. ¶ 69. These online marketplaces are alleged to have "facilitate[d] information sharing among prospective buyers, sellers, and brokers," and "have greatly reduced the time and effort required for buyers to shop for boats." ¶ 4.

Defendant Boats Group operates several online marketplaces. ¶ 54. Two of its

marketplaces alleged in the Complaint—boats.com and Boat Trader—accept FSBO listings, allowing yacht sellers to advertise and sell their yachts online without using a broker.[7]

As for the only association-owned marketplace, Plaintiffs allege that the "public-facing, lead-generating advertising site, called Yachtr.com," ¶ 48, "allows yacht brokers to see one another's listings with the goal of connecting buyers to sellers through a yacht sales professional." ¶ 81. Aside from brokers, buyers and sellers can also access Yachtr.com to "locate and research vessels for sale." ¶¶ 48, 69. The Complaint is devoid of nonconclusory allegations that membership in any of the four Defendant Associations is mandatory to receive access to Yachtr.com or any other marketplace where yachts are advertised online.

Likewise, there are no nonconclusory allegations that participation in the marketplaces is conditioned on adherence to any Association Defendant's guidelines. No marketplace has any requirement that brokers must agree to charge a yacht seller any commission—never mind specifically a 10% commission—or must share any commission with a buyer's broker in order to list yachts. And there certainly is no requirement that a seller broker must include an offered commission to a buyer's broker in order to list a yacht for sale on any of the marketplaces. For example, with respect to Yatco and Yachtr.com, Plaintiffs simply point to a requirement that listings be made by a broker, ¶ 110, with membership in "a professional association." ¶ 123. In

---

[7]  *See* **Ex. B**, "For Sale By Owner Terms and Conditions," Boats Group, https://www.boatsgroup.com/advertising-policy. This website is quoted in the Complaint (¶ 130 n.42) and thus incorporated by reference. Prominently displayed on the home page of boats.com is a link that reads "Sell my Boat": anyone can follow it to list their boat "[r]egardless of selling price, type or size" across "a wide variety of boat types and price ranges." **Ex. C**, "Sell your boat fast today on boats.com," Boats, https://www.boats.com/sell-my-boat/ (last accessed July 18, 2024); **Ex. D**, "Sell Your Boat Fast," Boat Trader, https://www.boattrader.com/sell/ ("Enter your boat information, upload photos, and you're ready to sell."). The contents of these websites are also subject to judicial notice because the Marketplace Defendants' websites *are* the MLS platforms complained about, such that the contents of the websites go to the heart of Plaintiffs' claims and "the complaint necessarily relies on the website[s]." *Langer v. Music City Hotel LP*, 2021 WL 5919825, at *4 (N.D. Cal. Dec. 15, 2021).

other words, there is no allegation that any seller has to be a member of one of the Association Defendants in order to list a yacht on any of the marketplaces.

Plaintiffs allege that Boats Group requires that *some* (but not all) yachts listed on YachtWorld—only *one* of Boats Groups' marketplace websites—be offered for co-brokerage, but points to nothing to support the requirement of a particular commission or commission-sharing between buyer and seller brokers. ¶ 119 ("The *vast majority* of yachts sold through YachtWorld are sold through a co-brokerage agreement with the selling and buying broker sharing in the brokerage commission") (emphasis added). While Plaintiffs allege that "the commission split on a given boat . . . is accessible on the MLS only to brokers," ¶ 119, they do not identify "the MLS" or allege that the commission split is actually posted on the online marketplaces at issue.

Plaintiffs allege that "if the independently owned MLS want to obtain listings from brokers, they must conform to industry practice at the insistence of boat brokers, who are also members of the yacht broker associations." ¶ 10. But the Complaint contains no factual allegations about any enforcement mechanism over the marketplaces, by either the Defendant Brokers or the Defendant Associations. Nor are there any factual allegations of any punishment mechanism by any of the Defendants over a supposedly non-compliant co-conspirator. And there are no nonconclusory allegations of any economic incentive for the Marketplace Defendants or the Associations Defendants to participate in the purported "conspiracy."

## **ARGUMENT**

### 1. **PLAINTIFFS FAIL TO SUFFICIENTLY PLEAD THAT DEFENDANTS AGREED TO INFLATE COMMISSIONS**

To allege a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, plaintiffs must plead a "(1) conspirac[y] that (2) unreasonably (3) restrain[s] interstate or foreign trade." *Quality Auto Painting Ctr. of Roselle, Inc. v. State Farm Indem. Co.*, 917 F.3d 1249, 1260 (11th Cir. 2019). For

the first element, the Court must determine whether the Complaint "contains 'allegations plausibly suggesting (not merely consistent with) a conspiracy or agreement'"—that is, "whether the complaint 'possesses enough heft to show that the pleader is entitled to relief.'" *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1332-33 (11th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)) (punctuation altered). Indeed, "conspiracy [allegations] must tend to rule out the possibility that the defendants were acting independently." *Twombly*, at 554.

"The first inquiry in any" claim brought under Section 1 "is to locate the agreement that restrains trade." *In re Jan. 2021 Short Squeeze Trading Litig.*, 2021 WL 5359731, at *14 (S.D. Fla. Nov. 17, 2021) (citation omitted). To plead the existence of such an agreement, Plaintiffs must allege "direct or circumstantial evidence that reasonably tends to prove that the [defendants] had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* (quoting *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984) (internal quotation marks and citations omitted)). Here, Plaintiffs have failed to plead factual allegations that plausibly suggest that Defendants entered into an agreement to "*require[]* pre-owned yacht sellers to pay a supracompetitive total aggregate commission fee that includes an inflated brokerage fee for the buyer's broker." ¶ 1 (emphasis added).

### a. Plaintiffs Fail to Allege Any Direct Evidence of an Agreement

Direct evidence of a conspiratorial agreement "is *explicit* and requires no inferences to establish the proposition or conclusion being asserted." *In re Farm-Raised Salmon & Salmon Prods. Antitrust Litig.*, 2021 WL 1109128, at *10 (S.D. Fla. Mar. 23, 2021) (emphasis added). Plaintiffs have not alleged any such direct evidence. The Complaint does not allege a single document or recording that *explicitly*—and "without inference"—shows that Defendants entered into *any* agreement to set yacht broker commission rates. Plaintiffs do not allege any recorded meeting, document, transcribed phone call, text-message exchange, or email thread showing an

agreement on commission rates between *any* Defendants or any subgroup of Defendants.

> **b.   Plaintiffs Fail to Allege Adequately Circumstantial Evidence of an Agreement**

Having failed to plead direct evidence of any unlawful agreement among Defendants, Plaintiffs "may present circumstantial facts supporting the inference that a conspiracy existed." *In re Jan. 2021*, 2021 WL 5359731, at *17 (quoting *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 465 (2d Cir. 2019) (internal quotation marks omitted).

Circumstantial evidence of an antitrust conspiracy must be supported by facts of *both* (1) parallel conduct *and* (2) "plus factors" that tend to show that any such parallel conduct was not the product of independent action, but rather a collusive agreement. *Quality Auto*, 917 F.3d at 1262; *see also Auto. Alignment & Body Serv., Inc. v. State Farm Mut. Auto. Ins. Co.*, 953 F.3d 707, 726 (11th Cir. 2020) (parallel conduct is "insufficient standing alone to raise an inference of conspiracy"). Allegations of parallel conduct could be, for example, "competitors adopting similar policies around the same time in response to similar market conditions[.]" *Run it First, LLC v. CVS Pharmacy, Inc.*, 2022 WL 484862, at *4 (S.D. Fla. Feb. 16, 2022) (quoting *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015)).

"Plus factors" are "economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action," including actions against a defendant's self-interest. *Run it First*, 2022 WL 484862, at *4 (quoting *In re Musical Instruments*, 798 F.3d at 1194); *see also Quality Auto*, 817 F.3d at 1270. Examples of plus factors include a concentration of sellers, uniformity of tactics, and opportunity to exchange information. *Id.* at 1270; *Williamson Oil Co. v. Philip Morris USA*, 346 F.3d 1287, 1317 (11th Cir. 2003). Well-pled plus factors are required to comport with *Twombly's* mandate that, when relying on circumstantial evidence, a complaint's "conspiracy [allegations] must tend to rule out the possibility that the defendants were acting independently." *Twombly*, at 554. Stated another way,

10

because parallel conduct is as consistent with unilateral action as it is with conspiracy, "plus factors" are needed to "remove a plaintiff's evidence from the realm of equipoise and render that evidence more probative of conspiracy than of conscious parallelism." *Quality Auto*, 817 F.3d at 1262. Dismissal is proper where a plaintiff fails to allege "any facts supporting plus factors that would tip the scale from equipoise towards conspiracy." *Id.* at 1271; *see United Am. Corp. v. Bitmain, Inc.*, 530 F. Supp. 3d 1241, 1259 (S.D. Fla. 2021) (dismissing plaintiff's claim where "alleged plus factors [fell] far short of its pleading obligation.").

i. <u>Plaintiffs Fail to Allege Parallel Conduct</u>

Plaintiffs do not plead that Defendants engaged in parallel conduct. Plaintiffs not only fail to allege that the different groups of Defendants have behaved similarly—which they would have to do to state a claim in the absence of direct evidence—but also fail to plausibly allege any similar conduct among the members of *any* group of Defendants.

**Marketplace Defendants:** The Complaint does not allege that *all* Marketplace Defendants (1) refuse FSBO listings; (2) require that all listings be subject to a co-brokerage agreement with a commission shared between the seller's broker and the buyer's broker; or (3) require membership in one of the Association Defendants to be able to list a yacht for sale. *See* ¶¶ 67-82, 110-20.[8] Plaintiffs would have to allege such conduct across all Marketplace Defendants to establish the kind of parallel conduct within the Marketplace Defendant group necessary for the Court to find an agreement. They have not done so, and cannot consistent with their obligations under Rule 11.

As noted, two of Boats Groups' alleged online marketplaces—boats.com and Boat Trader—*do* allow FSBO listings. *See supra* at 7, n.7; *see also* ¶ 200 (alleging that Defendants have

---

[8] The limited nature of Plaintiffs' allegations is evidenced by the fact that the Complaint only addresses the alleged conduct of two online marketplaces—Yatco and YachtWorld—though it purports to challenge the conduct of at least five different "MLSs." *See, e.g.*, ¶¶ 54, 60, 200.

engaged in anticompetitive conduct by enforcing the alleged "rules of YATCO and YachtWorld," conspicuously omitting boats.com and Boat Trader). This means yacht sellers can—and do—list yachts for sale on these marketplaces without using a broker at all. Similarly, while Plaintiffs allege that Yatco requires that listings be made by a broker with membership in "a professional association," ¶¶ 110, 123, they allege no such membership requirement for listing on Boats Group websites. Even for Yatco, Plaintiffs do not allege that it requires brokers to be a member of one of the Association Defendants. This means that Marketplace Defendants are not actually alleged to have engaged in any conduct underlying Plaintiffs' alleged conspiracy, never mind the key parallel conduct upon which they apparently rely. At most, Plaintiffs allege that YachtWorld and Yatco's websites rules *encourage* co-brokerage agreements. ¶¶ 111, 119. But Plaintiffs *concede* that many yachts on those platforms are sold without any kind of co-brokerage agreement whatsoever. *See* ¶ 75 (alleging that "about 70 percent of all brokerage sales are co-brokered").

**Broker Defendants:**  The Complaint's allegations as to the parallel conduct of all Broker Defendants are similarly limited. Plaintiffs' core allegation regarding the Broker Defendants' conduct is limited to a single paragraph (¶ 131) that lumps them all together and generally alleges that they all engaged in the same conduct. Such a conclusory allegation falls short of providing "*enough factual matter* . . . to suggest that an agreement was made." *Twombly*, 550 U.S. at 556 (emphasis added); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 682 (2009) ("the complaint must contain *facts* plausibly showing" the existence of an alleged agreement) (emphasis added); *infra* at § 1.d. The Complaint's allegations demonstrate a lack of parallel conduct:

- Certain (but not all) employees or agents of certain (but not all) Broker Defendants serve on certain (but not all) Boards of certain (but not all) Association Defendants, ¶¶ 132-46;
- Certain (but not all) employees of certain (but not all) Broker Defendants have publicly stated that they support the Association Defendants' goal of promoting professionalism in the industry, ¶ 147;
- Certain (but not all) Broker Defendants have brokers with professional certifications,

¶¶ 149-50;

- Certain (but not all) Broker Defendants are "affiliated" with or are members of certain (but not all) Association Defendants, ¶¶ 152, 154, 158;

- Certain (but not all) Broker Defendants market to customers the message that buyers do not pay brokerage fees, ¶¶ 155-57; and

- Certain (but not all) Broker Defendants have listed yachts for sale on various websites operated by certain (but not all) Marketplace Defendants, ¶ 159.

None of these allegations plausibly alleges the existence of an anticompetitive conspiracy. Indeed, there are no allegations that *any* Broker Defendant (1) requires all sellers to pay 10% or any particular commission on the sale of a yacht, (2) will only list yachts for sale on marketplaces that refuse FSBO listings, or (3) will only use listing contracts that require a co-broker agreement with split commissions. Indeed, Plaintiffs tellingly hedge their allegations that a "typical"—*but not every*—"co-brokerage listing agreement . . . provides for a pre-owned yacht commission equal to 10% of the purchase price of the yacht." ¶ 64; *see also* ¶ 5 (the "[a]ggregate broker commission on the sale [of a pre-owned yacht] is frequently"—*but not always*—"10% of the sales price.").

**Association Defendants:** Similarly, the Complaint does not allege that all Association Defendants require their member brokers to (1) use form contracts that require a certain percentage of the yacht sales price to be charged to sellers as commission; or (2) split any commission on the sale of a yacht with a broker representing the buyer. *See* ¶¶ 83-108. Instead, it points to various non-mandatory provisions contemplating that brokers representing a seller may cooperate with a broker representing a buyer in selling their client's yacht whenever that cooperation would be "in the interest of the client," and may negotiate a sharing of fees as appropriate. *See, e.g.*, ¶ 90 (IYBA: "Members should cooperate with other members on vessels listed whenever it is in the interest of the client . . . All shared commission agreements should be negotiated prior to the submission of any Offer to Purchase."); ¶10 (NYBA: "Member should cooperate with other Members on vessels listed with them whenever it is in the interest of the client. . . . All shared commission agreements

13

should be negotiated prior to the submission of an Offer to Purchase."); ¶ 87 (YBAA: "The Broker will cooperate with other Brokers on vessels listed by him/her on a Central Listing basis whenever it is in the interest of the Seller, sharing commissions on a previously agreed basis.").

It is well-settled that non-mandatory trade association rules do not give rise to antitrust liability. *See Consolidated Metal Prods., Inc. v. Am. Petroleum Institute,* 846 F.2d 284, 292 (5th Cir. 1988) (trade association, "without constraining others to follow its recommendations," did not violate *per se* or rule of reason standard by offering recommendations); *see also Schachar v. Am. Acad. of Ophthalmology, Inc.*, 870 F.2d 397, 398–99 (7th Cir. 1989) (Easterbrook, J.) (same). In an attempt to overcome the plainly non-mandatory nature of these provisions, Plaintiffs cite and selectively quote provisions in bylaws and ethics codes of various Association Defendants that reference broker *cooperation* and commission practices generally, but say nothing of the sharing of commissions or an amount thereof. This sleight of hand cannot mask Plaintiffs' failure to identify any common rules regarding the conduct *actually at issue in this case*—i.e., an alleged agreement to inflate commissions.

Plaintiffs mischaracterize even these irrelevant Association Defendant provisions, however, because they do not support Plaintiffs' contention that there is a standard industry rule imposing and enforcing the challenged anticompetitive behavior. Indeed, many of the cited provisions are prefaced with the auxiliary verb "should" as opposed to "must," and are conditioned on the client's best interests, expressly belying Plaintiffs' characterization as unconditional rules or mandates. None contain a requirement regarding the amount of commissions to be charged to sellers, nor a commission sharing mandate, much less establishes a common requirement adopted, enforced, and implemented by all Defendants.

This patchwork of qualified and inconsistent allegations does not allege "parallel conduct" between eighteen Defendants, many of whom participate at different levels in the industry. *See*

14

*Bitmain*, 530 F. Supp. 3d at 1272-73 (rejecting similarly "qualifie[d]" and "hedge[d]" claims and allegations). Plaintiffs' allegations do not establish that any "competitors act similarly or follow the same course of action—for example, adopting similar policies at or around the same time in response to similar market conditions." *In re Salmon*, 2021 WL 1109128, at *11 (citations omitted). Accordingly, the Complaint "imparts no information from which the Court could conceivably, never mind plausibly, discern concerted, cooperative action among the Defendants." *Run it First*, 2022 WL 484862, at *5, 6 (noting that "even though all the defendants supported a particular course of action, . . . without more, the allegations were insufficient to imply even parallel conduct") (citing *Bitmain*, 530 F. Supp. 3d at 1259).

ii.   <u>Plaintiffs Also Fail to Allege Plus Factors</u>

Even if Plaintiffs had sufficiently alleged parallel conduct, the Complaint remains deficient because Plaintiffs fail to plead any "plus factors" that would make any parallel conduct "more probative of conspiracy than of conscious parallelism." *Williamson Oil*, 346 F.3d at 1301. Plaintiffs have alleged no facts showing that any such parallel conduct "would probably not result from chance, coincidence, independent responses to common stimuli, or mere *interdependence unaided by an advance understanding among the parties*." *Twombly*, 550 U.S. at 556 n.4 (emphasis added).

*First,* there are no allegations that Defendants acted against their own individual economic self-interests. *See In re Jan. 2021 Short Squeeze Trading Litig.*, 2022 WL 1522054, at *9 (S.D. Fla. May 13, 2022). Such allegations are typically required because they cut against a defense that defendants were acting in their unilateral self-interest. Here, Plaintiffs do not allege that any of the practices complained of make sense only in the presence of an agreement; *i.e.*, that such practices would be contrary to each Defendant's own interest but for an agreement. Instead, if the practice is profitable, such a practice would be expected by all industry members irrespective of an

15

agreement. *Quality Auto*, 917 F.3d at 1267 ("All of these purported 'highly uniform' tactics are easily explained by the most common of corporate stimuli: a desire to increase profits."). For example, commission sharing—which, by Plaintiffs' own admission, was not always employed—makes independent economic sense to each Broker Defendant because offering such payments increases demand for yachts, thus facilitating their clients' ability to buy and sell their yachts.[9]

*Second*, to the extent that Plaintiffs do allege similar commission pricing practices, they have not alleged the requisite existence of any "variables that would ordinarily result in divergent pricing," thereby rendering any similar pricing practices suspect absent an anticompetitive agreement. *Quality Auto*, 917 F.3d at 1263. There are no allegations that the average commission rate in the industry is a secret, or that the quality of the services provided in the relatively rarefied world of yacht sales and purchases vary so greatly by broker that divergent prices should be expected, or that costs vary significantly from broker to broker. And there are no allegations that Defendants engaged in "uniform tactics." *Id.* at 1267. Instead, Plaintiffs allege a wide range of distinct rules and practices, and ask the Court to infer a single agreement from them. *See supra* at 6-8 (discussing the diversity of marketplace and association guidelines Plaintiffs rely upon).

*Finally,* there are no allegations of high-level inter-Defendant communications, *see Jan. 2021*, 2022 WL 1522054, at *9; nor are there allegations of a government investigation of the yacht selling industry. *Cf. In re Salmon*, 2021 WL 1109128, at *17.

Simply put, the Complaint's factual allegations "fall[] well short of alleging any plus

---

[9] Relatedly, there are "plausible, procompetitive explanation[s]" for commission sharing. *Seagood Trading Corp. v. Jerrico, Inc*., 924 F.2d 1555, 1574 (11th Cir. 1991). Plaintiffs attempt to paint Marketplace and Association Defendants' alleged encouragement of commission sharing as evidence of a conspiracy to set competitor broker commissions. But elsewhere, Plaintiffs allege that "dual-agency clauses" that permit listing brokers to represent both the buyer and seller are themselves "anticompetitive." ¶ 100; *see also* ¶¶ 137, 142. Encouraging the sharing of commissions—resulting in buyers and sellers being represented by different agents—is a way of preventing the dual agency arrangement Plaintiffs describe as anticompetitive.

factors from which the Court could plausibly infer an actual conspiracy among the Defendants . . . of [any] variety." *Run it First*, 2022 WL 484862, at *5. Instead, the allegations are either "supported only by conclusory allegations," or "appear to simply be complaints about the way Defendants operate, divorced from any explanation as to how these allegedly questionable business practices might imply something more than parallel conduct." *Id.* at *6, 7. In sum, a complaint that merely "alleg[es] several common and obvious industry practices should not proceed directly past a motion to dismiss and into the expensive and settlement-inducing quagmire of antitrust discovery." *Quality Auto*, 917 F.3d at 1267.

> ### c. <u>Plaintiffs' Attempt to Analogize to the Real Estate Industry Is Inapt, and Fails on its Own Terms</u>

Plaintiffs' claims represent a strained effort to analogize the decentralized yacht-sales industry to the real estate industry. The Complaint lumps two independent Marketplace Defendants—each with no connection to any of the Association Defendants or Broker Defendants and with different listing policies and services—into a vaguely-defined "MLS" to try to make a superficial comparison to recent cases involving the real estate industry and its single trade association, NAR, that governed the single MLS operating in each relevant geographic market. *See* ¶¶ 9, 164, 167. These contorted comparisons fail.

*First*, claims against NAR were predicated on allegations of *mandatory* common rules that bound *all* real estate industry defendants together in a single agreement that all of the defendants allegedly adopted, implemented, and enforced. Specifically, NAR was alleged to have a common set of broker commission rules that required an offer of compensation be made to buyer brokers. Each defendant allegedly supported those rules, and compliance was a precondition to listing a property on the sole real estate MLS operating in the relevant region. As the court explained in denying the motion to dismiss in *Moehrl v. National Association of Realtors*:

> The purported anticompetitive restraints here are a product of ***written rules*** issued by the NAR **that each Corporate Defendant expressly imposes upon their franchisees and realtors**. That suggests that each Corporate Defendant has reviewed, understood, **and ultimately agreed to the NAR's rules, including the Buyer-Broker Commission Rules.**
>
> ***
>
> **Perhaps most importantly**, Plaintiffs point to the allegation that each of the Corporate Defendants **requires** its franchisees, affiliates, and realtors to comply with the NAR's allegedly anticompetitive restraints to secure the benefits of their brands, infrastructure and resources. [Citation omitted] They do this by **requiring their franchisees and realtors to join the NAR and follow the NAR's Handbook and Code of Ethics, including the Buyer-Broker Commission Rules**. (*Id.*) In addition, Plaintiffs allege that the Corporate Defendants **require their franchisees and realtors join a local realtor association and MLS, which themselves require compliance with the NAR's rules**.

492 F. Supp. 3d 768, 778 (N.D. Ill. 2020) (emphases added); *see also Sitzer*, 420 F. Supp. 3d at 912 (denying the motion to dismiss and describing how mandatory rules issued by NAR formed the basis of the alleged conspiracy).

Needless to say, the yacht-sales industry is not the real estate industry. As demonstrated above, *supra* at 13-15, § 1.c, Plaintiffs cannot allege facts establishing the existence of common rules or requirements that all Defendants agreed to follow. Any custom of sharing fees is not enforced by listing rules or requirements of the five "MLSs" identified in the Complaint. *See* ¶¶ 54, 60.

*Second*, the marketplaces at issue here are different in critical ways from the MLS in the real estate cases. First, the local MLSs in the real estate cases was "owned by a local NAR association" and was required to adhere to NAR's single set of mandatory rules applicable to all MLS and NAR members. *Sitzer*, 420 F. Supp. 3d at 914. Here, four of the online marketplaces—Yacht World, boats.com, Boat Trade, and Yatco—are *independent*: they are not operated by brokers, do not require membership in any brokerage organization, and are not alleged to benefit in any way from brokerage fees. Given their independence and financial incentives, it is implausible to infer that they would be part of the alleged conspiracy.

18

Competition *between and among* the marketplaces in this case also makes it distinct. In the real estate cases, only <u>one</u> MLS operated in each geographic region, so the rules of that MLS (which were mandated by NAR) allegedly pertained to the listing of all properties for sale within that MLS's territory, and neither buyers nor sellers had any alternative MLS to facilitate the purchase or sale of a home. *See Sitzer*, 420 F. Supp. 3d at 910. But here, the alleged online marketplaces are not limited in geographic scope, and serve sellers and buyers throughout the United States and the world. ¶¶ 71, 170. While Plaintiffs attempt to obfuscate this difference by collectively referring to the multiple marketplaces as a singular "MLS," the Complaint identifies no fewer than five online marketplaces alleged to have participated in the supposed conspiracy. But these marketplaces are alleged to have different rules, none of which resemble the mandatory rules challenged in the NAR real estate cases. And, as noted above, boats.com and Boat Trader neither require sellers to be represented by brokers to list yachts, nor to be members of any Defendant Association. *Supra* at 7, n.7 and 12.

A recent real estate case addressing non-mandatory rules of an MLS not governed by NAR rules is instructive. In *Grace v. RE/MAX Holdings, Inc.*, plaintiffs were sellers of real estate who claimed they were unlawfully forced to offer and pay buyer's broker commissions due to MLS rules requiring such payment as a condition of listing. 2024 WL 2761188 (N.D. Cal. May 29, 2024). The *Grace* court examined non-NAR MLS rules at issue and dismissed the claims because the "[r]ules simply do not on their face *require*" offers of compensation by the seller's broker to the buyer's broker. *Id.* at *4 (emphasis added). The *Grace* court's dismissal makes sense because, absent rules *mandating* conduct, there were neither (1) facts connecting the defendants to a common, overarching agreement, nor (2) an enforcement mechanism in place to police compliance

with the alleged agreement, further demonstrating the alleged agreement's implausibility. *Id.*[10]

The same is true here. Plaintiffs claim a common set of rules and requirements impose a commission sharing mandate, but the plain language of the cited Association Defendant bylaws and ethics codes show that there is no common set of rules, and no sharing mandate. *See supra* at 13. And as to the alleged "MLSs," boats.com, Boat Trader, and Yachtr.com are not alleged to have any commission-sharing rule, and YachtWorld's co-brokerage requirement that Plaintiffs rely upon applies to only a portion of listings. *See supra* at 12. Accordingly, this Court should follow the reasoning of *Grace* and dismiss the Complaint.

### d.   Plaintiffs Rely on Improper "Group Pleading," Requiring Dismissal

Plaintiffs are obligated to allege *each* Defendant's distinct unlawful conduct, including how each joined the alleged conspiracy and what each did in furtherance of the illegal anticompetitive agreement. Federal Rule of Civil Procedure 8 cannot be satisfied with "group pleading" that lumps all Defendants together without alleging facts specific to each Defendant. *See, e.g.*, *Pierson v. Orlando Reg'l Healthcare Sys., Inc.*, 619 F. Supp. 2d 1260, 1274 (M.D. Fla. 2009) (dismissing antitrust claim because of complaint "grouping together of the[] Defendants without differentiation."); *see also In re Auto Body Shop Antitrust Litig.*, 2015 WL 4887882, at *6 (M.D. Fla. June 3, 2015) (dismissing antitrust claims based on "improper group pleading.").

But Plaintiffs rely on group pleading—between and among each group of Defendants— for each of their claims. For example, Plaintiffs group all of the Broker Defendants—OneWater,

---

[10] *See also Petruzzi's IGA Supermarkets, Inc. v. Darling–Delaware Co.*, 998 F.2d 1224, 1233 (3d Cir. 1993) (citing Richard A. Posner, *Economic Analysis of Law* 265–66 (3d ed. 1986)) ("Game theory teaches us that a cartel cannot survive absent some enforcement mechanism because otherwise the incentives to cheat are too great."); *Kleen Prod. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 842 (N.D. Ill. 2017), *aff'd sub nom. Kleen Prod. LLC v. Georgia-Pac. LLC,* 910 F.3d 927 (7th Cir. 2018) ("A punishment mechanism is crucial for another reason as well: it helps to distinguish illicit express collusion from lawful tacit collusion.").

Denison, Allied Marine, United Yacht Sales, HMY, Galati, Northrop & Johnson, MarineMax East, and the Fraser Defendants—together (along with other defendant groups), making undifferentiated allegations that "Defendants," "Broker Defendants," "brokers," or "Brokerage Defendants" engaged in alleged misconduct. ¶¶ 13, 83, 131, 208, 209. For example:

- Plaintiffs make no specific allegations whatsoever against OneWater and MarineMax East;

- The only allegations about Denison are that "most [of its] brokers are licensed and bonded" and that one of its brokers is "the current director of NYBA." ¶¶ 103, 151.

- The only allegations about Allied Marine are that one of its brokers is on the Board of Defendant IYBA, and that its brokers adhere to the IYBA code of ethics. ¶¶ 133, 150.

- The two allegations as to United Yacht Sales regarding its recruitment of brokers and the buyer's cost to hire a broker to "find the right vessel" do not demonstrate distinct unlawful conduct. ¶¶ 153, 156.

- The only substantive allegations against Galati are that its brokers are certified professional yacht brokers and that one of its employees serves on the IYBA Board. ¶¶ 133, 149.

- Plaintiffs fail to allege any specific facts against Northrop & Johnson, save for the fact that its website says it is affiliated with yacht broker associations and that one of its former employees served on the YBAA Board of Directors. ¶¶ 152, 132.

- The two allegations as to HMY state the unremarkable proposition that HMY lists yachts for sale on MLSs, and that an employee of HMY is also a member of the IYBA Board of Directors. ¶¶ 76, 133.

Without more—and nothing more is plead—these facts do not demonstrate conspiracy. *See Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008) ("[e]ven participation on the association's board of directors is not enough by itself" to create liability) (citing *Twombly*, 550 U.S. at 556-57).[11] Because Plaintiffs' group-pleaded claims fail to articulate necessary facts as to

---

[11] Nor can Plaintiffs implicate OneWater in a conspiracy simply because it acquired Denison Yachting in 2022. The antitrust laws do not suspend the "general principal of corporate law . . . that a parent corporation . . . is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998). Thus, a parent company is not a proper defendant absent some allegation that the parent is involved in the challenged conduct. *See In re Fla. Cement & Concrete Antitrust Litig.*, 746 F. Supp. 2d 1291, 1324 (S.D. Fla. 2010) (parent not liable for conduct of subsidiary where there is no evidence that both were involved in the challenged conduct) (quotation omitted); *Spanish Broad. Sys., Inc. v. Clear Channel Comm'ns, Inc.*, 242 F. Supp. 2d 1350, 1363 (S.D. Fla. 2003), *aff'd*, 376 F.3d 1065 (11th Cir. 2004) (recognizing that "before one corporate entity can be held liable for the alleged federal antitrust wrongs of another corporate entity, the plaintiff must satisfy the state law standard for piercing the corporate veil").

specific Defendants, Plaintiffs' claims must be dismissed as to these Defendants.

> ## 2. **PLAINTIFFS FAIL TO PLEAD THE REMAINING ELEMENTS OF A SECTION 1 CLAIM**
>
> > ### a. **Plaintiffs' Allegations Do Not Qualify For _Per Se_ Treatment Under the Antitrust Laws**

The "presumption" in an antitrust case "is that the rule-of-reason standard applies." *Seagood Trading Corp. v. Jerrico, Inc.*, 924 F.2d 1555, 1567 (11th Cir. 1991). Nothing in the Complaint suggests that this presumption does not apply here.

While Plaintiffs invoke the *per se* standard, ¶ 204, that standard is "limited to a very small class of antitrust practices whose character is well understood and that almost always harm competition." *Jacobs*, 626 F.3d at 1334 (citing *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006)). The *per se* rule is reserved for agreements for which "history and analysis have shown that in sufficiently similar circumstances the rule of reason unequivocally results in a finding of liability." *Consultants & Designers, Inc. v. Butler Serv. Group, Inc.*, 720 F.2d 1553, 1562 (11th Cir. 1983).

"History and analysis" cut in precisely the opposite direction in this case. The Supreme Court has made clear that trade association rules that do not directly restrain prices must be evaluated under the rule of reason, because trade associations are generally procompetitive. *See, e.g., Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 24 (1979) (agreements among associations of musicians and publishers to collectively set prices reviewed under rule of reason); *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 297 (1985) (trade association action facilitating horizontal refusal to deal reviewed under rule of reason).

This case is no exception. The *per se* rule is reserved for horizontal restraints with "immediately obvious" anticompetitive effects. *See FTC v. Indiana Fed'n of Dentists,* 476 U.S.

447, 458-59 (1986). "Horizontal" restraints are "imposed by agreement *between* competitors," whereas "vertical" restraints are "imposed by agreement between firms at *different* levels of distribution." *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018) (emphasis added). This distinction is critical because "virtually all vertical agreements now receive a traditional rule-of-reason analysis rather than straightforward *per se* condemnation." *In re Jan. 2021*, 2022 WL 1522054, at *13 (internal marks and citations omitted). The rule of reason also applies to mixed horizontal and vertical agreements , sometimes called "hybrid" agreements. *See, e.g., Winn-Dixie Stores, Inc. v. E. Mushroom Mktg. Coop., Inc.*, 89 F.4th 430, 435 (3d Cir. 2023) (application of rule of reason to "hybrid scheme" involving "myriad organizational structures with varying degrees of vertical integration" and that "required cooperation at multiple levels to succeed").

Here, Plaintiffs do not and cannot allege a horizontal conspiracy among four Association Defendants; two Marketplace Defendants (in addition to an Association Defendant alleged to operate an online marketplace); and twelve Broker Defendants. These entities do not compete with one another across categories. Yet Plaintiffs' theory of harm is predicated on a single agreement among all of Defendants. "Where predominantly vertical firms enter into a vertical restraint of trade, rule of reason analysis is appropriate 'even though in some ways the companies may have operated in similar lines of business.'" *In re Jan. 2021*, 2022 WL 1522054, at *14 (quoting *Generac Corp. v. Caterpillar, Inc.*, 172 F.3d 971, 977 (7th Cir. 1999)).

The challenged practices, moreover, do not directly restrain prices and, as is evident from Plaintiffs' allegations, have plausible—even obvious—procompetitive effects. Plaintiffs allege that by offering a commission, a seller's broker incentivizes buyer brokers to show their clients the listed yacht. ¶ 11. More showings mean greater demand, which means higher sales prices, making Plaintiffs better off, not worse. A practice that, as here, enhances overall market efficiency cannot be deemed *per se* illegal. *See Nat'l Bancard Corp. (NaBanco) v. VISA U.S.A., Inc.*, 779

23

F.2d 592, 603 (11th Cir. 1986) (affirming district court's refusal to apply *per se* standard). As such, the *per se* rule does not apply, and the Complaint must be assessed under the rule of reason.

### b.  <u>Plaintiffs Fail to State a Claim Under the Rule of Reason</u>

Under the rule of reason, a plaintiff is required to show that the alleged restraint had an anticompetitive effect on the relevant market. *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1084 (11th Cir. 2016) (citing *Levine v. Cent. Fla. Med. Affiliates, Inc.*, 72 F.3d 1538, 1551 (11th Cir. 1996)). Application of the rule of reason is fatal to Plaintiffs' claims because they fail to plead both (1) a plausible relevant market and (2) anticompetitive impact on the alleged market – bedrock requirements in a rule of reason case.

A plaintiff must plausibly allege the relevant market because otherwise "there is no way to measure the defendant's ability to lessen or destroy competition" in that market. *Am. Express*, 585 U.S. at 543 (2018) (alterations omitted); *see also Q Club Resort & Residences Condo. Ass'n, Inc v. Q Club Hotel, LLC*, 2010 WL 11454483, at *2 (S.D. Fla. Jan. 6, 2010) (relevant market is "a threshold requirement" at the pleading stage) (citing *Spectrofuge Corp. v. Beckman Instr., Inc.*, 575 F.2d 256, 276 (5th Cir. 1978)). The Eleventh Circuit recently reaffirmed the impracticality of applying the rule of reason without an accurate definition of the relevant market in *In re Jan. 2021 Short Squeeze Trading Litigation*, 105 F.4th 1346 (11th Cir. 2024). Relying on the Supreme Court's decision in *American Express*, the Court upheld the dismissal of plaintiffs' Section 1 claims where, like here, the plaintiffs failed plausibly to allege "anticompetitive effects *in a relevant market defined by their Amended Complaint*." *Id.* at 1357 (emphasis in original).

A relevant antitrust market has two components: a product market and a geographic market. *See, e.g.*, *Duty Free Ams., Inc. v. Estée Lauder Cos.*, 797 F.3d 1248, 1263 (11th Cir. 2015). As explained in greater detail below, the Complaint should be dismissed because it fails to allege either a plausible product market *or* a plausible geographic market. *Jacobs*, 626 F.3d at 1336

24

("[B]oth the geographic and product market allegations are necessary for a plaintiff suing under §
1 of the Sherman Act to succeed.").

Plaintiffs allege that the relevant product market is "yacht brokerage services provided to
yacht sellers and buyers by yacht brokers with access to the MLS," ¶ 168, and allege the geographic
market is "the United States," ¶ 170. Yet they fail to allege plausibly, as they must, that other
means of selling and buying yachts, excluded from the relevant market definition—whether
through sellers' FSBO efforts through listings on Defendant marketplaces, through listings on
other websites, or through other dealers or marketplaces other than those alleged to be part of "the
MLS"—are not reasonable substitutes. Nor have they provided any reason to exclude brokerage
services facilitating yacht purchases and sales outside the United States from the relevant market.

### i.    Plaintiffs Fail to Allege a Plausible Relevant Product Market

A plaintiff must "properly plead the boundaries of the alleged relevant product market,"
*L.H. Equity Invs. LLC v. Wade*, 2010 WL 11505176, at *3 (S.D. Fla. Mar. 29, 2010). To do so,
Plaintiffs must plead factual allegations regarding cross-elasticity of demand or other indications
of why consumers treat products in the alleged relevant market differently than they treat products
outside of the alleged market. *See Jacobs*, 626 F.3d at 1339 (dismissing complaint for failure to
plead relevant market).[12] Where a plaintiff "alleges a proposed relevant market that clearly does
not encompass all interchangeable substitute products even when all factual inferences are granted
in plaintiff's favor, [the] relevant market is legally insufficient." *Lockheed Martin Corp. v. Boeing
Co.*, 314 F. Supp. 2d 1198, 1225 (M.D. Fla. 2004) (citation omitted). That is the case here:  the
Complaint alleges facts that are irreconcilable with Plaintiffs' purported market.

---

[12] Cross elasticity of demand is an economic concept that measures the responsiveness in the
quantity demanded of one good when the price for another one changes. The higher the cross
elasticity between two products, the more likely they are in the same market. *See United States v
E.I. du Pont de Nemours & Co*, 351 US 377, 404 (1956).

Plaintiffs allege that the relevant product market is "yacht brokerage services provided to yacht sellers and buyers by yacht brokers with access to the MLS," ¶ 168, but fail to include any allegations to address the "cross-elasticity of demand" or "reasonable substitutability" (or lack thereof) of any alternative services provided to yacht sellers and buyers, including services provided by websites like Facebook Marketplace or Craigslist, industry magazines, sales from dealerships or manufacturers, or FSBO sales. *See Jacobs*, 626 F.3d at 1337-38 (identifying "cross-elasticity of demand" and "reasonable substitutability" of products or services as key factors to "pay particular attention to" in assessing product markets). Plaintiffs only allege, in a conclusory way, that "[a]ccess to the MLS is critical for brokers and agents to assist sellers and buyers" ¶ 174, and that "there is not a listing service that meaningfully competes with the MLS [*sic*]." ¶ 180.

These conclusory assertions should not be credited. The Complaint itself shows that there are means of selling and buying yachts through channels other than "the MLS[s]" and without brokerage services at all. For example, the Complaint cites materials that illustrate that brokers utilize an "omni-channel" approach that involves marketing beyond the Marketplace Defendants' websites, including "at major boat shows, on Google, social media, email, YouTube, in yachting magazines, [], blogs, digital ads and more." *See* **Ex. A**, *Market Your Yacht*, HMY Yachts, https://www.hmy.com/about-hmy/market-your-yacht/ (last visited August 9, 2024). Similarly, Plaintiffs acknowledge the existence of FSBO yacht sales (*see, e.g.*, ¶ 6) but fail to allege any facts as to why any yacht buyers would not consider FSBO yachts (whether sold on a Defendant's marketplace or not) as substitutes for yachts sold by brokers, including by the Defendant Brokers. And, as described above, online marketplaces like Boats.com and Boat Trader that Plaintiffs have alleged are part of "the MLS" allow FSBO listings, demonstrating that sellers need not use brokers in order to list boats on the marketplaces. *See supra* at 7, n.7.

Further, with respect to yacht buyers, the Complaint focuses exclusively on "pre-owned"

26

yachts. *See, e.g.*, ¶ 181 (defining alleged class as persons or entities who "sold a *pre-owned* boat or yacht . . . .") (emphasis added); *see also* ¶¶ 1, 3, 5, 8, 10, 13, 14, 17, 42, 52, 64, 66, 67, 79, 83, 159, 162 n.57, 192 (qualifying the yachts at issue as "pre-owned"). Plaintiffs include no allegations to establish why yacht buyers would not consider new yachts to be substitutes for used yachts. This failure is fatal, warranting dismissal. *See, e.g.*, *First Priority Emergency Vehicles, Inc. v. REV Ambulance Grp. Orlando, Inc.*, 2020 WL 2029344, at *4 (D.N.J. Apr. 28, 2020) (dismissing second amended complaint and explaining that while amended allegations "distinguish between the role of new and used ambulances," such allegations are "insufficient to demonstrate [new and] used ambulances are not reasonably interchangeable substitutes" in the relevant market).

ii.  <u>Plaintiffs Fail to Allege a Plausible Relevant Geographic Market</u>

Plaintiffs have also not plausibly alleged a geographic market limited to the United States because they have not alleged facts showing that buyers and sellers cannot look outside the United States for brokerage services to assist them in buying and selling yachts.

The geographic market is "the area of effective competition in which a product or its reasonably interchangeable substitutes are traded." *Duty Free*, 797 F.3d at 1263. As such, it must encompass both "the area in which [defendants] effectively compete[]" and "where buyers can turn for alternate sources of supply." *McArthur Dairy, LLC v. McCowtree Bros. Dairy, Inc.*, 2011 WL 2118701, at *4 (S.D. Fla. May 27, 2011).

Plaintiffs must plead facts "plausibly suggesting" the composition of the purported geographic market, *Twombly*, 550 U.S. at 545, and may not employ "pleading maneuvers" to "artificially narrow a broader economic market." *Q Club Resort*, 2010 WL 11454483, at *2 (citation omitted). A complaint must be dismissed where, as here, it presents "inconsistent allegations related to competitive harm in the relevant [geographic] market," *QSGI, Inc. v. IBM Glob. Fin.*, 2012 WL 13019046, at *4 (S.D. Fla. July 31, 2012), or alleges an "artificially narrow"

geographic market that fails to "correspond to the commercial realities of the industry," *Q Club Resort*, 2010 WL 11454483, at *2 (citation omitted). Further, an "internally inconsistent" geographic market both "hinder[s] the Court's ability to determine whether Plaintiff's allegations of harm to the relevant market can withstand a motion to dismiss" and "fails to provide adequate notice of the allegations to Defendants," requiring dismissal. *Location 24, LLC v. Drs. Same Day Surgery Ctr., Inc.*, 2023 WL 2931458, at *6-8 (M.D. Fla. Jan. 18, 2023).

Plaintiffs allege that the relevant geographic market encompasses only "the United States," excluding the rest of North America and the rest of the world. ¶ 170. This alleged geographic market makes no sense. As a threshold matter, Plaintiffs fail to explain how this interacts with the alleged product market. Does the geographic market encompass only "yacht brokerage services" offered in the United States? *See* ¶ 168. Or does the market encompass only "services provided to yacht sellers and buyers" in the United States? *See id.* The Complaint simply does not say. Instead, the Complaint makes clear that brokerages operate internationally, that yachts themselves are listed internationally, that buyers may buy internationally, and that sellers may sell internationally.[13] The Complaint flatly contradicts the artificial geographic boundaries asserted by Plaintiffs.

For example, Plaintiffs acknowledge that "MLS[s] are available on the internet worldwide," ¶ 170, concede that Defendants cater to a worldwide consumer base, and repeatedly invoke Defendants' U.S. *and* non-U.S. operations, marketing, and sales. *See, e.g.*, ¶¶ 33, 35, 37, 38, 44-45 (describing the *international* operations of Galati Yacht Sales, MarineMax, Inc., Fraser

---

[13] In fact, the publicly available U.S. Coastguard records for the yachts that Plaintiffs Magna Charta, LLC and Juan Galan sold, ¶¶ 28, 31, were registered internationally for a period of time. *See* **Ex. E**, (Magna Charta Abstract of Title, 1227342) (registered under Republic of South Africa in 2010); **Ex. F**, (Juan Galan Abstract of Title, 1038690) (registered in the Bahamas in 2021); *see also Ellison v. Postmaster Gen., U.S. Postal Serv.*, 2022 WL 4726121, at *7 (11th Cir. Oct. 3, 2022) ("It is clear a district court, at the motion to dismiss stage, may take judicial notice of relevant public documents" and finding district court did not abuse its discretion when taking judicial notice of relevant public documents from a federal agency administrative record).

Yachts, and United Yacht Sales); ¶ 47 (describing defendant *International* Yacht Brokers Association, Inc.); ¶ 71 (Yachtworld is a "worldwide" database of brokerage boats for sale); *see supra* at 4, n.6 **Ex. A** (describing HMY Yachts' services as "putting your yacht in front of boaters *all over the world*," including on "top European websites") (emphasis added).

Plaintiffs' proposed geographic market "clearly excludes relevant geographic areas, purchasers, or suppliers," *Lockheed Martin*, 314 F. Supp. 2d at 1225, is contradicted by Plaintiffs' own allegations, and fails to reflect commercial realities, rendering it insufficient as a matter of law and requiring dismissal of Plaintiffs' claims.

    iii.  <u>Plaintiffs Fail to Allege an Anticompetitive Effect on the Purported Market</u>

Even if Plaintiffs had alleged a cognizable relevant market, dismissal is still mandated because Plaintiffs fail to allege plausibly any anticompetitive effect on the purported market. *See Jacobs*, 626 F.3d at 1336 ("[r]ule of reason analysis requires the plaintiff to prove . . . an anticompetitive effect … on the relevant market."). Under the rule of reason, a plaintiff bears "the initial burden to prove that the challenged restraint has a *substantial anticompetitive effect* that harms consumers *in the relevant market*." *Am. Express*, 585 U.S. at 541 (emphases added).

A plaintiff may establish an anticompetitive effect in one of two ways: (1) showing that the defendants' behavior had "an actual detrimental effect" on competition or (2) by demonstrating that the behavior had "the potential for genuine adverse effects on competition." *Levine*, 72 F.3d at 1551 (citation omitted). Plaintiffs have failed to allege either.

    1.  *Plaintiffs Fail to Plead Actual Harm*

Plaintiffs bears the burden of demonstrating actual harm with "specific factual allegations[;]" broad allegations of damage to "competition in general" will not suffice. *Spanish Broad. Sys.*, 376 F.3d at 1072-73. "Actual" harm is "indicated by a factual connection between the alleged harmful conduct and its impact on competition in the market." *Jacobs*, 626 F.3d at 1339

(citing *Spanish Broad. Sys.*, 376 F.3d at 1072). Actual harm can be supported by allegations that "include, but are not limited to, reduction of output, increase in price, or deterioration in quality" relative to the competitive level. *In re Jan. 2021*, 105 F.4th at 1355 (citation omitted). The Complaint fails to meet this standard. Plaintiffs declare, without elaboration, that "boat sellers pay hundreds of millions of dollars more in commissions every year than they would in a competitive market." ¶ 17. This conclusory allegation is not enough. Plaintiffs do not plead what "the competitive level" would have been absent Defendants' alleged anticompetitive conduct, nor do Plaintiffs assert allegations of reduced output or deterioration in quality.

2.   *Plaintiffs Fail to Plead Potential Harm*

Where a plaintiff fails to "provide allegations plausibly suggesting actual harm to competition," the "only avenue of relief" is "to sufficiently allege potential harm." *Jacobs*, 626 F.3d at 1339. To establish potential harm to competition, a plaintiff must plead that defendants possessed market power in a cognizable relevant market, and make "specific allegations linking market power to harm to competition in that market." *Spanish Broad. Sys.*, 376 F.3d at 1073. Before a plaintiff can demonstrate potential detrimental effects on competition, the plaintiff must first "establish that the defendants had sufficient market power to affect competition." *Levine*, 72 F.3d at 1554 (citation omitted). Thus, well-pled factual allegations of market power in a cognizable relevant market are required to show potential harm.[14]

"The Eleventh Circuit has defined market power narrowly as: the ability to raise price significantly above the competitive level without losing all of one's business." *Spanish Broad. Sys.*, 242 F. Supp. 2d at 1359 (citations omitted). It is well-established that "the principal judicial device for measuring actual or potential market power [is] market share, typically measured in

---

[14]Because Plaintiffs have not pleaded market power in their purported U.S. geographic market, it follows that they have not pleaded market power in any cognizable *international* market either.

terms of a percentage of total market sales." *U.S. Anchor Mfg., Inc. v. Rule Indus., Inc.*, 7 F.3d 986, 994 (11th Cir. 1993); *see also, e.g.*, *Jacobs*, 626 F.3d at 1339-40 (market share is "used in litigation as a surrogate for market power").

The Complaint does not contain *any* allegations relating to any of Defendants' market shares in any market (never mind the purported relevant market). Nor does it allege facts sufficient to suggest what "percentage of total market sales" Defendants possess, either individually or collectively, in the alleged relevant market. Although "exact percentages" are not required to establish market power, *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1580 (11th Cir. 1991), a plaintiff must at least present allegations from which this Court could plausibly infer the requisite market power component of a Defendant. *Levine*, 72 F.3d at 1553 (affirming dismissal where plaintiff presented "no evidence to prove the defendants' market power").

Nor do Plaintiffs allege anything else to establish market power. In *Jacobs v. Tempur-Pedic International Inc.*, the Court considered whether a plaintiff who alleged that the defendant had 80-90% market share in the alleged market had established market power for purposes of a Section 1 claim. 626 F.3d at 1340. The Eleventh Circuit explained that even a high market share, without additional allegations showing the "injurious exercise of market power such as evidence of restricted output and supracompetitve prices," was not sufficient to establish market power. *Id.* (citation omitted). Here, Plaintiffs have failed to allege either market share *or* other supporting evidence of market power. This deficiency is a "fatal blow" to Plaintiffs' case. *Id.*

Plaintiffs do not allege facts (market share or otherwise) to support a finding that any of the Defendants individually or collectively possess either market power in the alleged relevant market for "yacht brokerage services provided to yacht sellers and buyers by yacht brokers with

access to the MLS" in the United States,[15] or market shares that could allow for an inference of market power in that supposed relevant market. Instead, Plaintiffs rest on the conclusory and unsupported allegation that "Defendants and their co-conspirators collectively have market power through their control of the MLS, YBAA, IYBA, and their dominant share of the market," ¶ 173, without providing any plausible explanation for how the Broker and Association Defendants might "control" the independent Marketplace Defendants.[16] Plaintiffs further assert that "[a]s a result of collusive, anticompetitive conduct among boating MLS[s], yacht broker associations and boat broker firms, boat sellers pay hundreds of millions of dollars more[17] in commissions every year than they would in a competitive market." ¶ 17. But there is no support for this allegation either.

In an effort to prop up their singular conclusory market power allegation (*see* ¶ 173), Plaintiffs summarily allege that there are "substantial barriers to entry," but fail to articulate what these barriers are. *See* ¶ 180; *see* also ¶ 175 (asserting that brokers competing outside of the alleged agreement face "insurmountable barriers"). Plaintiffs also allege, without any explanation, that "[t]he fact that there is not a listing service that meaningfully competes with the MLS is indicative of the substantial barriers to entry." ¶ 180.[18] These conclusory allegations especially ring hollow given that both Boats.com and Boat Trader accept FSBO listings. *See supra* at 7, n.7.

These allegations fail to establish market power. The Complaint alleges no facts to support the bald assertion of market power, and provides *no* allegations about the unnamed co-conspirators

---

[15]Notably, the Marketplace Defendants and Association Defendants do not provide yacht brokerage services at all, so it is not clear how they can be alleged to have any market power in such a market.

[16]The Complaint mentions "market power" only twice—once in the subheading "Relevant Markets and Defendants' Market Power" on page 44, and again at paragraph 173.

[17]As discussed above, "more" than what is not defined or alleged anywhere in the Complaint. *See supra* at § 2.b.iii.1.

[18] Moreover, Plaintiffs' conclusory reference to five distinct website marketplaces at issue (boats.com, Yacht Broker, YachtWorld, Yatco, and Yachtr.com) as a single "MLS" conveniently ignores that these marketplaces themselves compete with each other.

or their conduct, which is critical given the allegation that Defendants and the unnamed co-conspirators *collectively* have market power. ¶ 173; *see also* ¶ 62 .[19] Plaintiffs' allegations therefore provide no basis whatsoever to evaluate the market shares or market power of the allegedly conspiring entities, including *the Defendants in this case*, let alone meet their burden of alleging that Defendants have market power. Here, Defendants lack market power because, if the Broker Defendants raised the price of their services, yacht sellers would simply sell their yachts themselves—as many already do—or they would use the services of *other* non-Defendant brokers. *See Spanish Broad. Sys.*, 242 F. Supp. 2d at 1359.

Plaintiffs' allegations regarding "the MLS" also fail to show that Defendants have market power. Again, there is no *single* MLS operated by Defendants, but instead a variety of *competitor* marketplaces, each with separate ownership, memberships, and rules. *See supra* at 6-8 and § 2.b.i. As described above, some online marketplaces—including Boats.com and Boat Trader—accept listings from yacht sellers who are not represented by brokers, undercutting any argument that they are part of a conspiracy to inflate broker's commissions. *See id.* Furthermore, there is competition both among the alleged Marketplace Defendants, and between the Marketplace Defendants and other online marketplaces where yachts are advertised. Just as new brokers can enter the market and sell yachts through whatever means suit them and their clients—including on whatever platform they like— new marketplaces (which would also belong to the Plaintiffs' definition of "MLSs") can enter and compete, just as the Marketplace Defendants in this case have done.

In the absence of factual allegations that Defendants "had sufficient market power to affect

---

[19] The aggregation of Defendants' alleged market power is also improper because Plaintiffs have not plausibly alleged the participation of all Defendants in the alleged conspiracy. *See Maris Distrib. Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1218 (11th Cir. 2002) ("aggregation is inappropriate"); *Dickson v. Microsoft Corp.*, 309 F.3d 193, 210-11 (4th Cir. 2002) (rejecting aggregation of individual market shares where overarching conspiracy implausible).

competition," Plaintiffs' "section 1 claim must fail." *Levine*, 72 F.3d at 1553. Because Plaintiffs have not alleged that Defendants individually or collectively have market power in the alleged relevant market, they cannot plausibly allege potential harm, requiring dismissal of the Complaint.

### 3. PLAINTIFFS ALLEGE NO AGREEMENT SUPPORTING A CONCERTED REFUSAL TO DEAL CLAIM

Count II of the Complaint purports to assert a concerted refusal to deal claim in violation of Section 1 of the Sherman Act. Plaintiffs posit two supporting theories: (1) "Marketplace Defendants, in conspiracy with and at the behest of Broker Defendants, have refused to deal with sellers who are not represented by a licensed broker by refusing to accept FSBO listings"; and (2) "Broker Defendants, when acting in the capacity of a seller's broker, have refused to deal with potential buyers unless the potential buyer is also represented by a licensed broker[.]" ¶¶ 208-09. In addition to the deficiencies explained above, Count II should also be dismissed because Plaintiffs fail to allege plausibly an agreement concerning either of these theories.

A party "has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently." *Monsanto*, 465 U.S. at 761. The antitrust laws "do[ ] not restrict the long recognized right of [a party] engaged in an entirely private business, freely to exercise his own independent discretion as to parties with whom he will deal; and, of course, he may announce in advance the circumstances under which he will refuse to sell." *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919).

Accordingly, as with Plaintiffs' commission-based claim, for a concerted refusal to deal claim, Plaintiffs must plead "facts that plausibly suggest an agreement or conspiracy[.]" *Auto. Alignment*, 953 F.3d at 726; *see also Constr. Aggregate Transp., Inc. v. Fla. Rock Indus., Inc.*, 710 F.2d 752, 774 (11th Cir. 1983) ("the touchstone of an illegal group boycott or concerted refusal to deal is the agreement between two or more merchants not to deal with another merchant when, in

the absence of such an agreement, the conspiring merchants would normally have been free to deal with that merchant").[20] "Conclusory allegations of agreement or conspiracy are insufficient. . . . '[A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice.'" *Quality Auto*, 917 F.3d at 1262 (quoting *Twombly*, 550 U.S. at 556-57).

### a. **Plaintiffs' FSBO Theory Fails to Allege an Anticompetitive Agreement**

Plaintiffs' first theory requires Plaintiffs to plead three levels of agreement: (1) Marketplace Defendants *agreed* amongst themselves to refuse to allow FSBO listings on their websites; (2) Broker Defendants *agreed* among themselves to cause Marketplace Defendants to refuse to allow FSBO listings on their websites; and (3) Marketplace Defendants *agreed* with Broker Defendants to refuse to allow FSBO listings on their websites. Plaintiffs plead no such agreements, and their allegations are not remotely plausible on their face.

At the first level, there are *no* allegations that the Marketplace Defendants agreed among themselves not to accept FSBO listings. Indeed, Plaintiffs allege "Boats Group, LLC owns and operates several large yachting MLS[s], including Boat Trader, YachtWorld, and Boats.com[,]" ¶ 54, but Plaintiffs make no allegation (nor can they) that either Boat Trader or Boats.com do not accept FSBOs. In fact, both Boat Trader and Boats.com *do allow* FSBO listings, as demonstrated by their websites. *See supra* at 7, n.7. Given that such "large yachting MLS[s]" (¶ 54) are available to FSBO yacht sellers/listers, Plaintiffs' conclusory allegation of an agreement among all of the Marketplace Defendants to refuse to accept FSBO listings cannot stand.

At the second level, nowhere do Plaintiffs allege that Broker Defendants reached a horizontal agreement to refuse to deal with Marketplace Defendants unless they refused to accept

---

[20] Plaintiffs' group boycott claim is also inconsistent with the alleged market. They define the relevant market as "yacht brokerage services provided to yacht sellers and buyers by yacht brokers with access to the MLS." ¶ 168. But the FSBO group boycott claim is predicated on the fact that FSBO sales are a reasonable alternative to sales using broker services.

FSBO listings. There is no allegation, for example, that any individual Broker Defendant refuses to list yachts for sale on Boat Trader or Boats.com (or any other marketplace that accepts FSBO listings, *e.g.*, Facebook Marketplace or Craigslist) because they accept FSBO listings, much less that the Broker Defendants collectively agreed not to do so. Nor do Plaintiffs allege facts as to any plus factors that would tend to show such an agreement. *See Auto. Alignment*, 953 F.3d at 726 ("Where a conspiracy claim rests on allegations of parallel conduct, a plaintiff must allege sufficient 'plus factors' to make the parallel conduct 'more probative of conspiracy than of conscious parallelism.'") (quoting *Quality Auto*, 917 F.3d at 1262).[21] Whether an individual Broker Defendant decides unilaterally to list yachts on marketplaces that host FSBO listings would be supported by that Broker's individual economic interests based on its client base and go-to-market strategy, among other considerations.

At the third level, Plaintiffs fail to allege an anticompetitive agreement between or among any Broker Defendant and any Marketplace Defendant, let alone ***all*** such parties. For example, nowhere do Plaintiffs allege (nor could they consistent with Rule 11) that Broker Defendants posted their listings to Marketplace Defendants' platforms *on the condition that* the platforms not accept FSBO listings. All that Plaintiffs allege is that when "independently owned MLS[s] want to obtain listings from brokers, they must conform to industry practice at the insistence of boat brokers, who are also members of the yacht broker associations." ¶ 10. Such an allegation is not only improperly conclusory under *Twombly*, but Plaintiffs nowhere allege or explain that such "industry practice" means refusing to accept FSBO listings. Furthermore, given that the independent marketplaces are just that – independent – whether anyone who includes yacht listings

---

[21]Clearly, there is also no punishment mechanism among the Broker Defendants vis a vis the Marketplace Defendants to deter them from allowing FSBO listings, since several of their marketplaces openly allow for such listings and provide for them in their rules. *See supra* at 7, n.7.

on their marketplaces are members (or not) of any Defendant Association is irrelevant. As for the one non-independently owned marketplace—*i.e.*, Yachtr.com—its alleged refusal to accept such FSBO listings is also explained by its owners' own independent and economically sound commercially differentiating strategy to make available a competing marketplace maintained for the benefit of its broker members, including but not limited to the Broker Defendants and not by any agreement.[22] *See* ¶ 47 ("IYBA, in conjunction with other yacht broker associations. . . founded yachtbroker.org (now, Yachtr.com), as an industry-wide association-owned MLS platform to serve the yacht brokerage community."); ¶ 48 (noting Yachtr.com "effectively replaces yachtbroker.org as the yacht-broker-association-owned MLS"); *see also* ¶¶ 49, 80-81 (similar). Again, independent conduct explains why an Association-owned marketplace would not want to list FSBOs—*i.e.*, listings not posted by brokers, who are their key customers. Moreover, Marketplace Defendants are not otherwise required to deal with FSBO listers. *See Verizon Commc'ns., Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407-08 (2004) ("Compelling . . . firms to share the source of their advantage is in . . . tension with the underlying purpose of antitrust law, since it may lessen the incentive for the monopolist, the rival, or both to invest in those economically beneficial facilities.").

**b. <u>Plaintiffs' Buyer Broker Theory Fails to Allege an Anticompetitive Agreement</u>**

Plaintiffs' second theory requires Plaintiffs to plead a horizontal agreement by and among Broker Defendants to refuse to deal with potential yacht buyers who lack their own brokers. Plaintiffs fail to plead even in conclusory fashion that there was an agreement to do so, and their allegations otherwise concede the opposite.

---

[22]There are no allegations (and there can be none consistent with Rule 11) that Brokers who list yachts for sale on Yachtr.com are precluded from also posting listings for yachts for sale on other marketplaces.

For example, Plaintiffs allege that "pre-owned boat and yacht buyers increasingly look for and find yachts themselves on yachting MLS[s] on the internet." ¶ 14; *see also* ¶ 4 ("more and more prospective yacht buyers utilize MLS[s] to locate boats and yachts to purchase."); ¶ 69. Plaintiffs further allege that "Defendants are *aware* of th[e] trend" of "buyers increasingly retain[ing] a buyer broker after the buyer has already found the vessel the buyer wishes to buy." ¶ 15 (emphasis added). But nowhere do Plaintiffs allege that the Broker Defendants are the reason why buyers choose to retain their own brokers even after finding yachts to purchase by themselves. Nor do Plaintiffs allege that Broker Defendants otherwise caused buyers to retain their own brokers. For example, beyond a conclusory fashion, nowhere do Plaintiffs allege facts supporting the notion that Broker Defendants refused to deal with buyers who—without using a licensed broker—contacted Broker Defendants directly. Because Plaintiffs nowhere tie back Broker Defendants' purported knowledge of this alleged "trend" to any agreement or conspiracy not to deal with buyers lacking their own brokers, such knowledge is immaterial.[23]

Rather, Plaintiffs' allegations that certain listing broker "standardized agreements and forms" include dual-agency clauses, which permit the listing broker to represent both the buyer and seller, acknowledge that listing brokers *do* work with buyers that are not represented by their own broker. ¶ 100; *see also* ¶ 137 ("a 'Yacht Broker may also represent both the Seller and the Buyer, as a "Dual Agent," with responsibilities to both parties.'"); ¶ 142 ("Fraser Yachts' brokers

---

[23] If anything, Broker Defendants' alleged knowledge of this trend undermines Plaintiffs' unsupported steering conclusions. *See*, *e.g.*, ¶ 161 ("yacht sellers have been compelled to set a high buyer broker commission to induce buyer brokers to show their yachts to the buyer brokers' clients;" and "yacht sellers who do not offer a sufficiently high commission to buyer's brokers risk having buyer brokers direct or steer their clients to sellers who offer a higher buyer broker commission"). Where buyers themselves are selecting the boats they wish to view and/or buy rather than having brokers research and identify potential yachts to purchase—and Broker Defendants are aware of such a trend, Plaintiffs allege—Broker Defendants no longer have an incentive to "induce buyer brokers to show their yachts" through the use of "sufficiently high commissions" as the buyer brokers are removed from the selection and/or purchase process.

use a dual agency"). In such cases, there would be no need for a separate buyer's agent, nor would a listing agent seek to split her commission unnecessarily. If a qualified buyer approached a listing broker directly to seek to purchase the seller's yacht, the seller's broker would have no incentive to co-broker the deal and perhaps have to share her own commission with another broker representing the buyer. Instead, the seller's broker has every incentive to work directly with the buyer without getting another broker involved. The buyer, however, may wish to have his own broker to best represent the his interests alone, educate him on the market, assist him in finding and negotiating any deal, and any other idiosyncratic reasons an individual buyer may have. This explains why a buyer may choose to retain a separate broker even "after the buyer has already found the vessel the buyer wishes to buy[,]" ¶¶ 14-15—a phenomenon the Complaint ignores.

Plaintiffs' own allegations concede that at least 30% of yachts sold on the YachtWorld marketplace are sold without brokers separately representing the buyer and the seller. *See* ¶ 75 ("About 70-percent of all brokerage sales are co-brokered."); ¶ 119 (noting that about 70% sales on YachtWorld are co-brokered); ¶ 126 (same).[24] The clear implication is at least 30% of deals are closed using only one broker (or no brokers at all), undermining any notion of a refusal to deal, let alone a *concerted* refusal to deal.

### 4. DEFENDANTS EXPRESSLY RESERVE THE RIGHT TO COMPEL ARBITRATION AGAINST YACHT SELLERS WHO HAVE AGREED TO ARBITRATE THEIR CLAIMS

Mandatory arbitration clauses are commonly included in yacht broker agreements, including in the agreements used by many Defendants and referenced by Plaintiffs in the Complaint. Defendants do not waive their rights to require arbitration of the claims of both named

---

[24] Given the Complaint's silence regarding the other online marketplaces, the Court can draw no inferences in favor of Plaintiffs about the percentage of co-brokered versus non-co-brokered transactions facilitated by those other website platforms.

and unnamed Plaintiffs. Specifically, Defendants are currently investigating whether and to what extent any named Plaintiffs are subject to mandatory arbitration agreements. Because Plaintiffs did not name as a Defendant each yacht broker associated with each named Plaintiff's yacht sale, Defendants lack access to some of the listing agreements to determine whether arbitration should be compelled as to any of the named Plaintiffs. Defendants reserve all rights to move to compel arbitration upon further investigation and discovery as to the any of the named Plaintiffs.

Whether unnamed class members are required to arbitrate their claims is not ripe for this Court's consideration. *Gutierrez v. Wells Fargo Bank, N.A.*, 889 F.3d 1230, 1237-39 (11th Cir. 2018) (district court lacks jurisdiction over motions to compel arbitration against unnamed class members until a class is certified). To avoid any later assertion of waiver by Plaintiffs, Defendants reserve all rights to oppose class certification based on issues including adequacy and predominance under Rule 23 based on the requirement that some percentage of class members may be compelled to arbitrate the claims advanced in this lawsuit. Defendants further reserve their rights to seek to compel arbitration against absent class members in the event that a class is certified that includes yacht sellers subject to arbitration agreements.

## **CONCLUSION**

For the foregoing reasons, Defendants are entitled to an Order: (1) granting their Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint, and (2) granting any and all other additional relief this Court may deem just and proper.

<u>Dated</u>:  August 9, 2024

Respectfully submitted,

<u>/s/ Christina M. Paul</u>

Sean A. Burstyn
**Burstyn Law PLLC**
1101 Brickell Avenue
Ste S-700
Miami, FL 33131
305-204-9808
Email: sean.burstyn@burstynlaw.com

Lawrence Buterman – PHV
**Latham & Watkins LLP**
1271 Avenue of the Americas
New York, NY 10020
Tel: 212-906-1264
Email: Lawrence.buyerman@lw.com

Anna M. Rathbun – PHV
Christopher J. Brown – PHV
**Latham & Watkins LLP**
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
(202) 637-2200
Email: anna.rathbun@lw.com
Email: chris.brown@lw.com

*Counsel for Boats Group, LLC*

Christina McGinley Paul
**K&L Gates LLP**
Southeast Financial Center
200 South Biscayne Boulevard, Suite 3900
Miami, FL 33131-2399
305-539-3316
Fax: 305-358-7095
Email: christina.paul@klgates.com

Michael E. Martinez – PHV
Brian J. Smith – PHV
**K&L Gates LLP**
70 W. Madison St., Suite 3300
Chicago, IL 60602
Tel: (312) 372-1121
Email: michael.martinez@klgates.com
Email: brian.j.smith@klgates.com

*Counsel for Galati Yacht Sales, LLC,*
*MarineMax, Inc., MarineMax East, Inc.,*
*Fraser Yachts Florida, Inc., Fraser Yachts*
*California Corporation, and Northrop &*
*Johnson Yacht Ships, LLC*

Jeffrey A. LeVee – PHV
Eddie Hasdoo – PHV
**Jones Day**
555 S. Flower Street, 50th Fl.
Los Angeles, CA 90071
Tel:  (213) 489-3939
Email: jlevee@jonesday.com
Email: ehasdoo@jonesday.com

*Counsel for OneWater Marine Inc.*

W. Scott Turnbull (FBN 0038626)
**Crary Buchanan, P.A.**
759 SW Federal Hwy, Suite 106
Stuart, FL 34994
Tel: 772-287-2600
Fax: 772-398-8122
Email: turnbull@crarybuchanan.com

*Counsel for United Yacht Sales, LLC*

Christopher M. Brainard – PHV
**C.M. Brainard & Assoc.**
8549 Wilshire Blvd., Pmb 2095
Beverly Hills, CA 90211
(310) 266-4115
Email: christopherbrainard@gmail.com

Emily M. Heim – PHV
**Bayramoglu Law Offices LLC**
1540 West Warm Springs Road, Suite 100
Henderson, NV 89014
Tel: 702-462-5973
Fax: 702-553-3404
Email: emily@bayramoglu-legal.com

*Counsel for Denison Yachts International,*
*LLC*

Jeffrey T. Foreman
William Jay Blechman
Joshua B. Gray – PHV
**Kenny Nachwalter, P.A.**
Four Seasons Tower – Suite 1100
1441 Brickell Avenue
Miami, FL 33131
Tel: (305) 373-1000
Fax: (305) 372-1861
Email: jtf@knpa.com
Email: wblechman@knpa.com
Email: jgray@knpa.com

*Counsel for International Yacht Brokers*
*Assoc, Inc.*

Jennifer Patterson – PHV
**Haug Partners LLP**
745 Fifth Avenue, 10th Floor
New York, NY 10151
(212) 588-0800
Email: jpatterson@haugpartners.com

Michael F. Brockmeyer – PHV
**Haug Partners LLP**
1717 K Street NW, Suite 900
Washington, DC 20006
202-292-1530
Email: mbrockmeyer@haugpartners.com

*Counsel for Allied Marine, Inc*

Roy Fitzgerald
Gregory Weiss
Jennifer Perrone
**Mrachek, Fitzgerald, Rose, et al P.A.**
505 South Flagler Drive, Suite 600
West Palm Beach, FL 33401
Telephone: (561) 655-2250
rfitzgerald@mrachek-law.com
gweiss@mrachek-law.com
jperrone@mrachek-law.com

*Counsel for Yatco, LLC*

David B. Esau
Amanda R. Jesteadt
**Carlton Fields, P.A.**
CityPlace Tower Suite 1200
525 Okeechobee Boulevard
West Palm Beach, FL 33401
Tel: 561-659-7070
Fax: 561-659-7368
Email: desau@carltonfields.com
Email: ajesteadt@carltonfields.com

Scott Abeles – PHV
**Carlton Fields, P.A.**
1025 Thomas Jefferson St., NW
Suite 400 West
Washington, DC 20007
Tel: (202) 965-8189
Email: sabeles@carltonfields.com

*Counsel for Yacht Broker's Association of
America, Inc.*


Caitlin Saladrigas
Fla. Bar. No. 95728
**Holland & Knight LLP**
777 South Flagler Drive
Suite 1900, West Tower
West Palm Beach, FL 33401
Tel: (561) 833-2000
Email: caitlin.saladrigas@hklaw.com

David Kully – PHV forthcoming
**Holland & Knight LLP**
800 17th St NW,
Suite 1100
Washington, DC 20006
Tel: (202) 955-3000
Email: david.kully@hklaw.com

*Counsel for Northwest
Yacht Brokers Association*

A. Thomas Connick
**A. Thomas Connick, P.A.**
411 E Hillsboro Blvd
PO Box 1186
Deerfield Beach, FL 33441
954-428-0300
Email: tomconnick@gmail.com

Kenneth M. Kliebard – PHV
**Morgan, Lewis & Bockius, LLP**
110 North Wacker Drive
Chicago, IL 60606
312-324-1774
Email: kenneth.kliebard@morganlewis.com

Stacey Anne Mahoney – PHV
**Morgan, Lewis & Bockius, LLP**
101 Park Avenue
New York, NY 10178
212.309.6930
Email: stacey.mahoney@morganlewis.com

William T. McEnroe – PHV
**Morgan, Lewis & Bockius, LLP**
2222 Market Street
Philadelphia, PA 19103
215.963.5265
Email: william.mcenroe@morganlewis.com

*Counsel for HMY Yacht Sales, Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that a true and correct copy of the foregoing was electronically filed with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties either via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing on this 9th day of August, 2024.

*/s/ Christina M. Paul*