UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 24-cv-20805-KMM

YA MON EXPEDITIONS, LLC, BLUEBERRY )
ENTERPRISES, LLC, MAGNA CHARTA, LLC, )
PRIDE CONTRACTING, INC., KIP LAMAR )
SNELL, and JUAN GALAN, Individually and on )
Behalf of All Others Similarly Situated, )
 )
    Plaintiffs, )
 )
vs. )
 )
ALLIED MARINE, INC., GALATI YACHT )
SALES, LLC, HMY YACHT SALES, INC., )
MARINEMAX, INC., NORTHROP & JOHNSON )
YACHTS-SHIPS, LLC, FRASER YACHTS )
FLORIDA, INC., FRASER YACHTS )
CALIFORNIA CORPORATION, MARINEMAX )
EAST, INC., ONEWATER MARINE INC., )
DENISON YACHTS INTERNATIONAL, LLC, )
YACHTING ASSETS AND OPERATIONS LLC, )
UNITED YACHT SALES, LLC, )
INTERNATIONAL YACHT BROKERS )
ASSOCIATION, INC., YACHT BROKERS )
ASSOCIATION OF AMERICA, INC., )
CALIFORNIA YACHT BROKERS )
ASSOCIATION, INC., NORTHWEST YACHT )
BROKERS ASSOCIATION, BOATS GROUP, )
LLC, PERMIRA ADVISERS LIMITED, )
PERMIRA ADVISERS LLC, and YATCO, LLC. )
 )
    Defendants. )
_____)

**PLAINTIFFS' RESPONSE IN OPPOSITION TO OMNIBUS MOTION TO DISMISS
BY CALIFORNIA YACHT BROKERS ASSOCIATION**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................................... 1

FACTUAL BACKGROUND ................................................................................................... 2

ARGUMENT ............................................................................................................................ 3

   A.    The Court Should Reject CYBA's Attempts to Introduce Factual Disputes .................. 3

   B.    CYBA is not Immune from Suit Under the Sherman Act ................................................ 4

      1)    CYBA's Anticompetitive Conduct was not "Clearly Articulated and
Affirmatively Expressed in State Policy" ................................................................ 4

      2)    California did not "Actively Supervise" CYBA's Anticompetitive Conduct ............ 5

   C.    Plaintiffs Have Alleged that CYBA is Part of an Antitrust Conspiracy .......................... 6

      1)    Applicable Sherman Act Standards ......................................................................... 6

      2)    Plaintiffs Allege CYBA Conspired with the MLS Defendants, Other
Association Defendants and Broker Defendants ....................................................... 8

      3)    The Conspiracy is Anti-Competitive ..................................................................... 10

      4)    CYBA Improperly Deconstructs Plaintiffs' Claims .............................................. 13

        a)    CYBA's Code of Ethics Requiring all Brokers to use Standard Business Practices
Demonstrates CYBA's Participation in the Conspiracy ................................... 14

        b)    CYBA's Participation with MLS Defendants is Part of the Conspiracy .................. 16

        c)    Brokers' Fiduciary Duties do not Negate CYBA's Participation in the Conspiracy. 16

   D.    CYBA's Indispensable Party Argument Falls Flat ....................................................... 18

   E.    Venue in this District is Proper Under 28 U.S.C. § 1391 ............................................ 19

CONCLUSION ....................................................................................................................... 20

i

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Am. Contractors Supply, LLC v. HD Supply Constr. Supply, Ltd.*,
   989 F.3d 1224 (11th Cir. 2021) ................................................................. 6

*Bryant v. Avado Brands, Inc.*,
   187 F.3d 1271 (11th Cir. 1999) ................................................................. 4

*Burnett v. Nat'l Ass'n of Realtors*,
   2022 WL 17741708 (W.D. Mo. Dec. 16, 2022) ....................................... 10

*Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*,
   445 U.S. 97 (1980)...................................................................... 4, 5, 6

*Campbell v. Universal City Dev. Partners, Ltd.*,
   72 F. 4th 1245 (11th Cir. 2023) ............................................................... 19

*Compass, Inc. v. Real Estate Bd. of N.Y., Inc.*,
   2022 WL 992628 (S.D.N.Y. Mar. 31, 2022) ............................................. 8

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
   370 U.S. 690 (1962)................................................................................ 2, 8

*Delong Equip. Co. v. Wash. Mills Abrasive Co.*,
   840 F.2d 843 (11th Cir. 1988) ................................................................. 20

*FTC v. Ind. Fed'n of Dentists*,
   476 U.S. 447 (1986)................................................................................ 13

*FTC v. Phoebe Putney Health Sys., Inc.*,
   568 U.S. 216 (2013)................................................................................. 4

*Gold Cross Ambulance & Transfer v. City of Kansas*,
   705 F.2d 1005 (8th Cir. 1983) ................................................................. 6

*In re Blue Cross Blue Shield Antitrust Litig.*,
   26 F. Supp. 3d 1172 (N.D. Ala. 2014) .....................................................11

*In re Disposable Contact Lens Antitrust Litig.*,
   2024 WL 3337686 (M.D. Fla. July 9, 2024)............................................. 6

*In re Disposable Contact Lens Antitrust Litig.*,
   215 F. Supp. 3d 1272 (M.D. Fla. 2016) ...............................................7, 11

*In re Jan. 2021 Short Squeeze Trading Litig.*,
   105 F.4th 1346 (11th Cir. 2024) ............................................................... 7

*In re Terazosin Hydrochloride Antitrust Litig.*,
   352 F. Supp. 2d 1279 (S.D. Fla. 2005) ................................................................. 13

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
   626 F.3d 1327 (11th Cir. 2010) ........................................................................... 7

*Learning Connections, Inc. v. Kaufman, Englett & Lynd, PLLC*,
   2012 WL 13103015 (M.D. Fla. Jan. 18, 2012) ..................................................... 3

*Lucasys Inc. v. PowerPlan, Inc.*,
   576 F. Supp. 3d 1331 (N.D. Ga. 2021) ............................................................... 12

*Moehrl v. Nat'l Ass'n of Realtors*,
   492 F. Supp. 3d 768 (N.D. Ill. 2020) ................................................... 11, 13, 15

*Molinos Valle Del Cibao, C. por A. v. Lama*,
   633 F.3d 1330 (11th Cir. 2011) ......................................................................... 19

*Monsanto Co. v. Spray-Rite Service Corp.*,
   465 U.S. 752 (1984) ............................................................................................. 7

*N.C. State Bd. of Dental Exam'rs v. FTC*,
   574 U.S. 494 (2015) ............................................................................................. 5

*Nat'l Soc'y of Pro. Eng'rs v. United States*,
   435 U.S. 679 (1978) ........................................................................................... 13

*Ohio v. Am. Express Co.*,
   585 U.S. 529 (2018) ............................................................................................. 8

*OJ Commerce, LLC v. KidKraft, Inc.*,
   34 F.4th 1232 (11th Cir. 2022) ........................................................................... 6

*Quinones v. City of Evanston, Ill.*,
   58 F.3d 275 (7th Cir. 1995) ............................................................................... 19

*Robertson v. Sea Pines Real Estate Cos.*,
   679 F.3d 278 (4th Cir. 2012) ............................................................................... 8

*Sage Chem., Inc. v. Supernus Pharms., Inc.*,
   2024 WL 2260331 (D. Del. May 9, 2024) ......................................................... 13

*Shahar v. Bowers*,
   120 F.3d 211 (11th Cir. 1997) ............................................................................. 3

*Sitzer v. Nat'l Ass'n of Realtors*,
   420 F. Supp. 3d 903 (W.D. Mo. 2019) ........................................................ 12, 13

*Taser Int'l, Inc. v. Phazzer Elecs., Inc.*,
  2022 WL 19826877 (M.D. Fla. Aug. 31, 2022) ....................................................................... 19

*Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.*,
  998 F.2d 1073 (1st Cir. 1993) ............................................................................................... 6

*United States v. Dibble*,
  429 F.2d 598 (9th Cir. 1970) ................................................................................................. 4

*United States v. General Motors Corporation*,
  384 U.S. 127 (1966) .............................................................................................................. 7

*United States v. Topco Associates, Inc.*,
  405 U.S. 596 (1972) ............................................................................................................ 10

*Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*,
  746 F.3d 1008 (11th Cir. 2014) ........................................................................................... 18

**Statutes**

15 U.S.C. § 1 .................................................................................................................................. 1

15 U.S.C. § 22 .............................................................................................................................. 19

28 U.S.C. § 1391 ..................................................................................................................... 19, 20

28 U.S.C. § 1746 .......................................................................................................................... 19

Cal. Harb. & Nav. Code § 712 ............................................................................................... 5, 14

CAL. HARB. & NAV. CODE § 732 ................................................................................................... 5

CAL. HARB. & NAV. CODE § 733 ................................................................................................... 6

CAL. HARB. & NAV. CODE § 734 ................................................................................................... 6

Plaintiffs respectfully submit their response in opposition to Defendant California Yacht Brokers Association's ("CYBA") Omnibus Motion to Dismiss (ECF No. 173).

## **INTRODUCTION**

Plaintiffs are boat sellers who bring this action against CYBA and three other large industry trade associations[1] ("Association Defendants"), major boat brokers[2] ("Broker Defendants"), and the dominant multi-listing services ("MLS Defendants")[3] in the United States for conspiring to impose, implement, and enforce anticompetitive restraints that cause boat sellers to pay inflated commissions, in violation of the Sherman Antitrust Act of 1890 ("Sherman Act"), 15 U.S.C. § 1. Because they dominate and control the listing and sale of pre-owned boats, the Association Defendants, Broker Defendants, and MLS Defendants have been able to impose and maintain anticompetitive restraints that force boat sellers to pay commissions to buyers' brokers and to pay overall commissions at far higher rates than those that would have prevailed in a competitive market. By Defendants' own admission, it is the "norm" for boat sellers to pay 10% of the listing or sales price as the commission, which collectively frequently costs sellers hundreds of millions of dollars more in commissions every year, if not more. Compl. at ¶¶ 3–8, 11–13, 17, 64–66, 72, 75, 126.[4] CYBA is a key player in that conspiracy. *Id.* at ¶¶ 47, 52, 79, 94–100.

---

[1] The Association Defendants are CYBA, International Yacht Brokers Association, Inc. ("IYBA"), Yacht Brokers Association of America, Inc. ("YBAA"), and Northwest Yacht Brokers Association ("NYBA").

[2] The Broker Defendants are Allied Marine, Inc., Galati Yacht Sales, LLC, HMY Yacht Sales, Inc., MarineMax, Inc., MarineMax East, Inc., Northrop & Johnson Yachts-Ships, LLC, Fraser Yachts Florida, Inc., Fraser Yachts California Corporation, OneWater Marine Inc., Denison Yachts International, LLC, Yachting Assets and Operations LLC, and United Yacht Sales, LLC.

[3] The MLS Defendants are Boats Group, LLC ("Boats Group") and YATCO, LLC ("YATCO"). The Association Defendants, Broker Defendants, and MLS Defendants are collectively, "Defendants."

[4] References to "Compl." and "Complaint" are to the Consolidated Class Action Complaint (ECF No. 140). Unless otherwise indicated, all emphasis is added and internal citations are omitted.

In the face of overwhelming allegations of pervasive conspiracy, CYBA seeks to (a) introduce factual disputes that are inappropriate at the pleadings stage, and (b) advance largely procedural defenses concerning immunity, failure to join an indispensable party, and lack of venue, none of which has merit. For the reasons set forth below, CYBA's motion should be denied in its entirety.

## FACTUAL BACKGROUND

As one of the largest trade associations in the industry, CYBA has more than 260 brokerage firms as members. *Id.* at ¶ 50. CYBA regularly conducts business in Florida, *inter alia*, through its affiliation with MLS Defendants. *Id.* CYBA's bylaws state that its purpose is "[t]o unite those engaged in the yacht brokerage business for the purpose of promoting cooperation and professionalism among its members." *Id.* at ¶¶ 89, 94. In reality, however, the required cooperation is to participate in the anti-competitive conspiracy. *Id.* at ¶¶ 83, 94–100. CYBA's rules must be viewed in the context of the Complaint's allegations as a whole. *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698 (1962). CYBA's rules compel its members to negotiate the brokers' commissions split ***prior to*** submitting an offer to buy a yacht and prohibit brokers from participating in a deal without the permission of the listing broker, *id.* at ¶ 95–96. CYBA promotes these anti-competitive policies and practices uniformly and on a widespread basis, for example, by inserting provisions requiring seller to pay inflated commissions, including seller's paying the buyer-broker commission in its standardized agreements terms and forms, which it in turn supplies to all CYBA members. *Id.* at ¶ 100.

CYBA requires its members to comply with the above anticompetitive rules, and with other rules contained in CYBA's so-called Code of Ethics. *Id.* at ¶ 97. CYBA has the power to impose significant penalties on members who do not comply. For example, Article V of CYBA's bylaws

provides that members may be suspended or expelled "[f]or failure to abide by the Bylaws of the Association." *Id*. In addition to the threat of formal CYBA sanctions, brokers of CYBA face the prospect of losing business, since buyer brokers steer potential buyers away from seller brokers offering below-standard buyer-broker commissions. *See id.* ¶ 11.

As explained further below, the Complaint plausibly alleges CYBA is part of a national conspiracy of yacht brokers, other broker trade associations, and yacht-sale MLSs. Through their conspiracy, Defendants impose standardized, industry-wide terms for listing yachts for sale that restrain competition among yacht brokers and inflict widespread harm by forcing sellers to pay a buyer's broker's commission and therefore pay inflated commissions. *Id*. at ¶ 192.

## ARGUMENT

### A.     The Court Should Reject CYBA's Attempts to Introduce Factual Disputes

CYBA requests judicial notice of five exhibits in support of its Motion, ECF No. 173-2, and otherwise attempts to create an inherently one-sided factual record to support its effort to dismiss Plaintiffs' Complaint. CYBA's request for judicial notice should be denied.

Because the judicial notice process "bypasses the safeguards which are involved with the usual process of proving facts by competent evidence in district court. . . . the taking of judicial notice of facts is, as a matter of evidence law, a highly limited process." *Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997). The "kinds of things about which courts ordinarily take judicial notice are [scientific facts, matters of geography, and matters of political history]." *Id*. CYBA bears the burden of establishing that judicial notice is appropriate. *Learning Connections, Inc. v. Kaufman, Englett & Lynd, PLLC*, 2012 WL 13103015, at *6 (M.D. Fla. Jan. 18, 2012).

To authenticate the exhibits, CYBA offers only a declaration from its president, Mark White, stating that the documents "are true and correct copies." ECF No. 173–1 at 3. But a "writing

3

is not authenticated simply by attaching it to an affidavit," *United States v. Dibble*, 429 F.2d 598, 602 (9th Cir. 1970), and CYBA's exhibits should not be considered.[5]

Critically, even if CYBA's documents were appropriate for judicial notice—they are not—it is only the fact of the statements that is subject to judicial notice, not the **truth** of the statements or the conclusions CYBA proposes be drawn from them. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1278 (11th Cir. 1999).

**B.    CYBA is not Immune from Suit Under the Sherman Act**

CYBA seeks immunity for its anticompetitive conduct under the "state action doctrine." ECF No. 170 at 5 (citing *Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105 (1980)). However, "state-action immunity is disfavored" and does not apply here. *See FTC v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 236 (2013). In *Midcal*, the Court established two requirements for antitrust immunity: "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed in state policy'; second, the policy must be 'actively supervised' by the State itself." *Midcal*, 445 U.S. at 105. CYBA meets neither requirement.

**1)    CYBA's Anticompetitive Conduct was not "Clearly Articulated and Affirmatively Expressed in State Policy"**

CYBA relies on § 712(a) of the California Harbors and Navigation Code ("CHNC"), and newsletters citing to it, to claim that its conduct meets the first *Midcal* prong. Not so. Section 712(a) bars compensation of unlicensed persons and allows, but does not require, licensed brokers to pay commissions to "broker[s] **of another state or country**." *See* CAL. HARB. & NAV. CODE §

---

[5] *See U.S. v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994) (to be judicially noticed, "the fact must be one that only an unreasonable person would insist on disputing"). CYBA has not submitted any certified or official information as to Exhibit 1's or Exhibit 3's source or background or how it obtained them. CYBA has similarly failed to properly authenticate Exhibit 4 and Exhibit 5, because the White Declaration does not offer any information whatsoever as to these documents, including who authored them, their purpose, and when they were in effect.

712(a) (2024). This is a far cry from a "clearly articulated and affirmatively expressed" state policy favoring the conduct Plaintiffs allege here, *i.e.*, forcing yacht sellers to pay buyers' brokers' commissions, thereby diminishing price competition and stabilizing and fixing the commissions imposed on sellers. *See* Compl. at ¶¶ 47, 83, 100; *Midcal*, 445 U.S. at 105. Nowhere in the California code is such anticompetitive conduct permitted.

### 2) California did not "Actively Supervise" CYBA's Anticompetitive Conduct

CYBA likewise fails to meet the second *Midcal* prong—that California "actively supervised" its anticompetitive conduct. "The Court has identified only a few constant requirements of active supervision: The supervisor must review the substance of the anticompetitive decision, not merely the procedures followed to produce it; the supervisor must have the power to veto or modify particular decisions to ensure they accord with state policy; and the 'mere potential for state supervision is not an adequate substitute for a decision by the State.'" *N.C. State Bd. of Dental Exam'rs v. FTC*, 574 U.S. 494, 515 (2015). Further, "the adequacy of supervision otherwise will depend on all the circumstances of a case." *Id.*

None of the hallmarks of active supervision exist here, nor does this case present special circumstances that would provide a "realistic assurance" of active state supervision. *Id.* at 515 (state immunity turns on "whether the State's review mechanisms provide 'realistic assurance' that a non-sovereign actor's anticompetitive conduct 'promotes state policy, rather than merely the party's individual interests'"). CYBA's argument that, pursuant to §§ 732, 733, and 734 of the CHNC, the Department of Boating and Waterways is authorized to "supervise and enforce HNC § 712" is unavailing. Mot. at 6. As noted above, § 712 is irrelevant to the anticompetitive conduct Plaintiffs allege. Even assuming § 712 meets the first *Midcal* requirement, §§ 732, 733, and 734 **solely regulate** the denial, suspension or revocation of **licensees**, not the action of **associations**.

As a result, no part of §§ 732, 733, or 734 allows the Department of Boating and Waterways to review, veto, or modify any of the alleged anticompetitive conduct by CYBA.

Further, CYBA finds no support in its proffered authority: *Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.*, 998 F.2d 1073 (1st Cir. 1993) and *Gold Cross Ambulance & Transfer v. City of Kansas*, 705 F.2d 1005 (8th Cir. 1983), which CYBA asserts support the proposition that "courts generally agree that supervision of private action meets the requirement if authorized by state legislation." Mot at 6. In both cases, the courts considered actions only of municipalities and their instrumentalities and, therefore, *Midcal*'s second requirement, active state supervision, was not even a factor the courts considered. *Gold Cross*, 705 F.2d at 1014; *Tri-State Rubbish*, 998 F.2d at 1075–80. CYBA's bid for immunity should fail.

### C.   Plaintiffs Have Alleged that CYBA is Part of an Antitrust Conspiracy

#### 1)   Applicable Sherman Act Standards

The lynchpin of Section 1 of the Sherman Act is an agreement. *In re Disposable Contact Lens Antitrust Litig.*, 2024 WL 3337686, at *3 (M.D. Fla. July 9, 2024); *accord Am. Contractors Supply, LLC v. HD Supply Constr. Supply, Ltd.*, 989 F.3d 1224, 1232 (11th Cir. 2021) ("contract," "combination" and "conspiracy" are used interchangeably to capture the concept of concerted action, *i.e.*, an "agreement."). The inquiry is one of "competitive reality," addressing whether "a contract, combination, or conspiracy amongst separate economic actors pursuing separate economic interests . . . deprives the marketplace of independent centers of decision making, and therefore of diversity of entrepreneurial interests, and thus of actual or potential competition." *See OJ Commerce, LLC v. KidKraft, Inc.*, 34 F.4th 1232, 1242 (11th Cir. 2022).

An anticompetitive agreement can be shown by either "direct or circumstantial evidence that reasonably tends to prove that the [defendant] and others had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Service*

*Corp.*, 465 U.S. 752, 764 (1984). An "explicit agreement is not a necessary part of a Sherman Act conspiracy" where "joint and collaborative action was persuasive in the initiation, execution, and fulfillment of the plan."[6] *United States v. General Motors Corporation*, 384 U.S. 127, 142–43 (1966).

On the merits, courts evaluate Section 1 claims as either *per se* violations or under a rule of reason framework. *In re Jan. 2021 Short Squeeze Trading Litig.*, 105 F.4th 1346, 1355 (11th Cir. 2024). There are two types of restraints—horizontal and vertical. *Disposable Contact Lens*, 215 F. Supp. 3d at 1287. Horizontal restraints are imposed by agreements between competitors, while vertical restraints are imposed by agreements between firms at different levels of distribution. *Id. Per se* treatment typically applies to practices, such as "horizontal price fixing among competitors, group boycotts, and horizontal market division," which "virtually always stifle competition." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1333–34 (11th Cir. 2010).

For conduct falling under the rule of reason approach, "courts must ask whether the plaintiff 'has shown that the alleged restraint has had an anticompetitive effect on the market.'" *Short Squeeze Trading*, 105 F.4th at 1355. As an initial step in the rule of reason analysis, plaintiffs must "plausibly suggest the contours of the relevant geographic and product markets" to analyze the effect on competition of the challenged restraints. *Jacobs*, 626 F.3d at 1336. A plaintiff can show anticompetitive effects on the market by direct evidence, such as reduced output, increased prices, or decreased quality in the relevant market, or through indirect evidence, for example, proof

---

[6] "[O]nly in rare cases [can] a plaintiff . . . establish the existence of a conspiracy by showing an explicit agreement." *See Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1299 (11th Cir. 2003). Indeed, "most conspiracies" are shown by "circumstantial evidence." *In re Disposable Contact Lens Antitrust Litig.*, 215 F. Supp. 3d 1272, 1294–95 (M.D. Fla. 2016).

of market power plus some evidence that the challenged restraint harms competition. *Ohio v. Am. Express Co.*, 585 U.S. 529, 541 (2018).

### 2) Plaintiffs Allege CYBA Conspired with the MLS Defendants, Other Association Defendants and Broker Defendants

"[T]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Continental Ore*, 370 U.S. at 699. In analyzing CYBA's Motion, therefore, the Court must consider Plaintiffs' allegations as a whole, not the few selected allegations CYBA references. When a plaintiff challenges a trade association's rules as anti-competitive, the rules themselves can be ***direct*** evidence of the contract or combination among the association and its members. *See, e.g.*, *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 289–90 (4th Cir. 2012) ("The complaints do not rest on evidence of parallel business conduct but on allegations that the MLS board members conspired in the form of the MLS rules, the very passage of which establishes that the defendants convened and came to an agreement."); *Compass, Inc. v. Real Estate Bd. of N.Y., Inc.*, 2022 WL 992628, at *8 (S.D.N.Y. Mar. 31, 2022) ("The Court concludes that Compass has plausibly pled that Article II, Section 7 can itself constitute an agreement since 'there is no conceptual difficulty in treating trade associations as continuing conspiracies when they regulate areas where their members are in competition.'").

Plaintiffs allege that yacht brokers, including the Broker Defendants, conspired through the Association Defendants, including CYBA, to impose uniform codes of conduct upon all members of the various Association Defendants. Compl. at ¶¶ 9, 13, 131–59. Those uniform codes of conduct include the use of standard contract terms that require that yacht sellers pay the commissions of both the seller's broker and buyer's broker, prohibit brokers from competing for commissions, and generally fix the commission to be paid at 10% of the sales price. *Id.* at ¶¶ 10,

64–67, 77–78, 83–108. The Association Defendants and MLS Defendants all have a process for disciplining members who do not adhere to their respective bylaws and codes of conduct. *Id.* at ¶¶ 125–30. Further, industry practice steers business away from any brokers who refuse to "cooperate" and play by the industry's anticompetitive rules. *Id.* at ¶ 11. Taken together, these actions show that Defendants, including CYBA, have agreed to and do maintain standard arrangements in the industry that yacht sellers pay all commissions.

In addition, the Association Defendants, including CYBA, coordinate with each other through their sponsorship of the Certified Professional Yacht Broker program. *Id.* at ¶ 52. To become a certified professional yacht broker, the broker must promise to adhere to a code of conduct that likewise requires the broker to have yacht sellers pay the commissions for both the seller and buyer brokers and includes form contract terms to that effect. *Id.* The obligations of Certified Professional Yacht Brokers further maintain standard industry practice that the yacht seller pays all commissions.

MLS Defendants, YATCO and Boats Group, are "gold sponsors" of CYBA, backing CYBA's efforts with the other Association Defendants to standardize yacht-selling practices. The Association Defendants' MLS, as well as the MLS Defendants' MLS, prohibits un-represented yacht sellers from listing yachts for sale. *Id.* at ¶¶ 6, 73, 75, 110–20. In fact, YATCO requires brokers seeking to list yachts for sale be a member of one of the Association Defendants or have a referral from two existing YATCO members. *Id.* at ¶¶ 121–24. "This means that to get access to the single most important tool to sell a Yacht, a seller must: (1) retain a seller-broker; and (2) agree

that the seller-broker will charge a 10% commission and share half of that commission with the buyer's broker." *Id.* at ¶ 127.[7]

### 3)   The Conspiracy is Anti-Competitive

The result of the Defendants' conspiracy is to eliminate competition and to fix, stabilize, and maintain broker commissions at a supracompetitive level. In a competitive marketplace, brokers would compete for boat buyers on the basis of price, *i.e.*, they would reduce their commissions. *Id.* at ¶ 161. Defendants' conspiracy has had widespread effects, namely, it has reduced the availability of yachts for sale on MLSs, decreased options for yacht buyers and sellers, and dramatically hampered competition among brokers for their services. *Id.* at ¶¶ 160–67.

Defendants' conduct warrants *per se* treatment. At bottom, it is a conspiracy among entities on the same level in the market structure, *i.e.*, the Broker Defendants and Association Defendants, with the MLS Defendants in cahoots with the brokers. *Id.* at ¶ 204; *see Burnett v. Nat'l Ass'n of Realtors*, 2022 WL 17741708, at *10 (W.D. Mo. Dec. 16, 2022) (finding *per se* standard applied to challenge of realtor association's broker commission rules, which had the effect of stabilizing commission rates); *United States v. Topco Associates, Inc.*, 405 U.S. 596, 605–09 (1972) (applying *per se* standard to anti-competitive practices imposed by association made up of competitors). CYBA does not argue otherwise, *see* Mot. at 13, warranting application of the *per se* standard and denial of CYBA's motion to dismiss.

Nonetheless, the Complaint plausibly alleges an unreasonable restraint of trade even if the rule of reason were to apply. Because Plaintiffs' allegations meet either standard, the Court does not need to decide at this stage which standard applies. *See, e.g.*, *In re Blue Cross Blue Shield*

---

[7] Ten percent is far higher than (roughly double) the well-accepted rate for realtors' commissions, which itself has led to a record-setting jury verdict and industry-changing settlements. *See Sitzer v. Nat'l Ass'n of Realtors*, No. 4:19-cv-00322(W.D. Mo.), ECF Nos. 1294, 1460, 1487, 1520.

*Antitrust Litig.*, 26 F. Supp. 3d 1172, 1186 (N.D. Ala. 2014) (deferring consideration at motion to dismiss stage of whether to apply *per se* or rule of reason standard because "while the mode of analysis is certainly a question of law, 'underpinning that purely legal decision are numerous factual questions'"); *see also Moehrl v. Nat'l Ass'n of Realtors*, 492 F. Supp. 3d 768, 782 (N.D. Ill. 2020).

Here, the Complaint defines the relevant product market as "yacht brokerage services provided to yacht sellers and buyers by yacht brokers with access to the MLS." Compl. at ¶ 168. The Complaint describes the attributes of broker-assisted services with MLS access that render proposed substitutes inadequate, such as the lack of comprehensive listing and the inability to reach a sufficient number of buyers. *See id.* at ¶¶ 6, 116, 174–80; *Disposable Contact Lens*, 215 F. Supp. 3d at 1303 (product market definition sufficient where plaintiffs described attributes of other products that rendered them as inadequate substitutes). The Complaint also plausibly alleges that the relevant geographic market is the United States. Compl. at ¶ 170.

The Complaint alleges that Defendants, which are among the largest yacht brokerages, trade associations, and MLSs, have substantial market power. *Id.* at ¶¶ 8, 32–61, 71–74, 79–82, 114, 171–80. This market power enables Defendants to set rules, impose uniform practices, and limit access to MLSs, resulting in commissions that are higher than they would be in a competitive market. *Id.* at ¶¶ 4, 8–9, 161. Plaintiffs allege that in the absence of Defendants' rules and uniform commission practices, "brokers would compete with each other by offering lower commissions to prospective buyer clients." *Id.* at ¶ 105.

Additionally, Plaintiffs allege numerous other anticompetitive effects in the relevant market that injure both buyers and sellers of yachts. The Complaint describes how Defendants' restrictions on access to MLSs limit the supply of listings on MLSs to broker-represented sellers.

*Id.* at ¶ 6. The Complaint also illustrates how the lack of price transparency and competition for brokerage services not only inflated commissions, but also prevented competition for the optimal level of broker services. *Id.* at ¶¶ 9, 161–62. Buyers were harmed because the brokers steered them to listings with inflated commissions and prevented buyers from competing for the purchase of a yacht by lowering the buyer-broker commission. *Id.* at ¶ 161. In a competitive market where the buyer-broker commission was not set by the selling broker in advance, the fee structure for brokerage services would correspond to their costs, as well as the quantity, quality, and value of the services. *Id.* at ¶¶ 165–66.

Despite CYBA's protestations, courts routinely hold that those types of allegations are sufficient under the rule of reason. *See, e.g.*, *Lucasys Inc. v. PowerPlan, Inc.*, 576 F. Supp. 3d 1331, 1350 (N.D. Ga. 2021) (finding "allegations of harm to competition . . . in the form of reduced output, decreased product quality, stymied innovation, and raised prices—which are supported by specific examples—sufficiently allege anticompetitive effects in these markets"). Indeed, similar allegations of harm to competition were adequate to show anticompetitive effects in cases challenging nearly identical conduct in the real estate brokerage industry. *See, e.g.*, *Moehrl*, 492 F. Supp. 3d at 783 ("At this stage, the comparison is sufficient to raise a reasonable inference that the Buyer-Broker Commission Rules have resulted in supracompetitive commission rates in the United States real estate market."); *Sitzer v. Nat'l Ass'n of Realtors*, 420 F. Supp. 3d 903, 915 (W.D. Mo. 2019) ("Viewed in a light most favorable to Plaintiffs, allegations that Section 2-G-1 requires seller-brokers to present blanket commission offers to buyer-brokers could plausibly create a skewed compensation structure within the residential real estate market, leading to inflated commissions that would otherwise be lower under competitive market conditions.").

Ignoring Plaintiffs' allegations of anticompetitive harm, CYBA instead focuses on its claimed procompetitive justifications for the challenged restraints. Procompetitive justifications are not relevant to *per se* violations. *In re Terazosin Hydrochloride Antitrust Litig.*, 352 F. Supp. 2d 1279, 1311 (S.D. Fla. 2005).  Moreover, under rule-of-reason treatment, the question whether procompetitive justifications outweigh anticompetitive effects is a factual issue not suitable for a motion to dismiss. *See Sage Chem., Inc. v. Supernus Pharms., Inc.*, 2024 WL 2260331, at *14 (D. Del. May 9, 2024) (collecting cases holding that procompetitive justifications are not appropriately weighed at this stage); *Moehrl*, 492 F. Supp. 3d at 782–83 ("But to the extent Defendants contend that the Buyer-Broker Commission Rules have a procompetitive effect on balance, the Court will not consider such arguments at this stage."); *Sitzer*, 420 F. Supp. 3d at 915 (same). In any event, CYBA's speculative justification that its broker-commission rules are necessary to protect buyers from undisclosed defects in yachts fails as a matter of well-settled law. *See Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679, 693–96 (1978) (rejecting professional association's attempt to justify a restraint on price competition "on the basis of the potential threat that competition poses to the public safety and the ethics of its profession" as "nothing less than a frontal assault on the basic policy of the Sherman Act"); *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 463–64 (1986) (same).

### 4)      CYBA Improperly Deconstructs Plaintiffs' Claims

CYBA contends that Plaintiffs fail to demonstrate it agreed to do anything with anyone with respect to the payment of yacht commissions based on its own: (a) denial of the Complaint allegations; (b) recharacterization of those allegations; (c) breaking down its recharacterized allegations into separate parts and arguing that certain individual parts are not unlawful; and (d) completely ignoring other allegations. Putting ***all*** the facts together, however, as the law requires

(*see* section C2, *supra*), Plaintiffs plausibly allege that CYBA has conspired with the other Defendants to require yacht sellers to pay all commissions, to fix the amount of those commissions, and to exclude non-represented buyers from MLS listings.

> **a)** **CYBA's Code of Ethics Requiring all Brokers to use Standard Business Practices Demonstrates CYBA's Participation in the Conspiracy**

CYBA focuses on Section 18 of its Code of Ethics, which provides that members should cooperate with other brokers and agree upon the amount and division of commissions as early as possible in the negotiation process. *See* Mot. at 9–10. CYBA argues in the abstract that this Section can only be parallel conduct because there is nothing wrong with sharing commissions. Next, CYBA points to CHNC § 712, which it argues merely allows seller brokers to compensate buyer brokers. As discussed above, however, CHNC § 712 provides that licensed brokers cannot employ non-licensed persons to perform acts that must be performed by a licensed broker or pay a commission to an unlicensed California broker. Mot., Exhibit 1 to the Decl. of Mark P. White ("White Declaration"), ECF 173-3 at 14. Neither argument addresses the antitrust issues before this Court.

Among the items CYBA ignores is that its own form listing terms obligate the seller to pay a commission to the broker. Compl. at ¶ 9. While the amount of the commission is left blank, making the amount theoretically negotiable, who pays the commission is not. Similarly, the YBAA and IYBA form listing terms similarly require the seller to pay the broker's commissions. *Id.* at ¶¶ 77, 92. As admitted by a long-time officer of the YBAA, the standardization of listing terms means "unity within the industry." *Id.* at ¶ 136. This arrangement eliminates any incentive for buyer brokers to compete with one another based on commission. The buyer pays nothing for the services of their own broker; the seller pays both seller- and buyer-broker commissions. The listing agreement locks in the amount of commissions the seller will pay, just as with the sale of real

estate. *See Moehrl*, 492 F. Supp. 3d at 785 (explaining that because the seller broker locks in the overall commission rate, there is no ability or incentive for the buyer, the buyer broker, or the seller to negotiate the buyer-broker's commission). Also, just as in the real estate industry, the ethical rules of the Association Defendants, including CYBA, require that the seller broker and buyer broker negotiate their commission split before price negotiations can begin, and this arrangement is equally anti-competitive in the pre-owned yacht industry. *See id.* (explaining that in the real estate market, because the only time a buyer-broker can negotiate the commission is before showing the property, and it is difficult to gauge a client's interest, negotiation is practically impossible).

CYBA is also a co-administrator of the Certified Professional Yacht Broker program, which sets uniform business practices for yacht brokers across the country. Compl. at ¶ 52. The CYBA handbook encourages the use of a central listing agreement, which prohibits the owner from listing the yacht for sale with another broker, requires the broker to list the yacht on an MLS (which in turn requires a co-brokerage agreement), and requires brokers to negotiate their commission split when the listing is made, before any negotiations on a sale have begun. *Id.* at ¶ 96. In short, when negotiating their commission split, brokers are incentivized to maintain that arrangement that the seller pays commissions and have no incentive to reduce the commission percentage.

The other Association Defendants' model forms are very similar in these respects (*id.* at ¶¶ 77–78, 92, 104), all mandating that the seller pay all broker commissions. This is indicative of an agreement with other Association Defendants and the brokers using CYBA's standard terms that sellers pay all broker commissions—not simply parallel action. If it were parallel action, each broker would be independently preparing its own contract terms, rather than the Association

Defendants preparing form contracts for use by all. By using these form contracts, the Broker Defendants are agreeing to and maintaining the conspiracy with the Association Defendants.

> **b)** **CYBA's Participation with MLS Defendants is Part of the Conspiracy**

CYBA concedes that the Complaint plausibly alleges that CYBA maintains some control over the YachtBroker.org/Yachtr.com MLS website with the other Association Defendants. Mot. at 11; Compl. at ¶¶ 47, 79–81. With respect to other MLS Defendants, Plaintiffs do not allege that CYBA "controls" them or the market. Rather, Plaintiffs allege that CYBA's affiliation with the other MLS Defendants indicates that CYBA is part of the conspiracy with the other Defendants to fix the party who pays commissions, the amount of those commissions, and to keep sellers who are not represented by a broker from listing their yachts for sale on an MLS.

For example, YATCO, which operates the yatco.com MLS, and Boats Group, which operates the boattrader.com and yachtworld.com MLSs, among others, are "gold sponsors" of CYBA. Compl. at ¶ 50. CYBA is an association partner of the NYBA, and as such, NYBA members adhere to the YBAA and CYBA codes of ethics, including commission sharing requirements. *Id.* at ¶ 51. The Complaint further alleges that CYBA has the power to impose penalties on its members for failing to comply with its bylaws and ethical rules. *Id.* at ¶¶ 97, 102.

Taken together, these allegations show that CYBA has conspired to impose and maintain uniform standards requiring that yacht sellers pay both the seller- and buyer-broker commissions, maintain inflated commission amounts, and exclude sellers without brokers from the MLSs.

> **c)** **Brokers' Fiduciary Duties do not Negate CYBA's Participation in the Conspiracy**

CYBA contends that it cannot be part of the conspiracy because yacht brokers have fiduciary duties to both their own client and the opposing party in the transaction, and because

California requires that the seller pay the buyer's broker. *See* Mot. at 12. Both claims are wrong. The exhibits to the White Declaration (none of which should be considered at this stage to begin with) do not establish any relevant fiduciary duty. The fiduciary duty referenced in Exhibit 3 (ECF No. 173-6) at 9–10 is a duty of candor and a duty to investigate the facts relating to the yacht being sold. Nothing in Exhibit 3 states the proposition contained on the cover page, that "by definition seller pays for buyer's broker representation in CA." And nothing in California law requires yacht sellers to pay the commission of a buyer's broker—indeed, CYBA cites no such authority. *See* section B, *supra*.

At best, CYBA appears to be attempting to negate a claim that Plaintiffs aren't making. Plaintiffs allege that from an economic perspective the interests of the yacht buyer and yacht seller conflict. The yacht seller wants to end up with as much money as possible when the transaction is consummated, and the buyer wants to pay as little as possible. Part of that calculation is the amount of the commission, where there is a conflict between the seller and the brokers because the brokers want to maximize their commission. However, under the anticompetitive restraints imposed by Defendants, there is no competition between the buyer and seller with respect to commissions because the buyer always pays nothing, and the commission paid by the seller is fixed at the time the seller lists the yacht for sale.

In addition, Plaintiffs do not allege that a buyer does not need their own broker. Mot. at 12. Plaintiffs allege simply that buyer brokers have become less important to the yacht-buying process because of online MLSs. Compl. ¶ 4. This is because a potential buyer does not need a broker to research yachts that may be appropriate for the buyer; the buyer can do that research himself online. As a result, buyer brokers get paid the same commission percentage for doing much less work. In a free market, buyer-broker's commissions would be decreasing, not staying the same.

17

CYBA's contention that there is not really a conflict of interest between yacht buyers and yacht sellers, between principals and brokers, or between seller brokers and buyer brokers ignores economic reality and is a distraction from the issue at hand. The Complaint plainly alleges that CYBA is part of an industry-wide conspiracy to impose and maintain uniform standards in the yacht-brokerage industry that harms competition and fixes prices.

### D.   CYBA's Indispensable Party Argument Falls Flat

CYBA next argues the Court should dismiss the Complaint under Rule 12(b)(7) of the Federal Rules of Civil Procedure because Plaintiffs failed to join the State of California and its Division of Boating and Waterways. CYBA argues that it "may neither require nor prohibit commission sharing, nor prohibit cooperative brokerage because" to do so "would violate California law." Mot. at 1. This argument fails.

A party is necessary under Rule 19(a)(1)(A) of the Federal Rules of Civil Procedure if the Court "cannot accord complete relief" without the absent party's presence, or under Rule 19(a)(1)(B), if the absent party "claims an interest relating to the subject of the action" such that the party's absence will either (a) impede the absent party's ability to protect that party's interest or (b) will expose an existing party to "inconsistent obligations." *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1039 (11th Cir. 2014).

CYBA nowhere contends California's presence is necessary to enable it to pay a monetary judgment; nor has it adequately explained why it, as a private organization, would need California's help or permission to amend its own anti-competitive ethics code, bylaws, and standard forms to comply with an injunction. Instead, CYBA claims granting Plaintiffs relief would require "changing California State law." Mot. at 17. Again, this is simply not true. As discussed in section B, *supra*, California law does not permit or require CYBA's anticompetitive

behavior. But, even if California law did mandate CYBA's conduct, a state entity cannot be a necessary party under Rule 19 as a result of its rules or legislation. *Quinones v. City of Evanston, Ill.*, 58 F.3d 275, 277 (7th Cir. 1995) ("A person aggrieved by the application of a legal rule does not sue the rule *maker* . . . . He sues the person whose acts hurt him."); *Campbell v. Universal City Dev. Partners, Ltd.*, 72 F. 4th 1245, 1258–59 (11th Cir. 2023). Even if CYBA established that necessary parties are missing, CYBA has failed to show the Complaint should be dismissed under Rule 19(b). *See, e.g.*, *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1344–45 (11th Cir. 2011) (placing burden on moving party to show indispensability).

### E.   Venue in this District is Proper Under 28 U.S.C. § 1391

CYBA's final bid for dismissal under Rule 12(b)(3) is similarly unpersuasive. First, the White Declaration should not be considered because it is not dated and, therefore, fails to conform to the requirements of 28 U.S.C. § 1746. *See, e.g.*, *Taser Int'l, Inc. v. Phazzer Elecs., Inc.*, 2022 WL 19826877, at *1 (M.D. Fla. Aug. 31, 2022) (striking undated declaration for failure to comply with 28 U.S.C. § 1746).

Even assuming it is proper to consider the White Declaration, CYBA's venue challenge under 15 U.S.C. § 22 still falls woefully short of its mark. While Plaintiffs maintain venue is proper in this District under 15 U.S.C. § 22,[8] the Court need not decide that issue because venue is clearly established under the general venue statute, 28 U.S.C. § 1391, which as the Eleventh Circuit has explained, applies to federal antitrust actions. *See Delong Equip. Co. v. Wash. Mills Abrasive Co.*,

---

[8] Under 15 U.S.C. § 22, CYBA transacts business in this district as CYBA is affiliated with MLS pages operated in Florida, Compl. at ¶ 50, partners with other associations to certify brokers in Florida, and other states, under the Certified Professional Yacht Broker Program, *see id.* at ¶ 52, and enforces rules on all of its members that further the conspiracy alleged in the Complaint, *id.* at ¶¶ 94, 96–98, 100, 160, 200.

840 F.2d 843, 855 (11th Cir. 1988) ("In a federal antitrust case, venue may be established under . . . 15 U.S.C. § 15, . . . 15 U.S.C. § 22, *or* the general federal venue statute, 28 U.S.C. § 1391(b).").

Under 28 U.S.C. § 1391(b), a "civil action may be brought in . . . a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." Venue is proper here under 28 U.S.C. § 1391(b)(2) because Plaintiffs' claims against CYBA arise from its alleged participation in an antitrust conspiracy, substantial parts of which occurred in this District.

The Complaint amply alleges that Plaintiffs paid a buyer's broker commission for the sale of a vessel in this District. Compl. at ¶ 29. Likewise, other Plaintiffs were represented by Broker Defendants or other brokers located in this District. *Id.* at ¶¶ 26–27, 29–30, 33. Other Defendants who are alleged to have furthered the conspiracy are also located in and do substantial business in this District. *See id.* ¶¶ 22–23, 25, 32–34, 36, 41, 44, 131, 148–53, 155–56, 158–61. Even more, Plaintiffs' claims against CYBA are founded on its own independent participation in the antitrust conspiracy (*id.* at ¶¶ 94, 96–98, 100, 160, 200), which Plaintiffs alleged caused them injury in this District. *See id.* at ¶¶ 197–217.

## CONCLUSION

For the reasons discussed above, CYBA's Motion should be denied in its entirety. To the extent the Court finds any merit in the arguments made by Defendant, Plaintiffs' respectfully request leave to amend their complaint.

DATED:  August 26, 2024

**PODHURST ORSECK, P.A.**
LEA P. BUCCIERO (FBN 84763)
RICARDO M. MARTINEZ-CID (FBN 383988)
MATTHEW WEINSHALL (FBN 84783)


/s *Lea P. Bucciero*
LEA P. BUCCIERO

One SE 3rd Avenue, Suite 2300
Miami, FL  33131
Telephone:  305/358-2800
lbucciero@podhurst.com
rmartinez-cid@podhurst.com
mweinshall@podhurst.com
RMCTeam@podhurst.com

**ROBBINS GELLER RUDMAN**
**   & DOWD LLP**
PAUL J. GELLER
Florida Bar No. 984795
MARK J. DEARMAN
Florida Bar No. 982407
STUART A. DAVIDSON
Florida Bar No. 0084824
LINDSEY H. TAYLOR
Florida Bar No. 1027908
225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33432
Telephone:  561/750-3000
pgeller@rgrdlaw.com
mdearman@rgrdlaw.com
sdavidson@rgrdlaw.com
ltaylor@rgrdlaw.com

**ROBBINS GELLER RUDMAN**
**   & DOWD LLP**
ARTHUR L. SHINGLER III
DAVID W. MITCHELL
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
ashingler@rgrdlaw.com
davidm@rgrdlaw.com

**BONI, ZACK & SNYDER LLC**
MICHAEL J. BONI (*pro hac vice*)
JOSHUA D. SNYDER (*pro hac vice*)
JOHN E. SINDONI (*pro hac vice*)
BENJAMIN J. EICHEL (*pro hac vice*)
15 St. Asaphs Road
Bala Cynwyd, PA  19004
Telephone:  610/822-0200
mboni@bonizack.com
jsnyder@bonizack.com
jsindoni@bonizack.com
beichel@bonizack.com

*Interim Co-Lead Class Counsel*

**GALLAGHER & KENNEDY, P.A.**
KEVIN D. NEAL (*pro hac vice*)
WILLIAM F. KING (*pro hac vice*)
KENNETH N. RALSTON (*pro hac vice*)
2575 East Camelback Road
Phoenix, AZ  85016-9225
Telephone:  602/530-8000
kevin.neal@gknet.com
bill.king@gknet.com
ken.ralston@gknet.com

**NAPOLI SHKOLNIK PLLC**
HUNTER SHKOLNIK (*pro hac vice*)
REBECA MARTINEZ
NESTOR D. GALARZA (*pro hac vice*)
1302 Avenida Ponce de León
Santurce, Puerto Rico  00907
Telephone:  787/493-5088
hunter@nsprlaw.com
rmartinez@nsprlaw.com
ngalarza@nsprlaw.com
* Napoli Shkolnik is a registered tradename for
NS PR Law Services, LLC.
A Puerto Rican Limited Liability Corporation

**NAPOLI SHKOLNIK PLLC**
SALVATORE C. BADALA (*pro hac vice*)
400 Broadhollow Road, Suite 305
Melville, NY  11747
Telephone:  212/397-1000 Ext. 1045
sbBadala@napolilaw.com

22

**GLANCY PRONGAY & MURRAY LLP**
LEE ALBERT
BRIAN D. BROOKS
230 Park Avenue, Suite 358
New York, NY 10169
Telephone: 212/682-5340

*Members of Plaintiffs' Executive Committee*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on August 26, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify the foregoing document is being served this 26th day of August, 2024. on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

By: */s/ Lea P. Bucciero*
       LEA P. BUCCIERO