UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 24-cv-20805-KMM

| | |
|---|---|
| YA MON EXPEDITIONS, LLC, BLUEBERRY ENTERPRISES, LLC, MAGNA CHARTA, LLC, PRIDE CONTRACTING, INC., KIP LAMAR SNELL, and JUAN GALAN, Individually and on Behalf of All Others Similarly Situated,<br><br>            Plaintiffs,<br><br>vs.<br><br>ALLIED MARINE, INC., GALATI YACHT SALES, LLC, HMY YACHT SALES, INC., MARINEMAX, INC., NORTHROP & JOHNSON YACHTS-SHIPS, LLC, FRASER YACHTS FLORIDA, INC., FRASER YACHTS CALIFORNIA CORPORATION, MARINEMAX EAST, INC., ONEWATER MARINE INC., DENISON YACHTS INTERNATIONAL, LLC, YACHTING ASSETS AND OPERATIONS LLC, UNITED YACHT SALES, LLC, INTERNATIONAL YACHT BROKERS ASSOCIATION, INC., YACHT BROKERS ASSOCIATION OF AMERICA, INC., CALIFORNIA YACHT BROKERS ASSOCIATION, INC., NORTHWEST YACHT BROKERS ASSOCIATION, BOATS GROUP, LLC, PERMIRA ADVISERS LIMITED, PERMIRA ADVISERS LLC, and YATCO, LLC.<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANTS' JOINT MOTION TO DISMISS
PLAINTIFFS' CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ......................................................................................................1

II.     STATEMENT OF FACTS ........................................................................................2

III.    ARGUMENT ............................................................................................................5

      A.      Standards for Pleading an Antitrust Agreement ..........................................5

      B.      Defendants Improperly Deconstruct Plaintiffs' Conspiracy Allegations ................8

            1.      Plaintiffs Allege a Conspiracy Among MLS Defendants, Association Defendants and Broker Defendants ..........................................8

            2.      There Is Ample Evidence of Parallel Conduct and Plus Factors ..............12

            3.      Defendants Analogize the Yacht Industry to the Real Estate Industry When It Suits Their Convenience ................................................16

      C.      Group Pleading of a Conspiracy Is Permissible ......................................21

      D.      Plaintiffs Plead the Elements of a Section 1 Claim ...............................24

            1.      Plaintiffs Allege a *Per Se* Violation .........................................................24

            2.      Plaintiffs Also Satisfy the Requirements for a Claim Under the Rule of Reason ..........................................................................................26

                  a.      Plaintiffs Plausibly Allege a Relevant Product Market.................26

            3.      The Complaint Alleges the Contours of a Relevant Geographic Market ........................................................................................................29

            4.      Plaintiffs Allege Anticompetitive Effects on the Market ..........................30

      E.      Plaintiffs Amply State Concerted Refusal to Deal Claims ....................33

            1.      MLS Defendants Refused to Deal with FSBO Listings ............................33

            2.      Broker Defendants Refuse to Deal with Unrepresented Buyers................36

      F.      Defendants Have No Arbitration Rights to Reserve ...............................37

IV.     CONCLUSION ........................................................................................................38

# TABLE OF AUTHORITIES

**Page**

## CASES

*All Tag Corp. v. Checkpoint Sys., Inc.*,
2018 WL 6514795 (S.D. Fla. Mar. 27, 2018).........................................................................27

*Allied Tube & Conduit Corp. v. Indian Head*,
486 U.S. 492 (1988).................................................................................................................12

*Am. Contractors Supply, LLC v. HD Supply Constr. Supply, Ltd.*,
989 F.3d 1224 (11th Cir. 2021) ................................................................................................6

*Am. Tobacco Co. v. United States*,
328 U.S. 781 (1946)...................................................................................................................6

*Amargos v. Verified Nutrition LLC*,
653 F. Supp. 3d 1269 (S.D. Fla. 2023) ...................................................................................38

*Arizona v. Maricopa Cnty. Med. Soc'y*,
457 U.S. 332 (1982).................................................................................................................25

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)........................................................................................................ *passim*

*Blumenthal v. United States*,
332 U.S. 539 (1947).............................................................................................................11, 12

*Burnett v. Nat'l Ass'n of Realtors*,
2022 WL 1203100 (W.D. Mo. Apr. 22, 2022) .......................................................................10

*Burnett v. Nat'l Ass'n of Realtors*,
2022 WL 17741708 (W.D. Mo. Dec. 16, 2022)................................................................10, 24

*City of Tuscaloosa v. Harcros Chems., Inc.*,
158 F.3d 548 (11th Cir. 1998) ................................................................................................34

*Consumer Fin. Prot. Bureau v. RD Legal Funding, LLC*,
332 F. Supp. 3d 729 (S.D.N.Y. 2018), *aff'd in part, re'vd in part on other grounds*,
828 F. App'x 68 (2d Cir. 2020) ..............................................................................................22

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962)...............................................................................................................4, 6

*Crowe v. Coleman*,
113 F.3d 1536 (11th Cir. 1997) .........................................................................................22, 23

**Page**

*Davis v. White*,
  795 F. App'x 764 (11th Cir. 2020) ........................................................................38

*DeCurtis LLC v. Carnival Corp.*,
  2021 WL 7539904 (S.D. Fla. Feb. 9, 2021), *report and recommendation adopted as modified*, 2021 WL 1540518 (S.D. Fla. Apr. 20, 2021) ........................................33

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
  720 F.3d 33 (1st Cir. 2013) ....................................................................................13

*First Priority Emergency Vehicles, Inc. v. REV Ambulance Grp. Orlando, Inc.*,
  2020 WL 2029344 (D.N.J. Apr. 28, 2020) ............................................................29

*Grace v. Re/Max Holdings, Inc.*,
  2024 WL 2761188 (N.D. Cal. May 29, 2024) ........................................................19

*Gutierrez v. Wells Fargo Bank, NA*,
  889 F.3d 1230 (11th Cir. 2018) ..............................................................................38

*Hudak v. Berkley Grp., Inc.*,
  2014 WL 354676 (D. Conn. Jan. 23, 2014) ............................................................23

*In re Auto Body Shop Antitrust Litig.*,
  2015 WL 4887882 (M.D. Fla. June 3, 2015) ....................................................22, 23

*In re Blue Cross Blue Shield Antitrust Litig.*,
  26 F. Supp. 3d 1172 (N.D. Ala. 2014) ........................................................25, 26, 27

*In re Disposable Contact Lens Antitrust*,
  215 F. Supp. 3d 1272 (M.D. Fla. 2016) ........................................................ *passim*

*In re Disposable Contact Lens Antitrust Litig.*,
  2024 WL 3337686 (M.D. Fla. July 9, 2024) ........................................6, 9, 12, 26

*In re Interior Molded Doors Antitrust Litig.*,
  2019 WL 4478734 (E.D. Va. Sept. 18, 2019) ........................................................13

*In re Jan. 2021 Short Squeeze Trading Litig.*,
  105 F.4th 1346 (11th Cir. 2024) ..............................................................24, 26, 31

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
  580 F. Supp. 2d 896 (N.D. Cal. 2008) ....................................................................23

**Page**

*In re Text Messaging Antitrust Litig.*,
  630 F.3d 622 (7th Cir. 2010) ...................................................................7, 12, 13

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  599 F. Supp. 2d 1179 (N.D. Cal. 2009) ..........................................................22, 23

*In re Turkey Antitrust Litig.*,
  642 F. Supp. 3d 711 (N.D. Ill. 2022) ......................................................................13

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
  626 F.3d 1327 (11th Cir. 2010) ................................................................. *passim*

*Kraft Foods Glob., Inc. v. United Egg Producers, Inc.*,
  2023 WL 6065308 (N.D. Ill. Sept. 18, 2023) .........................................................13

*Kyle K. v. Chapman*,
  208 F.3d 940 (11th Cir. 2000) ...............................................................................22

*Leeder v. Nat'l Ass'n of Realtors*,
  601 F. Supp. 3d 301 (N.D. Ill. 2022) ....................................................................10

*Lucasys Inc. v. PowerPlan, Inc.*,
  576 F. Supp. 3d 1331 (N.D. Ga. 2021) ..................................................27, 30, 32

*Marino Performance, Inc. v. Zuniga*,
  326 So.3d 93 (Fla. Dist. Ct. App. 2021) ...............................................................37

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*,
  62 F.3d 967 (7th Cir. 1995) ...................................................................................19

*Moehrl v. Nat'l Ass'n of Realtors*,
  2023 WL 2683199 (N.D. Ill. Mar. 29, 2023)..........................................9, 10, 18, 21

*Moehrl v. Nat'l Ass'n of Realtors*,
  492 F. Supp. 3d 768 (N.D. Ill. 2020) ................................................... *passim*

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
  465 U.S. 752 (1984)................................................................................................6

*Morgan v. Sundance, Inc.*,
  596 U.S. 411 (2022)..............................................................................................38

**Page**

*Nat'l Soc'y of Pro. Eng'rs v. United States*,
435 U.S. 679 (1978)...................................................................................9, 10

*NYNEX Corp. v. Discon, Inc.*,
525 U.S. 128 (1998)...................................................................................34, 36

*Offshore Tugs Corp. v. St. Andrew Bay Pilots Ass'n, LLC*,
2012 WL 13032942 (N.D. Fla. Aug. 31, 2012)...................................................30

*Ohio v. Am. Express Co.*,
585 U.S. 529 (2018)...................................................................................30

*OJ Com., LLC v. KidKraft Inc.*,
34 F.4th 1232 (11th Cir. 2022) .....................................................................6

*Omni Healthcare, Inc. v. Health First*,
2015 WL 275806, at *12 (M.D. Fla. Jan. 22, 2015)............................................30

*Pierson v. Orlando Reg'l Healthcare Sys., Inc.*,
619 F. Supp. 2d 1260, 1273 (M.D. Fla. 2009)...................................................23

*Poller v. Columbia Broad. Sys., Inc.*,
368 U.S. 464 (1962)...................................................................................23

*Procaps S.A. v. Patheon, Inc.*,
845 F.3d 1072 (11th Cir. 2016) .....................................................................26

*Relevent Sports, LLC v. U.S. Soccer Fed'n, Inc.*,
61 F.4th 299 (2d Cir. 2023) .........................................................................8

*Sentry Data Sys., Inc. v. CVS Health*,
379 F. Supp. 3d 1320 (S.D. Fla. 2019) ...........................................................29

*Sitzer v. Nat'l Ass'n of Realtors*,
420 F. Supp. 3d 903 (W.D. Mo. 2019) ...................................................16, 28, 32

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*,
376 F.3d 1065 (11th Cir. 2004) .....................................................................30

*United States v. Gen. Motors Corp.*,
384 U.S. 127 (1966).............................................................................7, 8, 10

**Page**

*United States v. Hansen*,
    262 F.3d 1217 (11th Cir. 2001) ........................................................................11

*United States v. Paramount Pictures*,
    334 U.S. 131 (1948)........................................................................................19

*United States v. Parke, Davis & Co.*,
    362 U.S. 29 (1960)...........................................................................................7

*Williamson Oil Co., Inc. v. Philip Morris USA*,
    346 F.3d 1287 (11th Cir. 2003) .............................................................7, 8, 15

## STATUTES, RULES, AND REGULATIONS

15 U.S.C. §1................................................................................................ *passim*

Federal Rules of Civil Procedure
    Rule 8(a)(2)......................................................................................................2
    Rule 12(b)(6)..................................................................................................22

## I.    INTRODUCTION

Plaintiffs are pre-owned yacht sellers who bring this action against industry trade associations ("Association Defendants"),[1] major yacht brokers ("Broker Defendants"),[2] and multi-listing services ("MLS Defendants")[3] in the United States for violating the Sherman Antitrust Act of 1890 ("Sherman Act"), 15 U.S.C. §1. Defendants, which dominate and control the listing and sale of pre-owned yachts have imposed and maintained anticompetitive restraints that force pre-owned yacht sellers to pay commissions to buyers' brokers and to pay overall commissions at higher rates than those that would have prevailed in a competitive market.

Defendants' scheme is no different than the anticompetitive conspiracy that real estate brokers engaged in and has been adjudged as unlawful. If anything, the effects of Defendants' anticompetitive conduct are far worse, and Defendants' ability to control this market is far more extensive. Defendants' anticompetitive restraints have resulted in yacht commissions that are roughly double the challenged real estate commissions. By Defendants' own admission, it is the "norm" for yacht sellers to pay *10%* of the listing or sales price as the commission. *See* Complaint ¶¶3-8, 11-13, 17, 64-66, 72, 75, 126.[4] With far fewer yacht brokers than real estate brokers,

---

[1]    The Association Defendants are California Yacht Brokers Association ("CYBA"), International Yacht Brokers Association, Inc. ("IYBA"), Yacht Brokers Association of America, Inc. ("YBAA"), and Northwest Yacht Brokers Association ("NYBA").

[2]    The Broker Defendants are Allied Marine, Inc., Galati Yacht Sales, LLC, HMY Yacht Sales, Inc., MarineMax, Inc., MarineMax East, Inc., Northrop & Johnson Yachts-Ships, LLC ("Northrop & Johnson"), Fraser Yachts Florida, Inc., Fraser Yachts California Corporation, OneWater Marine Inc. ("OneWater"), Denison Yachts International, LLC ("Denison Yachting"), Yachting Assets and Operations LLC, and United Yacht Sales, LLC.

[3]    The MLS Defendants are Boats Group, LLC ("Boats Group") and YATCO, LLC ("YATCO"). The Association Defendants, Broker Defendants, and MLS Defendants are collectively, "Defendants."

[4]    References to "Complaint" are to the Consolidated Class Action Complaint (ECF 140). Unless otherwise indicated, all emphasis is added and internal citations are omitted.

Defendants' conspiracy is far easier to implement and enforce. Tellingly, although Defendants now disclaim any comparisons to the real estate industry, that was not the case before realtors received antitrust scrutiny. *See* Complaint ¶¶81, 112, 115, 124, 126 (setting forth Defendants' own pre-litigation comparisons between the yacht-selling industry and real estate industry). For the reasons set forth in more detail below, Plaintiffs' (and Defendants' pre-litigation) analogy to the real estate industry is apt.

Defendants' attack on Plaintiffs' well-pled Complaint lacks merit. Under Federal Rule of Civil Procedure Rule 8's plausibility standard, Plaintiffs need only "nudge[] their claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plaintiffs pass that standard here, alleging direct and circumstantial evidence of Defendants' anticompetitive conspiracy, as well as robustly pleading the remaining elements of their Sherman Act claim. The Court should deny Defendants' Joint Motion to Dismiss Plaintiffs' Consolidated Class Action Complaint (ECF 178) ("Motion" or "Mot.").

## II.    STATEMENT OF FACTS

Because of their dominant presence in the industry and control of the listing and sale of pre-owned boats and yachts in the United States,[5] Broker Defendants, Association Defendants, and MLS Defendants have been able to create, impose, enforce, and maintain anticompetitive rules that require boat and yacht sellers to pay commissions to boat buyers' brokers in order to sell their boats, as well as to pay overall commissions thereby at artificially inflated rates higher than such

---

[5]    "There is no universally accepted definition for differentiating water vessels as 'boats' or 'yachts.' As a general proposition, recreational watercraft 10 meters (33 feet) or longer intended for overnight use, are typically referred to as 'yachts.'" Complaint at 1 n.1. The putative class on whose behalf claims are brought in this action includes sellers of pre-owned boats or yachts that utilized a yacht broker who listed the boat on one of the subject MLSs and paid a commission in connection with that sale. *Id*. ¶181.

sellers would absent Defendants' anticompetitive conduct, which by Defendants' own admission is normally 10% of the listing or sales price. Complaint ¶¶3-8, 11-13, 64-66, 72, 75, 126. Defendants and other conspiring brokers are connected to almost every subject boat and yacht sale in the United States. *Id*. ¶¶62, 171-177. Indeed, at the core of Defendants' conspiracy are Defendants MLSs, which enforce Defendants' commission rules by refusing to allow non-commission-sharing and for-sale-by-owner ("FSBO") listings on the dominant multiple listing services ("MLS(s)") for the overwhelming majority of all yacht and boat sales in the United States. *Id*. ¶¶3-4, 6-10, 12, 109-120. Defendants' conspiracy has eliminated virtually all competition with respect to seller's payment of boat and yacht sale commissions, as well as the inflated amount of the commissions themselves. *Id*. ¶¶160-167.

The totality of Plaintiffs' allegations detail: (a) Defendants' anticompetitive commission rules and their enforcement through Defendants' control of the market for the purchase and sale of pre-owned boats and yachts; (b) Defendants' interconnected web of relationships and rules meant to maintain and enforce the alleged anticompetitive conduct, including, *inter alia*, form contract terms, so-called "ethical" rules, and restrictive MLS listing rules; and (c) Defendants' forcing Plaintiffs and other members of the class to pay inflated commissions to buyers' brokers.

Defendants do not engage with the totality of Plaintiffs' allegations, however. Instead, Defendants focus on selected facts in isolation, a smattering of which are outside the Complaint.[6] This tactic raises fact questions at best and runs counter to the long-standing rule in antitrust

---

[6] For the same reasons set forth in section A of Plaintiffs' Response in Opposition to Omnibus Motion to Dismiss by California Yacht Brokers Association (ECF 182), Plaintiffs similarly request the Court deny Defendants' collective request that the Court consider facts outside the four-corners of the Complaint as judicially noticeable.

litigation that all factual components must be viewed in the context of the Complaint's allegations as a whole. *See Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 698 (1962). –

There is no dispute that across the subject pre-owned vessel sales and throughout the United States that sellers are required to pay the buyers' brokers' commission. *See, e.g.*, Complaint ¶¶5, 9, 12, 64, 66, 72, 75, 77, 92, 110-112, 115-120. There is also no real dispute that across such transactions, the "norm" within the yacht broker community is a 10% commission on the sale of a boat. *Id*. ¶¶5, 13, 64, 72. This is despite the emergence of technological advancements (*i.e.*, prospective boat buyers often only hire a broker ***after*** they have found the boat they would like to purchase online) that lessen the importance of buyer brokers' role over time. *Id*. ¶¶4, 14-15, 163. Even more egregiously, and contrary to the result that a competitive market would produce, the commissions paid by sellers to buyer brokers have increased, despite the duties of buyers' brokers having substantially diminished. *Id*. ¶16.

All Defendants have agreed to limit competition. For example, Association Defendants draft central listing agreement terms that Broker Defendants and other yacht broker co-conspirators adhere to and that: (a) require the client grant an exclusive right to the broker to sell the seller's vessel; and (b) require co-brokerage terms (*i.e.*, seller pays both the seller's own broker, as well as the buyer's broker).[7] Such agreements are in turn required by MLS Defendants for listing purposes, which, in turn, are owned, controlled, or otherwise related to the yacht broker associations. *See, e.g.*, *id*. ¶¶6-7, 9-10, 12, 47-48, 50, 57, 59, 77-80, 92, 100, 104, 110-111, 115-117, 124, 126, 128, 130.

---

[7]    Broker Defendants enforce these rules through so-called ethical rules that prohibit certain types of competition amongst brokers ***and*** require cooperation on commissions (*see id.* ¶¶86-87, 90-91, 95-96), and enforce them through threats of suspension or expulsion, which would limit the ability to list pre-owned vessels on the dominant MLSs. *Id.* ¶¶97-98, 107, 121, 125.

- 4 -

Significantly, beyond interlocking anticompetitive rules and practices, Defendants are deeply interconnected through direct participation in the operations and support of each other. Association Defendants created and maintain the "industry-owned" MLS Yachtbroker.org (now Yachtr.com). *Id.* ¶¶47-48, 79-81. Association Defendants established and maintain the nationwide Certified Professional Yacht Broker ("CPYB") certification training program, which require compliance with Defendants' anticompetitive commission rules and practices. *Id.* ¶52. A vast number of positions of control and influence are maintained by Broker Defendants and other broker co-conspirators in Association Defendants' inner decision making. *Id.* ¶¶131-159. And, in addition to requiring the challenged co-brokerages to list on their MLSs, Defendants MLSs' directly sponsor and support Association Defendants and their activities. *See, e.g.*, *id.* ¶¶50, 57, 117 (YBAA and YachtWorld collaboration to promote co-brokerage (*i.e.*, seller pays buyer's broker) listings), 121-124 (YATCO requires Association Defendant membership in order to list).

As explained further below, the Complaint plausibly alleges Defendants' nationwide conspiracy to impose standardized, industry-wide terms for listing yachts for sale that restrain competition among yacht brokers and inflict widespread harm by forcing sellers to pay buyers' brokers' commissions and, therefore, inflated commissions. *Id.* ¶¶160-167, 172-180, 192.

## III.   ARGUMENT

### A.   Standards for Pleading an Antitrust Agreement

On a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the allegations in the complaint are to be taken as true. *Twombly*, 550 U.S. at 555.

> In applying these general standards to a § 1 claim, we hold that stating such a claim requires a complaint with enough factual matter (taken as true) to suggest that an agreement was made. Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.

*Id.* at 556. A plaintiff meets this standard when that plaintiff sets forth "allegations plausibly suggesting (not merely consistent with) agreement." *Id.* at 545. "The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole." *Cont'l Ore*, 370 U.S. at 699 (cleaned up). Thus, in determining whether Plaintiffs have pleaded an agreement among Defendants, the Court should consider the allegations together as a whole that is A+B+C+D, not, as Defendants wish, to consider A, B, C, and D individually and whether those facts, standing alone, are indicative of collusion.

The lynchpin of Section 1 is an agreement. *In re Disposable Contact Lens Antitrust Litig.*, 2024 WL 3337686, at *3 (M.D. Fla. July 9, 2024) ("*Disposable Contact Lens II*"). Despite using different terminology, the terms "contract," "combination," and "conspiracy" are used interchangeably to capture the concept of concerted action, *i.e.,* an "agreement." *Am. Contractors Supply, LLC v. HD Supply Constr. Supply, Ltd.*, 989 F.3d 1224, 1232 (11th Cir. 2021). The inquiry is one of competitive reality – whether a contract, combination, or conspiracy amongst separate economic actors deprives the marketplace of independent centers of decision making, as well as diversity of entrepreneurial interests, and, thus, of actual or potential competition. *OJ Com., LLC v. KidKraft Inc.*, 34 F.4th 1232, 1242 (11th Cir. 2022).

An antitrust plaintiff's claim can be supported by either direct or circumstantial evidence that reasonably tends to show the defendant and others had a conscious commitment to a common scheme designed to achieve an unlawful objective. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984). A court may conclude that a conspiracy exists where the circumstances warrant a finding that the conspirators had a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement. *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946).

Explicit agreement is not necessary as part of a Sherman Act conspiracy where joint and collaborative action is pervasive in the initiation, execution, and fulfillment of the plan. *United States v. Gen. Motors Corp.*, 384 U.S. 127, 142-43 (1966). Whether the conspiracy or combination is achieved by agreement or acquiescence of co-conspirators coupled with assistance in effectuating its purpose is immaterial. *United States v. Parke, Davis & Co.*, 362 U.S. 29, 43 (1960).

Only in rare cases can a plaintiff show the existence of a conspiracy by an explicit agreement.

> As numerous courts have recognized [though], it often is difficult to determine which of these situations—illegal price fixing or conscious parallelism—is present in a given case. This is largely attributable to the efforts typically made by those who fall on the wrong side of this line to disguise the illegal nature of their endeavors.

*Williamson Oil Co., Inc. v. Philip Morris USA*, 346 F.3d 1287, 1299 (11th Cir. 2003). Most conspiracies are shown by circumstantial evidence. *In re Disposable Contact Lens Antitrust*, 215 F. Supp. 3d 1272, 1294-95 (M.D. Fla. 2016) ("*Disposable Contact Lens I*"). Among the circumstantial evidence demonstrating a conspiracy is a pattern of parallel behavior by conspirators and other "plus factors" that tend to exclude the possibility that they acted independently. *Id.* "Plus factors" include, among others:

> Circumstances that may raise an inference of conspiracy includ[ing] a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications . . . .

*Id*. Plus factors are not limited to these enumerated factors. "[A]ny showing by [plaintiffs] that tends to exclude the possibility of independent action can qualify as a plus factor." *Williamson Oil*, 346 F.3d at 1301 (cleaned up). An industry structure that facilitates collusion constitutes supporting evidence of collusion. *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627-28 (7th Cir. 2010). It is of no consequence for purposes of determining whether there is a combination or conspiracy

under Section 1 of the Sherman Act that each party acted in its own lawful interest. *Gen. Motors*, 384 U.S. at 142. Once a plus factor is established, that creates a rebuttable presumption of conspiracy that the defendant must defeat with its own evidence on the merits. *See Williamson Oil*, 346 F.3d at 1301.

### B.     Defendants Improperly Deconstruct Plaintiffs' Conspiracy Allegations

Ignoring the well-established *Continental Ore* standard, Defendants isolate bits and pieces of Plaintiffs' allegations to argue that Plaintiffs fail to demonstrate the existence of a conspiracy among them to determine which party pays yacht brokerage commissions, the amount of those commissions, and to require the use of a broker to list a yacht on the major yacht MLSs.

### 1.     Plaintiffs Allege a Conspiracy Among MLS Defendants, Association Defendants and Broker Defendants

First, Defendants argue that Plaintiffs have no direct evidence that Defendants conspired. Defendants miss the boat, as Plaintiffs have plainly alleged that there is direct evidence of a conspiracy. "[A]doption of a binding association rule designed to prevent competition is direct evidence of concerted action. No further proof is necessary." *Relevent Sports, LLC v. U.S. Soccer Fed'n, Inc.*, 61 F.4th 299, 307 (2d Cir. 2023). The Association Defendants codes of ethics prohibit competition in various circumstances, including if a broker has a Central Listing Agreement, while simultaneously requiring cooperation in splitting commissions. Complaint ¶¶86-87, 90-91, 95-96, 101-102. YBAA requires that its members conducted their business "in full" compliance with the Code of Ethics, including abiding by the co-brokerage requirement. *Id.* ¶¶107-108. YATCO touts that its members adhere to strict codes of ethics, including the anticompetitive rules discussed above. *Id.* ¶112.

Those who do not comply with these rules can be expelled from the yacht broker associations and therefore directly and effectively excluded from MLSs like YATCO and Boats

Group's dominant YachtWorld, which require co-brokerages or are only available to members of yacht broker associations who comply with these anticompetitive rules. *Id.* ¶¶97-98, 121-123, 125; *see Disposable Contact Lens II*, 2024 WL 3337686, at *3 ("A purportedly unilateral policy may be an unlawful agreement in restraint of trade where, for example, the manufacturer relies on distributors or other third parties for enforcement."). In addition to the threat of more formal sanctions, brokers face the prospect of losing business – as they will be ignored or even ostracized by other brokers – for failing to comply with the industry-wide anticompetitive practices. Complaint ¶11.

Plaintiffs allege how Broker Defendants and Association Defendants impose a nationwide, uniform system of anticompetitive conduct, including the use of uniform contract terms to require sellers of used yachts to pay inflated commissions and the commission fees for buyers' brokers. *Id.* ¶¶131-159. Association Defendants worked together to establish the CPYB certification program, which explicitly makes the seller-pays-the-buyer's-broker requirement a professional standard. *Id.* ¶52; *see Moehrl v. Nat'l Ass'n of Realtors*, 2023 WL 2683199, at *3 (N.D. Ill. Mar. 29, 2023) ("*Moehrl II*") (explaining importance of how retailers had sat on National Association of Realtors ("NAR") committees and approved rules).

For decades, courts have found that "ethical" rules are merely a pretext for anticompetitive conduct, with the recent jury verdict in the realtors' litigation (*see* B.3, *infra*) serving as only a very recent example. Nearly 50 years ago, the United States Supreme Court explained how an engineering trade group's "ethical" rule through which engineers agreed to refuse to negotiate or even discuss fees until after an engineer was chosen by a client violated the federal antitrust laws. *Nat'l Soc'y of Pro. Eng'rs v. United States*, 435 U.S. 679 (1978). Similarly, here, Association Defendants rules specify that commission splits should be agreed to between the brokers

themselves and finalized ***before*** the submission of any offer to purchase. Complaint ¶¶93, 96, 101. As in *Engineers*, this rule effectively precludes competitive bidding. 435 U.S. at 692. Moreover, just as in the real estate cases, Defendants' rules require that any commission-split negotiations regarding the buyer-broker's commission be completed by the brokers prior to the showing of the vessel. *See Moehrl II*, 2023 WL 2683199, at *2; *Burnett v. Nat'l Ass'n of Realtors*, 2022 WL 17741708, at *2 (W.D. Mo. Dec. 16, 2022) ("the Code of Ethics requires that any negotiation of the cooperative compensation offer must occur before the property is shown and cannot be negotiated after that point"). Also, like the real estate cases, Defendants' rules "create one-sided transparency with respect to commission offers," where the brokers know them, and not only are consumers in the dark, but Defendants affirmatively misrepresent that boat buyers pay no broker fee, which is the same type of misleading representation found in the real estate cases. *Moehrl II,* 2023 WL 2683199, at *3; *Leeder v. Nat'l Ass'n of Realtors*, 601 F. Supp. 3d 301, 306 (N.D. Ill. 2022) (same); *Burnett v. Nat'l Ass'n of Realtors*, 2022 WL 1203100, at *3 (W.D. Mo. Apr. 22, 2022) (same); *see* Complaint ¶¶67, 113, 155-157.

This is "smoking gun" evidence of joint and concerted action by and through Association Defendants to thwart competition among boat brokers. *See General Motors*, 384 U.S. at 142-43. Likewise, MLS Defendants require that yacht sellers to be represented by a broker in order to list a boat on the MLS. This requirement highlights MLS Defendants' participation in the conspiracy, as it forces any yacht seller using a broker to pay commissions to both their broker and the buyer's broker on the other side of the deal.[8]

---

[8] Contrary to Defendants' argument (Mot. at 11-12), Plaintiffs did not allege that there are no on-line boat MLSs that accept FSBO listings. The claims here relate to sales of larger vessels listed on the defined MLSs, which make up nearly all such transactions involving such vessels in the United States. This case does not rest on the resale of the smaller boats to which Defendants refer.

Defendants try to sow confusion by arguing that Plaintiffs have failed to plead parallel conduct because: (a) not all employees of all of Defendants participate in Association Defendants' activities; (b) not all Broker Defendants are members of every Association Defendant; and (c) not all Broker Defendants have listed yachts for sale on all of MLS Defendants' websites. Mot. at 12-13. Proof of a conspiracy, however, does not require every co-conspirator know of every other co-conspirator and participate in every aspect of the conspiracy. The law is the opposite. Indeed, even at trial, "[i]t is unnecessary . . . to prove that each conspirator participated in all aspects of a conspiracy, knew each phase or every detail of the conspiracy, or knew all of the participants." *United States v. Hansen*, 262 F.3d 1217, 1247 (11th Cir. 2001). "[C]onspiracies involving . . . elaborate arrangements generally are not born full grown." *Blumenthal v. United States*, 332 U.S. 539, 556 (1947). "Hence the law rightly gives room for allowing the conviction of those discovered

---

Complaint at 1 n.1. As explained on Boat Group's BoatTrader.com and boats.com websites, each accepts FSBO listings for smaller boats because brokers do not bother themselves with such boats.

> "What is the best site to sell a boat?
>
> It all depends on what type of vessel you're selling and the kind of boat buyer who would be most interested in purchasing that type of boat. For larger yachts, you may want to check out YachtWorld where many of the buyers are searching for luxurious, ocean-going yachts that can be used for a variety of commercial and recreational purposes from running their own fishing charter companies to trawling around the ICW or Great Loop. ***If you have a trailerable boat under 35 feet, both boats.com and Boat Trader are two great places to reach a mass audience of boaters of all levels and interests***.

Frequently Asked Questions, https://www.boats.com/boat-sellers-guide/how-to-sell-your-boat/ (last visited Aug. 28, 2024).

> ***Small boats are rarely sold by brokers, since they produce too little income for the amount of time required to make the sale.*** Large boats often involve complex negotiations (documentation, etc.) that are simplified by yacht brokers.

Frequently Asked Questions, https://www.boats.com/boat-sellers-guide/how-to-choose-between-boat-brokers-boat-dealers-and-for-sale-by-owner/ (last visited Aug. 28, 2024).

- 11 -

upon showing sufficiently the essential nature of the plan and their connections with it, without requiring evidence of knowledge of all its details or of the participation of others." *Id.* at 557.

### 2. There Is Ample Evidence of Parallel Conduct and Plus Factors

In deciding Defendants' Motion, the Court must consider Plaintiffs' allegations as a whole, not just the few selected allegations referenced in the Motion. Plaintiffs' allegations go beyond mere parallel conduct and plausibly allege that Defendants' anticompetitive conduct is the result of a conspiracy and agreement. *See Twombly*, 550 U.S. at 553.

As one district court found in analyzing the real estate industry:

> Unlike in *Twombly*, where the plaintiffs only set forth parallel business conduct bound together by a conclusory allegation of a secret agreement, the purported anticompetitive restrains here are a product of written rules issued by the NAR that each Corporate Defendant expressly imposes upon their franchisees and realtors. That suggests that each Corporate Defendant has reviewed, understood, and ultimately agreed to the NAR's rules, including the Buyer-Broker Commission Rules.

*Moehrl v. Nat'l Ass'n of Realtors*, 492 F. Supp. 3d 768, 778 (N.D. Ill. 2020) ("*Moehrl I*").

In addition to the direct evidence of collusion set forth above, there is also circumstantial evidence of collusion among Defendants. The structure of the yacht-broker industry itself provides evidence of collusion. *Text Messaging,* 630 F.3d at 627-28. For example, a "high level of interfirm communications" is indicative of collusion. *Disposable Contact Lens I*, 215 F. Supp. 3d at 1295; *see also Disposable Contact Lens II*, 2024 WL 3337686, at *4 (describing various boards, social media, industry associations, and trade shows by which defendants had the opportunity to engage in conspiracy). Private standard-setting associations have traditionally been objects of antitrust scrutiny. *Allied Tube & Conduit Corp. v. Indian Head*, 486 U.S. 492, 500 (1988). While opportunities to cooperate in trade associations are not *ipso facto* evidence of conspiracy, in the broader context, evidence of those opportunities plausibly help fill out the picture of the

conspiracy. *In re Turkey Antitrust Litig.*, 642 F. Supp. 3d 711, 727 (N.D. Ill. 2022). "The exchange of pricing information is not illegal itself, but facilitates price fixing." *Id.* at 726 (cleaned up) (citing *Text Messaging*, 630 F.3d at 626). "When a trade association urges its members to co-opetition[9] for competition, participation in the association may be a plus factor." *Id.* at 727 (cleaned up) (quoting *Text Messaging*, 630 F.3d at 628). The ability to monitor compliance with the conspiracy and the ability to detect cheating are also industry structures that supports an inference of collusion. *See Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 49-50 (1st Cir. 2013); *In re Interior Molded Doors Antitrust Litig.*, 2019 WL 4478734, at *6 (E.D. Va. Sept. 18, 2019).

Plaintiffs allege that yacht brokers, including Broker Defendants, conspired through Association Defendants, to impose uniform codes of conduct upon all members of the various Association Defendants. Complaint ¶¶9, 13, 131-159. Those uniform codes of conduct include the use of standard contract terms that require that yacht sellers pay the commissions of both the seller's broker and buyer's broker, prohibits brokers from competing for commissions, and to generally fix commissions at 10% of the sales price. *Id.* ¶¶10, 64-67, 77-78, 83-108. At a minimum, all of these are examples of co-opetition rather than competition. Association Defendants and MLS Defendants all have a process for disciplining members who do not adhere to their respective bylaws and code of conduct. *Id.* ¶¶125-130.

There also is substantial overlap and opportunities to conspire among Association Defendant officers and Broker Defendant executives. *Id.* ¶¶131-159. For example, Jonathan Chapman, who used to be with Northrop & Johnson, is a former YBAA President and 2024 YBAA Treasurer. *Id.* ¶132. The IYBA Board of Directors is composed of brokers from Broker Defendants.

---

[9]   "Co-opetition" is cooperative competition. *Kraft Foods Glob., Inc. v. United Egg Producers, Inc.*, 2023 WL 6065308, at *13 (N.D. Ill. Sept. 18, 2023).

*Id.* ¶133. The CYBA's former Executive Director has a complimentary membership with the IYBA. *Id.* ¶99). Similarly, the current director of the NYBA is a broker for Denison Yachting, one of the Broker Defendants. *Id.* ¶103. MLS Defendant YachtWorld and Association Defendant YBAA touted their agreement in 2009 for its power to promote co-brokerage arrangements and spread YBAA's professional standards, including the anticompetitive provisions discussed above. *Id.* ¶117.

Not only are members of Broker Defendants involved in Association Defendants, but they have influence on implementing the anticompetitive policies at issue. For example, Trevor Carroll, a broker at Defendant Fraser Yachts, is the Vice President of the Board of Directors of the IYBA, and exercises great influence over the decision-making and rule-making process of IYBA's requirements that sellers pay both seller and buyer commissions. *Id.* ¶134. Similarly, Hal Slater, president and owner of co-conspirator Brewer Yacht Yard Group Holdings, has been a longtime member of the YBAA Board of Directors, and continues to be vital to the decision-making process of the association, including the rule-making process regarding commission sharing, as well as continued promotion and adherence to the YBAA Code of Ethics. *Id.* ¶¶135-136. Defendants' assertion that there are no allegations of high-level inter-Defendant communications is just wrong.

The Association Defendants also work together in sponsoring the CPYB certification program. To become a CPYB, the broker must promise to adhere to a code of conduct that likewise requires yacht sellers to pay the commissions for both the seller and buyer brokers, and includes uniform contract terms to that effect. *Id.* ¶52. YachtWorld is a diamond sponsor of CPYB. *Id.* ¶57. Association Defendants jointly operate a MLS website at YachtBroker.org/Yachtr.com. *Id.* ¶¶79-82. MLS Defendants are "gold sponsors" of CYBA, encouraging CYBA's efforts, along with the efforts of the other Association Defendants, to standardize yacht-selling practices.

Association Defendants' MLS, as well as MLS Defendants' MLSs rules prohibit un-represented yacht sellers from listing yachts for sale. *Id.* ¶¶6, 73, 75, 110-120. In fact, YATCO requires brokers seeking to list yachts for sale be a member of one of Association Defendants or have a referral from two existing YATCO members. *Id.* ¶¶121-124. To take advantage of the conventional marketplace for selling a yacht, the seller must enlist a broker, who in turn will require the seller to pay both the seller's and buyer's broker's an inflated commission. *Id.* ¶¶8, 10-12, 68-76.

While there are a significant number of yacht brokers in the industry (but only a fraction of the number of licensed realtors, a fact Defendants conveniently ignore in their brief), there are a limited number of MLSs – the MLS Defendants. Commission arrangements for listed yachts are available to brokers on the MLSs. *Id.* ¶113. As a result, any member of the conspiracy can monitor compliance with the conspiracy and detect cheating with only a few clicks on an office computer or smartphone.

The result of the conspiracy is to eliminate any competition whatsoever with respect to the party paying and the amount of brokerage commissions on the sale of yachts, which in turn has resulted in payment of inflated commissions in excess of what would exist in a competitive market. *Id.* ¶¶160-167. Defendants' conclusory assertion that they have not acted against their own individual economic interests is wrong. *See Williamson*, 346 F.3d at 1301; *see also Disposable Contact Lens I*, 215 F. Supp. 3d at 1295-1297 (denying motion to dismiss where plus factors present). In the absence of Defendants' agreement (which is enforceable, *inter alia,* through mechanisms such as loss of license or removal from MLS) brokers could compete on commission amounts to gain greater volume of clients and additional revenue.

### 3.    Defendants Analogize the Yacht Industry to the Real Estate Industry When It Suits Their Convenience

Defendants cannot meaningfully distinguish the challenged conduct in the yacht-selling industry from the anticompetitive practices prevalent in the real estate industry, which last October faced a $1.8 billion verdict for fixing and inflating the amount of commissions for real estate transactions (which also were paid completely by the real estate seller), leading to a nationwide class settlement.[10] In the real estate industry, the seller of the property would hire a broker, who generally charged a commission of 6% of the sales price, which usually would be divided evenly between the seller's broker and the buyer's broker. Local real estate brokers jointly own MLSs, which are a centralized database of properties listed for sale in the region. *Moehrl I*, 492 F. Supp. 3d at 773-76; *Sitzer v. Nat'l Ass'n of Realtors*, 420 F. Supp. 3d 903, 910-11 (W.D. Mo. 2019). The only differences identified by Defendants between the real estate industry and pre-owned yacht industry are: (a) the standard commission in the real estate industry is 6%, while the standard commission in the pre-owned yacht industry is 10%; and (b) yacht brokers own only one of the MLSs, while the remainder are independently owned. These distinctions are immaterial to whether the Complaint plausibly alleges a conspiracy among brokers and MLSs to fix commissions, who pays them and whether such commission-related practices are anticompetitive.

While Defendants now disclaim any analogy to the real estate industry, historically they have done the opposite. For example, the Complaint sets forth Defendants' own pre-litigation analogies between the yacht-selling industry and real estate industry:

> 81.    According to IYBA, [Yachtr.com] "unites our members for the benefit of our members." IYBA describes the MLS this way:

---

[10]   *See* Complaint at 43 n.59; *see also* National Association of Realtors, *National Association of REALTORS® Reaches Agreement to Resolve Nationwide Claims Brought by Home Sellers* (Mar. 15, 2024), https://www.nar.realtor/newsroom/nar-reaches-agreement-to-resolve-nationwide-claims-brought-by-home-sellers.

The member listing service (MLS) is a database established by our industry's leading professional yacht broker associations to collect, control & provide data about vessels for sale and is exclusively for yacht sales professional use. The MLS allows yacht brokers to see one another's listings with the goal of connecting buyers to sellers through a yacht sales professional (YSP)[11].

* * *

112.    YATCO touts its similarity to the regional MLS that dominate the market for the sale of residential real estate, stating: "***Similar to realtors using a real estate MLS system, YATCO Members adhere to a strict code of rules and ethics.***" Those rules include the rules of IYBA and YBAA, and other yacht broker associations, which mandate brokers to share the commission paid, which must be paid by the seller.

* * *

115.    YachtWorld, like others, limits listing to subscribing professional agents: "***O****nly brokers can list boats on the site, which functions much like the Multiple Listing Service for real estate agents*.*"

* * *

124.    YATCO accepts "only central yacht and boat MLS listings. We are concerned about the negative impact of open listings on our industry."

* * *

126.    MarineMax explains the situation more directly, describing how YachtWorld enforces the Broker Rules: "Brokers have exclusive access to websites such as Yachtworld, which has become the gold standard for searching from anywhere in the world. ***It functions much like the Multiple Listing Service (MLS) of the real estate brokering community***." "This is important. By listing on YachtWorld, your broker has agreed to sell it through a co-brokerage agreement that requires your broker to split the typically 10-percent commission with the buyer's broker. About 70-percent of all brokerage sales are co-brokered. Remember, that in this type of agreement, if you bring the buyer or even end up donating your yacht, you are still liable for the broker's commission."

---

[11]   IYBA calls Yachtr.com a "member listing service" rather than a "multiple listing service". A real estate "multiple listing service" is a "centralized database of properties listed for sale in the region. . . ." *Moehrl*, 492 F. Supp. 3d at 773-76. That is exactly what Yachtr.com is. Calling it an "MLS" is hardly a coincidence.

In *Moehrl*, the court found that plaintiffs had plausibly alleged the real estate broker defendants had participated in the conspiracy to impose and fix real estate commissions by requiring franchisees to join local MLSs and NAR, which requires its members to follow the association's rules. *Moehrl I*, 492 F. Supp. 3d at 778. In addition, Broker Defendants served in leadership positions in the NAR, which put them in a position to influence and enforce the broker rules. *Id.*

> In short, Plaintiffs' allegations plausibly demonstrate that each Corporate Defendant has participated in an agreement that centralizes control over how real estate brokers are compensated with the NAR. Thus, as pleaded, the Corporate Defendants' actions satisfy the conspiracy element because their actions "deprive[d] the marketplace of independent centers of decisionmaking," at least with respect to buyer-broker commissions.

*Id.* at 779.

The yacht brokerage business works essentially the same way. As is set forth above, Association Defendants, under the control of Broker Defendants, have agreed to set uniform codes of conduct and form contracts that include the payment of commissions by the yacht seller. Sponsored by all of Association Defendants, the CPYB program likewise imposes uniform codes of conduct and promulgates form contracts terms that require a yacht seller to pay all commissions. As with the real estate business, business necessity requires that yacht brokers list boats for sale on MLS Defendants' websites. Complaint ¶82. By limiting listings to potential sales by brokers, MLS Defendants reinforce the role of brokers, who, in turn charge supracompetitive commissions.

Defendants strain to distance themselves from the real estate industry conspirators that were the subject of *Moehrl* by arguing that the NAR rules were mandatory, whereas the rules of

Association Defendants with respect to charging and sharing commissions are voluntary.[12] Mot. at 17-18. But that argument misses the mark for several reasons. First, whether Association Defendant rules relating to yacht-sale commissions are mandatory or voluntary is beside the point. The relevant inquiry is whether Defendants agreed to them, and Plaintiffs allege that they did. "[A]cquiescence in an illegal scheme is as much a violation of the Sherman Act as the creation and promotion of one." *Moehrl I*, 492 F. Supp. 3d at 780 (quoting *United States v. Paramount Pictures*, 334 U.S. 131, 161 (1948)). "So long as defendants knew that they were acquiescing in conduct that was in all likelihood unlawful, we have no difficulty concluding that they thereby joined a combination or conspiracy for which they can be held accountable under section 1.") *Id.* (cleaned up) (quoting *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 62 F.3d 967, 975 (7th Cir. 1995)).

More importantly, regardless of the verbs used in Association Defendants' Code of Ethics and bylaws, the Complaint alleges that in practice those rules are far more than just suggestions. Plaintiffs allege, yet Defendants ignore, that each Association Defendant has mechanisms in place to and does discipline members for failing to abide by their "voluntary" ethical rules and bylaws. Complaint ¶¶97, 102, 106, 108, 125.

---

[12]   *Grace v. Re/Max Holdings, Inc.*, 2024 WL 2761188 (N.D. Cal. May 29, 2024), cited by Defendants (Mot. at 19-20), is inapposite. In *Grace*, plaintiffs alleged that local realtor rules required property sellers to make a unilateral, non-negotiable offer to pay the buyer's brokerage commissions. *Id.* at *3. But the court understood the cited rules mean that a buyer's broker could not use a signed offer as leverage to negotiate a higher commission for themself, so the court concluded that "there [was] a disconnect between Plaintiff's characterization of the rules and what they actually say." *Id.* at *3-4. While the court granted defendants' motion to dismiss, it left open the possibility that plaintiffs could plead a claim based upon how the realtor rules worked in practice rather than how they were worded. *Id.* at *4 & n.2. Nowhere do Defendants here contend that the rules and practices alleged in the Complaint fail to conform to the actual rules and practices cited.

Defendants also attempt to distinguish the real estate industry in that the NAR MLS was jointly owned by the real estate brokers, while some of the yacht broker MLSs are independently owned and are not regional. Mot. at 19. This is of no consequence. The fact that two MLSs are independently owned does not mean that they are not part of the conspiracy. They have agreed to and maintained the seller pays brokerage fee rules the same as Broker Defendants and Association Defendants. Complaint ¶¶6, 10, 12, 68, 116, 122, 128, 161, 169, 172-180.

In both industries, "[l]isting a property for sale on an MLS is essential to market that property effectively to prospective buyers." *Moehrl I*, 492 F. Supp. 3d at 773-74; *compare* Complaint ¶ 82 ("Almost all large boats, as that term is used herein, are advertised for sale on the MLS. Most brokerage firms require their brokers to list boats for sale on those MLS. Large boats not listed on those MLS are much less visible to potential buyers and severely disadvantaged in sales, if they sell at all.").

Defendants also sidestep the fact that Yachtbroker.org/Yachtr.com **is** owned and controlled by Association Defendants. YachtWorld enforces the rules of Broker Defendants. Complaint ¶126. While YATCO does not require listing brokers to be members of one of Association Defendants, it does require a listing broker to be an Association Defendant member or to have two existing YATCO members vouch for them, allowing YATCO to condition access on acquiescence to Defendants' anticompetitive rules. Complaint ¶123.

For purposes of determining whether MLS Defendants – or any other Defendants – are part of the conspiracy at the pleading stage, the key inquiry is not who owns whom, but rather is whether Defendants are adhering to the seller-pays-commissions program, which was also a central feature of the realtors' conspiracy. As explained in *Moehrl I*:

> Once a home seller has agreed to a commission rate, they are effectively
> locked in to paying that amount. There is no real incentive for either the buyer or

> seller to negotiate the offered rate. That is because the buyer is not required to pay any amount and the NAR Code of Ethics allows the buyer-broker to convey that their services are free. Conversely, the seller has contractually agreed to pay a total commission and even if the seller were able to negotiate down the buyer-broker's commission, the seller would not be entitled to the benefit as the seller-broker would be contractually entitled to retain any discount.

492 F. Supp. 3d at 785. Also, just as in the real estate industry, Association Defendants' and CPYB ethical rules require that the seller broker and buyer broker negotiate a commission split before price negotiations can begin, and this arrangement is equally anti-competitive in the pre-owned yacht industry.

> But even if the seller or buyer were inclined to negotiate the buyer-broker commission, the NAR rules make it a practical impossibility. According to the NAR's rules, the only time a buyer-broker can negotiate the listed commission amount is prior to showing the listed property to a potential buyer. It is difficult for a buyer-broker to gauge a client's interest in a property that the client has not even seen. Nor can the buyer-broker circumvent the rule by urging the buyer to negotiate with the seller directly. Conversely, once a seller-broker has received an offer on a property, they are prohibited from attempting to modify the buyer-broker commission unilaterally. Taken together, the NAR's rules allow for the hypothetical possibility of negotiation but it is difficult to imagine how such negotiation could occur.

*Id.* The anticompetitive character of the conspiracy in *Moehrl* I did not hinge on the ownership structure of the MLSs, nor should it here. The pre-owned yacht industry's seller pays commissions rule is equally as anti-competitive as in the real estate industry, and plainly all Defendants are alleged to adhere to it.

## C.   Group Pleading of a Conspiracy Is Permissible

Defendants' criticism that Plaintiffs improperly group Broker Defendants in the Complaint (Mot. at 20-21) ignores the robust allegations regarding the identical conduct of each of the Broker Defendants. *See, e.g.*, Complaint ¶¶131, 134, 155, 158-161, 192, 208-209 (outlining how Broker Defendants furthered the conspiracy by, *inter alia*, having their executives participate with Association Defendants, including the adoption, maintenance, and enforcement of the rule that:

(a) sellers pay buyers' commissions; (b) requiring their employees to comply and their executives to enforce the anticompetitive rules; and (c) listing yachts for sale on MLS). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires only that plaintiffs provide defendants "fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (cleaned up). "[U]nder the liberal requirements of notice pleading, no technical forms of pleading . . . are required." *Crowe v. Coleman*, 113 F.3d 1536, 1539 (11th Cir. 1997) (cleaned up.

Grouping allegations against defendants "does not render the complaint deficient;" rather, "[t]he complaint can be fairly read to aver that all defendants are responsible for the alleged conduct." *Kyle K. v. Chapman*, 208 F.3d 940, 944 (11th Cir. 2000). "When multiple defendants are named in a complaint, the allegations can be and usually are to be read in such a way that each defendant is having the allegation made about him individually." *Crowe*, 113 F.3d at 1539; *see also Consumer Fin. Prot. Bureau v. RD Legal Funding, LLC*, 332 F. Supp. 3d 729, 771 (S.D.N.Y. 2018), *aff'd in part, re'vd in part on other grounds*, 828 F. App'x 68 (2d Cir. 2020) ("Nothing in Rule 8 prohibits collectively referring to multiple defendants where the complaint alerts defendants that identical claims are asserted against each defendant.") (cleaned up).

Here, each of the allegations against Broker Defendants collectively apply to each Broker Defendant individually, which provides more than sufficient fair notice of the factual basis underlying the claims against them. *See In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d 1179, 1185 (N.D. Cal. 2009) ("The complaints allege a complex, multinational price-fixing conspiracy and, taken as a whole, they sufficiently allege each defendants' participation in that conspiracy, as well as present a factual basis for the allegations of agency."); *see also In re Auto Body Shop Antitrust Litig.*, 2015 WL 4887882, at *5 (M.D. Fla. June 3, 2015) (same).

Defendants' reliance on *Pierson v. Orlando Reg'l Healthcare Sys., Inc.* is unhelpful to them because there, plaintiffs did nothing more than name certain defendants and list them in the claims without describing their role in the scheme. 619 F. Supp. 2d 1260, 1273 (M.D. Fla. 2009). *Auto Body* is similarly inapposite because there plaintiffs used group allegations regarding "the Defendants" when the referenced conduct in fact only applied to a handful of defendants. 2015 WL 4887882, at *4 (M.D. Fla. June 3, 2015). Here, each time the Complaint refers to Broker Defendants' conduct, the allegations apply to each individual Broker Defendant. Even the court in *Auto Body* acknowledged the acceptability of group pleadings in that context. *Id.* at *5 (citing *Crowe*, 113 F.3d at 1539).

The fair notice standard does not require that plaintiffs "explain the details of each defendant's role in the planning, funding, and executing [the] scheme." *Hudak v. Berkley Grp., Inc.*, 2014 WL 354676, at *4 (D. Conn. Jan. 23, 2014). In fact, as the Supreme Court has recognized, "in complex antitrust litigation," "motive and intent play leading roles," and "the proof is largely in the hands of the alleged conspirators." *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962); *see also In re TFT-LCD (Flat Panel) Antitrust Litig.*, 599 F. Supp. 2d at 1184 (same). Plaintiffs, therefore, "only need to make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy." *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 904 (N.D. Cal. 2008). The Complaint amply alleges that each Broker Defendant has, *inter alia*, conspired with Association Defendants to implement and enforce anti-competitive rules in furtherance of their conspiracy, causing yacht sellers to pay brokerage fees elevated above commission rates that would prevail in a competitive market. *See, e.g.*, Complaint ¶¶160-161.

Defendants further protest that OneWater is not a proper Defendant because it is the corporate parent of Denison Yachting. Mot. at 21 n.11. This argument is misguided. While Plaintiffs plead that OneWater is the corporate parent of Denison Yachting, the Complaint also treats OneWater and Denison Yachting as separate defendants for the allegations relating to Broker Defendants' anticompetitive conduct, and the allegations collectively referring to Broker Defendants apply to each Defendant, including OneWater and Denison Yachting, individually. *See* Complaint ¶40 (alleging that OneWater "regularly sells yachts in Florida, has agents in Florida, collects brokerage commissions from yachts sold in Florida, and advertises in Florida").

### D.     Plaintiffs Plead the Elements of a Section 1 Claim

#### 1.     Plaintiffs Allege a *Per Se* Violation

Courts evaluate Section 1 claims as either *per se* violations or under a rule of reason framework. *In re Jan. 2021 Short Squeeze Trading Litig.*, 105 F.4th 1346, 1355 (11th Cir. 2024). There are two types of trade restraints – horizontal and vertical. *Disposable Contact Lens I*, 215 F. Supp. 3d at 1290. Agreements between competitors are horizontal restraints, while agreements between firms at different levels of distribution impose vertical restraints. *Id.* at 1291. *Per se* treatment typically applies to horizontal practices, such as "horizontal price fixing among competitors, group boycotts, and horizontal market division," which "virtually always stifle competition." *Jacobs v. Tempur-Pedic Int'l, Inc.*, 626 F.3d 1327, 1333-34 (11th Cir. 2010). Plaintiffs maintain that the challenged conduct here, which has raised, maintained, and/or stabilized yacht broker commissions, warrants *per se* treatment. Complaint ¶204. Indeed, in *Burnett*, 2022 WL 17741708, at *10, the court found that the *per se* standard applied when evaluating real estate broker association commission rules, which similarly had the effect of stabilizing commission rates.

Defendants argue that mixed horizontal and vertical relations should be analyzed under the rule of reason (Mot. at 23), but a "hub-and-spoke" conspiracy that involves both direct competitors and actors up and down the supply chain, should be analyzed as a *per se* Sherman Act violation. *Disposable Contact Lens I*, 215 F. Supp. 3d at 1294.

> Simply stated, a "hub-and-spoke" conspiracy involves an entity at one level of the market structure, the "hub," that coordinates an agreement among competitors at a different level, the "spokes." These arrangements consist of **both** vertical agreements between the hub and each spoke and a horizontal agreement among the spokes to adhere to the hub's terms, often because the spokes would not have gone along with the vertical agreements except on the understanding that the other spokes were agreeing to the same thing.

*Id.* at 1292 (cleaned up) (emphasis in original).

Defendants also argue that the *per se* rule is inapplicable because, in their view, the commission rules have procompetitive benefits (Mot. at 23-24), but this "argument indicates a misunderstanding of the *per se* concept" because "[t]he anticompetitive potential inherent in all price-fixing agreements justifies their facial invalidation even if procompetitive justifications are offered for some." *Arizona v. Maricopa Cnty. Med. Soc'y*, 457 U.S. 332, 351 (1982).

At this stage of the litigation, however, the Court need not decide whether the *per se* or rule of reason standard applies because, as discussed below, the Complaint, in any event, establishes an unreasonable restraint of trade under the rule of reason. *See, e.g.*, *In re Blue Cross Blue Shield Antitrust Litig.*, 26 F. Supp. 3d 1172, 1186 (N.D. Ala. 2014) (deferring consideration at motion to dismiss stage of whether to apply *per se* or rule or reason standard because "while the mode of analysis is certainly a question of law, 'underpinning that purely legal decision are numerous factual questions.'"); *see also Moehrl I*, 492 F. Supp. 3d at 782 (noting that plaintiffs asserted that "Defendants' conspiracy is a per se violation," but "in their motion to dismiss, Plaintiffs contend

that the Court need not decide whether the *per se* rule applies at this stage" and "employ the Rule of Reason analysis in arguing against dismissal").

### 2. Plaintiffs Also Satisfy the Requirements for a Claim Under the Rule of Reason

"Under the 'rule of reason' approach, courts must ask whether the plaintiff 'has shown that the alleged restraint has had an anticompetitive effect on the market.'" *Short Squeeze Trading*, 105 F.4th at 1355 (quoting *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1084 (11th Cir. 2016)). To do so, a plaintiff must "identify the relevant market in which the harm occurs" and "plead specific anticompetitive effects (be they actual or potential) in the relevant market." *Id*. Plaintiffs plausibly allege a relevant market comprising yacht brokerage services provided to yacht sellers and buyers in the United States by brokers with access to the MLS. Plaintiffs also explain how Defendants' anticompetitive rules and practices have resulted in brokerage commissions that are much higher than they would be in a competitive market and have stifled competition for brokerage services. Thus, Plaintiffs adequately state a claim under the rule of reason, and Defendants' Motion should be denied.

### a. Plaintiffs Plausibly Allege a Relevant Product Market

Plaintiffs must only "present enough information in their complaint to plausibly suggest the contours of the relevant geographic and product markets." *Jacobs*, 626 F.3d at 1336. "[I]nterchangeability – along with commercial realities facing consumers – is a key inquiry in defining markets." *Disposable Contact Lens II*, 2024 WL 3337686, at *5; *see also Blue Cross Blue Shield Antitrust Litig.*, 2017 WL 2797267, at *10 (N.D. Ala. June 28, 2017) ("Courts have described the requirement of defining a relevant product market in various ways. But the key is to identify the products or services, as well as the buyers or suppliers of those products, that compete to some substantial degree with each other."). Due to the inherently factual nature of this issue,

courts are often reluctant to dismiss antitrust claims based on the sufficiency of market definition allegations. *See, e.g.*, *All Tag Corp. v. Checkpoint Sys., Inc.*, 2018 WL 6514795, at *3 (S.D. Fla. Mar. 27, 2018) ("determining the relevant market in this case is, at least partially, a fact-based inquiry which the Court cannot undertake on a motion to dismiss"); *Lucasys Inc. v. PowerPlan, Inc.*, 576 F. Supp. 3d 1331, 1353 (N.D. Ga. 2021) ("In light of this 'fact-intensive' endeavor, a "'dismissal of an antitrust claim for failure to adequately plead the relevant market can be problematic.'"); *Blue Cross Blue Shield*, 2017 WL 2797267, at *7 ("The scope of the relevant market in an antitrust case is driven by marketplace facts; therefore, motions to dismiss in this area rarely are successful.").

Here, the Complaint defines the relevant product market as "yacht brokerage services provided to yacht sellers and buyers by yacht brokers with access to the MLS." Complaint ¶168. Defendants argue that the Complaint does not adequately explain why yacht sellers and buyers do not consider alternative means of selling or buying a yacht (*e.g.*, non-broker-assisted sales (FSBO) on websites like Facebook Marketplace or Craigslist or magazines) as interchangeable. Mot. at 26. Contrary to Defendants' assertion, however, the Complaint describes the attributes of FSBO sales and broker-assisted sales that demonstrate why listing through alternative sales channels are not interchangeable. Specifically, the Complaint explains that brokers without MLS access do not have comprehensive listings, nor can they reach a sufficient number of buyers and sellers. *See* Complaint ¶¶174-180. Similarly, FSBO sales cannot access the inventory or market participants of MLSs. *See, e.g.*, *id.* ¶¶6, 116. Because they cannot reach a sufficient number of buyers and have insufficient inventory, yacht sellers and buyers are not likely to view FSBOs and alternative channels as interchangeable with broker-assisted MLS-accessible services.

Such allegations are similar to those in *Disposable Contact Lens I*, 215 F. Supp. 3d at 1303, where the plaintiffs defined the relevant market as soft (disposable) contact lenses, and the defendants argued that the complaint did not explain why the market should be drawn so narrowly and "failed to address 'the cross-elasticity of demand' between 'soft (disposable) contact lenses' and potential substitutes such as eyeglasses or hard non-disposable contact lenses." *Id.* The court noted that the complaint described several attributes of soft (disposable) contact lenses, such as the ability to be replaced frequently, and because the proposed substitutes did not have these properties, and by "[d]rawing on its 'judicial experience and common sense,'" the court found that plaintiffs "alleged the relevant product market with requisite specificity." *Id.* (quoting *Jacobs*, 626 F.3d at 1333). The Complaint similarly describes the attributes of broker-assisted services with MLS access that render proposed substitutes inadequate.

The sufficiency of the relevant product market allegations in this case is also confirmed by the fact that similar allegations of a relevant market for brokerage services withstood indistinguishable challenges in the realtor cases. *See, e.g.*, *Sitzer*, 420 F. Supp. 3d at 914 (finding market definitions adequate where the complaint "describes in detail residential real estate commission structures and how brokers in the industry utilize MLS marketplaces, including the Subject MLS, to sell and purchase homes" and also includes "factual allegations demonstrating the ubiquitous use of MLS services and the limited alternatives available to those who cannot utilize MLS listings"); *see also Moehrl I*, 492 F. Supp. 3d at 782 & n.6 ("In their motion to dismiss, the Corporate Defendants make a brief, conclusory contention that Plaintiffs failed to define adequately a legally cognizable relevant market. Yet they do not elaborate on why Plaintiffs' definition of the relevant market is incorrect. Instead, they pivot to argue that Plaintiffs fail to allege a competitive harm to the market.").

Finally, Defendants posit that buyers may consider the sale of new yachts as interchangeable. Mot. at 26-27. However, this misconstrues the relevant market. Plaintiffs' allegations do not focus on the market for the sale of yachts (new or used). The relevant market, instead, is for brokerage services for owners who sell their yachts. Regardless of whether new yachts are interchangeable with used yachts, there is no service associated with the sale of a new yacht that a seller of a used yacht would find interchangeable with the brokerage services that comprise the relevant market in this case. For this reason, Defendants' citation to *First Priority Emergency Vehicles, Inc. v. REV Ambulance Grp. Orlando, Inc.*, 2020 WL 2029344, at *3 (D.N.J. Apr. 28, 2020), is plainly inapplicable to the allegations here. In that case, plaintiffs sought to bring a claim on behalf of a class of ambulance purchasers and attempted to define the market as a market for new ambulances – unlike the market here.

For these reasons, Plaintiffs have plausibly alleged the contours of a relevant product market consisting of yacht brokerage services provided to yacht sellers and buyers by yacht brokers with access to MLS, and Defendants' motion to dismiss on this basis should be denied.

### 3. The Complaint Alleges the Contours of a Relevant Geographic Market

Contrary to Defendants' assertions (Mot. at 27-29), Plaintiffs also plausibly allege a relevant geographic market. "With respect to the geographic market, a plaintiff must plead a geographic market that 'correspond[s] to the commercial realities of the industry, [is] economically significant . . . and include[s] the area in which consumers can practically seek alternative sources of the product.'" *Sentry Data Sys., Inc. v. CVS Health*, 379 F. Supp. 3d 1320, 1328 (S.D. Fla. 2019).

Here, the Complaint plausibly alleges that the relevant geographic market is the United States. Complaint ¶170. This allegation is sufficiently specific to "provide Defendants with notice and concrete boundaries for discovery purposes." *Omni Healthcare, Inc. v. Health First*, Inc.,

2015 WL 275806, at *12 (M.D. Fla. Jan. 22, 2015). The Complaint also alleges how this corresponds to the "commercial realities of the industry" by explaining that "MLS Defendants operate from the United States, Broker Defendants list boats for sale in the United States, and the transactions resulting from listings posted by Broker Defendants with MLS Defendants affect commerce in the United States." Complaint ¶170.

Defendants proffer countervailing factual assertions implying that the geographic market should be worldwide (Mot. at 28-29), but "[d]etermining the precise parameters of a geographic market is a question of fact" and "[t]he complaint need only present enough information 'to plausibly suggest the contours of the relevant geographic and product market.'" *Offshore Tugs Corp. v. St. Andrew Bay Pilots Ass'n, LLC*, 2012 WL 13032942, at *4 (N.D. Fla. Aug. 31, 2012) (quoting *Jacobs*, 626 F.3d at 1336); *see also Omni Healthcare*, 2015 WL 275806, at *12 (finding that "[a]lthough sparse" geographic market allegations were "sufficiently plausible to survive a motion to dismiss, especially considering that 'Rule 12(b)(6) dismissals are particularly disfavored in fact-intensive antitrust cases'" (quoting *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'ns, Inc.*, 376 F.3d 1065, 1071 (11th Cir. 2004)). Defendants' argument regarding the relevant geographic market is unpersuasive.

### 4.   Plaintiffs Allege Anticompetitive Effects on the Market

"A plaintiff can show anticompetitive effects on the market by direct evidence, 'such as reduced output, increased prices, or decreased quality in the relevant market,' or through indirect evidence, for example, 'proof of market power plus some evidence that the challenged restraint harms competition.'" *Lucasys*, 576 F. Supp. 3d at 1348-49 (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 541, (2018)). "Examples of '[a]ctual anticompetitive effects include, but are not limited

to, reduction of output, increase in price, or deterioration in quality.'" *Short Squeeze Trading*, 105 F.4th at 1355 (quoting *Jacobs*, 626 F.3d at 1339).[13]

Here, Plaintiffs have alleged direct evidence of anticompetitive effects in the relevant market that have injured both buyers and sellers of yachts. The Complaint repeatedly details how brokerage commissions – typically 10% – are much higher than they would be in a competitive market if they were negotiated openly and transparently, have remained consistently high despite improvements to technology and a diminished role for brokers, and have increased faster than the rate of inflation in recent years. *See, e.g.*, Complaint ¶¶10, 13-16, 64-70, 105, 161-167, 178. Plaintiffs make the plausible allegation that in the absence of Defendants' rules and uniform commission practices, "brokers would compete with each other by offering lower commissions to prospective buyer clients." *Id.* ¶105. In a competitive market where the buyer broker commission was not set by the selling broker and forced upon the seller in advance, the fee structure for brokerage services would correspond to their costs, as well as the quantity, quality, and value of the services. *Id.* ¶¶165-166.

In terms of reduced quality, because of Defendants' anticompetitive rules, brokerage fees in the yacht brokerage industry are unrelated to costs and wholly disconnected from the service's quantity, quality, and value. *Id.* The Complaint illustrates how the lack of price transparency and competition for brokerage services not only inflated commissions but also prevented competition

---

[13]   Defendants attempt to analogize this case to *Short Squeeze Trading*, where they assert dismissal was appropriate because plaintiffs failed to allege anticompetitive effects in a market defined by their complaint (Mot. at 24), but the facts in *Short Squeeze Trading* bear no resemblance to the allegations in this case. The issue in that case was that plaintiffs defined the relevant market as a no-fee brokerage market, but the harm they alleged was to the stock market more generally. 105 F.4th at 1357. Here, unlike in that case, there is no disconnect between the relevant market alleged (for yacht brokerage services) and the anticompetitive effects (supracompetitive commissions for those services).

for the optimal level of broker services. *Id.* ¶¶9, 161-162. The Complaint also alleges direct evidence of reduced output by alleging how Defendants' restrictions on access to MLSs limit the supply of listing on MLSs. *Id.* ¶6. Buyers were harmed because the brokers steered them to listings with inflated commissions, rather than all potential yachts they could have purchased, and prevented buyers from competing for the purchase of a yacht by lowering the buyer broker commission. *Id.* ¶161.

Courts have held that the types of allegations of harm in the Complaint are sufficient under the rule of reason. *See, e.g.*, *Lucasys*, 576 F. Supp. 3d at 1350 (finding "allegations of harm to competition . . . in the form of reduced output, decreased product quality, stymied innovation, and raised prices – which are supported by specific examples – sufficiently allege anticompetitive effects in these markets"). Indeed, similar allegations of harm to competition were adequate to show anticompetitive effects in cases challenging nearly identical conduct in the real estate brokerage industry. *See, e.g.*, *Moehrl I*, 492 F. Supp. 3d at 783 ("At this stage, the comparison is sufficient to raise a reasonable inference that the Buyer-Broker Commission Rules have resulted in supracompetitive commission rates in the United States real estate market."); *Sitzer*, 420 F. Supp. 3d at 915 ("Viewed in a light most favorable to Plaintiffs, allegations that Section 2-G-1 requires seller-brokers to present blanket commission offers to buyer-brokers could plausibly create a skewed compensation structure within the residential real estate market, leading to inflated commissions that would otherwise be lower under competitive market conditions.").

It is not necessary to reach Defendants' other argument regarding the sufficiency of Plaintiffs' allegations of indirect evidence of market power (Mot. at 30-34), because "an antitrust plaintiff is not required to rely on indirect evidence of a defendant's monopoly power, such as high market share within a defined market, when there is direct evidence that the defendant has actually

set prices or excluded competition." *DeCurtis LLC v. Carnival Corp.*, 2021 WL 7539904, at *23 (S.D. Fla. Feb. 9, 2021), *report and recommendation adopted as modified*, 2021 WL 1540518 (S.D. Fla. Apr. 20, 2021) (cleaned up).

Nonetheless, Plaintiffs also plausibly allege that Defendants have market power. Defendants comprise the largest yacht brokerages; trade associations, whose memberships consist of most yacht brokers; and MLSs on which the overwhelming majority of yachts are listed for sale. Complaint ¶¶32-61, 71-74, 79-82, 114, 171. The Complaint alleges how "it is virtually impossible to sell a preowned boat or yacht without using the services of Defendants and their co-conspirators" and "[t]his control of the market gives Defendants and their co-conspirators unchecked power to insist upon boat and yacht sellers paying inflated brokerage costs that are higher than they would otherwise be in a competitive market." Complaint ¶8. That is because Defendants control the MLSs and access to MLSs is critical for brokers and agents to attract sellers and buyers. Complaint ¶¶171-180. Defendants point to other potential websites and argue that if Defendants raised the prices of their services, sellers and buyers would turn to the services of non-defendants (Mot. at 33), but this hypothetical ignores reality. Despite the fact that Defendants already price their brokerage services at a supracompetitive level, alternative listing services have failed to meaningfully compete to reign in those prices or capture a sufficient share of the market. *See, e.g.*, Complaint ¶¶4, 8, 180.

**E.      Plaintiffs Amply State Concerted Refusal to Deal Claims**

**1.      MLS Defendants Refused to Deal with FSBO Listings**

Plaintiffs Complaint squarely alleges an anticompetitive agreement by and among MLS Defendants to refuse FSBO listings of yachts. *See* Complaint ¶208; *see also id.* ¶168. As explicitly noted on their respective multiple listing service webpages, YachtWorld, Yachter, and YATCO all disallow FSBO listings. *See e.g.*, *id.* ¶110 ("For instance, YATCO, one of the largest and most

important yachting MLS, only accepts centralized listings by professional brokers and those listings must make an offer of compensation to the buyer's broker."); ¶116 ("YachtWorld does not accept FSBO listings, that is, listing from boat owners who want to sell their boats themselves without the use of a broker.").

This horizontal agreement between and among MLS Defendants, forbidding FSBO yacht listings, amounts to a *per se* violation of the Sherman Act. *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 134 (1998). Because MLS Defendants collect fees for each listing posted to their MLS (*see* Complaint ¶¶ 57, 59), their agreement is not the product of permissible parallelism. Indeed, by prohibiting FSBO yacht listings, MLS Defendants are forgoing listings fees they would otherwise earn against their own economic interests. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 572 (11th Cir. 1998) (defendants' behavior was "not . . . reasonable or explicable (*i.e.*, not in their legitimate economic self-interest) if they were not conspiring to fix prices or otherwise restrain trade.")

In an ever so subtle sleight of hand, Defendants seek to dismiss this claim by reference to two, largely irrelevant MLSs owned by Boats Group that do, in fact, allow FSBO listings, namely BoatTrader and Boats.com.[14] Defendants posit "there are ***no*** allegations that MLS Defendants agreed among themselves not to accept FSBO listings." That contention is misdirection on their part. Whereas this lawsuit concerns the market for ***yachts***, BoatTrader and Boats.com – as their tradenames suggest – market and list "trailerable ***boat[s]*** under 35 feet."[15] *Cf.* Complaint ¶168 ("The relevant service market for the claims asserted herein is yacht brokerage services provided to yacht sellers and buyers by yacht brokers with access to the MLS."); s*ee also* Complaint at 1

---

[14]   BoatTrader and Boats.com are referenced one time in the Complaint. Complaint ¶54.

[15]   Lenny Rudow, *How to Sell Your Boat*, Boats.com (May 15, 2024), https://www.boats.com/boat-sellers-guide/how-to-sell-your-boat/.

n.1 ("As a general proposition, recreational watercraft '10 meters (33 feet) or longer intended for overnight use, are typically referred to as 'yachts.'").

Further underscoring this critical distinction, because "[s]mall boats are rarely sold by brokers, since they produce too little income for the amount of time required to make the sale,"[16] Boats Group, through its Boats.com webpage, directs interested buyers searching for yachts to its other, more relevant MLS, YachtWorld: "For larger yachts, you may want to check out YachtWorld where many of the buyers are searching for luxurious, ocean-going yachts . . ."[17] Not surprisingly, Boats Group through its website at Boats.com recommends yacht buyers retain the use of a broker as yacht sales "often involve complex negotiations . . . that are simplified by yacht brokers."[18]

The relevant context, as alleged in the Complaint, is that MLS Defendants have agreed amongst themselves[19] to prohibit FSBO *yacht* listings – none of the relevant listing MLSs allow it. Complaint ¶¶110, 116. Accordingly, MLS Defendants' bid for dismissal of Plaintiffs' concerted refusal to deal claim – which focuses entirely upon FSBO ***boat*** listings – is misplaced.

---

[16]   Carol Cronin, *How to Choose Between Boat Brokers, Boat Dealers, and For Sale by Owner*, BOATS.COM (July 29, 2021), https://www.boats.com/boat-sellers-guide/how-to-choose-between-boat-brokers-boat-dealers-and-for-sale-by-owner/.

[17]   Lenny Rudow, *How to Sell Your Boat*, BOATS.COM (May 15, 2024), https://www.boats.com/boat-sellers-guide/how-to-sell-your-boat/.

[18]   Carol Cronin, *How to Choose Between Boat Brokers, Boat Dealers, and For Sale by Owner*, BOATS.COM (July 29, 2021), https://www.boats.com/boat-sellers-guide/how-to-choose-between-boat-brokers-boat-dealers-and-for-sale-by-owner/.

[19]   This agreement between MLS Defendants, while encouraged by Broker Defendants, does not require Broker Defendants to refuse to use the MLSs if those MLSs permit FSBO listings, nor must Plaintiffs plead such an agreement occurred. An agreement of that kind between Broker Defendants would involve a group boycott against MLS Defendants. Plainly, such a claim would not be brought by plaintiff yacht sellers. Defendants' argument to this effect serves only to distract from the true claims alleged here.

### 2.    Broker Defendants Refuse to Deal with Unrepresented Buyers

Likewise, Broker Defendants, when acting in the capacity of a seller's broker, have agreed amongst themselves to refuse to deal with unrepresented yacht buyers. Complaint ¶209. As a horizontal agreement among competitors, this too is a *per se* violation of the Sherman Act. *NYNEX Corp..*, 525 U.S. at 134.

Defendants' conspiracy agreement, however, does not mean that Broker Defendants are unwilling to enter into dual agency agreements with an unrepresented buyer that initially approaches the seller's broker with an offer to purchase a listed yacht. In such situations, it is common for Broker Defendants to sign up a prospective yacht buyer through a dual agency agreement. Once such an agreement is executed, both sides are represented by a broker (albeit, the same one). *See* Complaint ¶100 ("[U]pon information and belief, CYBA's standardized agreements and forms include an anti-competitive dual agency clause"); ¶137 ("Yacht Broker may also represent both the Seller and the Buyer, as a 'Dual Agent,' with responsibilities to both parties."); ¶142 ("Fraser Yachts' brokers use a dual agency to collect brokerage commissions from yachts sold in Florida"). Only when a prospective buyer refuses to enter into a dual agency agreement do Broker Defendants continue to reject such buyers, thereby cementing their involvement in the vast majority of yacht sales.[20]

---

[20]    Defendants fail to acknowledge that when a prospective buyer enters into a dual agency agreement with the seller's broker, that prospective buyer *is no longer unrepresented*, and, therefore, fall outside the category of those buyers with whom Broker Defendants refuse to deal. Mot. at 38-39.

The sheer percentage of yacht sales that involve co-brokerage agreements further underscores Broker Defendants' market dominance.[21] Specifically, sales involving co-brokerage agreements represent approximately 70% of all yacht sales. Complaint ¶¶75, 119. Of the remaining 30%, an unknown percentage of those sales involve yachts sold in a dual-agency capacity, meaning that it is likely that far less than 30% of all yacht sales do not involve any broker on the buyer side.[22] The result is clear: an overwhelming majority of Broker Defendants (greater than 70%) are not entering into a transaction where the buyer has no representation at all, effectively foreclosing the ability of unrepresented buyers to participate in the market.

### F.   Defendants Have No Arbitration Rights to Reserve

Defendants conclude their Motion by reserving their rights to move to compel arbitration. Mot. at 39-40. They have no rights to reserve.

Under Florida law, a party waives its right to compel arbitration by taking actions inconsistent with that right, including active participation in a lawsuit governed by the arbitration clause. *Marino Performance, Inc. v. Zuniga*, 326 So.3d 93, 96 (Fla. Dist. Ct. App. 2021). Whether a party has waived arbitration depends upon the totality of the circumstances as to whether the

---

[21]   A co-brokerage agreement, of course, involves an agreement between the seller's and buyer's brokers (and their respective brokerages) to share the selling broker's commission. Complaint ¶¶9, 11.

[22]   It appears Defendants are confusing their own terminology and statistics. Co-brokerage agreements necessarily involve two brokerages (hence, co-brokerage); however, that does not mean 30% of sales do not involve a broker on the buyer side. More accurately, 30% of sales involve either dual-agency or no broker on the buyer side. Of course, if there is a dual-agency agreement, a broker *is* involved on both sides, in which case a broker has obviously not refused to deal with a buyer who they also represent. It is only those small number of buyers who refuse any representation at all, including dual-representation, with whom Broker Defendants are refusing to deal.

party seeking to arbitrate has acted inconsistently with its contractual right to arbitrate.[23] *Amargos v. Verified Nutrition LLC*, 653 F. Supp. 3d 1269, 1275 (S.D. Fla. 2023). The purpose of the waiver doctrine is to prevent litigants from abusing the judicial process. *Gutierrez v. Wells Fargo Bank, NA*, 889 F.3d 1230, 1236 (11th Cir. 2018).

> Acting in a manner inconsistent with one's arbitration rights and then changing course mid-journey smacks of outcome-oriented gamesmanship played on the court and the opposing party's dime. The judicial system was not designed to accommodate a defendant who elects to forego arbitration when it believes that the outcome in litigation will be favorable to it, proceeds with extensive discovery and court proceedings, and then suddenly changes course and pursues arbitration when its prospects of victory in litigation dim. Allowing such conduct would ignore the very purpose of alternative dispute resolution: saving the parties' time and money.

*Id.* A motion to dismiss addressed to the merits that would resolve all allegedly arbitrable claims is inconsistent with an intent to arbitrate. *Davis v. White*, 795 F. App'x 764, 769 (11th Cir. 2020).

Defendants' contention that they are reserving their rights to arbitrate under other brokers' unknown arbitration agreements borders on the nonsensical. To the extent any such right exists, which Plaintiffs dispute, Defendants waived such rights by moving to dismiss all of the claims they contend may possibly be subject to arbitration.[24] The law is clear that a party subject to an arbitration agreement can arbitrate or litigate, but it cannot do both at once.

## IV. CONCLUSION

For the reasons discussed above, Plaintiffs request that Defendants' Motion be denied in its entirety. To the extent the Court finds any merit in the arguments made by Defendants, Plaintiffs respectfully request leave to amend their complaint.

---

[23] Prejudice is no longer a factor to be considered with respect to whether a party has waived their right to arbitrate. *Morgan v. Sundance, Inc.*, 596 U.S. 411, 419 (2022).

[24] How arbitration terms may affect unnamed class members is a different story, and, if anything, may be contested in connection with class certification, not at the motion to dismiss stage. *See Gutierrez*, 889 F.3d at 1237-39.

DATED:  August 29, 2024

ROBBINS GELLER RUDMAN
  & DOWD LLP
PAUL J. GELLER
Florida Bar No. 984795
MARK J. DEARMAN
Florida Bar No. 982407
STUART A. DAVIDSON
Florida Bar No. 0084824
LINDSEY H. TAYLOR
Florida Bar No. 1027908

**Mark J. Dearman**

MARK J. DEARMAN

225 NE Mizner Boulevard, Suite 720
Boca Raton, FL  33432
Telephone:  561/750-3000
pgeller@rgrdlaw.com
mdearman@rgrdlaw.com
sdavidson@rgrdlaw.com
ltaylor@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DAVID W. MITCHELL
ARTHUR L. SHINGLER III
655 West Broadway, Suite 1900
San Diego, CA  92101-8498
Telephone:  619/231-1058
davidm@rgrdlaw.com
ashingler@rgrdlaw.com

PODHURST ORSECK, P.A.
LEA P. BUCCIERO (FBN 84763)
RICARDO M. MARTINEZ-CID (FBN 383988)
MATTHEW WEINSHALL (FBN 84783)
One SE 3rd Avenue, Suite 2300
Miami, FL  33131
Telephone:  305/358-2800
lbucciero@podhurst.com
rmartinez-cid@podhurst.com
mweinshall@podhurst.com
RMCTeam@podhurst.com

BONI, ZACK & SNYDER LLC
MICHAEL J. BONI (*pro hac vice*)
JOSHUA D. SNYDER (*pro hac vice*)
JOHN E. SINDONI (*pro hac vice*)
BENJAMIN J. EICHEL (*pro hac vice*)
15 St. Asaphs Road
Bala Cynwyd, PA  19004
Telephone:  610/822-0200
mboni@bonizack.com
jsnyder@bonizack.com
jsindoni@bonizack.com
beichel@bonizack.com

*Interim Co-Lead Class Counsel*

GALLAGHER & KENNEDY, P.A.
KEVIN D. NEAL (*pro hac vice*)
WILLIAM F. KING (*pro hac vice*)
KENNETH N. RALSTON (*pro hac vice*)
2575 East Camelback Road
Phoenix, AZ  85016-9225
Telephone:  602/530-8000
kevin.neal@gknet.com
bill.king@gknet.com
ken.ralston@gknet.com

NAPOLI SHKOLNIK PLLC
HUNTER SHKOLNIK (*pro hac vice*)
REBECA MARTINEZ
NESTOR D. GALARZA (*pro hac vice*)
1302 Avenida Ponce de León
Santurce, Puerto Rico  00907
Telephone:  787/493-5088
hunter@nsprlaw.com
rmartinez@nsprlaw.com
ngalarza@nsprlaw.com
* Napoli Shkolnik is a registered tradename for
NS PR Law Services, LLC.
A Puerto Rican Limited Liability Corporation

NAPOLI SHKOLNIK PLLC
SALVATORE C. BADALA (*pro hac vice*)
400 Broadhollow Road, Suite 305
Melville, NY  11747
Telephone:  212/397-1000 Ext. 1045
sbBadala@napolilaw.com

GLANCY PRONGAY & MURRAY LLP
LEE ALBERT
BRIAN D. BROOKS
230 Park Avenue, Suite 358
New York, NY  10169
Telephone:  212/682-5340

*Members of Plaintiffs' Executive Committee*